7/22/2025 3:30 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 103444881
By: Christopher Matthews
Filed: 7/22/2025 3:30 PM

2025-50856 / Court: 125

**CAUSE NO. ________________**

| | | |
|---|---|---|
| **CENTURY BANK,** | § | **IN THE DISTRICT COURT** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **HARRIS COUNTY, TEXAS** |
| **CADENCE BANK f/k/a BANCORPSOUTH BANK,** | § | |
| | § | |
| | § | |
| **Defendant.** | § | **_______ JUDICIAL DISTRICT** |

**ORIGINAL PETITION**

Comes now Century Bank ("Century"), Plaintiff, and files this Original Petition against Cadence Bank f/k/a BancorpSouth Bank ("Cadence Bank"), Defendant, and shows the Court and Jury as follows:

1. Pursuant to Texas Rule of Civil Procedure 190.1, Century states that discovery in this case should be conducted pursuant to a Level 3 discovery plan.

## I.

## INTRODUCTION

2. This case is necessitated due to the fraudulent and intentionally misleading acts of Cadence Bank. In 2021, Cadence Bank agreed to act as the facilitator of a large business loan to Bridgelink Engineering LLC ("Bridgelink"). Although Cadence Bank intended to personally fund a portion of the credit facility, it actively sought out other banks to participate and mitigate Cadence Bank's risk. Desperate for an additional bank to become part of the credit facility, Cadence Bank misled Century about the nature and history of its relationship with the borrower and fraudulently induced Century to fund $14,000,000 of the Bridgelink loan. Pursuant to the loan documents, Cadence Bank was to act as the administrative agent of the loan and perform various duties designed to ensure that the loan was monitored, secured, and paid timely. However, Cadence Bank

not only utterly failed to perform its obligations under the loan agreement, but it intentionally and deliberately misled Century about the loan to ensure that Century did not seek to foreclose. Unfortunately, Cadence Bank's efforts succeeded such that, by the time Century was able to discover that Bridgelink was an utter sham, the money was gone and no assets existed from which Century could seek to recover. Century, therefore, files this action seeking its actual damages, punitive damages, attorneys' fees, pre- and post-judgment interest, and costs.

## II.

## PARTIES

3. Plaintiff Century Bank is a New Mexico chartered bank headquartered in Santa Fe, New Mexico.

4. Defendant Cadence Bank is a Mississippi chartered bank that, pursuant to its website, is headquartered in both Texas and Mississippi. According to the Mississippi Secretary of State website, Cadence Bank can be served through its registered agent, E. Payne Atkinson, at 201 South Spring Street, Tupelo, MS 38804.

## III.

## JURISDICTION AND VENUE

5. Jurisdiction is proper in this court pursuant to TEX. GOV'T CODE § 24.007(b) because the amount in controversy exceeds the minimum jurisdiction of the district court.

6. Venue is proper in Harris County pursuant to TEX. CIV. PRAC. & REM. CODE § 15.002 both because it is the county of Defendant's principal office in this state and because a substantial part of the events and omissions giving rise to the claims asserted herein occurred in Harris County. Moreover, the parties contractually agreed to litigate this matter in Harris County pursuant to the loan documents.

## IV.

## BACKGROUND FACTS

7. Cadence Bank is a massive financial institution that began as a single bank branch in Verona, Mississippi. By 2000, through growth and acquisitions, Cadence Bank had become a large regional bank operating under the name BancorpSouth Bank with more than $9 billion in assets. By 2024, Cadence Bank was a publicly traded company with more than $50 billion in assets and more than 350 branch locations.

8. As Cadence Bank has expanded, Texas has become integral to its operations such that Cadence stresses that the bank's corporate headquarters are contained "in Houston, Texas and Tupelo, Mississippi." On April 25, 2025, Cadence Bank announced that it was further expanding its Texas operations by merging with Industry Bancshares, Inc., the bank holding company for six Texas banks with $4.4 billion in assets. In an investor presentation made in May 2025, Cadence Bank noted that it was the "3rd largest bank with its corporate headquarters in Texas."

9. Cadence Bank markets itself by stressing several core values of its business such as "Value Relationships" and "Do Right By Others." Cadence Bank claims to operate under a "Code of Business Conduct and Ethics" that mandates that the bank "do the right thing" and "treat teammates fairly and equitably." As Cadence Bank proudly proclaims in its governance report, "Doing the right thing and acting with integrity are essential to our business ethics and how we do business." To ensure this, Cadence claims that its employees are "required to act courageously when they witness wrongdoing and to promptly and fully disclose any concerns they may have regarding a potential ethical or compliance-related issue."

10. As Century discovered, however, the reality of Cadence Bank's operations proves to be significantly less than the bank claims.

### A. Cadence Bank Agrees to Facilitate a Business Loan for Bridgelink and Asks Century to Participate in the Loan.

11. In early 2021, Cadence Bank was approached by Bridgelink seeking a $60 million credit facility. After reviewing Bridgelink's application and relevant materials, Cadence Bank agreed to act as the "Sole Lead Arranger" and "Sole Bookrunner" to facilitate a $60 million credit facility that would include a $33 million revolving line of credit and a $17 million term loan. In addition, Cadence agreed that the revolving line of credit would have an "accordion feature" that would expand the credit line by $25 million (in $5 million increments) "subject to the receipt of additional commitments."

