**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **CADENCE BANK F/K/A BANCORPSOUTH BANK and CENTURY BANK,** | § | |
| **Plaintiffs,** | § | |
| | § | **Civil Action No. 4-23-cv-00609** |
| **v.** | § | |
| **BRIDGELINK ENGINEERING, LLC, COLE WAYNE JOHNSON, CORD HENRY JOHNSON, BIGHORN CONSTRUCTION AND RECLAMATION, L.L.C., BIGHORN SAND & GRAVEL LLC, AND BIGHORN INVESTMENTS AND PROPERTIES, LLC** | § | |
| **Defendants.** | § | |

---

**FORMER RECEIVERS' REPLY TO PLAINTIFF CADENCE BANK'S RESPONSE IN OPPOSITION TO FORMER RECEIVERS' MOTION TO COMPEL COMPLIANCE WITH ORDER DISCHARGING RECEIVERS [DKT. NO. 296]**

---

**TO THE HONORABLE JEFFREY L. CURETON**
**UNITED STATES MAGISTRATE JUDGE:**

Jason Rae and Kelly McCullough, former co-receivers (the "Former Receivers"), submit this *Reply to Plaintiff Cadence Bank's Response in Opposition*[1] *to Former Receivers' Motion to Compel*[2] *Compliance with Order Discharging Receivers [Dkt. No. 296]* (the "Reply"), and in support would respectfully show the Court as follows:

---

[1] *Plaintiffs* [sic] *Cadence Bank's Response in Opposition to Former Receivers' Motion to Compel Compliance with Order Discharging Former Receivers [Dkt. No. 296]* (the "Response") was filed on April 30, 2026, and is found at Docket No. 339. Note: Although both Cadence Bank and Century Bank sought the appointment of the Former Receivers, only Cadence Bank has objected to the Motion to Compel.

[2] *Former Receivers' Motion to Compel Compliance with Order Discharging Receivers [Dkt. No. 296]* (the "MTC") was filed on April 9, 2026, and is found at Docket No. 328.

**EXHIBIT 16**

## INTRODUCTION

1. The Former Receivers and their professionals did work that was reasonable and necessary under the circumstances of this case. The Former Receivers' choices in discharging their duties, were not "poor choices" as Cadence Bank ("Cadence") says; rather, those choices were objective, methodical, and on track to discover information that could lead to collection of the judgment held by Cadence and Century Bank ("Century") (collectively, the "Banks"). The Banks chose the Former Receivers for their forensic accounting expertise long before asking the Court to appoint them as independent fiduciaries. But once they were appointed, the Banks challenged their judgment at every turn. And the Banks insisted on unrealistic results on an impossible schedule. The Banks' own obstinance caused distraction and additional expense. This Reply has three components: (a) a timeline of events that puts Cadence's complaints – and their unreasonable expectations – into perspective; (b) a response to Cadence's specific objections; and (c) declarations supporting the reasonableness of fees requested.

## TIMELINE

2. On September 16, 2025, the Banks moved to appoint a receiver,[3] asserting that "[t]he Johnsons[4] have created a complex web of limited liability companies to shield assets, thwart liabilities, and prevent the collection of any judgment."[5] The Banks alleged the Johnson's had engaged in a "shell game."[6] So, the Banks knew the Former Receivers would be looking for difficult-to-trace assets, which the Banks and their counsel had not found in over a year.[7]

---

[3] *See* Dkt. 211.
[4] Individual judgment debtors Cord and Cole Johnson shall be collectively referred to herein as "the Johnsons."
[5] *Id.* at pg. 2.
[6] *Id.* at pg. 6.
[7] The underlying Final Judgment, awarding the Banks nearly $40m based on a breach of contract, was entered by the U.S. District Court for the Northern District of Texas on June 6, 2024 – more than 15 months before a receiver was requested.

3. On October 22, 2025, the Court entered the "Original Order."[8] That afternoon, Cadence's counsel informed the Former Receivers, asking to set up a meeting about next steps. The Former Receivers responded promptly. On October 24, 2025, receiver Kelly McCullough ("McCullough") asked Century's counsel for information for background checks on the Johnsons and began making plans for an inventory of their homes. However, these plans were interrupted.