12. However, Cadence Bank intended to personally fund only $20 million of the credit facility. In an effort to mitigate its risk, Cadence Bank began to seek other financial institutions willing to participate in the loan.

13. Cadence Bank created materials showing the loan opportunity that Bridgelink presented and stated that it was establishing "a syndicate of banks, financial institutions, and other entities" to participate in the credit facility and provide the additional $55 million in loan capital sought by Bridgelink. Among the institutions that Cadence Bank approached was Century.

14. Century was founded with $500 in 1887 with the goal of helping to develop the Santa Fe, New Mexico community through mortgage lending. Although the bank has grown significantly over the past 138 years, Century remains a locally owned, full-service community bank. Unlike the behemoth that is Cadence Bank (with its more than 5,300 employees), Century has remained a local bank with its 180 employees.

15. In May 2021, Cadence Bank organized a call for other lenders to hear about the credit facility being set up by Cadence Bank for Bridgelink. Century was asked to attend. In that call, Cadence Bank outlined the loan terms, stating that Cadence Bank would not only lead the

lending team, but would also act as the administrative agent to oversee the loan's operation and performance.

16. Cadence Bank's pitch, however, received little interest from most of the other financial institutions. Cadence Bank was turned down by at least seven financial institutions, including Liberty Bank, Regions Bank, Vista Bank, Woodforest National Bank, First Horizon Bank, CrossFirst Bank, and Sunflower Bank. Cadence Bank did not inform Century that no other banks joined the loan until after the allocation was completed.

17. Several executives at Cadence Bank had preexisting business relationships with some of the personnel at Century. Therefore, Cadence Bank believed that it could utilize those relationships to persuade Century to join the lender group.

**B. Desperate to Lower its Risk, Cadence Bank Makes Numerous Representations Designed to Induce Century to Participate in the Bridgelink Loan.**

18. Just as Cadence Bank hoped, Century was actively looking for new loans. Moreover, Cadence Bank was correct in its belief that several of Century's executives and employees trusted the Cadence Bank employees with whom they had previously worked. And Cadence Bank hoped to actively exploit that trust and friendship.

19. As Century performed its due diligence on the Bridgelink loan opportunity, it frequently communicated with Cadence Bank to obtain information that it needed. Cadence Bank sought to appear to be extremely helpful and worked hard to persuade Century that the Bridgelink credit facility provided a profitable opportunity.

20. Among other things, Cadence Bank stressed that it had a long-term relationship with the owners of Bridgelink and could vouch for their character and creditworthiness. In particular, Cadence Bank stressed that Grant Sifers—part of the BancorpSouth Bank team—had a

standing relationship with the Johnson Brothers of Bridgelink and vouched for their character and creditworthiness.

21. In the banking industry, while numbers are crunched, reports are read, and massive financial tables are created to try to determine whether a loan should be funded, perhaps the highest value a potential borrower can provide to a bank is a personal recommendation from a trusted source. Although banks try to familiarize themselves with a potential borrower by reviewing an application and financial documents, nothing is as reliable as a trusted source that vouches for the borrower. Knowing this fact, Cadence Bank stressed to Century that the owners and executives of Bridgelink were reputable persons with extensive business experience whom Cadence Bank had worked with successfully for years.

22. Just as Cadence Bank intended, Century relied upon the repeated statements of the Cadence Bank loan team. However, those statements were false.

23. Bridgelink was owned by Cole Wayne Johnson and Cord Henry Johnson, two brothers residing, respectively, in Weatherford and Aledo, Texas. Bridgelink had been formed in December 2020 as a Delaware company based in Fort Worth, Texas and owned 80% by Cole Johnson and 20% by his brother, Cord. At the time of the loan application, the Johnsons' business interests had been focused on various engineering, procurement, and construction projects in Wyoming that involved the energy industry. The Johnson brothers were new to the renewables space at the time Bridgelink began to discuss the loan, but the Johnson brothers had existing oil and gas businesses in Wyoming. Bridgelink claimed to have three subsidiary corporations: Bighorn Investments and Properties, LLC; Bighorn Construction & Reclamation, LLC; and Bighorn Sand & Gravel, LLC. The Johnsons also claimed ownership of numerous other entities.

24. The owners of Bridgelink were far from reputable businessmen. But Cadence Bank specifically failed to mention to Century the Johnson brothers' criminal and civil issues. Had this information been disclosed to Century or had Cadence Bank not repeatedly vouched for the character and reliability of the Johnsons and their companies, Century would not have agreed to loan money to Bridgelink.

25. Critically, Cadence Bank did not inform Century that it had been turned down by numerous other lenders and had failed to obtain any other bank willing to join the lending group. Similarly, Cadence Bank did not inform Century that Bridgelink had repeatedly stressed that it needed the full $60 million credit facility to succeed in its ventures and that a loan for a lesser amount would significantly increase the chance of a default.

26. Based on its review of the materials provided by Cadence Bank as well as the numerous representations made by Cadence Bank regarding the borrower, Century agreed to be one of the lenders in the Bridgelink loan and committed to provide up to $14 million.

27. As the facilitator of the loan, Cadence Bank provided all information regarding the loan and drafted all the necessary documents. Century had almost no contact with Bridgelink or its owners. Any materials or information that Century received came directly from Cadence Bank.