4. Specifically, on October 27, 2025, the judgment debtors filed an emergency motion for relief from or modification of the Original Order (the "Emergency Motion").[9] The Emergency Motion questioned the due process, validity, and breadth of the Original Order. Century's counsel informed the Former Receivers of this development, saying he would keep them informed. At that point, the Former Receivers reasonably believed that their authority was limited or non-existent – at the very least, under Court review. That belief was supported by the Court's briefing schedule on the Emergency Motion. Thus, the Former Receivers sent a document preservation letter on October 29, 2025, but otherwise waited for the Court to rule on the Emergency Motion.

5. On October 31, 2025, the Court directed the parties to provide an agreed form of amended order or a joint report of disputed matters by November 5, 2025.[10] On November 5, 2025, the parties submitted a joint report which set forth their agreements and disputes.[11] In the report, counsel apprised the Court of a two-hour meeting of opposing counsel. The Former Receivers were not included in this meeting, further supporting their belief that their work was paused during the dispute. On November 6, 2025, the Court entered the "Amended Order."[12] The Amended Order added protections for exempt assets and limited the Former Receivers' authority

---

[8] *See* Dkt. 231, *Order Granting Plaintiffs' Joint Application for Appointment of Receiver and Injunctive Relief.*
[9] *See* Dkt. 234.
[10] *See* Dkt. 240.
[11] *See* Dkt. 242.
[12] *See* Dkt. 243, *Amended Order Granting Plaintiffs' Joint Application for Appointment of Receiver and Injunctive Relief.*

regarding the various LLCs formed by the Johnsons, making the Former Receivers subject to limitations in the Texas Business Organization Code.[13]

6. On November 7, 2025, the Banks took Cole Johnson's deposition in the courtroom, pursuant to a Court order entered on October 15, 2025.[14] Former Receiver McCullough was present. The Court took the bench during the deposition to resolve several disputes. The Banks' counsel asked that Cole Johnson turn over a debit card in his possession. David Skeels, counsel for the judgment debtors, argued that the debit card was owned by a non-judgment debtor, therefore it could not be taken without a motion, per the terms of the Amended Order. Based on the unofficial transcript, the Court agreed. Nonetheless, the Court permitted the Banks' counsel and McCullough to see the debit card. Based on the Court's comments, indicating that a motion would be necessary, McCullough believed he did not have authority to take the debit card.

7. The week of November 10, 2025, the Former Receivers began looking for counsel *in consultation with the Banks*. On November 14, 2025, McCullough called Laurie Rea, a partner at Rochelle McCullough, PLLC ("RM") about RM's ability to represent the Former Receivers. After checking conflicts and discussing other commitments, RM concluded that it could assist the Former Receivers. That was communicated late on November 14, 2025.

8. By the morning of Monday, November 17, 2025—before RM and the Former Receivers (the "Receiver Team") could complete an engagement letter—the Banks demanded that RM file an objection to a sale in the Triangle 40 Ranch LLC[15] bankruptcy case.[16] Although the Receiver Team questioned the soundness of such strategy, and communicated as much, they

[13] *Id.* at pgs. 14-15.
[14] *See* Dkt. 229.
[15] This entity is 100% owned by individual judgment debtor Cole Johnson.
[16] *See In re Triangle 40 Ranch LLC,* Bankr. No. 25-42047-elm11 (Bankr. N.D. Tex.).

did as the Banks requested and filed a limited objection to the sale on November 18, 2025. Thereafter, they appeared at the sale hearing on November 19, 2025.