28. After the allocation of the loan was completed, Century discovered for the first time that the credit facility involved only two lenders—Century and Cadence Bank—and that the total amount being loaned was only $34 million instead of the $60 million listed in all materials previously provided by Cadence Bank. And most significantly, Cadence Bank failed to disclose that Bridgelink had informed Cadence that it believed the full $60 million was necessary to be successful in its operations and to make payments under the loan.

### C. The Bridgelink Loan Closes and Cadence Bank Contractually Agrees to Act as Century's Agent to Monitor and Operate the Loan.

29. On August 6, 2021, the Bridgelink loan closed. Several contracts and documents make up the loan agreement, including a Credit Agreement, Promissory Notes with each lender, a Security Agreement, and a Pledge Agreement.

30. The terms of the loan listed both Cadence Bank and Century as "Lenders," Bridgelink as the "Borrower," and Cadence Bank as the "Administrative Agent."

31. As Administrative Agent, Cadence Bank was designated as the Lenders' agent to monitor the loan and enforce the borrower's compliance with the terms of the loan. Bridgelink was required to provide Cadence Bank with documents and reports as mandated under the Credit Agreement, and Cadence Bank was required to verify that such materials were received. Similarly, Bridgelink was to make loan payments directly to Cadence Bank with Cadence Bank sending payments to Century as appropriate. The various loan documents also provide terms for the payment of Cadence Bank for its services as Administrative Agent.

32. One of the key terms of the Credit Agreement was that Cadence Bank was to act as the "principal depository and disbursement bank for [Bridgelink], including for the maintenance of all primary business, cash management (including any corporate credit card programs), operating, and administrative deposit accounts." Credit Agreement § 6.15. This term, which is normal for almost every significant business loan, is a critical provision as it allows the deposit bank to constantly monitor the business of the borrower.

33. The Credit Agreement placed limits on the use of the funds loaned. Both Lenders were given significant lien rights on Bridgelink's assets to collateralize the loan. In addition, Bridgelink was required to submit regular reports on its use of the funds and its operations.

34. Pursuant to the loan's terms, Bridgelink would submit requests to draw down on its line of credit as needed. The funds provided under the loan would be provided by both Cadence

Bank and Century in proportion to the total amount of funds committed—approximately 59% of each draw from Cadence Bank and 41% from Century.

35. The Credit Agreement also contained an "accordion feature" that provided that the revolving credit line could be increased by up to $26 million in additional funds at the option of Bridgelink subject to various terms. Should Bridgelink ever ask for any increase in the credit line, Cadence Bank was required to contact Century and invite it to participate by increasing the size of its loan. Credit Agreement § 2.10(a). Should Century choose not to offer more funds, Cadence Bank could look for additional lenders to participate in the credit facility. Regardless, Century had to be notified of any request to increase the loan amount and, as an existing Lender, Century had certain rights to approve any such increase.

36. On the date that the loan closed, Bridgelink immediately drew down on the line of credit so that $7,632,590.13 was loaned from Century. Two additional draws were made in August, increasing the amount of Century's loan to $9,753,178.37.

### D. <u>Cadence Bank Confirms the Successful Operations of Bridgelink, Which Then Quickly Maxes Out the Line of Credit While Simultaneously Asking for the $26 Million Accordion Feature.</u>

37. While drawing down on the main loan, Bridgelink stayed in regular communication with Cadence Bank regarding its other financial needs. Among the key issues raised was the upcoming need for Bridgelink to have access to the additional $26 million designated under the "accordion feature." These additional funds would provide Bridgelink with the full $60 million that it had repeatedly stressed to Cadence Bank was needed for the company to succeed. On August 27, 2021, Cadence Bank's Vice President & Relationship Manager, Grant Sifers, wrote to Bridgelink to "recap my action items from our call" and assure Bridgelink that a "formal game-plan was in the works" to provide the additional necessary $26 million accordion funds. Sifers

also agreed to help Bridgelink obtain new corporate credit cards through Cadence Bank, help with project bonds, and locate a qualified CFO to ensure that Bridgelink could maintain proper accounting.

38. On September 3, 2021, Sifers again wrote to Bridgelink regarding the help that he had agreed to provide. Sifers noted that Cadence Bank had spoken with two new banks—Trustmark Bank and Community Bank of Texas—about joining the credit facility and providing the additional $26 million that Bridgelink needed.

39. Cadence Bank did not inform Century about Bridgelink's request to increase its credit line or any of its communications as to Bridgelink's reasons for needing the additional funds.

40. On September 9, 2021, Cadence Bank's Associate Portfolio Manager, Colton Poindexter, wrote to Century regarding the loan. Poindexter informed Century that Bridgelink had delivered several financial reports to Cadence Bank as required. Poindexter stressed that, just one month into the loan, "[Bridgelink] is crushing it, and their AR has grown significantly." Due to the quick success of the business, Poindexter informed Century that Bridgelink was seeking another draw from the loan and asked Century to please—if possible—wire out its portion of the new draw within 24 hours.

41. In response, Century noted that it might be able to fund that quickly depending on Bridgelink's financial situation and the size of the draw. Poindexter wrote back within five minutes to inform Century that its share of the draw would be $2,882,352.94. Poindexter further represented that "[Bridgelink's] TTM EBITDA is roughly $22MM+."