9. The Bankruptcy Court's reaction to the Former Receivers' appearance at the sale hearing was negative. The Bankruptcy Court indicated that counsel's appearance suggested an intention to improperly interfere with the business of a non-judgment debtor. Counsel for the judgment debtors parleyed the Bankruptcy Court's critical reception into a motion, filed with this Court on November 24, 2025, to require the Former Receivers to comply with the Amended Order and accusing the Receiver Team of egregious violations of said order (the "Admonishment Motion").[17] The Receiver Team was forced to spend time responding to the Admonishment Motion, which they did on December 8, 2025.[18]

10. This dispute (caused by the Banks' insistence that the Former Receivers appear in a non-judgment debtor entity case) exposed an ambiguity in the Amended Order. Specifically, on pg 3, it states: "*This Order gives the Receiver the ability to have full and complete access to the books and records of the Non-Judgment Debtor Entities*." In its application, the authority granted by this phrase seemingly conflicts with Texas Business Organizations Code Sections 101.112 and 152.308. The judgment debtors pointed this out in the Admonishment Motion, and it continued to be a source of angst in the case—with the Banks pressing the Former Receivers to stretch the limits of that ambiguity and the judgment debtors repeatedly threatening sanctions. The Receiver Team intended to bring this to the Court's attention, but the relationship between the Banks and the Receiver Team deteriorated completely before that could be done.

[17] *See* Dkts. 254 and 255.
[18] *See* Dkt. 272.

11. On November 25, 2025, the Receiver Team inspected the residences of the Johnsons. They did so after consulting with the judgment debtors' counsel and coordinating schedules, as that seemed consistent with the Amended Order and general professionalism.

12. Thereafter, the Former Receivers, after reviewing their options and *consulting with the Banks*, engaged an expert to copy the judgment debtors' electronics. On December 2, 2025, they informed the Banks that they would be hiring Chuck Easttom ("Easttom") of Allegiant Investigation. The Receiver Team worked *doggedly* with the Johnsons' counsel to facilitate the process of getting laptops and cell phones to Easttom for imaging and analysis. It was not an easy process. By December 11, 2025, Easttom reported having both computers imaged but that he could not access the data because of encryption issues (that were not resolved during the Former Receivers' tenure). By December 17, 2025, Easttom had Cord Johnson's cell phone imaged. By December 22, 2025, he had Cole Johnson's cell phone but could not access it due to a stolen device protection feature that needed to be disabled (that issue, too, was not resolved during the Former Receiver's tenure). To the Former Receivers' knowledge, both the Banks and the subsequent receiver were provided access to Easttom for purposes of obtaining this information and continuing the work. Moreover, the Former Receivers paid Easttom $5,400 for his services through the Lain Faulkner accounting firm.[19]

13. On December 8, 2025, the Former Receivers and one of their counsel met with the Court in chambers, at the Court's request, to provide a status update and general strategy moving forward. At that time, the Court requested periodic written updates from the Former Receivers.

[19] Both Former Receivers, Kelly McCullough and Jason Rae, are forensic accountants employed by the accounting firm of Lain Faulkner, P.C.

14. On December 9, 2025, the Former Receivers submitted the forms necessary for forwarding the judgment debtors' mail. The Amended Order authorized but did not require them to do so. However, the Banks believed it would be useful, so the Former Receivers complied.

15. On December 10, 2025, the Former Receivers conducted a deposition at which Cord Johnson testified under oath (the "Cord Deposition"). To facilitate the efficient gathering of information, they agreed to the following regarding the Cord Deposition: (a) the Banks would not attend, but there would be no limitations on the Banks' ability to depose Cord Johnson in the future; (b) Cord Johnson's counsel could ask him questions on direct examination first; (c) Former Receivers' counsel could cross-examine Cord Johnson without limitations on their ability to depose him in the future; and (d) the Former Receivers and the Johnsons would split the cost of the deposition. The Former Receivers discussed the format for the deposition during the in-chambers meeting with the Court on December 8th, and the Court indicated that it thought the deposition was a good idea. A copy of the Cord Deposition is attached to the Response.[20]

16. On December 15, 2025, the Former Receivers' counsel provided their first written report to the Court, updating the Court on the status of the copying of the electronic devices, the Cord Deposition, document review, asset analysis, the non-judgment debtor entities, possible avenues for collection, and filling in any gaps in the documentation.

17. On December 17, 2025, the Former Receivers were forced to seek the Court's help regarding a dispute between the Banks and judgment debtors about releasing the Cord Deposition transcript to the Banks. The Court communicated that the Banks and Cord Johnson should agree or file something with the Court. Late the next day, the parties conveyed that they had agreed, and the Former Receivers sent the Banks a copy of the Cord Deposition transcript the next morning.