42. Century's Senior Vice President then wrote to other members of the loan team to state that "[Bridgelink's lenders] want to advance $7MM in new money, with Century's share

being $2,882,352.94. They will make the official request tomorrow, but I wanted to give you a heads up and provide the updated borrowing base certificate as OK'd by [Cadence Bank]."

43. Per Cadence Bank's request and representations, Century funded the new draw on September 10, 2021.

44. Throughout this entire time, Cadence Bank deliberately did not inform Century that Bridgelink was consistently stressing to Cadence Bank that it desperately needed the $26 million in accordion funds to maintain its business. Century, therefore, continued to fund the original loan in utter ignorance of the desperate nature of Bridgelink's business and the fact that Cadence Bank was actively locating additional funds because Bridgelink expected to imminently draw down the entirety of the original loan and would immediately need more.

45. On September 21, 2021, Sifers again wrote to Bridgelink to update it on the efforts to fund the additional $26 million. Sifers informed Bridgelink that two banks, Trustmark Bank and Veritex Bank, were provided access to the "Bridgelink data room with hopes that they will participate in the $26MM accordion." Sifers stressed that Cadence Bank "was making good progress" in locating the additional funds that Bridgelink stated was desperately needed.

46. Bridgelink made two other draws on September 24, 2021 and October 4, 2021 which combined to max out the loan and bring Bridgelink's indebtedness to Century to the full $14 million offered in the Century Promissory Note. Bridgelink's draws had also taken all $20 million provided for in the Cadence Bank Promissory Note.

**E. <u>Cadence Bank Fails to Require Bridgelink to Maintain Its Operating Account with Cadence Bank, Allowing Bridgelink to Provide Fraudulent Financials Without Century's Knowledge.</u>**

47. Although Bridgelink maintained a bank account with Cadence Bank, the borrower's main operating account was kept elsewhere. The Credit Agreement mandated that

Cadence Bank hold the main operating funds and accounts for Bridgelink, but Cadence Bank failed to do so. Moreover, Cadence Bank failed to inform Century that it was not holding Bridgelink's funds as mandated by the contract.

48. Cadence Bank's failure to hold Bridgelink's operating account had significant consequences.

49. As part of its reporting obligations under the Credit Agreement, Bridgelink provided Cadence Bank with regular financial reports, including its outstanding accounts receivables. Those reports, which Cadence Bank forwarded to Century, showed Bridgelink appearing to have significant business and cash flow. Indeed, based on the company's financial reports, Bridgelink's operating account(s) should have shown hundreds of thousands of dollars of deposits and withdrawals as Bridgelink's clients paid bills and Bridgelink paid expenses.

50. As Century found out several years later, Bridgelink's reports were pure fiction, and the company was providing the Lenders with false information so that it could maintain the loans and use the money elsewhere. But because of Cadence Bank's failure to perform under the Credit Agreement, this fraud went unnoticed.

51. Among the key reasons that the loan contract required Cadence Bank to maintain Bridgelink's operating accounts was that it both secured the loan and provided Cadence Bank—as the Agent—with a constant view into Bridgelink's business. But without holding Bridgelink's bank accounts, Cadence Bank was blind as to the reality of Bridgelink's ongoing business.

52. Had Cadence Bank complied with the contract, it would have immediately noticed that Bridgelink's bank accounts did not match the information provided in the financial reports. While the accounts receivable ("AR") reports showed hundreds of thousands of dollars passing through Bridgelink's accounts, the reality was that no such business was being conducted. Thus,

when Cadence Bank asked Century to immediately wire funds to Bridgelink because Bridgelink was "crushing it," Cadence Bank knew that the accounts it maintained for Bridgelink did not support the rosy picture that it painted for Century.

53. Cadence Bank knew immediately that it did not hold Bridgelink's operating accounts and deliberately did not share that information with Century. Alternatively, if Cadence Bank thought that the account it held for Bridgelink was the main business account, it knew that the financial reports were inaccurate and that Cadence Bank's representations to Century were false.

### F. Bridgelink Meets With Cadence Bank to Stress Its Need for the Accordion Funds and then Breaches the Original Credit Agreement.

54. As Bridgelink was rapidly drawing down all funds available under the loan, Cadence Bank began to set up a meeting between Bridgelink and the Lenders to discuss Bridgelink's business operations. Sifers wrote to Bridgelink and suggested a two-day meeting. The first day would include only Cadence Bank and Bridgelink. The second day would additionally include Century. Although originally scheduled for late September, Sifers wrote to Bridgelink and asked that the meeting be moved to October 7 and 8, 2021.

55. On October 5, 2021, Sifers emailed the principals at Bridgelink and discussed the agenda for the meeting. No one at Century was involved in these discussions.

56. On October 7, 2021, the Lenders met with Bridgelink at Bridgelink's offices in Fort Worth. Cadence Bank was represented by Sifers and Jacob McGee while Century was represented by Keith Miller. At the meeting, Bridgelink presented a PowerPoint presentation regarding the state of its finances and business plans. Bridgelink claimed to have $1.8 billion in renewable energy projects of which $95 million were active, $500 million were in the final stages of contract negotiations, and $1.3 billion were projects in the late stages of development that had a "very high

chance of success." Bridgelink further noted that it expected to have more than $400 million in new projects under way in 2022. Bridgelink claimed that its 2021 financials would show a 53% profit for the year and that 2022 would provide a lower profit margin, but a significantly higher total profit of $147 million.