---

[20] RM paid $2,944.25 for the costs of the one-half of Cord Deposition and a copy of the transcript.

18. On December 18, 2025, Century's representative asked to speak with the Receiver Team. Based on that phone call (and others before it), it became clear that the Banks would not allow the Former Receivers to exercise independence of judgment. Nevertheless, the Receiver Team continued to make as much progress as possible.

19. On December 30, 2025, the Former Receivers' counsel provided their second (and final) written report to the Court, updating the Court on the problems with the Johnsons' laptops and cell phones, the status of the resolved transcript dispute, and the extensive formal and informal document requests being prepared and issued by the Former Receivers.

20. Later that same day, the Former Receivers tendered their resignation.[21] On December 31, 2025, RM filed its *Motion to Withdraw as Counsel*, which was granted by electronic order on January 28, 2026.[22]

21. On January 28, 2026, the Court entered the *Order Discharging Jason Rae and Kelly McCullough as Receivers* (the "Discharge Order"). As noted in the MTC, the Discharge Order says that the Former Receivers' actions were proper and in the best interest of the receivership estate and that the Former "Receivers and their professionals are entitled to payment for the services rendered in this case."

29. Subsequently, the Receiver Team has assisted in the efficient transition of information to the new receiver. Specifically, on or about February 9, 2026, both Lain Faulkner and RM uploaded all of their non-work product files to Mr. Korn's office.[23] They have also assisted in answering any questions from the new receiver as those have arisen.

**RESPONSES TO CADENCE BANK'S SPECIFIC COMPLAINTS**

---

[21] *See* Dkt. 281.
[22] *See* Dkts. 282 and 298.
[23] Attorney Andrew Korn ("Mr. Korn") was appointed as substitute counsel on January 28, 2026. *See* Dkt. 297.

***Cadence Bank Thinks the Receiver Team Did Not Do Enough***

30. Cadence complains that it should not have to pay the Receiver Teams' fees and expenses, because they did not do enough, arguing there is "nothing to show for" the work or "it did not aid in the collection of the judgement." That is simply false. In less than two months, the Receiver Team advanced the Banks' ability to collect on its judgment in several ways, including:

a. Inspecting the Johnsons' residences within a reasonable time. Those inspections resulted in valuable information for further investigation.

b. Facilitating and conducting the Cord Deposition, which also provided new information given by Cord Johnson *under oath*. The Banks have a copy of that deposition transcript (paid for by RM) for their use.

c. Obtaining access to the Johnsons' electronics for imaging and review as quickly as possible. Although those efforts were not complete, Easttom's work was, or is, available to the Banks and has been paid for by the Former Receivers' accounting firm.

d. In addition, the Receiver Team spent many hours tracing funds, reviewing documents, and compiling document requests. All information gathered has been given to or made available to Mr. Korn.

31. The work was beneficial and had to be done. The fact that the Receiver Team did not break down doors and find $40 million is not a measure of the Receiver Team's value.

***Cadence Bank Thinks the Receiver Team Did Too Much***

32. At the same time, Cadence complains that the Receiver Team did too much, alleging it overbilled, overstaffed, and did duplicative work. First, the Receiver Team are professionals and billed the amount of time they worked (if not less). Second, the number of people involved was a function of the Banks' own (unrealistic) expectations and demands. The



EXHIBIT 16

Banks repeatedly expressed disappointment that the Receiver Team wasn't working quickly enough or devoting enough time to the case. Simply put, the Banks wanted everything done, all at once. It was not feasible for a few attorneys, who have other obligations, to devote as much time as the Banks wanted. As a result, the Receiver Team added additional attorneys to handle different tasks. The Receiver Team does not believe they duplicated efforts and were all trying to advance different objectives for the Banks quickly and efficiently.

***Cadence Bank Thinks the Former Receivers Made "Poor Choices"***

33. Cadence provides examples of the Receiver Team's "poor choices," asserting they caused harm to the Banks and allowed the judgment debtors to benefit from their bad acts; there is no evidence to support this assertion.