57. After the meeting with Century and Cadence Bank, Bridgelink decided to follow up with Cadence Bank, but not Century. In those private discussions, Bridgelink noted the significant commitments it had made in future projects and stressed that Bridgelink needed the full $26 million accordion funds almost immediately in order to maintain its business operations. Bridgelink additionally stressed that it expected to need an additional $60 million in financing, for a total of $120 million.

58. On October 12, 2021, Bridgelink's Chief Financial Officer, Preston Bass, wrote to Sifers and McGee to follow up on the previous week's meeting. Bass stressed that they needed to understand the timeline for the $26 million accordion feature—and for additional financing through Standby Letters of Credit ("SLOC")—and again stressed the critical timing of said financing as it expected to close on another large project on November 13, 2021.

59. Bridgelink continued to communicate with Cadence Bank regarding the need for the accordion funds and suggested that due to the urgency, Bridgelink was prepared to meet with any and all banks that Cadence Bank was seeking to partner with so that the additional $26 million would be funded.

60. On October 22, 2021, Sifers wrote to Bridgelink—copying Poindexter and McGee—and referred to a call between Bridgelink and Cadence Bank earlier that week. Sifers noted that, as discussed earlier, the third quarter results for Bridgelink showed "recent declines in gross profit and EBITDA," which Cadence Bank expected would be a problem for the other

lenders. He recommended waiting on meeting with the other banks and, instead, offered to work with Bridgelink to find a way to present the trends to the banks in a positive way.

61. Critically, Century was not informed that Bridgelink was telling Cadence Bank that its need for the accordion funds was critical to its ongoing business and ability to make payments on the loan.

62. Also in October, Sifers reminded Bridgelink that the Credit Agreement required Bridgelink to provide the Lenders with a third-party review of its percentage of completion accounting no later than November 30, 2021. Sifers offered to work with Bridgelink to meet the obligation.

63. Despite Sifers' warning to Bridgelink about the mandatory report, Bridgelink failed to conduct a proper third-party audit of its percentage of completion accounting. In response to this failure, the Lenders and Bridgelink entered into the First Amendment to the Credit Agreement on December 22, 2021 ("First Amendment"). In the First Amendment, the Lenders agreed to waive Bridgelink's default and to change the due date for the third-party audit to January 31, 2022.

64. At the time it presented the First Amendment to Century, Cadence Bank failed to inform Century of two key facts: (1) Cadence Bank was not maintaining Bridgelink's operating accounts as required, and (2) Bridgelink claimed to desperately need the additional $26 million accordion funds for its operations and, as a result, Cadence Bank was actively working to persuade other banks to provide the funds.

**G. Bridgelink Again Breaches the Loan Terms and, as Part of an Amendment to the Credit Agreement, Seeks to Have the Lenders Temporarily Release A Lien.**

65. Not long after signing the First Amendment, new issues arose between Bridgelink and the Lenders. As a result of the two issues outlined below, the parties agreed to a Second Amendment to the Credit Agreement ("Second Amendment") that was signed on March 29, 2022.

1. *Bridgelink violates the Credit Agreement's liquidity covenant*.

66. Under the Credit Agreement, Bridgelink was required to hold at least $4 million in unencumbered cash at the end of every fiscal quarter. However, Bridgelink promptly violated this financial covenant. When Century saw Bridgelink's 2021 year-end financials, it discovered that Bridgelink failed to maintain the required $4 million for the fiscal quarter that ended on December 31, 2021.

67. Century raised this issue with Cadence Bank, which then approached Bridgelink. According to Cadence Bank, Bridgelink claimed to have $4 million in liquidity, which was related to the amount of the available borrowing base above the note amount of $34 million. According to Cadence Bank, Bridgelink seemed not to understand that the excess availability did not exist if there was no legal capacity to lend the money, since the note was maxed out. According to Cadence Bank, Bridgelink appeared to be relying on the excess borrowing base amount based on Accounts Receivable value to meet the requirement. Thus, the Lenders agreed that Bridgelink had violated the terms of the Credit Agreement.

68. Cadence Bank proposed that the Lenders agree to waive the breach and not seek a default in exchange for certain concessions. Specifically, Cadence Bank proposed that the Credit Agreement be modified to require a current ratio instead of the existing minimum liquidity covenant. Going forward, this current ratio hid the fact that Bridgelink did not have real liquidity. In addition, Cadence Bank proposed that the owners of Bridgelink sign personal guarantees for the loan.[1]

69. Although Century was alarmed that Bridgelink had managed to violate the terms of the Credit Agreement twice in just a few months, it informed Cadence Bank that since Cadence

[1] Cadence Bank also recommended that the Credit Agreement be modified to allow Bridgelink to obtain SLOCs as needed to secure various projects.

Bank was the Administrative Agent, Century would follow its lead. Cadence Bank, therefore, drafted the Second Amendment and presented it to Century for signature.