34. The first example is the Former Receivers' "failure" to collect assets in Cole Johnson's possession on November 7, 2025. As explained, Cole Johnson had a debit card in the name of a *non-judgment debtor entity* in his possession at his deposition. The parties had *just left* the courthouse, where the Court stated that the Amended Order would require a motion to obtain such property. Accordingly, McCullough looked at the debit card but did not take it. Cadence criticizes him for that, either because it did not listen to the Court or it thought it okay to pressure him into violating the Amended Order. Either explanation is unacceptable.

35. The next example is equally disingenuous. Cadence complains that the Receiver Team failed to appear at the Johnsons' residences for a month. As mentioned, the Amended Order was entered on November 6. November 7 was spent in the deposition. The Former Receivers did not have counsel until November 17. That means it took 8 days to inspect the residences, not a month. And there was nothing about the Amended Order requiring a surprise visit. In fact, that likely would have required multiple trips and increased costs. Coordinating with the Johnsons'

counsel and meeting as a group was safer and more effective.[24] Again, Cadence had an unreasonable belief that the Receiver Team would find $40 million at those residences and blames the Receiver team because that did not happen.

36. The final example is the Cord Deposition, which Cadence calls a "shocking example" of ineffectiveness and waste. It was (and is) the Receiver Team's professional opinion that Cord Johnson testifying *under oath* was very important. They maintain that it was a sage decision and they gained valuable information about the non-judgment debtor structure and the Johnsons' financial operations and plans. The Receiver Team would have gained more information, but they ran out of time and the Banks refused to allow them to schedule a continuation of the deposition. Excluding the Banks was a tool to make the deposition less combative, less aggressive, calmer, and more informative. The Receiver Team *did not* exclude the Banks from looking at the transcript. The Banks have had the transcript since December 18, 2025. The only delay was because the Johnsons' counsel and the Banks' counsel could not agree to limitations on the use of the deposition. The Court instructed them to work it out, and they did.

**EVIDENCE OF REASONABLENESS OF THE FEES AND EXPENSES**

37. The Receiver Team requests a hearing on the MTC. Cadence opposes the hearing but criticizes the Receiver Team for not providing evidentiary support. Accordingly, the Receiver Team provides the attached *Declarations in Support* by Kelly McCullough and Laurie Rea in support of the fees and expenses requested in the MTC.

WHEREFORE, PREMISES CONSIDERED, the Former Receivers respectfully pray that

[24] Cadence criticizes the Former Receivers for not "springing" a surprise visit on the Johnsons; however, emails indicate that John Lenninger, counsel for Century, previously communicated with the judgment debtors' counsel on November 12, 2025, in an effort to arrange a *coordinated inspection* of the residences. Thus, it would seem Century's own counsel, working in conjunction with Cadence's counsel, thought it prudent to work amicably with judgment debtors on the inspection.

the Court enter an Order (i) granting the MTC, (ii) further awarding attorney's fees for the time and expense incurred in preparing this MTC, and (iii) granting other just relief.

Dated: May 14, 2026.

Respectfully submitted,

Shannon S. Thomas
State Bar No. 24088442
Rochelle McCullough, PLLC
901 Main Street, Suite 3200
Dallas, Texas 75202
Telephone: (214) 953-0182
Facsimile: (888) 467-5979
Email: sthomas@romclaw.com

and

*/s/ Laurie Dahl Rea*
Laurie Dahl Rea
State Bar No. 00796150
Rochelle McCullough, PLLC
300 Throckmorton Street, Suite 520
Fort Worth, Texas 76102
Telephone: (817) 346-5267
Facsimile: (888) 467-5979
Email: laurie.rea@romclaw.com

COUNSEL FOR JASON RAE AND
KELLY McCULLOUGH, [FORMER] COURT
APPOINTED CO-RECEIVERS

**CERTIFICATE OF SERVICE**

I hereby certify that, on May 14, 2026, a copy of this document was electronically filed in this case with the Clerk of the United States District Court by using the CM/ECF system, a copy was served on the parties who receive notice via the Court's ECF notification system.

*/s/ Laurie Dahl Rea*
Laurie Dahl Rea



**EXHIBIT 16**