70. At the time Cadence Bank recommended that Century waive the default and sign the Second Amendment, Cadence Bank still had not informed Century of two key facts: (1) Cadence Bank was not maintaining Bridgelink's operating accounts as required, and (2) Bridgelink claimed to desperately need the additional $26 million accordion funds for its operations and, as a result, Cadence Bank was actively working to persuade other banks to provide the funds.

2. *Bridgelink seeks to have the Lenders release their lien on certain assets so that it can complete a purchase of a solar energy company*.

71. As Bridgelink had repeatedly informed Cadence Bank, the borrower needed additional funds to move forward with its business. Among its financial obligations, Bridgelink had signed a term sheet on September 13, 2021 to purchase Old Hickory Solar, LLC ("Old Hickory"), a large solar electric generation facility in Jackson County, Texas. Although it appears Bridgelink had hoped to purchase Old Hickory using a portion of the $26 million accordion funds, Cadence Bank had not located additional lenders to fund the increase by the time the Old Hickory transaction was set to close. Hoping that Cadence Bank would locate funds soon, Bridgelink signed extensions of the term sheet on November 11, 2021 and December 1, 2021.

72. Eventually, Bridgelink closed the Old Hickory purchase and, as part of the purchase agreement, was to make an initial payment of $1 million at closing and a secondary payment of approximately $12.7 million by March 31, 2022, or a later date if extended. The sale contract also provided that the seller was given a lien on the Old Hickory stock and assets as collateral for the second payment.

73. Because the Lenders had a lien on all of Bridgelink's assets pursuant to the Credit Agreement, Bridgelink asked the Lenders to temporarily release the lien so that Bridgelink could comply with the terms of the Old Hickory purchase. The Lenders agreed.

74. Pursuant to the Second Amendment, Cadence Bank—as the agent for both Lenders—agreed to file a partial release of lien in Delaware, which would then allow the Old Hickory seller to file its own lien on the relevant assets. However, as soon as the second payment was made, Cadence Bank was to file a new lien on the assets to secure the loan.

75. Century agreed to this amendment in full reliance that Cadence Bank would release and then promptly refile the lien so that the loan would remain secured.

76. Unbeknownst to Century, however, while Cadence Bank promptly took action to release the lien, Cadence Bank never refiled the new lien as required. As a result, there was no recorded public record of the fact that Century owned a lien on all Old Hickory stock and assets.

### H. <u>Bridgelink Defaults on the Loan Yet Again and, Following Cadence Bank's Recommendation, Century Agrees to Amend the Credit Agreement for the Third Time.</u>

77. Among the reports that Bridgelink was required to submit to the Lenders was an annual field audit. Specifically, either Cadence Bank or an independent third party was to have access to Bridgelink's facilities to perform an audit. The auditor would then provide a report as to the loan collateral; Bridgelink's accounting and financial processes; Bridgelink's overall financial condition; and Bridgelink's books, records, and documents. The field audit was due within 60 days of the beginning of each fiscal year.

78. In addition, Bridgelink was to have an outside accountant audit its books and records and deliver a copy of the audited financial statements within 120 days.

79. Bridgelink failed to deliver either a field audit or audited financial statements to Cadence Bank as required under the Credit Agreement.

80. This default was yet another significant issue in regard to the Bridgelink loan as, yet again, Bridgelink had missed the very first reporting deadline for these audits.

81. As the agent, Cadence Bank approached Bridgelink regarding the breaches and, after a discussion, informed Century that it appeared that Bridgelink simply misunderstood their obligations. As a result, Cadence Bank recommended that the Lenders waive the breaches and amend the Credit Agreement again.

82. The Lenders and Bridgelink then signed the Third Amendment to the Credit Agreement ("Third Amendment"). Pursuant to the Third Amendment, Bridgelink was to provide audited financials by July 15, 2022 and a field audit by December 31, 2022. Century never received these audited financials. Instead, Century received in January, 2023 a quality of earnings report as of August 22, 2022 that was dated November 9, 2022. In addition, Bridgelink was required to pay Cadence Bank a waiver fee of $170,000 for the benefit of the Lenders. Century never received this waiver fee of $170,000 which was due to Century when the Third Amendment was closed.

83. Although Century was extremely concerned about the fact that Bridgelink kept violating the terms of the loan, it recognized that the loan was performing in that Bridgelink had made all payments due under the loan terms. Moreover, Bridgelink's business plan and financial reports appeared to show that the company was moving in the right direction. Finally, Century was comforted by the fact that Cadence Bank, as Administrative Agent for the loan, was confident in the way that the loan was performing and seemed convinced that the issues to date were mostly caused by Bridgelink's misunderstanding of the loan's terms.



**EXHIBIT 5**

84. However, at the time it recommended that Century waive the defaults and sign the Third Amendment, Cadence Bank still had not informed Century of three key facts: (1) Cadence Bank was not maintaining Bridgelink's operating accounts as required; (2) Bridgelink claimed to desperately need the additional $26 million accordion funds for its operations and, as a result, Cadence Bank was actively working to persuade other banks to provide the funds; and (3) Cadence Bank had not refiled the lien on the Old Hickory assets.

**I. Starved for Cash, Bridgelink Seeks Financing From a Third Party and, when Bridgelink Quickly Defaults, Many of Its Assets—Including Old Hickory—Are Seized and Sold Without Notice to Century.**

85. Because Cadence Bank had been unable to obtain commitments to fund the $26 million of accordion funds, Bridgelink sought financing from other sources.

86. On April 12, 2022, Bridgelink Investments—an affiliate of Bridgelink Engineering—announced that it closed on a $200 million senior secured revolving credit facility funded by Crayhill Capital Management LP ("Crayhill"). Crayhill promotes itself as a New York-based private credit manager with experience in renewable energy companies.

87. Under the Crayhill loan, Bridgelink Investments received an initial advance of $26 million—the exact amount that Bridgelink had been requesting from Cadence Bank—on the date that the credit facility was signed.

88. Less than fifty days later, Bridgelink Investments defaulted on the Crayhill loan. Crayhill initially entered into a forbearance agreement with Bridgelink Investments in exchange for an interest rate increase. However, as part of its normal procedure to monitor the loan, Crayhill performed lien searches and discovered that Bridgelink Investments had granted multiple liens to multiple parties on the assets that had been pledged to Crayhill.

89. Upon discovering Bridgelink Investment's fraudulent actions, Crayhill declared the loan in immediate default and began to seize the pledged collateral. In addition, Crayhill auctioned off many of Bridgelink Investment's ownership interests in various projects to seek funds to repay the loan. Old Hickory was among the assets that were seized and sold.

90. Century was completely unaware of the Crayhill loan default and of the actions to seize and sell Bridgelink Investments' assets.

91. Because Cadence Bank had failed to refile the lien on the Old Hickory property as required, the Lenders received no notice of the Crayhill default and asset sale. Had Cadence Bank performed as required and filed the lien, the Lenders would have known about the Crayhill loan default.

92. There is no doubt that had Century known of the allegations in the Crayhill dispute and/or received notice that a lender was accusing Bridgelink of fraud and seizing assets, Century would have immediately taken action to protect itself either through securing assets or immediately foreclosing on the Bridgelink loan. However, because of Cadence Bank's inaction, Century was not aware of the Bridgelink crisis.

### J. Bridgelink Defaults On its Payment Obligations and, as the Lenders Scramble to Seek Repayment, Cadence Bank's Failures Are Exposed.

93. Although the Bridgelink loan had involved repeated issues, payments were being made to the Lenders as required. The one caveat was that Bridgelink had not paid Cadence Bank the $170,000 waiver fee required by the Third Amendment. Although apparently not a significant concern to Cadence Bank, Century repeatedly asked Cadence Bank, as the agent, to follow up and obtain the agreed payment. Each time Cadence Bank responded, it indicated that it would ask for payment. However, Bridgelink apparently kept delaying the payment and informing Cadence Bank that it needed more time.

94. Bridgelink was late to make payment under the loan due September 30, 2022. Bridgelink also completely failed to pay the amount due under the loan on December 31, 2022.

95. Century immediately contacted Cadence Bank and notified it that the payment had been missed. Around the same time, Century had grown concerned due to Bridgelink's failure to pay the waiver fee and the reluctance of Cadence Bank to press Bridgelink for payment.

96. As the Agent for the loan, Cadence Bank reached out to Bridgelink to investigate the missed payment. Cadence Bank informed Century that Bridgelink claimed to have issues with its AR and stated that it needed a little more time to make the payment.

97. Cadence Bank recommended sending a "soft" demand letter asking for payment by the end of January. Bridgelink replied that it could pay the interest by February 3, 2023 (but not by January 31). Cadence Bank emailed Bridgelink on February 2 and stressed the importance of making the payment by February 3. No payment was received.

98. Cadence Bank then recommended that it send a "hard" demand letter which stated that all interest and fees needed to be paid within five days. At around the same time, Bridgelink wrote to Cadence saying that it had worked out a payment plan regarding some of its AR and, therefore, proposed that it pay $200,000 per week until it was caught up on the loan. Century suggested that, rather than sending a hard demand, the Lenders should approach Bridgelink with a forbearance agreement showing the suggested payment plan because Century was concerned that a hard demand letter would cause Bridgelink to hire counsel and cease payments. Cadence Bank noted that it was the agent for the loan and, because Cadence disagreed with Century, sent the hard demand letter on February 8, 2023, demanding payment within five days.

99. When no payment was made, Cadence Bank placed the loan in default and began to try to work out a plan with Bridgelink. After several weeks of discussions, a face-to-face meeting was scheduled for March 15, 2023.

100. At the meeting, Cadence Bank demanded that Bridgelink make the December 2022 interest payment no later than March 28, 2023. Bridgelink responded that it would be able to make the loan current in 90 days, but that Bridgelink could not pay a large sum by the end of March. Bridgelink stated that its plan was to sell the company in the next four to six months. In addition, Bridgelink proposed selling the Old Hickory project for $28 million of profit within 90 days. Bridgelink claimed that it was having AR collection issues because it was unable to pay its subcontractors. Bridgelink stated that once it sold Old Hickory, it would have access to the $200 million Crayhill line of credit, which Bridgelink claimed was restricted due to the size of the Old Hickory project. Once that happened, Bridgelink would pay its subcontractors, collect the AR, and have the funds needed to pay the Lenders. Bridgelink therefore asked the Lenders to convert the line of credit into a term loan and fund an additional $16 million to allow Bridgelink to complete the Old Hickory sale and move toward the sale of the entire company (for which Bridgelink said it expected to receive up to $300 million).

101. Significantly, Bridgelink failed to inform the Lenders about the true status of the Crayhill loan and that, rather than being available to pay subcontractors, Crayhill had already defaulted the loan and begun collection efforts. Indeed, it was not possible for Bridgelink to sell Old Hickory because Bridgelink's interest in the company already had been seized and was scheduled to be auctioned on April 28, 2023. Of course, had Cadence Bank filed the lien on Old Hickory as required, the Lenders would already have been aware of the dire straits that Bridgelink was facing.

102. As the meeting neared an end, Cadence Bank disclosed that it was not in possession of Bridgelink's operating accounts as required under the Credit Agreement. Cadence Bank asked Bridgelink where the company actually maintained its bank accounts, and Bridgelink declined to answer. This was the first time that Century was made aware that Cadence Bank had breached the contract by failing to hold Bridgelink's accounts.

103. After the meeting, Cadence Bank stated that as the Agent for the loan it would run a series of lien checks to confirm that the company's projects were not subject to liens due to nonpayment. Once those checks were run, Cadence Bank discovered that the vast majority of Bridgelink's projects were subject to liens or seized. Cadence Bank also discovered that its failure to file the lien on Old Hickory had resulted in the property being seized by Crayhill.

104. In March of 2023, Century learned from Cadence for the first time that more than $58 million of Bridgelink's AR had been seized by Crayhill. Although this property should have been available to the Lenders to pay down the loan, Cadence Bank's failures directly caused the loss of the funds.

105. Having lost the largest sources of repayment, the Lenders filed suit against Bridgelink and the Johnsons for breach of the loan contract. A judgment for the full amount was awarded to the Lenders on summary judgment.

106. Unfortunately, it appears that the judgment has little to no actual value. Upon information and belief, the funds loaned to Bridgelink were used for improper purposes and there appears to be no avenue for Century to recover the loan from the borrower or the guarantors.

107. This loss would never have occurred had Cadence Bank complied with the terms of the Credit Agreement and, as part of its Agent duties, properly informed Century regarding the material aspects of the loan.

## CAUSES OF ACTION

**A. Fraud**

108. Century repeats and realleges the facts stated above.

109. As discussed at length above, Cadence Bank repeatedly omitted material facts in its discussions with Century that were necessary to make its representations regarding the loan true and factual. For example, Cadence Bank failed to inform Century that it was not maintaining Bridgelink's operating accounts, that Cadence Bank had failed to file the lien on the Old Hickory Project, or the true nature of its relationship with Bridgelink and its founders. Cadence Bank had a duty to disclose these facts, especially considering its earlier representations and the impact on Century.

110. Cadence Bank knew that it omitted telling Century these facts and intended the omissions to induce Century to enter into the loan and continue to fund the credit facility without any attempt at foreclosure.

111. Century justifiably relied on the omission and suffered injury as a result.

112. Moreover, Cadence Bank made such omissions intentionally and recklessly such that the imposition of punitive damages is warranted.

**B. Negligent Misrepresentation**

113. Century repeats and realleges the facts stated above.

114. As disclosed above, Cadence Bank made false material representations by failing to exercise reasonable care in communicating accurate information. Cadence Bank intended to induce Century to rely on its representations and agreements, and Century properly relied on the statements, suffering injury as a result.

115. Moreover, Cadence Bank made such omissions and representations intentionally and recklessly such that the imposition of punitive damages is warranted.

**C. Breach of Contract**

116. Century repeats and realleges the facts stated above.

117. As disclosed above, a valid contract existed between Cadence Bank and Century. While Century performed under the agreement, Cadence Bank breached the agreement by, among other things, failing to maintain Bridgelink's bank accounts, filing the Old Hickory lien, and monitoring the accounts as required.

118. Such breach caused damage to Century.

**D. Monies Had and Received**

119. Century repeats and realleges the facts stated above.

120. For the reasons stated above, Cadence Bank holds money that rightfully belongs to Century in equity and good conscience.

**F. Attorneys' Fees**

121. Century repeats and realleges the facts stated above.

122. Century has been forced to obtain counsel to prosecute the above causes of action against Cadence Bank due to its wrongful actions. Century, therefore, is entitled to recover its reasonable and necessary attorneys' fees incurred in prosecuting this action.

**JURY DEMAND**

123. Century hereby requests a trial by jury pursuant to Texas Rule of Civil Procedure 216 (a).

Dated: July 22, 2025

Respectfully submitted,

**WINSTON & STRAWN LLP**
*/s/ Steven H. Stodghill*
Steven H. Stodghill
Texas Bar No. 19261100
sstodghill@winston.com
Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
James W. Kappos
Texas Bar No. 24143068
jkappos@winston.com
2121 N. Pearl St., Suite 900
Dallas, Texas 75201
Telephone: (214) 453-6500
Fax: (214) 453-6400

Michelle N. Toro
Texas Bar No. 24137246
mtoro@winston.com
800 Capitol St., Suite 2400
Houston, Texas 77002
Telephone: (713) 651-2600
Fax: (713) 651-2700

**ATTORNEYS FOR CENTURY BANK**