# EXHIBIT A

# CREDIT AGREEMENT

**dated as of August 6, 2021**

**among**

**BRIDGELINK ENGINEERING, LLC,**

**as the Borrower,**

**THE LENDERS PARTY HERETO,**

**BANCORPSOUTH BANK,**
**as Administrative Agent**

**and**

**BANCORPSOUTH BANK,**
**as Sole Lead Arranger and Sole Bookrunner**

# TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS AND RULES OF CONSTRUCTION ..... 1

Section 1.1 Definitions ..... 1
Section 1.2 Classification of Loans and Borrowings ..... 41
Section 1.3 Terms Generally ..... 41
Section 1.4 Accounting Terms; GAAP ..... 41
Section 1.5 Rounding ..... 42
Section 1.6 References to Time ..... 42
Section 1.7 Resolution of Drafting Ambiguities ..... 42
Section 1.8 Status of Loan Document Obligations ..... 42
Section 1.9 Interest ..... 42
Section 1.10 Divisions ..... 42

ARTICLE 2 THE CREDITS ..... 43

Section 2.1 Commitments ..... 43
Section 2.2 Borrowings, Conversions, and Continuations of Loans ..... 43
Section 2.3 Reserved ..... 45
Section 2.4 Reserved ..... 45
Section 2.5 Termination and Reduction of Commitments ..... 45
Section 2.6 Repayment of Loans; Evidence of Debt ..... 45
Section 2.7 Prepayments ..... 46
Section 2.8 Payments Generally; Administrative Agent’s Clawback ..... 47
Section 2.9 Defaulting Lenders ..... 50
Section 2.10 Accordion ..... 51

ARTICLE 3 INTEREST, FEES, YIELD PROTECTION, ETC. ..... 52

Section 3.1 Interest ..... 52
Section 3.2 Fees ..... 53
Section 3.3 Alternate Rate of Interest ..... 54
Section 3.4 Increased Costs; Illegality ..... 56
Section 3.5 Break Funding Payments ..... 57
Section 3.6 Taxes ..... 58
Section 3.7 Mitigation Obligations; Replacement of Lenders ..... 61

ARTICLE 4 CONDITIONS PRECEDENT TO CREDIT EXTENSIONS ..... 62

Section 4.1 Conditions to Initial Credit Extensions ..... 62
Section 4.2 Conditions to All Credit Extensions ..... 65

ARTICLE 5 REPRESENTATIONS AND WARRANTIES ..... 65

Section 5.1 Existence, Qualification and Power; Compliance with Laws ..... 65
Section 5.2 Authorization; No Contravention ..... 66
Section 5.3 Governmental Authorization; Other Consents ..... 66

Section 5.4 Binding Effect ..... 66
Section 5.5 Financial Statements; No Material Adverse Effect ..... 66
Section 5.6 Litigation ..... 66
Section 5.7 Environmental Matters ..... 67
Section 5.8 Ownership of Properties; Liens ..... 68
Section 5.9 Casualty, Etc ..... 68
Section 5.10 Investment Company Status, Etc ..... 68
Section 5.11 Taxes ..... 68
Section 5.12 ERISA ..... 69
Section 5.13 Subsidiaries; Equity Interests ..... 70
Section 5.14 Insurance ..... 70
Section 5.15 Federal Reserve Regulations, Etc ..... 70
Section 5.16 Collateral Documents ..... 70
Section 5.17 Solvency ..... 71
Section 5.18 Anti-Corruption Laws; Sanctions; Anti-Terrorism Laws ..... 71
Section 5.19 Material Owned Real Property ..... 72
Section 5.20 Accuracy of Information, Etc ..... 72
Section 5.21 Labor Matters ..... 72
Section 5.22 Absence of Certain Restrictions ..... 72
Section 5.23 No Default ..... 72
Section 5.24 Brokers' Fees ..... 72
Section 5.25 EEA Financial Institutions ..... 73
Section 5.26 Use of Proceeds ..... 73
Section 5.27 Capitalization ..... 73
Section 5.28 Affiliate Transactions ..... 73
Section 5.29 Material Contracts ..... 73

ARTICLE 6 AFFIRMATIVE COVENANTS ..... 73

Section 6.1 Financial Statements and Other Information ..... 73
Section 6.2 Notices of Material Events ..... 76
Section 6.3 Existence; Conduct of Business ..... 77
Section 6.4 Payment and Performance of Obligations ..... 77
Section 6.5 Maintenance of Properties ..... 77
Section 6.6 Books and Records; Inspection Rights ..... 77
Section 6.7 Compliance with Laws ..... 78
Section 6.8 Use of Proceeds ..... 78
Section 6.9 Information Concerning Collateral ..... 78
Section 6.10 Insurance ..... 79
Section 6.11 Casualty Events ..... 80
Section 6.12 Covenant to Guarantee and Provide Security ..... 81
Section 6.13 Environmental Matters ..... 83
Section 6.14 Reserved ..... 83
Section 6.15 Depository ..... 83
Section 6.16 Material Contracts ..... 83

ARTICLE 7 NEGATIVE COVENANTS ..... 84

Section 7.1 Indebtedness; Equity Interests ..... 84
Section 7.2 Liens ..... 85
Section 7.3 Fundamental Changes; Business; Fiscal Year; Accounting Policies ..... 85

Section 7.4 Investments, Loans, Advances, Guarantees and Acquisitions ... 86
Section 7.5 Dispositions ... 87
Section 7.6 Sale and Lease Back Transactions ... 88
Section 7.7 Swap Agreements ... 88
Section 7.8 Restricted Payments ... 88
Section 7.9 Transactions with Affiliates ... 89
Section 7.10 Restrictive Agreements ... 89
Section 7.11 Amendment of Material Documents ... 89
Section 7.12 Financial Covenants ... 89
Section 7.13 Payments on Subordinated and Junior Debt ... 90
Section 7.14 Government Regulation ... 90
Section 7.15 Hazardous Materials ... 90
Section 7.16 Use of Proceeds ... 90

ARTICLE 8 EVENTS OF DEFAULT ... 91

Section 8.1 Events of Default ... 91
Section 8.2 Remedies Upon Event of Default ... 93
Section 8.3 Application of Funds ... 93
Section 8.4 Equity Cure ... 94

ARTICLE 9 THE ADMINISTRATIVE AGENT ... 95

Section 9.1 Appointment and Authority ... 95
Section 9.2 Rights as a Lender ... 95
Section 9.3 Exculpatory Provisions ... 95
Section 9.4 Reliance by Administrative Agent ... 96
Section 9.5 Delegation of Duties ... 96
Section 9.6 Resignation of Administrative Agent ... 97
Section 9.7 Non-Reliance on Administrative Agent and Other Lenders ... 98
Section 9.8 No Other Duties, Etc ... 98
Section 9.9 Administrative Agent May File Proofs of Claim ... 98
Section 9.10 Collateral and Guarantee Matters ... 98
Section 9.11 Compliance with Flood Insurance Laws ... 99
Section 9.12 Cash Management Obligations and Swap Agreement Obligations ... 99

ARTICLE 10 MISCELLANEOUS ... 100

Section 10.1 Notices ... 100
Section 10.2 Waivers; Amendments ... 101
Section 10.3 Expenses; Indemnity; Damage Waiver ... 103
Section 10.4 Successors and Assigns ... 105
Section 10.5 Survival ... 109
Section 10.6 Counterparts; Effectiveness; Electronic Execution ... 109
Section 10.7 Severability ... 110
Section 10.8 Right of Setoff ... 110
Section 10.9 Governing Law; Jurisdiction; Consent to Service of Process ... 110
Section 10.10 WAIVER OF JURY TRIAL ... 111
Section 10.11 Payments Set Aside ... 111
Section 10.12 Headings ... 111
Section 10.13 Interest Rate Limitation ... 111

Section 10.14 Ceiling Election ........ 112
Section 10.15 Treatment of Certain Information; Confidentiality ........ 113
Section 10.16 USA PATRIOT Act Notice ........ 114
Section 10.17 No Fiduciary Duty ........ 114
Section 10.18 Acknowledgement and Consent to Bail-In of EEA Financial Institutions ........ 114
Section 10.19 Certain ERISA Matters ........ 115
Section 10.20 Acknowledgment Regarding Any Supported QFCs ........ 116
Section 10.21 ENTIRE AGREEMENT ........ 117

SCHEDULES:

Schedule 1.1(a) Approved Projects
Schedule 1.1(b) Specific Exclusions from Material Owned Real Property
Schedule 1.1(c) Mortgage Requirement
Schedule 2.1 Commitments
Schedule 5.13 Subsidiaries; Equity Interests
Schedule 5.14 Insurance
Schedule 5.16(a) UCC Filing Offices
Schedule 5.16(b) Mortgage Filing Offices
Schedule 5.19 Material Owned Real Property
Schedule 5.27 Capitalization
Schedule 5.28 Affiliate Transactions
Schedule 5.29 Material Contracts
Schedule 7.1 Existing Indebtedness
Schedule 7.2 Existing Liens
Schedule 7.10 Existing Restrictions
Schedule 10.1 Notice Information

EXHIBITS:

Exhibit A Form of Assignment and Assumption
Exhibit B Form of Committed Loan Notice
Exhibit C Form of Revolving Loan Note
Exhibit D Form of Compliance Certificate
Exhibit E Form of Borrowing Base Certificate
Exhibit F Form of Closing Certificate
Exhibit G Form of Subsidiary Joinder Agreement
Exhibit H-1 Form of U.S. Tax Compliance Certificate For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes
Exhibit H-2 Form of U.S. Tax Compliance Certificate For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes
Exhibit H-3 Form of U.S. Tax Compliance Certificate For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes
Exhibit H-4 Form of U.S. Tax Compliance Certificate For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes
Exhibit I Form of Solvency Certificate
Exhibit J Form of Secured Obligation Designation Notice

# CREDIT AGREEMENT

**CREDIT AGREEMENT**, dated as of August 6, 2021 among **BRIDGELINK ENGINEERING, LLC**, a Delaware limited liability company (the "Borrower"), the Lenders party hereto and **BANCORPSOUTH BANK,** as Administrative Agent.

## RECITALS

A. The Borrower has requested that the Lenders make loans and other financial accommodations to the Borrower as more fully set forth herein.

B. The Lenders have indicated their willingness to lend on the terms and subject to the conditions set forth herein.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE 1

## DEFINITIONS AND RULES OF CONSTRUCTION

Section 1.1 Definitions. As used in this Credit Agreement, the following terms have the meanings specified below:

"ABR Borrowing" means, as to any Borrowing, the ABR Loans comprising such Borrowing.

"ABR Loan" means a Loan bearing interest based on the Alternate Base Rate.

"Accounts Receivable" has the meaning assigned to such term in the Security Agreement.

"Acquisition" means any transaction or series of related transactions resulting, directly or indirectly, in: (a) the acquisition by any Person of (i) all or substantially all of the assets of another Person or (ii) all or substantially all of any business line, unit or division of another Person, (b) the acquisition by any Person (i) of in excess of 50% of the Equity Interests of any other Person, or (ii) otherwise causing any other Person to become a subsidiary of such Person whereby such Person has the ability to exercise Control over such other Person, or (c) a merger, amalgamation consolidation, liquidation into, or any other combination of any Person with another Person (other than a Person that is a Loan Party or a Subsidiary of a Loan Party) in which a Loan Party or any of its Subsidiaries is the surviving Person.

"Adjusted LIBOR Rate" means, with respect to any LIBOR Borrowing for any Interest Period, an interest rate per annum equal to the LIBOR Rate in effect for such Interest Period multiplied by the Statutory Reserve Rate; provided, however, that the Adjusted LIBOR Rate shall at no time be less than 0.50% per annum.

"Administrative Agent" means BancorpSouth Bank, in its capacity as administrative agent for the Lenders or any successor thereto.

"Administrative Agent's Payment Office" means the Administrative Agent's office located at 2800 North Loop West, Suite 1000, Houston, TX 77092, Attn: Mina Valverde, or such other office as to which the Administrative Agent may from time to time notify the Borrower and the Lenders.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agent Parties" has the meaning assigned to such term in Section 10.1(d)(iii).

"Agreement Date" means the first date appearing in this Credit Agreement.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 0.50% per annum and (c) the Adjusted LIBOR Rate in effect on such day for deposits in Dollars for a one-month Interest Period (subject to any interest rate floor set forth in the definition of "Adjusted LIBOR Rate") plus 1.00% per annum, provided that the Alternate Base Rate shall at no time be less than 0.50% per annum. If the Administrative Agent shall have determined (which determination shall be conclusive absent clearly manifest error) that it is unable to ascertain the Federal Funds Effective Rate or the Adjusted LIBOR Rate for any reason, including the inability or failure of the Administrative Agent to obtain sufficient quotations in accordance with the terms of the definition of the term Federal Funds Effective Rate, the Alternate Base Rate shall be determined without regard to clause (b) or (c), as applicable, of the preceding sentence until the circumstances giving rise to such inability no longer exist. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBOR Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBOR Rate, respectively.

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction applicable to the Loan Parties or their respective Subsidiaries from time to time concerning or relating to bribery or corruption, including the United States Foreign Corrupt Practices Act of 1977.

"Anti-Terrorism Laws" has the meaning assigned to such term in Section 5.18(c).

"Applicable Lending Office" means for any Lender, such Lender's office, branch or affiliate designated for Revolving Loans, as notified to the Administrative Agent, any of which offices may be changed by such Lender.

"Applicable Margin" means, (a) with respect to Revolving Loans, in the case of (i) ABR Borrowings, the percentage set forth in the following table under the heading "ABR Margin for Revolving Loans", and (ii) LIBOR Borrowings, the percentage set forth in the following table under the heading "LIBOR Margin for Revolving Loans, and (b) with respect to the Commitment Fee, the percentage set forth in the following table under the heading "Commitment Fee":

| Pricing Level | Senior Leverage Ratio | ABR Margin for Revolving Loans | LIBOR Margin for Revolving Loans | Commitment Fee |
|---|---|---|---|---|
| | | | | |
| I | Less than 1.50 to 1.00 | 1.00% | 3.00% | 0.25% |
| II | Equal to or greater than 1.50 to 1.00 but less than 2.25 to 1.00 | 1.25% | 3.25% | 0.25% |
| III | Equal to or greater than 2.25 but less than 3.00 to 1.00 | 1.50% | 3.50% | 0.25% |
| IV | Equal to or greater than 3.00 to 1.00 | 2.00% | 4.00% | 0.25% |

The Applicable Margin shall be determined and adjusted quarterly on the date (each a "Margin Determination Date") that is five Business Days after receipt by the Administrative Agent of the Compliance Certificate pursuant to Section 6.1(c) for the most recently ended fiscal quarter of the Borrower (but in any event, not later than the 90th day after the end of each of the first three quarterly periods of each Fiscal Year or the 120th day after the end of each Fiscal Year, as the case may be); provided that (a) the Applicable Margin shall be based on Pricing Level II for Revolving Loans until the Margin Determination Date for the first full fiscal quarter ending after the Closing Date, (b) if the Borrower fails to deliver the Compliance Certificate as required by Section 6.1(c) for the most recently ended fiscal quarter preceding the applicable Margin Determination Date, the Applicable Margin from such Margin Determination Date shall be based on Pricing Level IV for Revolving Loans until the fifth Business Day after an appropriate Compliance Certificate is delivered, at which time the Pricing Level for the remainder of the then current period shall be determined by reference to the Senior Leverage Ratio as of the last day of the most recently ended fiscal quarter of the Borrower preceding such Margin Determination Date. The Applicable Margin shall be effective from one Margin Determination Date until the next Margin Determination Date. Any adjustment in the Applicable Margin shall be applicable to all Loans then existing or subsequently made during the applicable period for which the relevant Applicable Margin applies. Notwithstanding the foregoing, in the event that any financial statement delivered pursuant to Section 6.1(a) or (b) or any Compliance Certificate delivered pursuant to Section 6.1(c) is inaccurate (regardless of whether (i) this Credit Agreement is in effect, or (ii) any of the Commitments are in effect, or (iii) any Loans or Letters of Credit are outstanding when such inaccuracy is discovered or such financial statement or Compliance Certificate was delivered), and such inaccuracy, if corrected, would have led to the application of a higher Applicable Margin for any period (an "Applicable Period") than the Applicable Margin applied for such Applicable Period, then (A) the Borrower shall immediately deliver to the Administrative Agent a corrected Compliance Certificate for such Applicable Period, (B) the Applicable Margin for such Applicable Period shall be determined as if the Senior Leverage Ratio in the corrected Compliance Certificate were applicable for such Applicable Period, and (C) the Borrower shall immediately pay to the Administrative Agent the accrued additional interest and fees owing as a result of such increased Applicable Margin for such Applicable Period, which payment shall be promptly applied by the Administrative Agent in accordance with Section 2.8. Nothing in this paragraph shall limit the rights of the Administrative Agent and Lenders with respect to Section 3.1 and Section 8.1.

"Applicable Percentage" means, at any time (a) with respect to any Lender with a Commitment of any Class, the percentage equal to a fraction the numerator of which is the amount of such Lender's Commitment of such Class and the denominator of which is the aggregate amount of all Commitments of such Class of all Lenders (provided that if (i) the Commitments under the Revolving Facility have terminated or expired, then the Applicable Percentages of the Lenders under the Revolving Facility shall be determined based upon the Revolving Exposure at such time of the determination pursuant to clause (b)

below) and (b) with respect to the Loans of any Class, a percentage equal to a fraction the numerator of which is such Lender's Outstanding Amount of the Loans of such Class and the denominator of which is the aggregate Outstanding Amount of all Loans of such Class.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Approved Line of Business" means, collectively, (a) those lines of business in which the Borrower and its Subsidiaries operate on the Closing Date (after giving effect to the Transactions occurring on the Closing Date) and (b) any business or activity that is the same, similar or otherwise reasonably related, ancillary, complementary or incidental thereto.

"Approved Projects" means (i) any projects listed in Schedule 1.1(a) on the Closing Date and (ii) with respect to any projects arising after the Closing Date, projects approved in writing by the Administrative Agent in its Permitted Discretion. Without limiting the foregoing, the Administrative Agent shall not be obligated to approve any project unless the Administrative Agent has reviewed and approved in form and content, in its Permitted Discretion, fully executed counterparts of the required contracts, as such requirements are determined by the Administrative Agent, with respect to each such project. Such contracts may include, but are not limited to, the following: an EPC Contract between the Borrower and a project owner acceptable to Administrative Agent, a power purchase agreement between the project owner and a purchaser acceptable to Administrative Agent, and an equity capital contribution agreement between the project owner and a tax equity investor acceptable to Administrative Agent.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.4) and accepted by the Administrative Agent, in substantially the form of Exhibit A or any other form approved by the Administrative Agent.

"Attorney Costs" means when referring to the Attorney Costs of (a) the Administrative Agent, all reasonable and documented fees and reasonable and documented out-of-pocket expenses, charges, disbursements and other charges of one law firm (and one local counsel in each relevant jurisdiction and one special or regulatory counsel for each relevant subject matter to the extent reasonably necessary) and (b) the Credit Parties other than the Administrative Agent, all reasonable and documented fees and reasonable and documented out-of-pocket expenses, charges, disbursements and other charges of one law firm (and one local counsel in each relevant jurisdiction and one special or regulatory counsel for each relevant subject matter to the extent reasonably necessary) for such Credit Parties and, solely in the case of an actual or potential conflict of interest, one additional counsel (and one additional local counsel in each relevant jurisdiction one special or regulatory counsel for each relevant subject matter to the extent reasonably necessary) for such Credit Parties affected by such conflict of interest.

"Attributable Indebtedness" means, at any date, (a) in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, (b) in respect of any Synthetic Lease Obligation of any Person, the capitalized or principal amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease or other agreement were accounted for as a Capitalized Lease, and (c) all Synthetic Debt of such Person.

"Audited Financial Statements" means (i) the audited balance sheet of (1) Bighorn Construction and Reclamation L.L.C and (2) Bighorn Investments and Properties, LLC and (ii) the related audited statements of income, comprehensive income, cash flows and shareholders' equity of (1) Bighorn

Construction and Reclamation L.L.C and (2) Bighorn Investments and Properties, LLC for the Fiscal Year ended December 31, 2020.

"Availability" means, as of any date of determination, the amount that Borrower is entitled to borrow under Section 2.1 (after giving effect to the Total Revolving Outstandings).

"Availability Period" means, with respect to the Revolving Facility, the period from and including the Closing Date to but excluding the earlier of the Revolving Maturity Date and, if different, the date of the termination of the Revolving Commitments in accordance with the provisions of this Credit Agreement.

"Available Increase Amount" means, as of any date of determination after the Closing Date, an amount equal to the result of (a) $26,000,000 *minus* (b) the aggregate principal amount of Increases to the Revolving Commitments made after the Closing Date pursuant to Section 2.10 of the Credit Agreement. As of the Closing Date, the Available Increase Amount is $26,000,000.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time that is described in the EU Bail-In Legislation Schedule.

"BancorpSouth Bank" means BancorpSouth Bank, a Mississippi banking corporation.

"Bankruptcy Code" means Title 11 of the United State Code or any similar federal or state law for the relief of debtors.

"Benchmark" means, initially, USD LIBOR; provided that if a replacement of the Benchmark has occurred pursuant to Section 3.3, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate. Any reference to "Benchmark" shall include, as applicable, the published component used in the calculation thereof.

"Benchmark Replacement" means, for any Available Tenor:

(1) For purposes of Section3.3(b)(ii), the first alternative set forth below that can be determined by the Administrative Agent:

the sum of: (i) Term SOFR and (ii) 0.11448% (11.448 basis points) for an Available Tenor of one-month's duration, 0.26161% (26.161 basis points) for an Available Tenor of three-months' duration, and 0.42826% (42.826 basis points) for an Available Tenor of six-months' duration, or

the sum of: (i) Daily Simple SOFR and (ii) the spread adjustments elected or recommended by the Relevant Governmental Body for the replacement of the tenor of USD LIBOR with a SOFR-based rate having approximately the same length as the interest payment period specified in Section 3.3(b)(ii); and

(2) For purposes of Section 3.3(b)(iii), the sum of (a) the alternate benchmark rate and (b) an adjustment (which may be a positive or negative value or zero), in each case, that has been selected by the Administrative Agent and the Borrower as the replacement for such Available Tenor of such Benchmark giving due consideration to any evolving or then-prevailing market convention, including any applicable

recommendations made by the Relevant Governmental Body, for U.S. dollar-denominated syndicated credit facilities at such time;

provided that, if the Benchmark Replacement as determined pursuant to clause (1) or (2) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Credit Agreement and the other Loan Documents.

"Benchmark Replacement Conforming Changes" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Business Day," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of such Benchmark Replacement exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Credit Agreement and the other Loan Documents).

"Benchmark Transition Event" means, with respect to any then-current Benchmark other than USD LIBOR, the occurrence of a public statement or publication of information by or on behalf of the administrator of the then-current Benchmark, the regulatory supervisor for the administrator of such Benchmark, the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark, a resolution authority with jurisdiction over the administrator for such Benchmark or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark, announcing or stating that (a) such administrator has ceased or will cease on a specified date to provide all Available Tenors of such Benchmark, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark or (b) all Available Tenors of such Benchmark are or will no longer be representative of the underlying market and economic reality that such Benchmark is intended to measure and that representativeness will not be restored.

"Beneficial Ownership Certification" means, with respect to the Borrower, a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation, which certification shall be substantially similar in form and substance to the form of Certification Regarding Beneficial Owners of Legal Entity Customers published jointly, in May 2018, by the Loan Syndications and Trading Association and Securities Industry and Financial Markets Association or such other form satisfactory to the Administrative Agent.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Benefit Plan" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. § 1841(k)) of such party.

"Board" means the Board of Governors of the Federal Reserve System of the United States.

"Bonded Receivable" means an Account Receivable that is bonded or insured by a surety company.

"Borrower" has the meaning assigned to such term in the Preamble.

"Borrowing" means Loans of the same Type made, converted or continued on the same date and, in the case of LIBOR Loans, as to which a single Interest Period is in effect.

"Borrowing Base" means, at any time, the sum of, without duplication, (a) 85% of Eligible Accounts at such time, plus (b) 50% of Eligible Inventory valued at book value, provided that the amount included pursuant to clause (b) of this definition shall not exceed an amount equal to the lesser of (i) 100% of the total amount included pursuant to clause (a) or (ii) 50% of the aggregate Revolving Commitments. The Administrative Agent may, in its Permitted Discretion, upon three (3) Business Days' prior written notice to Borrower reduce the advance rate, impose or adjust Reserves or reduce one or more of the other elements used in computing the Borrowing Base. Reductions in the advance rate shall not made without the written consent of Borrower unless the Administrative Agent has made such reduction based on the results of a field examination.

"Borrowing Base Certificate" means a certificate, signed and certified as true, accurate and complete in all material respects by a Financial Officer of the Borrower Representative or other Authorized Officer of the Borrower Representative acceptable to the Lender, in substantially the form of Exhibit E or another form that is acceptable to the Lender in its sole discretion.

"Borrowing Minimum" means in the case of a Revolving Borrowing, $100,000.

"Borrowing Multiple" means in the case of a Revolving Borrowing, $50,000.

"Business Day" means any day other than a Saturday, Sunday or day on which banks in Houston, Texas are authorized or required by law to close; provided, however, that when used in connection with a LIBOR Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in Dollar deposits in the London interbank market.

"Capital Expenditures" means, for any period, with respect to any Person, the aggregate of all expenditures (whether paid in cash or other consideration or accrued as a liability) by such Person and its subsidiaries for the acquisition or leasing (pursuant to a Capitalized Lease) of fixed or capital assets or additions to equipment (including replacements, capitalized repairs and improvements during such period) that should be capitalized under GAAP on a consolidated balance sheet of such Person and its Subsidiaries.

"Capitalized Lease Obligations" means, at the time any determination thereof is to be made, the amount of the liabilities in respect of Capitalized Leases that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) prepared in accordance with GAAP.

"Capitalized Leases" means all leases that are required to be, in accordance with GAAP, recorded as capitalized leases; provided that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with GAAP.

"Cash Equivalents" means each of the following to the extent, except with respect to items described in clause (f) below, denominated in Dollars:

(a) debt obligations maturing within one year from the date of acquisition thereof to the extent the principal thereof and interest thereon is backed by the full faith and credit of the United States;

(b) commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or Moody's;

(c) certificates of deposit, banker's acceptances and time deposits maturing within 270 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States or any state, commonwealth or other political subdivision thereof that has a combined capital and surplus and undivided profits of not less than $500,000,000 or, to the extent not otherwise included, any Lender, and which is rated at least A-2 by S&P and P-2 by Moody's in the note or commercial paper rating category;

(d) repurchase agreements with a term of not more than 30 days for securities described in clause (a) of this definition and entered into with a financial institution satisfying the criteria described in clause (c) of this definition;

(e) money market mutual funds, substantially all of the investments of which are in cash or investments contemplated by clauses (a), (b) and (c) of this definition; and

(f) with respect to any Foreign Subsidiary, (i) obligations of the national government of the country in which such Foreign Subsidiary maintains its chief executive office and principal place of business, provided that such country is a member of the Organization for Economic Cooperation and Development, in each case maturing within one year after the date of investment therein, (ii) certificates of deposit of, bankers acceptances of, or time deposits with, any commercial bank which is organized and existing under the laws of the country in which such Foreign Subsidiary maintains its chief executive office and principal place of business, provided such country is a member of the Organization for Economic Cooperation and Development, and whose short term commercial paper rating from S&P is at least "A-1" or the equivalent thereof or from Moody's is at least "P-1" or the equivalent thereof (any such bank being an "Approved Foreign Bank"), and in each case with maturities of not more than 270 days from the date of acquisition and (iii) the equivalent of demand deposit accounts which are maintained with an Approved Foreign Bank.

"Cash Management Obligations" means all obligations of the Loan Parties in respect of any Cash Management Services provided to any Loan Party (whether absolute or contingent and howsoever and whenever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor)) that are (a) owed to the Administrative Agent or any of its Affiliates, (b) owed on the Closing Date to a Person that is a Lender or an Affiliate of a Lender as of the Closing Date or (c) owed to a Person that is a Lender or an Affiliate of a Lender at the time such obligations are incurred or becomes a Lender or an Affiliate of a Lender after it has incurred such obligations, provided that any such provider of Cash Management Services (other than the Administrative Agent or its Affiliates) executes and delivers a Secured Obligation Designation Notice to the Administrative Agent.

"Cash Management Services" means, collectively, (a) commercial debit or credit cards, merchant card processing and other services, purchase or debit cards, including non-card e-payables services, (b) treasury management services (including cash pooling arrangements, controlled disbursement, netting, overdraft, lockbox and electronic or automatic clearing house fund transfer services, return items, sweep and interstate depository network services, foreign check clearing services), and (c) any other demand deposit or operating account relationships or other cash management services.

"Casualty Event" means any event that gives rise to the receipt by any Loan Party or any of its Subsidiaries of any insurance proceeds or condemnation awards arising from any damage to, destruction of, or other casualty or loss involving, or any seizure, condemnation, confiscation or taking under power of eminent domain of, or requisition of title or use of or relating to or in respect of any equipment, fixed assets or Real Property (including any improvements thereon) of such Loan Party or any of its Subsidiaries.

"CEA Swap Obligation" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Change in Law" means the occurrence, after the Agreement Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority or the compliance therewith by any Credit Party (or, for purposes of Section 3.4(b), by any Applicable Lending Office of such Credit Party or such Credit Party's holding company, if any); provided that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines and directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means an event or series of events by which:

(a) any Person or group (within the meaning of Rule 13d-5 of the Securities Exchange Act of 1934 as in effect on the Agreement Date) shall own directly or indirectly, beneficially or of record, shares representing more than 20% of the aggregate ordinary voting power or economic interests represented by the issued and outstanding Equity Interests of the Borrower on a fully diluted basis;

(b) the Borrower shall fail to own, directly or indirectly, free and clear of all Liens or other encumbrances (other than Liens created pursuant to any Loan Document), 100% of the aggregate ordinary voting power and economic interests represented by the issued and outstanding Equity Interests of each of its Subsidiaries (or such lesser percentage as may be owned, directly or indirectly, as of the Closing Date or the later acquisition thereof) except where such failure is as a result of a transaction permitted by the Loan Documents; or

(c) the occurrence of a change in control, or other similar event, under or with respect to any agreement governing Material Indebtedness or the Equity Interests of the Borrower or any of its Subsidiaries.

Notwithstanding the foregoing, a Permitted Reorganization shall not be deemed to be a Change of Control.

"Closing Date" means the date on which the conditions specified in Section 4.1 are satisfied (or waived in accordance with Section 10.2).

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" means all the "Collateral" as defined in the Collateral Documents and all other property of whatever kind and nature pledged or charged, or purported to be pledged or charged, as

collateral under any Collateral Document, and shall include the Mortgaged Properties; provided that the term Collateral shall exclude any Voting Equity Interests in any Controlled Foreign Corporation or Foreign Subsidiary Holdco, in each case in excess of 65% of the total combined voting power of such Controlled Foreign Corporation or such Foreign Subsidiary Holdco, if a pledge of a greater percentage would result in material adverse tax consequences to the Borrower and its Subsidiaries (as reasonably determined by the Borrower in consultation with the Administrative Agent). For the avoidance of doubt, the assets of Excluded Subsidiaries shall not constitute "Collateral".

"Collateral Access Agreement" has the meaning assigned to such term in the Security Agreement.

"Collateral and Guarantee Requirement" means, at any time, the requirement that:

(a) the Administrative Agent shall have received each Collateral Document required to be delivered on the Closing Date pursuant to Section 4.1, or, following the Closing Date, pursuant to pursuant to Section 6.14 (to the extent not delivered on the Closing Date) or Section 6.12, duly executed by each Loan Party that is a party thereto;

(b) all Secured Obligations shall have been unconditionally guaranteed jointly and severally on a senior basis by the Guarantors;

(c) except to the extent otherwise provided hereunder or under any Collateral Document, the Secured Obligations shall have been secured by a perfected first priority (subject to Liens expressly permitted pursuant to Section 7.2) security interest in, and Mortgages on, substantially all tangible and intangible assets of each Loan Party (including (i) accounts receivable, (ii) deposit accounts, commodity accounts and security accounts, (iii) inventory, (iv) machinery and equipment, (v) investment property, (vi) cash, (vii) Intellectual Property, (viii) other general intangibles, (ix) Material Owned Real Property, (x) Pledged Debt, Pledged Debt Securities and Pledged Equity Interests (as such terms are defined in the Security Agreement), (xi) motor vehicles (provided that no action shall be required to be taken to perfect the security interest therein other than the filing of a UCC financing statement) and (xii) letter of credit rights (provided that no action shall be required to be taken to perfect the security interest therein other than the filing of a UCC financing statement), (xiii) commercial tort claims (to the extent required under the Security Agreement), and (xiv) the proceeds of the foregoing), it being understood that in the case of the pledge of Equity Interests, the Administrative Agent shall have received all stock certificates or other instruments (if any) representing such Equity Interests, together with stock powers or other instruments of transfer with respect thereto endorsed in blank; provided that the pledge of any shares in respect of any Subsidiaries that are not Wholly-Owned Subsidiaries shall be limited to the shares actually owned by the applicable pledgor;

(d) [Reserved];

(e) none of the Collateral shall be subject to any Lien other than Liens expressly permitted by Section 7.2;

(f) [Reserved]; and

(g) the Mortgage Requirement shall have been satisfied.

The foregoing definition shall not require the creation or perfection of pledges of or security interests in particular assets if and for so long as the Administrative Agent agrees in writing that the cost of creating or perfecting such pledges or security interests in such assets shall be excessive in view of the benefits to be obtained by the Lenders therefrom.

The Administrative Agent may grant extensions of time for the perfection of security interests in and the other requirements pursuant to this definition with respect to particular assets (including extensions beyond the Closing Date for the perfection of security interests in the assets of the Loan Parties on such date) where it reasonably determines (and without the consent of any other Secured Party), that, except as may be required by law, perfection or other requirements cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Credit Agreement or the Collateral Documents.

Notwithstanding the foregoing provisions of this definition or anything in this Credit Agreement or any other Loan Document to the contrary, (i) Liens required to be granted from time to time pursuant to the Collateral and Guarantee Requirement shall be subject to exceptions and limitations set forth herein and in the Collateral Documents and, to the extent appropriate in the applicable jurisdiction, as agreed between the Administrative Agent and the Borrower, (ii) in no event shall the Collateral include any Excluded Assets (as such term is defined in the Security Agreement), and (iii) notwithstanding anything to the contrary included in this definition, delivery of only the Collateral Documents required to be delivered by Section 4.1 shall be a condition precedent to the Credit Extensions on the Closing Date.

"Collateral Documents" means, collectively, the Security Agreement, each account control agreement, each Collateral Access Agreement, each Mortgage, each Intellectual Property Security Agreement, the Pledge Agreement, each agreement creating or perfecting rights in Cash Collateral and each other security agreement, instrument or other document executed or delivered pursuant to the Collateral and Guarantee Requirement, Section 6.12, Section 6.14 or the Security Agreement to secure any of the Secured Obligations.

"Commitment" means with respect to each Lender, such Lender's Revolving Commitment.

"Commitment Fee" has the meaning assigned to such term in Section 3.2(a).

"Committed Loan Notice" means a notice of a Borrowing, a conversion of Loans from one Type to the other, or a continuation of LIBOR Loans pursuant to Section 2.2(a), which, if in writing, shall be substantially in the form of Exhibit B.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.) and any successor statute.

"Communications" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of any Loan Party pursuant to any Loan Document or the transactions contemplated therein which is distributed to the Administrative Agent or any Lender by means of electronic communications pursuant to Section 10.1, including through the Platform.

"Compliance Certificate" means a certificate, substantially in the form of Exhibit D.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated Current Assets" means, with respect to the Borrower and its Subsidiaries on a consolidated basis at any date of determination, all assets (other than cash and Cash Equivalents) that would, in accordance with GAAP, be classified on a consolidated balance sheet of the Borrower and its Subsidiaries as current assets (or any like caption) at such date.

"Consolidated Current Liabilities" means, with respect to the Borrower and its Subsidiaries on a consolidated basis at any date of determination, all liabilities that would, in accordance with GAAP, be classified on a consolidated balance sheet of the Borrower and its Subsidiaries as current liabilities (or any like caption) at such date, other than current liabilities in respect of any Indebtedness.

"Consolidated Depreciation and Amortization Expense" means, with respect to any Person for any period, the total amount of depreciation and amortization expense, including the amortization of deferred financing fees or costs, capitalized expenditures, customer acquisition costs and incentive payments, conversion costs and contract acquisition costs, the amortization of original issue discount and amortization of favorable or unfavorable lease assets or liabilities, of such Person and its Subsidiaries for such period on a consolidated basis and otherwise determined in accordance with GAAP.

"Consolidated EBITDA" means, with respect to any Person for any fiscal period, an amount equal to the sum of (without duplication):

(a) Consolidated Net Income of such Person and its Subsidiaries during such period; and

(b) to the extent Consolidated Net Income has been reduced thereby:

(i) all income taxes of such Person and its subsidiaries paid or accrued in accordance with GAAP for such period;

(ii) Consolidated Interest Expense of such Person and its Subsidiaries for such period;

(iii) the amount of non-cash charges, including depletion, and Consolidated Depreciation and Amortization Expense of such Person and its Subsidiaries for such period, in each case unless non-cash during such period but the subject of a cash payment in a future period;

(iv) reasonable Transaction Expenses and other costs, fees and charges incurred by the Loan Parties on or prior to the Closing Date in connection with this Agreement and the other Loan Documents in an amount not to exceed $250,000 in the aggregate;

(v) all expenses and charges indemnified by third parties and for which notice of a claim has been given and with respect to which liability is not being contested or reimbursed in cash by third parties or satisfied with the proceeds of business interruption insurance;

(vi) adjustments to Consolidated Net Income arising from the Borrower's establishment of percentage of completion accounting in accordance with GAAP to the extent such adjustments are verified by a third party accountant acceptable to Lender.

(c) *less*, to the extent included in calculating Consolidated Net Income, all non-recurring or extraordinary income or gains during such period (including, without limitation, as a result of the acquisition of Indebtedness at a discount);

all as determined on a consolidated basis for such Person and its consolidated Subsidiaries in accordance with GAAP.

"Consolidated Interest Expense" means, with respect to any Person and its Subsidiaries for any period, the sum of (a) consolidated total interest expense of such Person and its Subsidiaries for such period,

whether paid or accrued and whether or not capitalized (including (without duplication), amortization of debt issuance costs and original issue discount, premiums paid to obtain payment, financial assurance or similar bonds, interest capitalized during construction, non-cash interest payments, the interest component of any deferred payment obligations, the interest component of all payments under Capitalized Leases and the implied interest component of Synthetic Lease Obligations (regardless of whether accounted for as interest expense under GAAP), all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptances and net costs in respect of any obligations under any Swap Agreements constituting interest rate swaps, collars, caps or other arrangements requiring payments contingent upon interest rates of such Person and its Subsidiaries), plus (b) all cash dividends paid or payable on preferred stock during such period other than to such Person or a Loan Party, plus or minus, as applicable, to the extent they would otherwise be included in interest expense under GAAP, unrealized gains and losses arising from derivative financial instruments issued by such Person for the benefit of such Person or its Subsidiaries, in each case determined on a consolidated basis for such period.

"Consolidated Net Income" means, for any Person (the "first Person") for any period, the sum of net income (or loss) for such period of such first Person and its subsidiaries determined on a consolidated basis in accordance with GAAP, excluding, without duplication, to the extent included in determining such net income (or loss) for such period: (a) any income (or loss) of any other Person (the "second Person") if such second Person is not a subsidiary of such first Person, except that such first Person's equity in the net income of any second Person for such period shall be included in the determination of Consolidated Net Income up to the aggregate amount of cash actually distributed by such second Person during such period to such first Person or any of its subsidiaries as a dividend or other distribution, (b) the income (or loss) of any second Person accrued prior to the date it became a subsidiary of such first Person or is merged into or consolidated with such first person or any of its subsidiaries or such second Person's assets are acquired by such first person or any of its subsidiaries, (c) non-recurring gains (or losses), and (d) the income of any subsidiary of such first Person to the extent that the declaration or payment of dividends or similar distributions by such subsidiary of that income is prohibited by operation of the terms of its charter or any agreement, instrument, judgment, decree, statute, rule or governmental regulation applicable to such subsidiary.

"Consolidated Total Assets" means, as of any date of determination, the total assets of the Borrower and its Subsidiaries determined on a consolidated basis in accordance with GAAP.

"Consolidated Working Capital" means, with respect to the Borrower and its Subsidiaries on a consolidated basis at any date of determination, Consolidated Current Assets at such date minus Consolidated Current Liabilities at such date.

"Contested in Good Faith" means, with respect to any matter, that such matter is being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings analogous thereto. Without limiting the generality of the foregoing, a Person shall be deemed to be Controlled by another Person if such other Person possesses, directly or indirectly, power to vote ten percent (10%) or more of the securities having ordinary voting power for the election of directors, managing general partners or any equivalent thereof.

"Controlled Account" means, as the context may require, a commodities account, deposit account and/or securities account that is maintained with BancorpSouth Bank or is subject to a Control Agreement (as defined in the Security Agreement) in form and substance satisfactory to the Administrative Agent.

"Controlled Foreign Corporation" means a controlled foreign corporation within the meaning of Section 957(a) of the Code.

"Covered Entity" means any of the following: (a) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (b) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Credit Agreement" means this Credit Agreement.

"Credit Extension" means the making of a Loan.

"Credit Facility" means the Revolving Facility.

"Credit Parties" means collectively the Administrative Agent and the Lenders, and "Credit Party" means any one of the foregoing individually.

"Cure Amount" has the meaning set forth in Section 8.4.

"Cure Right" has the meaning set forth in Section 8.4.

"Daily Simple SOFR" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided, that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its reasonable discretion.

"Debt Incurrence" means the incurrence of any Indebtedness by any Loan Party or any of its Subsidiaries (excluding any Indebtedness permitted by Section 7.1).

"Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"Default" means any event or condition which constitutes an Event of Default or that upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Default Rate" means (a) when used with respect to the outstanding principal balance of any Loan, the sum of (i) the rate of interest otherwise applicable thereto plus (ii) 2.00% per annum, and (b) when used with respect to any amount payable under the Loan Documents which shall not have been paid when due, the sum of (i) the rate of interest otherwise applicable to the outstanding principal of any Loan plus (ii) the Applicable Margin applicable to Borrowings plus (iii) 2.00% per annum.

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"Defaulting Lender" means, subject to Section 2.9(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified the Borrower, the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder, provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower, or (d) has, or has a direct or indirect holding company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity or (iii) become the subject of a Bail-In Action; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect holding company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.9(b)) upon delivery of written notice of such determination to the Borrower and each Lender.

"Deposit Account" has the meaning assigned to such term in the Security Agreement.

"Disposition" means, with respect to any Person, the sale, transfer, license, lease or other disposition (including any Sale and Leaseback and any sale or issuance of Equity Interests including by way of a merger) by such Person to any other Person, with or without recourse, of (a) any notes or accounts receivable or any rights and claims associated therewith, (b) any Equity Interests of any Subsidiary (other than directors' qualifying shares), or (c) any other assets, provided, however, that none of the following shall constitute a Disposition: (i) any sale, transfer, license, lease or other disposition by a Loan Party to another Loan Party on terms which are no less favorable than are obtainable from any Person which is not one of its Affiliates, (ii) the collection of accounts receivable and other obligations in the ordinary course of business, (iii) sales of inventory in the ordinary course of business, and (iv) dispositions of substantially worn out, damaged, uneconomical, surplus or obsolete equipment, and other equipment that is no longer useful in the business of the Borrower or its Subsidiaries (which shall not include, for the avoidance of doubt, dispositions of non-core assets referred to in Section 7.5(h)). Each of the terms "Dispose" and "Disposed" when used as a verb shall have an analogous meaning.

"Disqualified Equity Interest" means, with respect to any Person, any Equity Interest of such Person which, by its terms, or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable, or upon the happening of any event or condition, (a) matures or is mandatorily

redeemable (other than solely for Qualified Equity Interests and cash in lieu of fractional shares of such Equity Interests) pursuant to a sinking fund obligation or otherwise (except as a result of a change in control or asset sale so long as any rights of the holders thereof upon the occurrence of a change in control or asset sale event shall be subject to the prior occurrence of the Termination Date), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provides for the scheduled payments of dividends in cash (other than customary tax distributions), or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is 91 days after the latest Maturity Date at the later of the date hereof and the time such Equity Interests are issued.

"Dollars" or "$" refers to lawful money of the United States.

"Domestic Subsidiary" means a Subsidiary incorporated or organized under the laws of the United States, or any state, commonwealth or other political subdivision thereof (including, for the avoidance of doubt, the District of Columbia).

"Early Opt-in Effective Date" means, with respect to any Early Opt-in Election, the sixth (6th) Business Day after the date notice of such Early Opt-in Election is provided to the Lenders, so long as the Administrative Agent has not received, by 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Early Opt-in Election is provided to the Lenders, written notice of objection to such Early Opt-in Election from Lenders comprising the Required Lenders.

"Early Opt-in Election" means the occurrence of:

(1) a notification by the Administrative Agent to (or the request by the Borrower to the Administrative Agent to notify) each of the other parties hereto that at least five currently outstanding U.S. dollar-denominated syndicated credit facilities at such time contain (as a result of amendment or as originally executed) a SOFR-based rate (including SOFR, a term SOFR or any other rate based upon SOFR) as a benchmark rate (and such syndicated credit facilities are identified in such notice and are publicly available for review), and

(2) the joint election by the Administrative Agent and the Borrower to trigger a fallback from USD LIBOR and the provision by the Administrative Agent of written notice of such election to the Lenders.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country that is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country that is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country that is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Eligible Accounts" means, at any time, the Accounts Receivable of any Loan Party other than any Accounts Receivable:

(a) that is subject to any Lien other than a first priority perfected Lien in favor of the Administrative Agent;

(b) (i) that has payment terms more than 120 days after invoice date, (ii) that remains unpaid for more than 60 days past its original due date or 120 days after its invoice date, or (iii) that has been written off the books of the Borrower or otherwise designated as uncollectible;

(c) that is owing by an Account Debtor for which more than 25% of the Accounts Receivable owing from such Account Debtor and its Affiliates are ineligible hereunder pursuant to clause (b) of this definition;

(d) that is owing by an Account Debtor to the extent the aggregate amount of Accounts Receivable owing from such Account Debtor and its Affiliates to the Borrower exceeds 25% of the aggregate amount of Eligible Accounts but only, in each case, to the extent of such excess, unless such Accounts Receivable is subject to Approved Credit Insurance;

(e) that (i) is not evidenced by an invoice issued on a form used in the relevant Loan Party's ordinary course of business or such other documentation as may be satisfactory to the Administrative Agent in its Permitted Discretion, and in each case that has been sent to the Account Debtor, (ii) represents a sale on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment, cash-on-delivery or any other repurchase or return basis, (iii) is contingent upon the Borrower's completion of any further performance (provided upon completion of such work, the relevant Account Receivable may become an Eligible Account so long as it is not excluded as an Eligible Account due to a different reason), (iv) relates to payments of interest, or (v) is an Ineligible Bonded Receivable;

(f) for which the Inventory giving rise to such Accounts Receivable has not been shipped to the Account Debtor or for which the services giving rise to such Accounts Receivable have not been performed by Borrower or if such Accounts Receivable was invoiced more than once;

(g) that is owed by an Account Debtor that has (i) applied for, suffered, or consented to the appointment of any receiver, custodian, trustee, or liquidator of its assets, (ii) had possession of all or a material part of its property taken by any receiver, custodian, trustee or liquidator, (iii) filed, or had filed against it, any request or petition for liquidation, reorganization, arrangement, adjustment of debts, adjudication as bankrupt, winding-up, or voluntary or involuntary case under any state or federal bankruptcy laws (other than post-petition accounts payable of an Account Debtor that is a debtor-in-possession under the Bankruptcy Code and reasonably acceptable to the Administrative Agent), (iv) admitted in writing its inability, or is generally unable to, pay its debts as they become due, (v) become insolvent, or (vi) ceased operation of its business;

(h) that is owed by an Account Debtor that is not organized under applicable law of the U.S. or any State thereof;

(i) that is owed in any currency other than U.S. dollars;

(j) that is owed by an Account Debtor that is a Governmental Authority;

(k) that is owed by any Affiliate of any Loan Party or any employee, officer, director, agent or stockholder of any Loan Party or any of its Affiliates (unless approved in writing by Administrative Agent in its sole discretion);

(l) that is owed by an Account Debtor or any Affiliate of such Account Debtor to which any Credit Party is indebted, but only to the extent of such indebtedness

(m) that is subject to any security, deposit, progress payment not yet payable, retainage not yet payable, or other similar advance made by or for the benefit of an Account Debtor, in each case to the extent thereof (unless approved in writing by Administrative Agent in its sole discretion);

(n) that is subject to any pending counterclaim, deduction, defense, setoff or dispute but only to the extent of any such pending counterclaim, deduction, defense, setoff or dispute;

(o) that is evidenced by any promissory note, chattel paper or instrument unless such promissory note, chattel paper or instrument has been pledged to, and is in the possession of, the Administrative Agent;

(p) that is for Inventory that has been sold under a purchase order or pursuant to the terms of a contract or other agreement or understanding (written or oral) that indicates or purports that any Person other than a Loan Party has an ownership interest in such Inventory or which indicates any party other than a Loan Party as payee or remittance party;

(q) which is owed by an Account Debtor located in any jurisdiction which requires filing of a "Notice of Business Activities Report" or other similar report in order to permit the Borrower to seek judicial enforcement in such jurisdiction of payment of such Account Receivable, unless Borrower has filed such report or qualified to do business in such jurisdiction; or

(r) that does not arise from an Approved Project;

In the event that an Accounts Receivable that was previously an Eligible Account ceases to be an Eligible Account hereunder, the Borrower shall notify the Administrative Agent thereof on and at the time of submission to the Administrative Agent of the next Borrowing Base Certificate. In determining the amount of an Eligible Account, the face amount of an Accounts Receivable may, in the Administrative Agent's Permitted Discretion and with prior notice to Borrowers, be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, Borrowers' finance charges or other allowances (including any amount that the Borrowers may be obligated to rebate to an Account Debtor pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Accounts Receivable but not yet applied by the Borrowers to reduce the amount of such Accounts Receivable.

"Eligible Assignee" means any Person that meets the requirements to be an assignee under Section 10.4(b)(iii), (v) and (vi) (subject to such consents, if any, as may be required under Section 10.4(b)(iii)).

"Eligible Inventory" means, at any time, the Inventory of any Loan Party other than any Inventory:

(a) that is subject to any Lien other than a first priority perfected Lien in favor of the Administrative Agent;

(b) for which reclamation rights have been asserted in writing by the seller;

(c) that is, in Administrative Agent's Permitted Discretion, obsolete, unmerchantable, defective, used, unfit for sale, not salable at prices approximating at least the cost of such Inventory in the ordinary course of business or unacceptable due to age, type, category and/or quantity;

(d) with respect to which any covenant, representation or warranty contained in this Agreement or in the Security Agreement has been breached or is not true and which does not conform to all applicable standards imposed by any Governmental Authority;

(e) that is not for an Approved Project;

(f) in which any Person other than the Borrower shall (i) have any direct or indirect ownership, interest or title to such Inventory or (ii) be indicated on any purchase order or invoice with respect to such Inventory as having or purporting to have an interest therein;

(g) that constitutes parts, supplies, or work in process;

(h) that is not marketable, or that constitutes packaging and shipping material, manufacturing supplies, samples, prototypes, displays or display items, bill-and-hold or ship-in-place goods, goods that are returned or marked for return, repossessed goods, defective or damaged goods, goods held on consignment, or goods which are not of a type held for sale in the ordinary course of business;

(i) that is not located in the U.S. or is in transit with a common carrier from vendors or suppliers;

(j) that contains or bears any intellectual property rights licensed to any Borrower unless the Administrative Agent is satisfied in its sole discretion that it may sell or otherwise dispose of such Inventory without (i) infringing the rights of such licensor, (ii) violating any contract with such licensor, or (iii) incurring any liability with respect to payment of royalties other than royalties incurred pursuant to sale of such Inventory under the current licensing agreement; or

(k) that is not reflected in a current inventory report of the Borrower.

"Environmental Claims" means any and all administrative, regulatory or judicial actions, suits, demands, demand letters, claims, liens, notices of liability, non-compliance or violation, investigations, proceedings, settlements, consent decrees, consent orders, consent agreements and all costs and liabilities relating to or arising from or under any Environmental Law, including (a) any and all claims by Governmental Authorities for enforcement, investigation, corrective action, cleanup, removal, response, remedial or other actions, cost recovery, damages, natural resource damages or penalties pursuant to or arising under any Environmental Law, (b) any and all claims by any one or more Persons seeking damages, contribution, restitution, indemnification, cost recovery, compensation or injunctive relief directly or indirectly resulting from, based upon or arising under Environmental Law, pertaining to Hazardous Materials or an alleged injury or threat of injury to human health, safety, natural resources, or the indoor or outdoor environment, and (c) all liabilities contingent or otherwise, expenses, obligations, losses, damages, fines and penalties arising under any Environmental Law.

"Environmental Law" means, collectively and individually any and all federal, state, local, or foreign statute, rule, regulation, code, guidance, ordinance, order, judgment, directive, decree, injunction or common law as now or previously in effect and regulating, relating to or imposing liability or standards of conduct concerning: the environment; protection of the environment and natural resources; air emissions; water discharges; noise emissions; the Release, threatened Release or discharge into the environment and physical hazards of any Hazardous Material; the generation, handling, management,

treatment, storage, transport or disposal of any Hazardous Material or otherwise concerning pollution or the protection of the outdoor or indoor environment, preservation or restoration of natural resources, employee or human health or safety, and potential or actual exposure to or injury from Hazardous Materials.

"Environmental Liability" means, in respect of any Person, any statutory, common law or equitable liability, contingent or otherwise of such Person directly or indirectly resulting from, arising out of or based upon (a) the violation of any Environmental Law or Environmental Permit, or (b) an Environmental Claim.

"Environmental Permit" means any permit, approval, authorization, certificate, license, variance, filing or permission required by or from any Governmental Authority pursuant to any Environmental Law.

"Equity Interests" means, with respect to any Person, (a) shares of capital stock of (or other ownership or profit interests in) such Person, (b) warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, (c) securities (other than Indebtedness) convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), (d) all other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or non-voting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination and (e) any Security Entitlement (as defined in the Security Agreement) in respect of any Equity Interest described in this definition.

"ERISA" means the Employee Retirement Income Security Act of 1974, and the rules and regulations issued thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or 414(c) of the Code or, solely for purposes of Sections 302 and 303 of ERISA and Sections 412 and 430 of the Code, is treated as a single employer under subsection (b), (c), (m) or (o) of Section 414 of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043(c) of ERISA with respect to a Pension Plan (other than an event for which the 30-day notice period referred to in Section 4043 of ERISA is waived); (b) the existence with respect to any Pension Plan of a non-exempt "prohibited transaction," as defined in Section 406 of ERISA or Section 4975(c)(1) of the Code; (c) any failure of any Pension Plan to satisfy the "minimum funding standard" applicable to such Pension Plan under Section 412 or Section 430 of the Code or Section 302 or Section 303 of ERISA, whether or not waived; (d) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Pension Plan, the failure to make by its due date a required installment under Section 430(j)(3) of the Code with respect to any Pension Plan or the failure of any Loan Party or ERISA Affiliate to make any required contribution to any Multiemployer Plan; (e) a determination that any Pension Plan is, or is expected to be, in "at-risk" status (as defined in Section 430(i)(4) of the Code or Section 303(i)(4) of ERISA; (f) the incurrence by any Loan Party or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Pension Plan including the imposition of any Lien in favor of the PBGC or any Pension Plan(other than for PBGC premiums due but not delinquent under Section 4007 of ERISA); (g) the filing of a notice of intent to terminate, the treatment of a Pension Plan amendment as a termination under Section 4041 or Section 4041A or ERISA, the receipt by any Loan Party or any ERISA Affiliate from the PBGC or a Pension Plan administrator of any notice relating to an intention to terminate any Pension Plan or Pension Plans or to appoint a trustee to administer any Pension Plan under Section 4042 of ERISA or the occurrence of an event or condition which constitutes grounds under Section 4042 of ERISA or the termination of, or the appointment of a trustee to administrator, any Pension Plan; (h) any limitations under Section 436 of the Code become applicable; (i) the incurrence by

any Loan Party or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Pension Plan or Multiemployer Plan; (j) a withdrawal by any Loan Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (k) the receipt by any Loan Party or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from any Loan Party or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA or in endangered or critical status within the meaning of Section 432 of the Code or Section 305 or Title IV of ERISA; or (l) the imposition on any Loan Party or any ERISA Affiliate of any tax under Chapter 43 of Subtitle D of the Code, or the assessment of a civil penalty on any Loan Party or any ERISA Affiliate under Section 502(c) of ERISA.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning assigned to such term in Section 8.1.

"Excluded CEA Swap Obligation" means, with respect to any Guarantor, any CEA Swap Obligation if, and only to the extent that, all or a portion of the Guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such CEA Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof), including by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guarantee of such Guarantor or the grant of such security interest becomes effective with respect to such CEA Swap Obligation. If a CEA Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such CEA Swap Obligation that is attributable to swaps for which such Guarantee or security interest is or becomes illegal.

"Excluded Subsidiary" means (a) any Subsidiary that is prohibited by applicable law, rule or regulation or by any contractual obligation (to the extent such contractual obligation is existing (i) on the Closing Date or (ii) at the time of acquisition of such Subsidiary so long as the prohibition or restriction in such contract is not entered into in contemplation thereof) from providing a Guarantee of the Secured Obligations or which would require governmental (including regulatory or any other Governmental Authority's) consent, approval, license or authorization to provide such a Guarantee unless such consent, approval, license or authorization has been received, (b) to the extent that the Borrower and the Administrative Agent determine that a Guarantee of the Secured Obligations by such Subsidiary would result in material and adverse tax consequences to the Borrower and its Subsidiaries, (i) any Foreign Subsidiary that is a Controlled Foreign Corporation, and (ii) any Foreign Subsidiary Holdco, (c) any captive insurance company, and (d) any not-for-profit Subsidiary, (e) any Subsidiary that is not a Wholly-Owned Subsidiary, (f) any Subsidiary acquired by the Borrower or any of its Subsidiaries that, at the time of the relevant acquisition, is an obligor in respect of assumed Indebtedness permitted by Section 7.1 to the extent (and for so long as) the documentation governing the applicable assumed Indebtedness prohibits such Subsidiary from providing a Guarantee (which prohibition was not incurred or modified in contemplation of such acquisition); and/or (g) any other Subsidiary with respect to which the Borrower and the Administrative Agent reasonably determine in writing the cost or other consequences of providing such a Guarantee shall be excessive in view of the benefits of such Guarantee to be afforded to the Lenders therefrom. Notwithstanding the foregoing, in the event that a Subsidiary guarantees, grants a lien on its assets to secure, or has greater than 65% of its voting Equity Interests pledged to secure, other Indebtedness

of the Loan Parties, such Subsidiary shall cease to be an Excluded Subsidiary and shall be required to become a Guarantor.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its Applicable Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 3.7(b)) or (ii) such Lender changes its Applicable Lending Office, except in each case to the extent that, pursuant to Section 3.6, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Applicable Lending Office, (c) Taxes attributable to such Recipient's failure to comply with Section 3.6(g) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Credit Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"Federal Funds Effective Rate" means, for any day, a rate per annum (expressed as a decimal, rounded upwards, if necessary, to the next higher 1/100 of 1%) equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published by the Federal Reserve Bank of Dallas on the Business Day next succeeding such day, provided that (a) if the day for which such rate is to be determined is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, (b) if such rate is not so published for any day, the Federal Funds Effective Rate for such day shall be the average of the quotations for such day on such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it and (c) if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Credit Agreement.

"Fee Letter" means that certain fee letter between BancorpSouth Bank and Borrower dated as of March 23, 2021.

"Field Audit" means audits, verifications, testing and inspections of (a) the Collateral, (b) the accounting and financial processes and procedures of the Borrower, (c) the financial condition of the Borrower, (d) the books, records and documents of the Borrower and (e) such other items, documents and matters related to the Borrower as the Administrative Agent may reasonably request, in each case conducted by a Person (who may be an employee of the Lender or who may be independent) satisfactory to the Administrative Agent.

"Financial Covenants" means the covenants set forth in Section 7.12.

"Financial Officer" means, with respect to any Person, the chief financial officer, principal accounting officer, treasurer or comptroller of such Person (or such other financial officer as is acceptable to the Administrative Agent).

"Fiscal Year" means the four fiscal quarter period of the Borrower ending on December 31 of each calendar year (i.e., the "2021 Fiscal Year" refers to the Fiscal Year ended on December 31, 2021).

"Fixed Charge Coverage Ratio" means, for any period, for the Borrower and its Subsidiaries on a consolidated basis in accordance with GAAP, the ratio of (a) Consolidated EBITDA plus (i) lease payments less the sum of (i) unfinanced Capital Expenditures, (ii) Taxes paid or payable in cash (including Permitted Tax Distributions), and (iii) dividends and distributions made in cash during such period to (b) the sum of (i) scheduled principal payments made in cash on Funded Indebtedness during such period, (ii) Consolidated Cash Interest Expense for such period, and (iii) lease payments.

"Flood Certificate" means a "Standard Flood Hazard Determination Form" of the Federal Emergency Management Agency and any successor Governmental Authority performing a similar function.

"Flood Documents" has the meaning assigned to such term in Section 9.11.

"Flood Insurance Laws" means, collectively, (i) the National Flood Insurance Reform Act of 1994 (which comprehensively revised the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973) as now or hereafter in effect or any successor statute thereto, (ii) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (iii) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"Flood Insurance Policies" has the meaning assigned to such term in Section 6.10(b).

"Flood Program" means the National Flood Insurance Program created by the U.S. Congress pursuant to the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973, the National Flood Insurance Reform Act of 1994 and the Flood Insurance Reform Act of 2004, in each case as amended from time to time, and any successor statutes.

"Flood Zone" means an area identified by the Federal Emergency Management Agency (or any successor agency) as a "Special Flood Hazard Area" with respect to which flood insurance has been made available under Flood Insurance Laws.

"Floor" means the benchmark rate floor, if any, provided in this Agreement initially (as of the execution of this Agreement, the modification, amendment or renewal of this Agreement or otherwise) with respect to USD LIBOR.

"Foreign Lender" means (a) if the Borrower is a U.S. Person, a Lender that is not a U.S. Person, and (b) if the Borrower is not a U.S. Person, a Lender that is resident or organized under the laws of a jurisdiction other than that in which the Borrower is resident for tax purposes.

"Foreign Plan" means any employee pension benefit plan or arrangement (a) maintained, or contributed to by any Loan Party or Subsidiary that is not subject to the laws of the United States, or (b) mandated by a government other than the United States for employees of any Loan Party or Subsidiary.

"Foreign Subsidiary" means any Subsidiary that is not a Domestic Subsidiary.

"Foreign Subsidiary Holdco" means any Domestic Subsidiary that has no material assets other than Equity Interests or Indebtedness of one or more Controlled Foreign Corporations or other such Domestic Subsidiaries.

"Fund" means any Person (other than a natural Person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit in the ordinary course of its activities.

"Funded Indebtedness" means as of any date of determination, on a consolidated basis, the sum of the following, without duplication: (a) the outstanding principal amount of all Indebtedness which is classified as "long-term debt" on the consolidated balance sheet of each Loan Party and its Subsidiaries prepared as of such date in accordance with GAAP (subject to year-end audit adjustments with respect to non-year-end periods) and any current maturities and other principal amount in respect of such Indebtedness due within one year; (b) the outstanding principal amount of Indebtedness for borrowed money of each Loan Party and its Subsidiaries outstanding under a revolving credit, term or similar agreement including, without limitation, any Subordinated Debt (and renewals and extensions of any thereof); (c) the borrowing of money or the obtaining of credit by each Loan Party and its Subsidiary (other than trade payables incurred in the ordinary course of business), including the issuance of notes or bonds (but excluding surety, performance or bid bonds); (d) the deferred purchase price of assets acquired (other than trade payables incurred in the ordinary course of business); (e) inventory financing; and (f) Indebtedness of the type referred to in clauses (a) through (e) above of another Person guaranteed by, or secured by a Lien on assets of, the Borrower, any Guarantor or any of their respective Subsidiaries.

"GAAP" means generally accepted accounting principles in effect from time to time in the United States.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any department, commission, board, bureau, agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra national bodies such as the European Union or the European Central Bank) and any group or body charged with setting financial accounting or regulatory capital rules or standards (including the Financial Accounting Standards Board, the Bank for International Settlements, the Basel Committee on Banking Supervision or the National Association of Insurance Commissioners or any successor or similar authority to any of the foregoing).

"Guarantee Agreement" means the Guarantee Agreement, dated as of the date Closing Date, among the Borrower, the Guarantors and the Administrative Agent.

"Guarantees" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation, provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The term "Guaranteed" has a meaning analogous

thereto. The amount of any Guarantee at any time shall be deemed to be an amount equal to the lesser at such time of (i) the stated or determinable amount of the primary obligation in respect of which such Guarantee is made (or, if not stated or determinable, the maximum reasonably anticipated amount of the obligations in respect of which such Guarantee is made) and (ii) the maximum amount for which the guarantor may be liable pursuant to the terms of the instrument embodying such Guarantee.

"Guarantors" means, initially Bighorn Construction and Reclamation, LLC, Bighorn Sand & Gravel LLC, and Bighorn Investments and Properties, LLC, and thereafter each Subsidiary of the Borrower that becomes party thereto by the execution and delivery of a Subsidiary Joinder Agreement, and the permitted successors and assigns of each such Person.

"Hazardous Materials" means all substances, wastes, chemicals, pollutants, or other contaminants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, mold, infectious, pharmaceutical or medical wastes and all other substances of any nature that are now or hereafter regulated under any Environmental Law or are now or hereafter defined, listed, classified, considered or described as hazardous, dangerous or toxic by any Governmental Authority or under any Environmental Law.

"Indebtedness" of any Person means, without duplication:

(a) all obligations of such Person for borrowed money;

(b) all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments, including seller paper;

(c) the maximum amount (after giving effect to any prior drawings or reductions which have been reimbursed) of all letters of credit (including standby and commercial), banker's acceptances, bank guaranties, surety bonds, and similar instruments issued or created by or for the account of such Person;

(d) the Swap Termination Value of each Swap Agreement (to the extent reflecting an amount owed by such Person or an amount that would be owing were such Swap Agreement terminated);

(e) the Attributable Indebtedness of such Person in respect of Capitalized Lease Obligations, Synthetic Debt and Synthetic Lease Obligations of such Person (regardless of whether accounted for as indebtedness under GAAP);

(f) all obligations of such Person to pay the deferred purchase price of property or services (other than (i) trade accounts payable in the ordinary course of business which are paid within 90 days of their respective due dates and (ii) any purchase price adjustments or similar obligation until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP and if not paid after becoming due and payable);

(g) indebtedness (excluding prepaid interest thereon) secured by a Lien (or for which the holder of such indebtedness has an existing right, contingent or otherwise, to be secured by a Lien) on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(h) all obligations of such Person in respect of Disqualified Equity Interests;

(i) all obligations of such Person to pay a specified purchase price for goods or services whether or not delivered or accepted (e.g., take or pay obligations) or similar obligations and, without duplication, all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person; and

(j) all Guarantees by such Person of any of the foregoing.

The Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation, company, or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person. The amount of Indebtedness of any Person for purposes of clause (g) shall be deemed to be equal to the greater of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Indemnitee" has the meaning assigned to such term in Section 10.3(b).

"Ineligible Bonded Receivable" means a Bonded Receivable generated from a project experiencing delays or any problems that could reasonably be expected to cause the bond relating to the Bonded Receivable to be pulled. The Administrative Agent has the right in its Permitted Discretion to determine if a Bonded Receivable is an Ineligible Receivable in accordance with the standard set forth in the preceding sentence, and shall notify Borrower in writing of any such determination.

"Information" has the meaning assigned to such term in Section 10.15(b).

"Intellectual Property" has the meaning assigned to such term in the Security Agreement.

"Intellectual Property Security Agreement" means any Patent Security Agreement, Trademark Security Agreement and/or Copyright Security Agreement (as each such term is defined in the Security Agreement) executed by any Loan Party in favor of the Administrative Agent.

"Interest Payment Date" means (a) with respect to any ABR Loan, the last day of each March, June, September and December, (b) with respect to any LIBOR Loan, the last day of the Interest Period applicable thereto and, in the case of a LIBOR Loan with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period and (c) with respect to all Loans, the Maturity Date of the Credit Facility under which such Loan was made.

"Interest Period" means, with respect to any LIBOR Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two, three, or six months (or, if made available by all of the Lenders, twelve months or a shorter period of time) thereafter, as the Borrower may elect, provided that: (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day, unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period, and (c) no Interest Period in respect of any Loan shall end after the Maturity Date

of the Credit Facility under which such Loan was made. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing. Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period.

"Interpolated Screen Rate" means in relation to the LIBOR Rate for any Loan, the rate per annum determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the rate as displayed on the applicable Bloomberg page (or on any successor or substitute page or service providing quotations of interest rates applicable to Dollar deposits in the London interbank market comparable to those currently provided on such page, as determined by the Administrative Agent from time to time; in each case the "Screen Rate") for the longest period (for which that Screen Rate is available) that is shorter than the applicable Interest Period and (b) the Screen Rate for the shortest period (for which that Screen Rate is available) that exceeds such Interest Period, in each case, at approximately 11:00 a.m., London time, on the Quotation Day for such Interest Period.

"Investment" means, as to any Person, (a) any Acquisition by such Person, (b) any direct or indirect acquisition or investment by such Person in another Person, whether by means of the purchase or other acquisition of Equity Interests or debt or other securities of another Person (including any partnership or joint venture interest), or (c) any direct or indirect loan, advance or capital contribution to, Guarantee with respect to any Indebtedness or other obligation of, such other Person. For purposes of covenant compliance, the amount of any Investment on any date of determination shall be, in the case of any Investment in the form of (i) a loan or an advance, the principal amount thereof outstanding on such date, (ii) a Guarantee, the amount of such Guarantee as determined in accordance with the last sentence of the definition of such term, (iii) a transfer of Equity Interests or other property by the investor to the investee, including any such transfer in the form of a capital contribution, or the issuance of Equity Interests to such investor, the fair market value (as determined reasonably and in good faith by the chief financial officer of the Borrower) of such Equity Interests or other property as of the time of the transfer or issuance, without any adjustment for increases or decreases in value of, or write-ups, write-downs or write-offs with respect to, such Investment, and (iv) any Investment (other than any Investment referred to in clauses (i), (ii) or (iii) above) in the form of an Acquisition or a purchase or other acquisition for value of any evidences of Indebtedness or other securities of any other Person, the original cost of such Investment (including any Indebtedness assumed in connection therewith), plus the cost of all additions, as of such date, thereto, and minus the amount, as of such date, of any portion of such Investment repaid to the investor in cash as a repayment of principal or a return of capital, as the case may be, but without any other adjustment for increases or decreases in value of, or write-ups, write-downs or write-offs with respect to, such Investment.

"Inventory" has the meaning assigned to such term in the Security Agreement.

"IRS" means the United States Internal Revenue Service.

"ISP" means the International Standby Practices, International Chamber of Commerce Publication No. 590 (or such later version thereof as may be in effect at the applicable time of issuance)

"Junior Debt" means any unsecured Indebtedness of the Borrower, any Guarantor or any of their respective Subsidiaries or any Indebtedness of the Borrower, any Guarantor, or any of their respective Subsidiaries that is junior in right of payment to the Loan Document Obligations or is secured by Liens that are junior to the Liens securing the Loan Document Obligations.

"Lead Arranger" means BancorpSouth Bank, in its capacity as lead arranger and bookrunner of the Credit Facility established under this Credit Agreement.

"Lenders" means (a) the financial institutions listed on Schedule 2.1 (other than any such financial institution that has ceased to be a party hereto pursuant to an Assignment and Acceptance) and (b) any financial institution that has become a party hereto pursuant to an Assignment and Assumption.

"LIBOR Borrowing" means, as to any Borrowing, the LIBOR Loans comprising such Borrowing.

"LIBOR Loan" means a Loan bearing interest based on the Adjusted LIBOR Rate.

"LIBOR Rate" means:

(a) with respect to each day during each Interest Period pertaining to a LIBOR Loan in Dollars, the rate per annum determined by the Administrative Agent to be the arithmetic average of the London Interbank Offered Rates administered by the ICE Benchmark Administration (or any Person that takes over administration of such rate) for deposits in Dollars for a duration equal to or comparable to the duration of such Interest Period which appear on the relevant Bloomberg page (or such other commercially available source providing quotations of the London Interbank Offered Rates for deposits in Dollars as may be designated by the Administrative Agent from time to time) at or about 11:00 a.m. (London time) on the Quotation Day for such Interest Period; or

(b) for any interest calculation with respect to an ABR Loan on any date, rate per annum determined by the Administrative Agent to be the arithmetic average of the London Interbank Offered Rates administered by the ICE Benchmark Administration (or any Person that takes over administration of such rate) for deposits in Dollars with a term of one (1) month commencing such day which appear on the relevant Bloomberg page (or such other commercially available source providing quotations of the London Interbank Offered Rates for deposits in Dollars as may be designated by the Administrative Agent from time to time), at or about 11:00 am (London time) on such day;

provided that if such rate is not available at such time for any reason, then the "LIBOR Rate" with respect to such Loan for such period shall be the Interpolated Screen Rate, where applicable. Each calculation by the Administrative Agent of the LIBOR Rate hereunder shall be conclusive and binding on the parties hereto for all purposes, absent clearly manifest error. Notwithstanding the foregoing, for purposes of this Credit Agreement, the LIBOR Rate shall at no time be less than 0.50% per annum.

"LIBOR Scheduled Unavailability Date" has the meaning specified in Section 3.3(b).

"LIBOR Successor Rate" has the meaning specified in Section 3.3(b).

"LIBOR Successor Rate Conforming Changes" means, with respect to any proposed LIBOR Successor Rate, any conforming changes to the definition of Alternate Base Rate, Interest Period, timing and frequency of determining rates and making payments of interest and other administrative and yield protection matters as may be appropriate, in the discretion of the Administrative Agent, to reflect the implementation of such LIBOR Successor Rate and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with then-prevailing market practice (or, if the Administrative Agent determines that implementation of any portion of such market practice is not administratively feasible or that no market practice for the administration of such LIBOR Successor Rate exists, in such other manner of administration as the Administrative Agent determines in consultation with the Borrower).

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, Capitalized Lease or title retention agreement relating to such asset, and

(c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan" means any Revolving Loan.

"Loan Document Obligations" means the due and punctual payment and performance of all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party under or pursuant to each of the Loan Documents or otherwise with respect to any Loan and all costs and expenses incurred in connection with enforcement and collection of the foregoing, including the fees, charges and disbursements of counsel, in each case whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, expenses and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest, expenses and fees are allowed claims in such proceeding.

"Loan Documents" means, collectively, this Credit Agreement, the Notes, the Guarantee Agreement, the Collateral Documents and each other document entered into in connection herewith.

"Loan Parties" means, collectively, the Borrower and the Guarantors.

"Main Street Loan" means the loan from Vista Bank to the Borrower in the amount approximately $22,272,000.

"Margin Stock" has the meaning assigned to such term in Regulation U.

"Master Agreement" has the meaning assigned to such term in the definition of "Swap Agreement."

"Material Adverse Effect" means (a) a material adverse effect on the business, assets, operations, liabilities, prospects or condition, financial or otherwise, of the Loan Parties and their respective Subsidiaries, taken as a whole, (b) the condition that results when the legality, validity or enforceability of any Loan Document is affected in a manner that is material and adverse to the Lenders, (c) the condition that results when the ability of any Loan Party to perform any of its obligations under any Loan Document is affected in a manner that is material and adverse to the Lenders, or (d) the condition that results when the rights of or benefits available to the Credit Parties under any Loan Document is affected in a manner that is material and adverse. In determining whether any individual event would result in a Material Adverse Effect, notwithstanding that such event in and of itself does not have such effect, a Material Adverse Effect shall be deemed to have occurred if the cumulative effect of such event and all other then-existing events would result in a Material Adverse Effect.

"Material Contract" means, for any Loan Party, any agreement to which that Loan Party is a party, by which that Loan Party is bound, that obligates such Loan Party to make payments, or entitles such Loan Party to receive payments, in each case, in an amount exceeding $1,000,000.00 in the aggregate over the term of such agreement, any contracts that are part of an Approved Project, and any contracts between any Loan Party and any Person that is an Affiliate of any Loan Party. .

"Material Indebtedness" means, as of any date, Indebtedness (including, without limitation, obligations in respect of one or more Swap Agreements, but excluding Indebtedness under the Loan Documents), of any one or more of the Loan Parties or any of their Subsidiaries in an aggregate principal amount exceeding the Threshold Amount. For purposes of determining Material Indebtedness, the "principal amount" of the obligations in respect of any Swap Agreement at any time shall be its Swap Termination Value.

"Material Owned Real Property" means each parcel of Real Property located in the United States which is acquired in fee by a Loan Party with a fair market value in excess of $1,000,000.00; provided that the Real Property set forth on Schedule 1.1(b) is excluded from the definition of Material Owned Real Property.

"Maturity Date" means the Revolving Maturity Date.

"Measurement Period" means, at any date of determination, (a) for the purposes of determining compliance with the Financial Covenants (other than compliance on a Pro Forma Basis for the purposes of any provision of the Loan Documents other than Section 7.12), the period of four consecutive fiscal quarters of the Borrower ending on such date and (b) for any other purpose, the most recent period of four consecutive fiscal quarters of the Borrower for which financial statements have been or are required to be delivered pursuant to Section 6.1(a) or Section 6.1(b). A Measurement Period may be designated by reference to the last day thereof (e.g. the December 31, 2021 Measurement Period refers to the period of four consecutive fiscal quarters of the Borrower ended December 31, 2021), and a Measurement Period shall be deemed to end on the last day thereof.

"Minimum Collateral Amount" has the meaning assigned to such term in Section 2.10(b).

"Minimum Collateral Percentage" means 105%.

"MIRE Event" means if there are any Mortgaged Properties at any time, any increase, extension of the maturity or renewal of any of the Commitments or Loans of any Class hereunder (but excluding (i) any continuation or conversion of Borrowings, (ii) the making of any Revolving Loans or (iii) the issuance, renewal or extension of Letters of Credit).

"Moody's" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"Mortgage Requirement" has the meaning set forth on Schedule 1.1(c).

"Mortgaged Property" means each parcel of Material Owned Real Property, if any, which shall be subject to a Mortgage delivered pursuant to Section 4.1(f), Section 6.12 or Section 6.14, as applicable.

"Mortgages" means mortgages, deeds of trust, assignments of leases and rents, modifications and other collateral documents delivered pursuant to Section 5.1(f), Section 6.12 or Section 6.14, each in form and substance reasonably satisfactory to the Administrative Agent.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Cash Proceeds" means, with respect to any (a) Disposition or Casualty Event by any Loan Party or any of its Subsidiaries, the cash proceeds (including cash proceeds subsequently received (as and when received) in respect of non-cash consideration initially received and including all insurance settlements (it being understood and agreed that any such receipts of insurance settlements shall exclude proceeds of business interruption insurance) and condemnation awards from any single event or series of related events) net of the sum, without duplication, of (i) transaction expenses (including reasonable broker's fees or commissions, legal fees, accounting fees, investment banking fees, consulting fees and other professional fees, transfer and similar taxes and the Borrower's good faith estimate of income taxes paid or payable in connection with the receipt of such cash proceeds), (ii) amounts set aside as a reserve, in accordance with GAAP, including pursuant to any escrow arrangement, against any liabilities under any indemnification obligations associated with such Disposition (provided that, to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Cash Proceeds), (iii)

in the case of insurance settlements and condemnation awards related to a Casualty Event, amounts previously paid by such Loan Party or such Subsidiary to replace or restore the affected property, and (iv) the principal amount, premium or penalty, if any, interest and other amounts on any purchase money Indebtedness or Capitalized Lease Indebtedness which is secured by the asset sold in such Disposition and is required to be repaid with such proceeds (other than any such Indebtedness assumed by the purchaser of such asset); provided, however, that if (A) the Borrower shall deliver a certificate of a Financial Officer to the Administrative Agent at the time of receipt thereof setting forth the Borrower's intent to reinvest such proceeds in productive assets of a kind then used or usable in the business of the Loan Parties and its Subsidiaries (or to repair any property damaged in a Casualty Event) within 180 days of receipt of such proceeds and (B) no Default or Event of Default shall have occurred and be continuing at the time of such certificate or at the proposed time of the application of such proceeds, such proceeds shall not constitute Net Cash Proceeds, except to the extent not so reinvested (or committed to be reinvested) by the end of such 180 day period, and if so committed to be reinvested, are not actually reinvested within 90 days following the end of such 180 day period, at which time such proceeds shall be deemed to be Net Cash Proceeds, and (b) with respect to any Debt Incurrence, the cash proceeds thereof, net of all taxes and customary fees, commissions, costs and other expenses (including reasonable broker's fees or commissions, legal fees, accounting fees, investment banking fees and other professional fees, and discounts and commissions) incurred in connection therewith.

"Non-Consenting Lender" means any Lender that does not approve any consent, waiver or amendment that (a) requires the approval of all or all affected Lenders in accordance with the terms of Section 10.2 and (b) has been approved by the Required Lenders.

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Nonrenewal Notice Date" has the meaning assigned to such term in Section 2.4(b)(iii).

"Notes" means, collectively, the Revolving Loan Notes.

"OFAC" means the U.S. Department of the Treasury's Office of Foreign Assets Control, and any successor thereto.

"Organizational Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-United States jurisdiction), (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating or limited liability company agreement and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 3.7(b)).

"Outstanding Amount" means (a) with respect to any Loan on any date, the outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments thereof occurring on such date.

"Participant" has the meaning assigned to such term in Section 10.4(d).

"Participant Register" has the meaning assigned to such term in Section 10.4(d).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"Pension Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 or Section 430 of the Code or Section 302 or Section 303 of ERISA, and in respect of which any Loan Party or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Permitted Discretion" means with respect to Administrative Agent, a determination made in the exercise of Administrative Agent's commercially reasonable (from the perspective of a secured lender) business judgment.

"Permitted Encumbrances" means:

(a) Liens imposed by law for taxes, assessments or other governmental charges that are not yet due or are being Contested in Good Faith, provided that enforcement of such Liens is stayed pending such contest;

(b) landlords', vendors', carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being Contested in Good Faith, provided that enforcement of such Liens is stayed pending such contest;

(c) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(d) deposits to secure the performance of bids, trade contracts (other than contracts for the payment of money), leases (other than Capitalized Lease Obligations), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case incurred in the ordinary course of business;

(e) judgment liens in respect of judgments that do not constitute an Event of Default under Section 8.1(k);

(f) easements, zoning restrictions, rights of way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary

obligation and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of the Loan Parties and their respective Subsidiaries;

(g) any interest or title of a licensor, sublicensor, lessor or sublessor with respect to any assets under any license or lease agreement entered into in the ordinary course of business, provided that the same do not in any material respect interfere with the business of the Loan Parties or their Subsidiaries or materially detract from the value of the relevant assets of the Loan Parties or its Subsidiaries;

(h) licenses, sublicenses, leases or subleases with respect to any assets granted to third Persons in the ordinary course of business, provided that the same do not in any material respect interfere with the business of the Loan Parties or their Subsidiaries or materially detract from the value of the relevant assets of the Loan Parties or their Subsidiaries;

(i) customary rights of set off, bankers' liens, refunds or charge backs, under deposit agreements, the Uniform Commercial Code or common law, of banks or other financial institutions where any Loan Party or any of such Loan Party's Subsidiaries maintains deposits (other than deposits intended as cash collateral) in the ordinary course of business;

(j) Liens on Margin Stock to the extent that a prohibition on such Liens would violate Regulation U;

(k) Liens on amounts deposited as "security deposits" (or their equivalent) in the ordinary course of business in connection with actions or transactions not prohibited by this Credit Agreement;

(l) Liens in favor of customs and revenue authorities arising in the ordinary course of business as a matter of law to secure payment of customs duties in connection with the importation of goods;

(m) Liens resulting from the filing of precautionary UCC-1 financing statements (or equivalent) with respect to operating leases;

(n) Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by any Loan Party or any of its Subsidiaries in the ordinary course of business;

(o) Liens incurred in the ordinary course of business imposed by law in connection with the purchase or shipping of goods or assets (or the related assets and proceeds thereof), which Liens are in favor of the seller or shipper of such goods or assets and only attach to such goods or assets; and

(p) Liens on equipment set forth on Schedule 7.2.

provided that the term "Permitted Encumbrance" shall not include any Lien securing Indebtedness.

"Permitted Restructuring" means any one or more transactions pursuant to which the initial Guarantors become Subsidiaries of Borrower.

"Permitted Tax Distributions" means, with respect to any Person, any dividend or distribution to any holder of such Person's stock or other equity interests to permit such holders to pay federal income taxes and all relevant state and local income taxes at a rate equal to the highest marginal applicable tax rate for the applicable tax year, however denominated (together with any interest, penalties, additions to tax, or

additional amounts with respect thereto) imposed as a result of taxable income attributed to such holder as a partner of such Person under federal, state, and local income tax laws, determined on a basis that combines those liabilities arising out of the net effect of the income, gains, deductions, losses, and credits of such Person and attributable to it in proportion and to the extent in which such holders hold stock or other equity interests of such Person.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Platform" means DebtX, Debt Domain, Intralinks, Syndtrak or a substantially similar electronic transmission system.

"Pledge Agreement" means the Pledge Agreement and Irrevocable Proxy, dated as of the Closing Date, among Cole Wayne Johnson, Cord Henry Johnson, and the Administrative Agent and acknowledged and agreed to by the Borrower, Bighorn Construction and Reclamation, LLC, and Bighorn Investments and Properties, LLC.

"Prime Rate" means a rate per annum equal to the prime rate of interest announced from time to time on the website of http://online.wsj.com/public/us as the current U.S. "Prime Rate". In the event http://online.wsj.com/public/us shall cease to exist or shall cease to publish a current U.S. Prime Rate, then the Prime Rate shall be determined by reference to another base rate, prime rate, or similar lending rate index, generally accepted on a national basis, as selected by Lender in its sole and absolute discretion.

"Pro Forma Basis" means, with respect to any transaction, that such transaction shall be deemed to have occurred as of the first day of the four-quarter period (or twelve month period, as applicable) ending as of the most recent quarter end (or month end, as applicable) preceding the date of such transaction for which financial statements have been delivered pursuant to Section 6.1(a) or (b). Each of the terms "Pro Forma Compliance" and "Pro Forma Effect" shall have an analogous meaning.

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Public Lender" has the meaning assigned to such term in Section 10.1(d)(i).

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. § 5390(c)(8)(D).

"Qualified Equity Interests" means, with respect to the Equity Interests of any Person, any Equity Interests other than Disqualified Equity Interests of such Person.

"Quotation Day" means, with respect to any LIBOR Borrowing and any Interest Period, the day that is two Business Days prior to the first day of such Interest Period.

"Real Property" means, collectively, all right, title and interest in and to any and all parcels of or interests in real property owned or leased by any Person, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership thereof.

"Recipient" means the Administrative Agent or any Lender, as applicable.

"Register" has the meaning assigned to such term in Section 10.4(c).

"Regulation D" means Regulation D of the Board.

"Regulation T, U or X" means Regulation T, U or X, respectively, of the Board.

"Relevant Governmental Body" means the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or any successor thereto.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, members, directors, officers, employees, agents, trustees, administrators, managers, advisors, attorneys-in-fact and representatives of such Person and of such Person's Affiliates.

"Relevant Governmental Body" means the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or any successor thereto.

"Release" means any actual or threatened releasing, spilling, leaking, pumping, pouring, leaching, seeping, emitting, migration, emptying, discharging, injecting, escaping, depositing, disposing, or dumping of Hazardous Materials into the indoor or outdoor environment, including the movement of any Hazardous Material through the air, soil, surface water, groundwater or property and any other conditions resulting in potential or actual human exposure to Hazardous Materials within a structure.

"Removal Effective Date" has the meaning assigned to such term in Section 9.6(b).

"Request for Credit Extension" means a Committed Loan Notice.

"Required Lenders" means, at any time, Lenders having Total Credit Exposures representing not less than 66 2/3% of the Total Credit Exposures of all Lenders; provided that, (i) if there are fewer than three (3) Lenders, "Required Lenders" shall mean Lenders representing not less than 100% of the Total Exposure of all Lenders and (ii) if there are more than four (4) Lenders, "Required Lenders" shall mean Lenders representing not less than 50.01% of the Total Exposures of all Lenders. The Total Credit Exposure of any Defaulting Lender shall be disregarded in determining Required Lenders at any time.

"Required Prepayment Date" has the meaning assigned to such term in Section 2.7(b)(iv).

"Reserves" means any and all reserves that the Administrative Agent deems necessary, in its Permitted Discretion, to maintain with respect to the Collateral or any Loan Party.

"Resignation Effective Date" has the meaning assigned to such term in Section 9.6(a).

"Responsible Officer" means the chief executive officer, president, vice president, chief financial officer, treasurer, assistant treasurer, or other similar officer of a Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means, as to any Person, (a) any dividend or other distribution by such Person (whether in cash, securities or other property) with respect to any Equity Interests of such Person, (b) any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to the holders of Equity Interests of such Person, (c) the acquisition for value by such Person of any Equity Interests issued by such Person or any other Person that Controls such Person, and (d) with respect to clauses (a) through (c) any transaction that has a substantially similar effect.

"Revolving Borrowing" means a Borrowing consisting of Revolving Loans of the same Type made, converted or continued on the same date and, in the case of LIBOR Loans, as to which a single Interest Period is in effect.

"Revolving Commitment" means, with respect to each Revolving Lender, the commitment hereunder of such Revolving Lender to make Revolving Loans in an aggregate outstanding amount not exceeding the amount of such Revolving Lender's Revolving Commitment as set forth on Schedule 2.1 or in the Assignment and Assumption pursuant to which such Revolving Lender shall have assumed its Revolving Commitment in accordance with Section 10.4(b), as applicable, as such Revolving Commitment may be adjusted from time to time pursuant to Section 2.5, Section 2.10, or pursuant to assignments by or to such Revolving Lender pursuant to Section 10.4. The initial aggregate amount of the Revolving Commitments on the Agreement Date is $34,000,000.00.

"Revolving Exposure" means, as to any Lender at any time, the sum of the Outstanding Amount of its Revolving Loans.

"Revolving Facility" means the credit facility established pursuant to Section 2.1(a) and evidenced by the Revolving Commitments.

"Revolving Lender" means a Lender having a Revolving Commitment or, if the Revolving Commitments have expired or terminated, having Revolving Exposure.

"Revolving Loan" means a loan referred to in Section 2.1(a) and made pursuant to Section 2.2.

"Revolving Loan Note" means with respect to a Revolving Lender, a promissory note evidencing the Revolving Loans of such Lender payable to the order of such Lender and its registered assigns substantially in the form of Exhibit C.

"Revolving Maturity Date" means the second anniversary of the Closing Date, provided that if such day is not a Business Day, the Revolving Maturity Date shall be the Business Day immediately preceding such day.

"S&P" means Standard & Poor's Financial Services LLC, a subsidiary of S&P Global Inc.

"Sale and Leaseback" means any transaction or series of related transactions pursuant to which any Loan Party or any of its Subsidiaries (a) sells, transfers or otherwise disposes of any property, real or personal, whether now owned or hereafter acquired, and (b) as part of such transaction, thereafter rents or leases such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold, transferred or disposed.

"Sanctioned Country" means any country, territory or region which is itself the subject or target of any comprehensive Sanctions (at the date of this Credit Agreement, the Crimean region of Ukraine, Cuba, Iran, North Korea, Darfur, South Sudan and Syria).

"Sanctioned Person" means (a) any Person or group listed in any Sanctions related list of designated Persons maintained by OFAC, including the List of Specially Designated Nationals and Blocked Persons, or the U.S. Department of State, the United Nations Security Council, the European Union or any EU member state, (b) any Person subject to any law that would prohibit all or substantially all financial or other transactions with that Person or would require that assets of that Person that come into the possession of a third-party be blocked (c) any legal entity organized or domiciled in a Sanctioned Country, (d) any agency, political subdivision or instrumentality of the government of a Sanctioned Country, (e) any natural person ordinarily resident in a Sanctioned Country, or (f) any Person 50% or more owned, directly or indirectly, individually or in the aggregate by any of the above.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by OFAC or the U.S. Department of State or (b) the United Nations Security Council, the European Union or any European Union member state, Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority.

"Secured Obligation Designation Notice" means a notice substantially in the form of Exhibit J executed and delivered to the Administrative Agent by a counterparty (other than the Administrative Agent and its Affiliates) to a Swap Agreement or an agreement to provide Cash Management Services in order that the obligations in respect thereof constitute Swap Agreement Obligations or Cash Management Obligations.

"Secured Obligations" means, collectively, (a) the Loan Document Obligations, (b) the Cash Management Obligations and (c) the Swap Agreement Obligations.

"Secured Parties" means, collectively, (a) the Administrative Agent, (b) each Lender, (c) each Person to whom any Cash Management Obligations are owed, (d) each counterparty to any Swap Agreement the obligations under which constitute Swap Agreement Obligations, (e) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document and (f) the permitted successors and assigns of each of the foregoing.

"Security Agreement" means the Pledge and Security Agreement, dated as of the Closing Date, among the Loan Parties and the Administrative Agent.

"Senior Leverage Ratio" means, with respect to any Measurement Period, the ratio of (a) Funded Indebtedness of the Loan Parties and each of their respective Subsidiaries as of the last day of such Measurement Period (excluding, without duplication, Subordinated Debt and Junior Debt) to (b) Consolidated EBITDA of the Loan Parties and each of their respective Subsidiaries for such Measurement Period.

"Solvency Certificate" means a certificate, substantially in the form of Exhibit I.

"Solvent" and "Solvency" mean, with respect to any Person on any date of determination, that on such date (a) the fair value of the present assets of such Person and its Subsidiaries, taken as a whole, is not less than the sum of the debt (including contingent liabilities) of such Person and its Subsidiaries, taken as a whole, (b) the present fair salable value of the assets of such Person and its Subsidiaries, taken as a whole, is not less than the amount that will be required to pay the probable liabilities (including contingent liabilities) of such Person and its Subsidiaries, taken as a whole, on their debts as they become absolute and

matured, (c) the capital of such Person and its Subsidiaries, taken as a whole, is not unreasonably small in relation to the business of such Person or its Subsidiaries, taken as a whole, contemplated as of such date and (d) such Person and its Subsidiaries, taken as a whole, do not intend to incur, or believe that they will incur, debts (including current obligations and contingent liabilities) beyond their ability to pay such debts as they mature in the ordinary course of business; provided that the amount of contingent liabilities at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any basic, marginal, special, emergency, supplemental or other reserves) expressed as a decimal established by the Board to which the Administrative Agent is subject for eurocurrency funding (currently referred to as "eurocurrency liabilities" in Regulation D). Such reserve percentages shall include those imposed pursuant to Regulation D. LIBOR Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subordinated Debt" means Indebtedness incurred by a Loan Party that is subordinated in right of payment to the prior payment of the Loan Document Obligations of such Loan Party and contains subordination and other terms acceptable to the Administrative Agent.

"Subordinated Debt Documents" means any agreement, indenture or instrument pursuant to which any Subordinated Debt is issued, in each case as amended to the extent permitted under the Loan Documents.

"subsidiary" means, with respect to any Person, as of any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of such Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power is or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held by such Person or one or more subsidiaries of such Person.

"Subsidiary" means any direct or indirect subsidiary of the Borrower or a Loan Party, as the context may require. Unless otherwise specified, a "Subsidiary" shall refer to a Subsidiary of the Borrower.

"Subsidiary Joinder Agreement" means a Subsidiary Joinder Agreement, substantially in the form of Exhibit G, pursuant to which a Subsidiary (other than an Excluded Subsidiary) becomes a party to the Guarantee Agreement, to the Security Agreement and to each other applicable Loan Document.

"Swap Agreement" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b)

any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Agreement Obligations" means all obligations of the Loan Parties under each Swap Agreement to which any Loan Party is a party and that (a) is with a counterparty that is the Administrative Agent or any of its Affiliates, (b) is in effect on the Closing Date with a counterparty that is a Lender or an Affiliate of a Lender as of the Closing Date, (c) is entered into after the Closing Date with any counterparty that is a Lender or an Affiliate of a Lender at the time such Swap Agreement is entered into or becomes a Lender or an Affiliate of a Lender after it has entered into such agreement or (d) is approved by Administrative Agent in its Permitted Discretion, provided that any such counterparty (other than the Administrative Agent or its Affiliates) executes and delivers a Secured Obligation Designation Notice to the Administrative Agent and, provided, further, that Swap Agreement Obligations shall not include, with respect to any Guarantor, Excluded CEA Swap Obligations of such Guarantor.

"Swap Termination Value" means, in respect of any one or more Swap Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Agreements, (a) for any date on or after the date such Swap Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Agreements (which may include a Lender or any Affiliate of a Lender).

"Synthetic Debt" means, with respect to any Person as of any date of determination thereof, all obligations of such Person in respect of transactions entered into by such Person that are intended to function primarily as a borrowing of funds (including any minority interest transactions that function primarily as a borrowing) but are not otherwise included in the definition of "Indebtedness" or as a liability on the consolidated balance sheet of such Person and its Subsidiaries in accordance with GAAP).

"Synthetic Lease Obligation" means the monetary obligation of a Person at any time of determination under (i) a so called synthetic, off balance sheet or tax retention lease, or (ii) an agreement for the use or possession of property, in each case, creating obligations that do not appear on the balance sheet of such Person but which could be characterized as the indebtedness of such Person (without regard to accounting treatment) (other than operating leases arising as a result of Sale and Leaseback transactions).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Date" means the date upon which all Commitments have terminated, and the Loans, together with all interest and fees related thereto and other Loan Document Obligations (other than unasserted contingent indemnification and unasserted expense reimbursement obligations in each case not yet due and payable), have been indefeasibly paid in full in cash.

"Term SOFR" means, for the applicable corresponding tenor, the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"Threshold Amount" means $1,000,000.00.

"Total Credit Exposure" means, as to any Lender at any time, the unused Commitments and Revolving Exposure of such Lender at such time.

"Total Revolving Outstandings" means at any time, the aggregate Outstanding Amount of all Revolving Loans at such time.

"Transaction Expenses" means any fees, premiums, expenses, or other costs incurred or paid by any Loan Party, or any Subsidiary in connection with the Transactions, this Credit Agreement and the other Loan Documents and the transactions contemplated hereby and thereby in connection therewith.

"Transactions" means (a) the execution, delivery and performance by each Loan Party of each Loan Document to which it is a party, (b) the borrowing of the Loans and the issuance of the Letters of Credit, (c) the use of the proceeds of the Loans and the Letters of Credit, (d) the satisfaction of the Collateral and Guarantee Requirement and (e) the payment of Transaction Expenses.

"Type", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBOR Rate or the Alternate Base Rate.

"Unaudited Financial Statements" means the unaudited consolidated and consolidating balance sheets and related statements of income, comprehensive income, changes in equity and cash flows of the Loan Parties and their respective Subsidiaries for the period ending May 31, 2021 and for any period ending at least ninety (90) days before the Closing Date.

"Uniform Commercial Code" or "UCC" means the Uniform Commercial Code as the same may from time to time be in effect in the State of Texas; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of Texas, "Uniform Commercial Code" or "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"United States" and "U.S." mean the United States of America.

"Unreimbursed Amount" has the meaning assigned to such term in Section 2.4(c)(i).

"USD LIBOR" means the London interbank offered rate for U.S. dollars.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning assigned to such term in Section 3.6(g)(ii).

"USA PATRIOT Act" means The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)).

"Voting Equity Interests" means, with respect to any Person, shares of such Person's Equity Interests having the right to vote for the election of the members of the board of directors or other managing person of such Person under ordinary circumstances.

"Wholly-Owned" means, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable law) are owned by such Person and/or by one or more wholly owned Subsidiaries of such Person.

"Withdrawal Liability" means a liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Withholding Agent" means any Loan Party and the Administrative Agent.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.2 Classification of Loans and Borrowings. For purposes of this Credit Agreement, Revolving Loans may be classified and referred to by Type (e.g. "LIBOR Revolving Loan" or "ABR Revolving Loan").

Section 1.3 Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including." Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Credit Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Credit Agreement, (e) any reference to any law or regulation herein shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. Any terms used in this Credit Agreement that are defined in the UCC shall be construed and defined as set forth in the UCC unless otherwise defined herein; provided, that to the extent that the UCC is used to define any term herein and such term is defined differently in different Articles of the UCC, the definition of such term contained in Article 9 of the UCC shall govern.

Section 1.4 Accounting Terms; GAAP.

(a) All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Credit Agreement shall be prepared in conformity with, GAAP except as otherwise specifically prescribed herein.

(b) If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Credit Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

Section 1.5 Rounding. Any financial ratios required to be maintained by the Borrower pursuant to this Credit Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.6 References to Time. Unless the context otherwise requires, references to a time shall refer to Eastern Standard Time or Eastern Daylight Savings Time, as applicable.

Section 1.7 Resolution of Drafting Ambiguities. Each Loan Party acknowledges and agrees that it was represented by counsel in connection with the execution and delivery of the Loan Documents to which it is a party, that it and its counsel reviewed and participated in the preparation and negotiation hereof and thereof and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation hereof or thereof.

Section 1.8 Status of Loan Document Obligations. In the event that any Loan Party shall at any time issue or have outstanding any Subordinated Debt, the Borrower shall take or cause each other Loan Party to take all such actions as shall be necessary to cause the Loan Document Obligations to constitute senior indebtedness (however denominated) in respect of such Subordinated Debt and to enable the Administrative Agent and the Lenders to have and exercise any payment blockage or other remedies available or potentially available to holders of senior indebtedness under the terms of such Subordinated Debt. Without limiting the foregoing, the Loan Document Obligations are hereby designated as "senior indebtedness" and as "designated senior indebtedness" and words of similar import under and in respect of the Subordinated Debt Documents under which such Subordinated Debt is issued and are further given all such other designations as shall be required under the terms of any such Subordinated Debt in order that the Administrative Agent and the Lenders may have and exercise any payment blockage or other remedies available or potentially available to holders of senior indebtedness under the terms of such Subordinated Debt.

Section 1.9 Interest. The Administrative Agent does not warrant, nor accept responsibility, nor shall the Administrative Agent have any liability with respect to the administration, submission or any other matter related to the rates in the definition of "LIBOR Rate" or with respect to any comparable or successor rate thereto.

Section 1.10 Divisions. For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from to the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

Section 1.11 Notification and Limitation of Liability - LIBOR and Related Matters. LIBOR is derived from the London Interbank Offered Rate, which is currently administered by ICE Benchmark Administration Limited ("IBA"). The U.K. Financial Conduct Authority ("FCA") announced in July 2017 that, after December 31, 2021, it would no longer persuade or compel contributing banks to make rate submissions to IBA. In December 2020, however, IBA issued a public consultation on its intention to extend the publication of certain dominant tenors of USD LIBOR until June 30, 2023. On March 5, 2021, further to that consultation, IBA announced that it will (i) permanently cease the publication of all non-U.S. dollar denominated settings and the one-week and two-month settings of USD LIBOR on December 31, 2021 and (ii) permanently cease the publication of the overnight, one-month, three-month, six-month, and twelve-month settings of USD LIBOR on June 30, 2023, unless the FCA exercises certain proposed new powers to require IBA to continue publication using a changed methodology, i.e., on a "synthetic basis"; also on March 5, 2021, the FCA announced that all LIBOR settings will either permanently cease or will no longer be representative immediately after the respective termination dates described in the IBA announcement. As a result, all USD LIBOR settings will cease to be available as representative benchmark rates immediately after June 30, 2023 (or after December 31, 2021 in the case of the one-week and two-month settings). Section 3.3 hereof provides a mechanism to determine an alternative rate of interest when LIBOR (or any other Benchmark) or any component thereof is no longer available or representative and in certain other circumstances if so elected by the Administrative Agent and/or the Borrower, and permits the Administrative Agent to make changes to give effect to any such alternative rate of interest. Neither the Administrative Agent, any Lender nor any of their respective affiliates warrants or accepts any responsibility for, or will have any liability with respect to (i) the administration or submission of, or any other matter related to, the London Interbank Offered Rate, LIBOR (or any component thereof) or any Benchmark Replacement (or any component thereof), including, without limitation, whether any Benchmark Replacement will have the same value as, be economically equivalent to, or have the same volume or liquidity as, LIBOR or the London Interbank Offered Rate or any other Benchmark that is replaced or (ii) the effect, implementation or composition of any Benchmark Replacement Conforming Changes, as defined herein. References herein to a component of, or a published component used in the calculation of, LIBOR are deemed to include the Screen Rate.

## ARTICLE 2

## THE CREDITS

Section 2.1 Commitments. Subject to the terms and conditions hereof and relying upon the representations and warranties herein set forth, each Revolving Lender agrees, severally and not jointly, to make Revolving Loans to the Borrower in Dollars from time to time during the Availability Period in an aggregate principal amount that will not result in (i) such Revolving Lender's Revolving Exposure exceeding such Revolving Lender's Revolving Commitment or the Borrowing Base, or (ii) the Total Revolving Outstandings exceeding the aggregate Revolving Commitments or the Borrowing Base. Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, prepay and reborrow Revolving Loans. Revolving Loans may be ABR Loans or LIBOR Loans, as further provided herein.

Section 2.2 Borrowings, Conversions, and Continuations of Loans.

(a) Each Borrowing, each conversion of Loans from one Type to the other, and each continuation of LIBOR Loans shall be made upon the Borrower's irrevocable notice, to the Administrative Agent, which may be given by telephone. Each such notice must be received by the Administrative Agent substantially in the form of a Committed Loan Notice (i) in the case of an ABR Borrowing on the Closing Date, not later than 11:00 a.m. on the date of the proposed Borrowing, (ii) in the case of a LIBOR Borrowing, not later than 11:00 am three Business Days before the date of the proposed Borrowing.

(b) Each telephonic notice by the Borrower pursuant to Section 2.2(a) must be confirmed promptly by hand delivery or facsimile (or transmitted by electronic communication, if arrangements for doing so have been approved by the Administrative Agent) of a written Committed Loan Notice, appropriately completed and signed by a Responsible Officer of the Borrower. Except as provided in Section 2.3(c) and Section 2.4(c), each Borrowing or conversion of Loans shall be in a principal amount of the Borrowing Minimum or a whole multiple of the Borrowing Multiple in excess thereof. Each Committed Loan Notice (whether telephonic or written) shall specify (A) whether the Borrower is requesting a Borrowing, a conversion of Loans from one Type to the other, or a continuation of LIBOR Loans, (B) the requested date of the Borrowing, conversion, or continuation, as the case may be (which shall be a Business Day), (C) principal amount of Loans to be borrowed, converted or continued, (D) the Type of Loans to be borrower or to which existing Loans are to be converted, (E) if applicable, the duration of the Interest Period with respect thereto which shall be a period contemplated by the definition of the term "Interest Period", and (F) the location and number of the Borrower's account to which funds are to be disbursed, which shall comply with the requirements of Section 2.2. Notwithstanding anything in this Credit Agreement to the contrary, if the Borrower requests a Borrowing of, conversion to, or continuation of LIBOR Loans in any such Committed Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one month. Any automatic continuation as provided above shall be effective as of the last day of the Interest Period then in effect with respect to the applicable LIBOR Loans.

(c) Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Applicable Percentage of the Loans, and if no timely notice of a conversion or continuation is provided by the Borrower, the Administrative Agent shall notify each Lender of the details of any automatic continuation described in Section 2.2(b). In the case of each Borrowing, each Lender shall make (or cause its Applicable Lending Office to make) the amount of its Loan available to the Administrative Agent, by transfer in immediately available funds to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders, not later than 11:00 a.m. on the Business Day specified in the applicable Committed Loan Notice. Upon satisfaction or waiver of the applicable conditions set forth in Section 4.2 (and, if such Borrowing is the initial Credit Extension, Section 4.1), the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by transfer to the account of the Borrower maintained with BancorpSouth Bank and designated in the Commitment Loan Notice the amount of such funds.

(d) Except as otherwise provided herein, a LIBOR Loan may be continued or converted only on the last day of an Interest Period for such Loan unless the Borrower pays the amount due, if any, under Section 3.5 in connection therewith. During the existence of an Event of Default, the Administrative Agent or the Required Lenders may require that (i) no Loans may be requested as, converted to or continued as LIBOR Loans, and (iii) unless repaid, each LIBOR Loan be converted to an ABR Loan at the end of the Interest Period applicable thereto.

(e) The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for LIBOR Loans upon determination of such interest rate. The determination of the Adjusted LIBOR Rate by the Administrative Agent shall be conclusive in the absence of manifest error.

(f) Anything in clauses (a) through (d) above to the contrary notwithstanding, after giving effect to all Borrowings, all conversions of Loans from one Type to the other, and all continuations of Loans as the same Type, there shall not be more than four Interest Periods in effect at any time for all Borrowings of LIBOR Loans.

(g) The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder, provided that the Commitments of the Lenders are several, and no Lender shall be responsible for any other Lender's failure to make Loans as required.

Section 2.3 Reserved.

Section 2.4 Reserved.

Section 2.5 Termination and Reduction of Commitments.

(a) Unless previously terminated, the Revolving Commitments shall terminate on the last day of the Availability Period.

(b) The Borrower may at any time terminate, or from time to time reduce, the Revolving Commitments, provided that (i) the Borrower shall not terminate or reduce the Revolving Commitments if, after giving effect to any concurrent prepayment or repayment of the Revolving Loans in accordance with Section 2.7, the sum of the Revolving Exposures of all Revolving Lenders would exceed the aggregate Revolving Commitments and (ii) each such reduction of the Revolving Commitments shall be in an amount that is an integral multiple of the applicable Borrowing Multiple and not less than the applicable Borrowing Minimum. If at any time, as a result of such a partial reduction or termination as provided in Section 2.5(a), the Revolving Exposure of all Lenders would exceed the aggregate Revolving Commitments, then the Borrower shall on the date of such reduction or termination of Revolving Commitments, repay or prepay Revolving Borrowings in an aggregate amount equal to such excess.

(c) In addition to any termination or reduction of the Revolving Commitments under paragraphs (a) and (b) of this Section, the Revolving Commitments shall be reduced as required under Section 2.7(b).

(d) The Borrower shall notify the Administrative Agent of any election to terminate or reduce the Revolving Commitments under paragraph (b) of this Section at least five (5) days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof. Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each notice delivered by the Borrower pursuant to this Section shall be irrevocable. Each reduction, and any termination, of the Revolving Commitments shall be permanent and each reduction of the Revolving Commitments or the shall be made ratably among the Revolving Lenders in accordance with their respective Revolving Commitments.

Section 2.6 Repayment of Loans; Evidence of Debt.

(a) Payment at Maturity. The Borrower hereby unconditionally promises to pay (i) to the Administrative Agent for the account of each Revolving Lender the then unpaid principal amount of each Revolving Loan together with all accrued interest thereon on the earlier of the Revolving Maturity Date and, if different, the date of the termination of the Revolving Commitments in accordance with the provisions of this Credit Agreement.

(b) [Reserved].

(c) [Reserved].

(d) Notes. Any Lender may request through the Administrative Agent that Loans made by it be evidenced by a promissory note. In such event, the Borrower shall execute and deliver to a

Revolving Lender a Revolving Loan Note. In addition, if requested by a Lender, its Note may be made payable to such Lender and its registered assigns in which case all Loans evidenced by such Note and interest thereon shall at all times (including after assignment pursuant to Section 10.4) be represented by one or more Notes in like form payable to the order of the payee named therein and its registered assigns.

(e) Lender Records. Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan owing to such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(f) Register. Entries made in good faith by the Administrative Agent in the Register pursuant to Section 10.4(c), and by each Lender in its account or accounts pursuant to Section 2.6(e), shall be prima facie evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Credit Agreement, absent manifest error; provided, however, that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Credit Agreement.

Section 2.7 Prepayments.

(a) Optional Prepayments. The Borrower may, upon written notice to the Administrative Agent, at any time and from time to time, voluntarily prepay any Borrowing of any Class in whole or in part without premium or penalty (except as set forth in Section 3.5), provided that (A) such notice must be received by the Administrative Agent not later than 1:00 p.m. (1) three Business Days prior to any date of prepayment of a LIBOR Borrowing and (2) one Business Day prior to the date of prepayment of an ABR Borrowing and (B) each prepayment shall be in a principal amount of the Borrowing Minimum or a whole multiple of the Borrowing Multiple in excess thereof or, in each case, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment and the Class(es) and Type(s) of Loans to be prepaid. The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Applicable Percentage of such prepayment. If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.

(b) Mandatory Prepayments.

(i) Net Cash Proceeds.

(A) Dispositions. In the event that any Loan Party or any of its Subsidiaries receives Net Cash Proceeds in respect of any Disposition in excess of $250,000 in any Fiscal Year, then, substantially simultaneously with (and in any event not later than the third Business Day next following) the receipt of such Net Cash Proceeds, the Borrower shall prepay the Revolving Loans in an aggregate principal amount equal to 100% of such Net Cash Proceeds in excess of such $250,000 threshold.

(B) Debt Incurrences. In the event that any Loan Party or any of its Subsidiaries receives Net Cash Proceeds in respect of any Debt Incurrence, then, substantially simultaneously with (and in any event not later than the third Business Day next following) the receipt of such Net Cash Proceeds, the Borrower shall prepay the Revolving Loans in an aggregate principal amount equal to 100% of such Net Cash Proceeds.

(C) Casualty Events. In the event that any Loan Party or any of its Subsidiaries receives Net Cash Proceeds in respect of any Casualty Event in excess of $250,000 in any Fiscal Year, then, subject in all respects to Section 6.11 hereof, substantially simultaneously with (and in any event not later than the third Business Day next following) the receipt of such Net Cash Proceeds, the Borrower shall prepay the Revolving Loans in an aggregate principal amount equal to 100% of such Net Cash Proceeds in excess of such $250,000.

(ii) If on any date (after giving effect to any other payments on such date) the Total Revolving Outstandings exceeds the lesser of (y) the Revolving Commitments and (z) the Borrowing Base, then, in the case of each of the foregoing, the Borrower shall, on such day, prepay the principal amount of Revolving Loans in an aggregate amount at least equal to such excess.

(iii) Application of Mandatory Prepayments. Each prepayment of outstanding Revolving Loans required to be made pursuant to Section 2.7(b) shall be allocated pro rata among the then outstanding Revolving Loans.

(iv) Notice of Mandatory Prepayment. The Borrower shall deliver to the Administrative Agent with respect to each prepayment required under this Section 2.7(b) a notice of prepayment at least three Business Days prior to the date on which the Borrower is required to make such prepayment (the "Required Prepayment Date"), together with a certificate signed by a Financial Officer of the Borrower setting forth in reasonable detail the calculation of the amount of such prepayment. Each notice of prepayment shall specify the prepayment date, the Class and Type of each Loan being prepaid and the principal amount of each Loan (or portion thereof) to be prepaid.

(c) Prepayments of Revolving Loans. If for any reason the Total Revolving Outstandings at any time exceed the aggregate Revolving Commitments then in effect, the Borrower shall immediately prepay, without premium or penalty, Revolving Loans in an aggregate amount equal to such excess.

(d) General Rules. All prepayments shall be subject to Section 3.5, but shall otherwise be without premium or penalty. Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing. All prepayments shall be accompanied by accrued interest thereon and, in the case of any prepayment of a LIBOR Loan, any additional amounts required pursuant to Section 3.5.

Section 2.8 Payments Generally; Administrative Agent's Clawback.

(a) General. Each Loan Party shall make each payment required to be made by it hereunder or under any other Loan Document (whether of principal of Loans, interest or fees, or of amounts payable under Sections 3.4, 3.5, 3.6 or 10.3, or otherwise) prior to 12:00 noon on the date when due, in Dollars and in immediately available funds. All payments to be made by a Loan Party hereunder shall be made free and clear of and without condition or deduction for any counterclaim, defense, recoupment or setoff, without setoff or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent's Payment Office, except that payments pursuant to Sections 3.4, 3.5, 3.6 or 10.3, shall be made directly to the Persons entitled thereto. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.

(b) Pro Rata Treatment. Except as otherwise provided in this Section 2.8 and as otherwise required under Section 3.4(e), each Borrowing, each payment or prepayment of principal of any Borrowing, each payment of interest on the Loans, each payment of fees, each reduction of the Revolving Commitments and each conversion of any Borrowing to or continuation of any Borrowing as a Borrowing of any Type shall be allocated pro rata among the Lenders in accordance with their respective applicable Commitments (or, if such Commitments shall have expired or been terminated, in accordance with the respective principal amounts of their outstanding Loans of the applicable Class). Each Lender agrees that in computing such Lender's portion of any Borrowing to be made hereunder, the Administrative Agent may, in its discretion, round each Lender's percentage of such Borrowing to the next higher or lower whole Dollar amount.

(c) Administrative Agent's Clawback.

(i) Funding by Lenders; Presumption by Administrative Agent. Unless the Administrative Agent shall have received notice from a Lender (x) in the case of ABR Borrowings, three hours prior to the proposed time of such Borrowing and (y) otherwise, prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.2 and may, in reliance upon such assumption, make available to the Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the Lenders and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, and (B) in the case of a payment to be made by the Borrower, the interest rate applicable to ABR Loans. If the Borrower and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period. If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing. Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(ii) Payments by Borrower; Presumptions by Administrative Agent. Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(iii) Notice by Administrative Agent. A notice from the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this paragraph (c) shall be conclusive, absent manifest error.

(d) Obligations of Lenders Several. The obligations of the Lenders hereunder to make Loans and to make payments pursuant to Section 10.3(c) are several and not joint. The failure of any Lender to make any Loan or make any payment under Section 10.3(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or to make its payment under Section 10.3(c).

(e) Failure to Satisfy Conditions Precedent. If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article 2, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the borrowing of Loans set forth in Article 5 are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(f) Funding Source. Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(g) Insufficient Payment. Subject to the provisions of Article 8, whenever any payment received by the Administrative Agent under this Credit Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Credit Parties under or in respect of this Credit Agreement and the other Loan Documents on any date, such payment shall be distributed by the Administrative Agent and applied by the Administrative Agent (i) first, towards payment of all fees and expenses due to the Administrative Agent under the Loan Documents, (ii) second, towards payment of all expenses then due hereunder, ratably among the parties entitled thereto in accordance herewith, (iii) third, towards payment of interest, fees and commissions then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest, fees and commissions then due to such parties, and (iv) fourth, towards payment of principal of Loans then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal of Loans then due to such parties.

(h) Sharing of Payments by Lenders. If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other obligations hereunder resulting in such Lender receiving payment of a proportion of the aggregate amount of its Loans and accrued interest thereon or other such obligations greater than its pro rata share thereof as provided herein, then such Lender shall (x) notify the Administrative Agent of such fact, and (y) purchase (for cash at face value) participations in the Loans and such other obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them; provided that:

(i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii) the provisions of this paragraph shall not be construed to apply to (x) any payment made by the Borrower pursuant to and in accordance with the express terms of this Credit Agreement (including the application of funds arising from the existence of a Defaulting Lender), or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant.

The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against each Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of each Loan Party in the amount of such participation.

Section 2.9 Defaulting Lenders.

(a) Defaulting Lender Adjustments. Notwithstanding anything to the contrary contained in this Credit Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i) Waivers and Amendments. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Credit Agreement shall be restricted as set forth in the definition of Required Lenders.

(ii) Defaulting Lender Waterfall. Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article 8 or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 10.8 shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, as the Borrower may request (so long as no Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Credit Agreement, as determined by the Administrative Agent; third, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Credit Agreement; fourth, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Credit Agreement; fifth, so long as no Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Credit Agreement; and sixth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made or the related Letters of Credit were issued at a time when the conditions set forth in Section 4.2 were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the Commitments under the applicable Credit Facility. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this Section 2.9(a)(ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii) Certain Fees. No Defaulting Lender shall be entitled to receive any Commitment Fee for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(b) Defaulting Lender Cure. If the Borrower and the Administrative Agent each agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held pro rata by the Lenders in accordance with the Commitments under the applicable Facility, whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

Section 2.10 Accordion.

(a) At any time during the period from and after the Closing Date through but excluding the date that is the Maturity Date, at the option of Borrower (but subject to the conditions set forth in clause (b) below), the Revolving Commitments may be increased by an amount in the aggregate for all such increases of the Revolving Commitments not to exceed the Available Increase Amount (each such increase, an "Increase"). Administrative Agent shall invite each Lender to increase its Revolving Commitment (it being understood that no Lender shall be obligated to increase its Revolving Commitment) in connection with a proposed Increase at the interest margin proposed by Borrower, and if sufficient Lenders do not agree to increase their respective Revolving Commitments in connection with such proposed Increase, then Administrative Agent or Borrower may invite any prospective lender who is an Eligible Assignee that is reasonably satisfactory to Administrative Agent and Borrower to become a Lender in connection with a proposed Increase. Any Increase shall be in an amount of at least $5,000,000 or such other amount as Administrative Agent may approve, and integral multiples of $1,000,000 in excess thereof.

(b) Each of the following shall be conditions precedent to any Increase of the Revolving Commitments:

(i) Administrative Agent or Borrower shall have obtained the commitment of one or more Lenders (or other prospective lenders) reasonably satisfactory to Administrative Agent and Borrower to provide the applicable Increase and any such Lenders (or prospective lenders), Borrower, and Administrative Agent have signed a joinder agreement to this Agreement (an "Increase Joinder"), in form and substance reasonably satisfactory to Administrative Agent, to which such Lenders (or prospective lenders), Borrower, and Administrative Agent are party,

(ii) each of the conditions precedent set forth in Section 4.2 are satisfied, and

(iii) Borrower shall have reached agreement with the Lenders (or prospective lenders) agreeing to the increased Revolving Commitments with respect to the interest margins applicable to Loans to be made pursuant to the increased Revolving Commitments (which interest margins may be higher than or equal to the interest margins applicable to Loans set forth in this Agreement immediately prior to the date of the increased Revolving Commitments (the date of the effectiveness of the increased Revolving Commitments, the "Increase Date")) and shall have communicated the amount of such interest margins to Administrative Agent. Any Increase Joinder may, with the consent of Administrative Agent, Borrower and the Lenders or prospective lenders agreeing to the proposed Increase, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate to effectuate the provisions of this Section 2.10 (including any amendment necessary to effectuate the interest margins for the Loans to be made

pursuant to the increased Revolving Commitments). Anything to the contrary contained herein notwithstanding, if the interest margin that is to be applicable to the Loans to be made pursuant to the increased Revolving Commitments are higher than the interest margin applicable to the Loans hereunder (as applicable) immediately prior to the applicable Increase Date (the amount by which the interest margin is higher, the "Excess"), then the interest margin applicable to the Loans immediately prior to the Increase Date shall be increased by the amount of the Excess, effective on the applicable Increase Date, and without the necessity of any action by any party hereto,

(iv) the payment of all fees with respect to such Increase as provided in the Fee Letter.

(c) Unless otherwise specifically provided herein, all references in this Agreement and any other Loan Document to Loans shall be deemed, unless the context otherwise requires, to include Loans made pursuant to the increased Revolving Commitments pursuant to this Section 2.10.

(d) Each of the Lenders having a Commitment prior to the Increase Date (the "Pre-Increase Lenders") shall assign to any Lender which is acquiring a new or additional Commitment on the Increase Date (the "Post-Increase Lenders"), and such Post-Increase Lenders shall purchase from each Pre-Increase Lender, at the principal amount thereof, such interests in the Loans on such Increase Date as shall be necessary in order that, after giving effect to all such assignments and purchases, such Loans and participation interests in Letters of Credit will be held by Pre-Increase Lenders and Post-Increase Lenders ratably in accordance with their Pro Rata Share after giving effect to such increased Revolving Commitments.

(e) The Loans, and Revolving Commitments, established pursuant to this Section 2.10 shall constitute Loans and Revolving Commitments under, and shall be entitled to all the benefits afforded by, this Credit Agreement and the other Loan Documents, and shall, without limiting the foregoing, benefit equally and ratably from any guarantees and the security interests created by this Credit Agreement and the other Loan Documents. Borrower shall take any actions reasonably required by Administrative Agent to ensure and demonstrate that the Liens and security interests granted by Borrower pursuant to this Agreement and the other Loan Documents continue to be perfected under the Uniform Commercial Code or otherwise after giving effect to the establishment of any such new Revolving Commitments.

## ARTICLE 3

## INTEREST, FEES, YIELD PROTECTION, ETC.

### Section 3.1 Interest.

(a) Interest Rate Generally. All ABR Loans shall bear interest at the Alternate Base Rate plus the Applicable Margin. Each LIBOR Loan shall bear interest at a rate per annum equal to the sum of the Adjusted LIBOR Rate for the Interest Period in effect for such Loan plus the Applicable Margin.

(b) Default Rate and Late Fees.

(i) Notwithstanding the foregoing, if any principal of or interest on any Loan, or any fee or other amount payable by the Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, after as well as before judgment, at a rate per annum equal to the Default Rate to the fullest extent permitted by applicable law.

(ii) Notwithstanding the foregoing, if an Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so notifies the Borrower (provided that no such notification shall be required, and the following interest shall automatically be payable, in the case of an Event of Default under Sections 8.1(a), (b), (h) or (i)), then, so long as such Event of Default is continuing, all outstanding principal of each Loan shall, without duplication of amounts payable under the preceding sentence, bear interest, after as well as before judgment, at a rate per annum equal to the Default Rate to the fullest extent permitted by applicable law.

(iii) Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(iv) Administrative Agent, at the request of Required Lenders, shall have the right to assess, and Borrower shall be required to pay, a late fee if any principal, interest, or fees under this Credit Agreement are not paid within ten (10) days after their due date, and in such a case, the late charge shall be in an amount equal to five percent (5%) of the amount not timely paid. Late fees shall not apply to the total principal amount of the Loan for failure to repay the Loan in full at the Maturity Date

(c) Interest Payment Dates. Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and at such other times as may be specified herein, provided that (i) interest accrued pursuant to paragraph (b) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment, and (iii) in the event of any conversion of any LIBOR Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(d) Computation of Interest. All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable Alternate Base Rate, Adjusted LIBOR Rate and LIBOR Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent clearly manifest error.

Section 3.2 Fees.

(a) Commitment Fee. The Borrower agrees to pay to the Administrative Agent for the account of each Revolving Lender, a commitment fee (the "Commitment Fee"), which shall accrue at a rate per annum equal to the Applicable Margin multiplied by the average daily unused amount of the Revolving Commitment of such Revolving Lender during the period from and including the date on which this Credit Agreement becomes effective pursuant to Section 10.6(a) to but excluding the date on which such Revolving Commitment terminates; provided that, if such Revolving Lender continues to have any Revolving Exposure after its Revolving Commitment terminates, the Commitment Fee shall continue to accrue on the daily amount of such Revolving Lender's Revolving Exposure from and including the date on which such Revolving Lender's Revolving Commitment terminates to but excluding the date on which such Revolving Lender ceases to have any Revolving Exposure. For purposes of computing Commitment Fees, the Revolving Commitment of any Revolving Lender shall be deemed to be used to the extent of the aggregate principal amount at such time of its outstanding Revolving Loans. Accrued Commitment Fees shall be payable in arrears on the last day of March, June, September and December of each year, each date on which the Revolving Commitments are permanently reduced and on the date on which the Revolving

Commitments terminate, commencing on the first such date to occur after the Agreement Date. All Commitment Fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(b) Other Fees. The Borrower agrees to pay to each Credit Party, for its own account, fees and other amounts payable in the amounts and at the times separately agreed upon between the Borrower and such Credit Party.

(c) Payment of Fees Generally. All fees and other amounts payable hereunder shall be paid on the dates due, in immediately available funds. Fees and other amounts paid shall not be refundable under any circumstances.

Section 3.3 Alternate Rate of Interest.

(a) If, prior to the commencement of any Interest Period for any LIBOR Borrowing:

(i) the Administrative Agent shall have reasonably determined (which determination shall be conclusive and binding upon the Borrower) that, by reason of circumstances affecting the relevant interbank market, adequate and reasonable means do not exist for ascertaining the Adjusted LIBOR Rate (including because the Screen Rate is not available or published on a current basis) for such Interest Period, provided that no Benchmark Transition Event or Early Opt-In Election shall have occurred at such time or for such Interest Period, or

(ii) the Administrative Agent shall have received notice from the Required Lenders that the Adjusted LIBOR Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making, funding or maintaining their LIBOR Loans for such Interest Period,

then the Administrative Agent shall give written notice thereof (or telephonic notice, promptly confirmed in writing) to the Borrower and to the Lenders as soon as practicable thereafter. Until the Administrative Agent shall notify the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) the obligations of the Lenders to make LIBOR Loans or to continue or convert outstanding Loans as or into LIBOR Loans shall be suspended and (ii) all such affected Loans shall be converted into ABR Loans on the last day of the then current Interest Period applicable thereto unless the Borrower prepays such Loans in accordance with this Agreement. Unless the Borrower notifies the Administrative Agent at least one (1) Business Day before the date of any LIBOR Borrowing for which a Committed Loan Notice has previously been given that it elects not to borrow, continue or convert to a LIBOR Borrowing on such date, then such Revolving Borrowing shall be made as, continued as or converted into an ABR Borrowing.

(b) Notwithstanding anything to the contrary herein or in any other Loan Document (and any Master Agreement shall be deemed not to be a "Loan Document" for purposes of this Section 3.,3(b):

(i) Replacing USD LIBOR. On March 5, 2021 the FCA, the regulatory supervisor of IBA, announced in a public statement the future cessation or loss of representativeness of overnight/Spot Next, 1-month, 3-month, 6-month and 12-month USD LIBOR tenor settings. On the earlier of (i) the date that all Available Tenors of USD LIBOR have either permanently or indefinitely ceased to be provided by IBA or have been announced by the FCA pursuant to public statement or publication of information to be no longer representative and (ii) the Early Opt-in Effective Date, if the then-current Benchmark is USD LIBOR, the Benchmark

Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any setting of such Benchmark on such day and all subsequent settings without any amendment to, or further action or consent of any other party to this Agreement or any other Loan Document. If the Benchmark Replacement is Daily Simple SOFR, all interest payments will be payable on a monthly basis.

(ii) Replacing Future Benchmarks. Upon the occurrence of a Benchmark Transition Event, the Benchmark Replacement will replace the then-current Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders. At any time that the administrator of the then-current Benchmark has permanently or indefinitely ceased to provide such Benchmark or such Benchmark has been announced by the regulatory supervisor for the administrator of such Benchmark pursuant to public statement or publication of information to be no longer representative of the underlying market and economic reality that such Benchmark is intended to measure and that representativeness will not be restored, the Borrower may revoke any request for a borrowing of, conversion to or continuation of Loans to be made, converted or continued that would bear interest by reference to such Benchmark until the Borrower's receipt of notice from the Administrative Agent that a Benchmark Replacement has replaced such Benchmark, and, failing that, the Borrower will be deemed to have converted any such request into a request for a borrowing of or conversion to Base Rate Loans. During the period referenced in the foregoing sentence, the component of Base Rate based upon the Benchmark will not be used in any determination of Base Rate.

(iii) Benchmark Replacement Conforming Changes. In connection with the implementation and administration of a Benchmark Replacement, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement.

(iv) Notices; Standards for Decisions and Determinations. The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Benchmark Replacement Conforming Changes. Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section.

(v) Unavailability of Tenor of Benchmark. At any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including Term SOFR or USD LIBOR), then the Administrative Agent may remove any tenor of such Benchmark that is unavailable or non-representative for Benchmark (including Benchmark Replacement) settings and (ii) the Administrative Agent may reinstate any such previously removed tenor for Benchmark (including Benchmark Replacement) settings.

Section 3.4 Increased Costs; Illegality.

(a) Increased Costs Generally. If any Change in Law shall:

(i) impose, modify or deem applicable any reserve, special deposit, liquidity, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement reflected in the Adjusted LIBOR Rate);

(ii) subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii) impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Credit Agreement or Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making, converting to, continuing or maintaining any Loan or of maintaining its obligation to make any such Loan, or to reduce the amount of any sum received or receivable by such Lender or other Recipient hereunder (whether of principal, interest or any other amount) then, upon request of such Lender or other Recipient, the Borrower will pay to such Lender or other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender or other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b) Capital Requirements. If any Lender determines that any Change in Law affecting such Lender or any Applicable Lending Office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Credit Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy and liquidity), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c) Certificates for Reimbursement. A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section and delivered to the Borrower, shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within ten days after receipt thereof.

(d) Delay in Requests. Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions, and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e) Illegality. Notwithstanding any other provision of this Credit Agreement, if, after the Agreement Date, any Change in Law shall make it unlawful for any Lender to make or maintain any LIBOR Loan or to give effect to its obligations as contemplated hereby with respect to any LIBOR Loan, then, by written notice to the Borrower and to the Administrative Agent:

(i) such Lender may declare that LIBOR Loans will not thereafter (for the duration of such unlawfulness) be made by such Lender hereunder (or be continued for additional Interest Periods) and ABR Loans will not thereafter (for such duration) be converted into LIBOR Loans, whereupon any request for a LIBOR Borrowing or to convert an ABR Borrowing to a LIBOR Borrowing or to continue a LIBOR Borrowing, as applicable, for an additional Interest Period shall, as to such Lender only, be deemed a request for an ABR Loan (or a request to continue an ABR Loan as such for an additional Interest Period or to convert a LIBOR Loan into an ABR Loan, as applicable), unless such declaration shall be subsequently withdrawn; and

(ii) such Lender may require that all outstanding LIBOR Loans made by it be converted to ABR Loans, in which event all such LIBOR Loans shall be automatically converted to ABR Loans, as of the effective date of such notice as provided in the last sentence of this paragraph.

In the event any Lender shall exercise its rights under clause (i) or (ii) of this paragraph, all payments and prepayments of principal that would otherwise have been applied to repay the LIBOR Loans that would have been made by such Lender or the converted LIBOR Loans of such Lender shall instead be applied to repay the ABR Loans made by such Lender in lieu of, or resulting from the conversion of, such LIBOR Loans, as applicable. For purposes of this paragraph, a notice to the Borrower by any Lender shall be effective as to each LIBOR Loan made by such Lender, if lawful, on the last day of the Interest Period currently applicable to such LIBOR Loan; in all other cases such notice shall be effective on the date of receipt by the Borrower.

Section 3.5 Break Funding Payments. In the event of (a) the payment or prepayment of any principal of any LIBOR Loan other than on the last day of an Interest Period applicable thereto (whether voluntary, mandatory, automatic, by reason of acceleration (including as a result of a bankruptcy filing, or otherwise), (b) the conversion of any LIBOR Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any LIBOR Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.7(a) and is revoked in accordance therewith), or (d) the assignment of any LIBOR Loan other than on the last day of the Interest Period or maturity date applicable thereto as a result of a request by the Borrower pursuant to Section 3.7(b), then, in any such event, the Borrower shall compensate each applicable Lender for the loss, cost and expense attributable to such event. In the case of a LIBOR Loan, such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBOR Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate that such Lender would bid were it to bid, at the commencement of such period, for Dollar deposits of a comparable amount and period from other banks in the eurocurrency market. A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within ten days after receipt thereof.

Section 3.6 Taxes.

(a) Defined Terms. For purposes of this Section 3.6, the term "applicable law" includes FATCA.

(b) Payments Free of Taxes. Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c) Payment of Other Taxes by the Loan Parties. Each of the Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d) Indemnification by the Loan Parties. Each of the Loan Parties shall jointly and severally indemnify each Recipient, within ten days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error. Each of the Loan Parties shall also, and does hereby, jointly and severally indemnify the Administrative Agent, and shall make payment in respect thereof within ten (10) days after demand therefor, for any amount which a Lender for any reason fails to pay indefeasibly to the Administrative Agent as required pursuant to Section 3.6(e)(ii).

(e) Indemnification by the Lenders. Each Lender shall severally indemnify the Administrative Agent, within ten days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.4(d) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f) Evidence of Payments. As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 3.6, such Loan Party shall deliver to the

Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(g) Status of Lenders.

(i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times prescribed by applicable law and at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 3.6(g)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii) Without limiting the generality of the foregoing,

(A) any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Credit Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Credit Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1) in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (A) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (B) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2) executed copies of IRS Form W-8ECI;

(3) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (A) a certificate substantially in the form of Exhibit H-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (B) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable; or

(4) to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, a U.S. Tax Compliance Certificate substantially in the form of Exhibit H-2 or Exhibit H-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit H-4 on behalf of each such direct and indirect partner;

(C) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Credit Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D) if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Credit Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(h) Treatment of Certain Refunds. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified

pursuant to this Section 3.6 (including by the payment of additional amounts pursuant to this Section 3.6), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i) (i) Survival. Each party's obligations under this Section 3.6 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender and the Termination Date.

(j) Confidentiality. Nothing contained in this Section shall require any Credit Party or any other indemnified party to make available any of its Tax returns (or any other information that it deems to be confidential or proprietary) to the indemnifying party or any other Person.

Section 3.7 Mitigation Obligations; Replacement of Lenders.

(a) Designation of a Different Lending Office. If any Lender requests compensation under Section 3.4, or requires the Borrower to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.6, then such Lender shall (at the request of the Borrower) use reasonable efforts to designate a different Applicable Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.4 or Section 3.6, as the case may be, in the future, and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b) Replacement of Lenders. If any Lender requests compensation under Section 3.4 or if the Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.6 and, in each case, such Lender has declined or is unable to designate a different Applicable Lending Office in accordance with Section 3.7(a), or if any Lender is a Defaulting Lender or a Non-Consenting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.4), all of its interests, rights (other than its existing rights to payments pursuant to Section 3.4 or Section 3.6) and obligations under this Credit Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that:

(i) unless waived by the Administrative Agent in its sole discretion, the Borrower shall have paid to the Administrative Agent the assignment fee (if any) specified in Section 10.4;

(ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.5) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(iii) in the case of any such assignment resulting from a claim for compensation under Section 3.4 or payments required to be made pursuant to Section 3.6, such assignment will result in a reduction in such compensation or payments thereafter;

(iv) such assignment does not conflict with applicable law; and

(v) in the case of any assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable assignee shall have consented (or is willing to consent upon becoming a Lender) to the applicable amendment, waiver or consent.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

## ARTICLE 4

## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

Section 4.1 Conditions to Initial Credit Extensions. The effectiveness of this Credit Agreement and the obligation of each Lender to make its initial Credit Extension hereunder on the Closing Date is subject to satisfaction or waiver of the following conditions precedent:

(a) Credit Agreement. The Administrative Agent (or its counsel) shall have received a counterpart of this Credit Agreement (which may include facsimile transmission or electronic mail transmission of a signed signature page of this Credit Agreement) that, when taken together, bear the signatures of the Borrower and each Lender.

(b) Notes. The Administrative Agent shall have received a Note for each Lender that shall have requested one, signed on behalf of the Borrower.

(c) Legal Opinion. The Administrative Agent shall have received a favorable written opinion (addressed to the Credit Parties and dated the Closing Date) from Wick Phillips, special counsel to the Loan Parties in form, scope and substance satisfactory to the Administrative Agent. The Borrower hereby requests such counsel to deliver such opinions.

(d) Officer's Closing Certificate. The Administrative Agent shall have received a certificate of the President or a Vice President and the Secretary or Assistant Secretary of each Loan Party, dated the Closing Date, substantially in the form of Exhibit F.

(e) Fees and Expenses. Substantially contemporaneously with the making of the Loans to be made on the Closing Date, the Borrower shall have paid all fees and expenses that under the

terms hereof or of the Fee Letter are due and payable on or prior to the Closing Date, as well as the reasonable fees, disbursements and other charges of counsel to the Administrative Agent and the Lead Arranger in connection with the Transactions to the extent invoiced on or prior to the Closing Date.

(f) Collateral and Guarantee Requirement.

(i) The Security Agreement and each Intellectual Property Security Agreement required to be delivered pursuant to the terms of the Security Agreement shall have been duly executed and/or delivered by each Loan Party that is to be a party thereto and shall be in full force and effect. The Administrative Agent on behalf of the Secured Parties shall have a security interest in the Collateral of the type and the priority described in each such Collateral Document; and

(ii) Reserved;

(iii) The Administrative Agent shall have received the results of a search of the Uniform Commercial Code filings (or equivalent filings) made with respect to the Loan Parties in the states (or other jurisdictions) of formation of such persons, together with copies of the financing statements (or similar documents) disclosed by such search, and accompanied by evidence satisfactory to the Administrative Agent that the Liens indicated in any such financing statement (or similar document) have been or will be contemporaneously released or terminated (other than Permitted Encumbrances), together with other relevant lien searches as reasonably requested by the Administrative Agent;

(iv) Each document (including any UCC (or similar) financing statement) required by any Collateral Document or under applicable law to be filed, registered or recorded in order to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a perfected Lien on the Collateral required to be delivered pursuant to such Collateral Document, shall be in proper form for filing, registration or recordation, as applicable;

(v) The Administrative Agent (or its counsel) shall have received (i) the certificates representing the Equity Interests required to be pledged pursuant to the Security Agreement, together with an executed undated stock power or similar instrument of transfer for each such certificate endorsed in blank by a duly authorized officer of the pledgor thereof, and (ii) any other possessory collateral to be pledged pursuant to the Security Agreement; and

(vi) The Administrative Agent shall have received a Field Audit satisfactory to Administrative Agent.

(g) Guarantee Agreement. The Guarantee Agreement shall have been duly executed and delivered by each Loan Party that is to be a party thereto and shall be in full force and effect.

(h) Solvency Certificate. The Administrative Agent shall have received a Solvency Certificate attesting to the Solvency of each Loan Party and its Subsidiaries (taken as a whole) on the Closing Date immediately before and after giving effect to the Transactions, from the chief financial officer or an authorized person performing similar function of the Borrower.

(i) Committed Loan Notice. The Administrative Agent shall have received a completed Committed Loan Notice, duly executed by a Responsible Officer of the Borrower with respect to any Credit Extensions to be made on the Closing Date.

(j) Insurance. The Administrative Agent shall have received evidence that all insurance required to be maintained pursuant to the Loan Documents has been obtained and is in effect and that the Administrative Agent has been named as lender's loss payee and/or additional insured, as applicable, under each insurance policy with respect thereto and all endorsements thereto have been delivered, in each case, in accordance with the terms of the Loan Documents, and the Administrative Agent is otherwise satisfied with all of the insurance arrangements of the Loan Parties and their Subsidiaries.

(k) USA PATRIOT Act; KYC. Each Lender shall have received:

(i) any and all documentation and other information requested by such Lender in connection with applicable "know your customer" and anti-money-laundering rules and regulations, including the USA PATRIOT Act; and

(ii) to the extent the Borrower constitutes a "legal entity customer" under the Beneficial Ownership Regulation, a completed Beneficial Ownership Certification in relation to the Borrower.

(l) Financial Statements. The Administrative Agent shall have received (i) the Audited Financial Statements, (ii) the Unaudited Financial Statements, and (iii) a quality of earnings report satisfactory to the Administrative Agent.

(m) Litigation. There shall not exist any pending or threatened claim, action, suit, investigation litigation or other proceeding that could, in the judgment of the Administrative Agent, be expected to cause a Material Adverse Effect.

(n) No Material Adverse Effect. Since May 31, 2021, there shall not have occurred a Material Adverse Effect or any event or circumstance that could reasonably be expected to result in a Material Adverse Effect and the Administrative Agent shall have received a certificate of a Financial Officer of the Borrower to the foregoing effect.

(o) Financial Officer Certificate. The Administrative Agent shall have received a certificate, dated the Closing Date and signed by a Financial Officer of the Borrower confirming that the conditions set forth in subsections (m), and (n) of this Section 4.1 and subsections (a) and (b) of Section 4.2 shall be satisfied.

(p) Material Contracts. The Administrative Agent shall have received copies of all Material Contracts.

(q) Outstanding Indebtedness. All outstanding Indebtedness of any Loan Party and its Subsidiaries (other than Indebtedness permitted under Section 7.1) shall have been indefeasibly paid in full and any Liens relating thereto released and/or terminated.

(r) Borrowing Base Certificate. A Borrowing Base Certificate in form and content acceptable to Administrative Agent.

(s) Other. The Administrative Agent shall have received such other documents, instruments or items the Administrative Agent may reasonably request.

For purposes of determining whether the Closing Date has occurred, each Lender that has executed this Credit Agreement shall be deemed to have consented to, approved or accepted, or to be satisfied with, each document or other matter required hereunder to be consented to or approved by or acceptable or satisfactory

to the Lead Arranger, Administrative Agent or such Lender, as the case may be, unless such Lender has notified the Administrative Agent of any disagreement prior to the initial Credit Extensions hereunder. Notwithstanding the foregoing, the obligations of the Lenders to make Credit Extension shall not become effective unless each of the foregoing conditions shall have been satisfied (or waived pursuant to Section 10.2).

Section 4.2 Conditions to All Credit Extensions. The obligation of each Lender to honor any Request for Credit Extension (other than a Committed Loan Notice requesting only a conversion of Loans to the other Type, or a continuation of LIBOR Loans) is subject to the satisfaction of the conditions in Section 4.1 and the following additional conditions precedent:

(a) Each of the representations and warranties of the Loan Parties set forth in the Loan Documents shall be true and correct in all material respects, in each case on and as of such date as if made on and as of such date, provided that to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided further that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(b) No Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds therefrom.

(c) The Administrative Agent shall have received a Request for Credit Extension in accordance with the requirements hereof.

Each Request for Credit Extension (other than a Committed Loan Notice requesting only a conversion of Loans to the other Type or a continuation of LIBOR Loans) submitted by the Borrower shall be deemed to be a representation and warranty that the applicable conditions specified in Sections 4.2(a) and, if applicable, (b) have been satisfied on and as of the date of the applicable Credit Extension.

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES

The Borrower, on behalf of itself and each of the other Loan Parties, represents and warrants to the Administrative Agent and the Lenders that:

Section 5.1 Existence, Qualification and Power; Compliance with Laws. Each Loan Party and each of its Subsidiaries (a) is duly incorporated, organized or formed, and validly existing and, where applicable, in good standing under the laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority to (i) own or lease its assets and carry on its business as now conducted and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and, where applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, and (d) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted; except in each case referred to in clause (c) or (d), to the extent that failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Each Loan Party and each of its Subsidiaries are in compliance with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property and maintains all permits and licenses necessary to conduct its business, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 5.2 Authorization; No Contravention. The execution, delivery and performance by each Loan Party of each Loan Document to which such Loan Party is a party, and the consummation of the Transactions, are within such Loan Party's corporate, limited liability company or other analogous powers, have been duly authorized by all necessary corporate, limited liability company or other analogous action, and do not and will not (a) contravene the terms of any of such Person's Organizational Documents, (b) conflict with or result in any breach or contravention of, or the creation of any Lien under (other than under the Loan Documents), or require any payment to be made under (i) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; (c) violate any law; except with respect to any conflict, breach or contravention or payment (but not creation of Liens) referred to in clause (b)(i), to the extent that such conflict, breach, contravention or payment could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, or (d) conflict with any Material Contract.

Section 5.3 Governmental Authorization; Other Consents. No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, any Loan Party of any Loan Document to which it is a party, or for the consummation of the Transactions, (b) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, (c) the perfection or maintenance of the Liens created under the Collateral Documents (including the priority thereof) or (d) the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Loan Documents, except for (i) filings and recordings necessary to satisfy the Collateral and Guarantee Requirement, and (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect.

Section 5.4 Binding Effect. Each Loan Document has been duly executed and delivered by each Loan Party that is party thereto and constitutes a legal, valid and binding obligation of each such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 5.5 Financial Statements; No Material Adverse Effect.

(a) The Audited Financial Statements and Unaudited Financial Statements:

(i) fairly present the financial condition of each Loan Party and its Subsidiaries, as applicable, as of the dates thereof and its results of operations for the period covered thereby in accordance with and contingent obligations.

(b) Since May 31, 2021, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

Section 5.6 Litigation. There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against any Loan Party or, to the knowledge of the Borrower, threatened against or affecting the Loan Parties or any of their Subsidiaries (a) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (b) that involve or affect, or that purport to or could reasonably be expected to involve or affect, any Loan Document or the Transactions.

Section 5.7 Environmental Matters.

(a) Except for Environmental Claims which have been fully resolved with no remaining obligations or conditions:

(i) each Loan Party and its Subsidiaries possess all Environmental Permits required under applicable Environmental Law to conduct their respective businesses and are, and within applicable statutes of limitation, have been, in material compliance with the terms of such Environmental Permits. No Loan Party or any of its Subsidiaries has received written notice that any Environmental Permits possessed by any of them will be revoked, suspended or will not be renewed;

(ii) the execution and delivery of this Credit Agreement and the consummation by the Loan Parties of the Transactions does not require any notification, registration, reporting, filing, investigation, or environmental response action under any Environmental Law;

(iii) each of the Loan Parties and their Subsidiaries are currently, and within applicable statutes of limitation, have been, in material compliance with all applicable Environmental Law;

(iv) no Loan Party nor any of its Subsidiaries has received (A) notice of any pending or threatened civil, criminal or administrative action, suit, demand, claim, hearing, notice of violation, investigation, notice or demand letter or request for information under any Environmental Law, or (B) notice of actual or potential liability under any Environmental Law including any Environmental Liability that such Loan Party or Subsidiary may have retained or assumed either contractually or by operation of law or of any Environmental Claim, in either case with respect to clauses (A) or (B) that reasonably could be expected to result in material expenditure by such Loan Party or Subsidiary. No Loan Party or any of its Subsidiaries has knowledge of any circumstances that reasonably could be expected to result in a material Environmental Liability;

(v) as of the Agreement Date: (A) no property or facility currently, or to the knowledge of each Loan Party, formerly owned, operated or leased by any Loan Party or any of its current or former Subsidiaries or by any respective predecessor in interest, and (B) no property at which Hazardous Materials generated, owned or controlled by any Loan Party, any of its present or former Subsidiaries or any predecessor in interest have been stored, treated or disposed of, have been identified by a Governmental Authority as recommended for or requiring or potentially requiring environmental assessment and/or response actions under Environmental Law;

(vi) (A) there has been no disposal, spill, discharge or Release of any Hazardous Material generated, used, owned, stored or controlled by any Loan Party, any of its Subsidiaries or any predecessor in interest, on, at or under any property currently or formerly owned, leased or operated by any Loan Party, any of its current or former Subsidiaries or any predecessor in interest, (B) there are no Hazardous Materials located in, at, on or under any such facility or property, or at any other location, in either case (A) or (B), that reasonably could be expected to require investigation, removal, remedial or corrective measures by any Loan Party or any of its Subsidiaries or that reasonably could result in material liabilities of, or material losses, damages or costs to any Loan Party or any of its Subsidiaries under any Environmental Law, and (C) neither the Loan Parties nor any of their Subsidiaries has retained or assumed any liability contractually or by operation of law with regard to the generation, treatment, storage or disposal of

Hazardous Materials or compliance with Environmental Law that could reasonably be expected to result in material expenditures by any Loan Party or any of its Subsidiaries;

(vii) (A) there has not been any underground or aboveground storage tank or other underground storage receptacle or related piping, or any impoundment or other disposal area in each case containing Hazardous Materials located on any facility or property currently or formerly owned, leased or operated by any Loan Party or any of its Subsidiaries, and (B) no asbestos or polychlorinated biphenyls have been used or disposed of, or have been located at, on or under any facility or property currently or formerly owned, leased or operated by any Loan Party or any of its Subsidiaries, in either case (A) or (B) except in material compliance with applicable Environmental Laws or as would not result in material Environmental Liability;

(viii) no Lien has been recorded against any properties, assets or facilities currently owned, leased or operated by any Loan Party or any of its Subsidiaries under any Environmental Law.

(b) The Loan Parties and their Subsidiaries have provided to the Administrative Agent and its authorized representatives all material records and files, including all material assessments, reports, studies, analyses, audits, tests and data in their possession or under their control concerning any Environmental Claim, the existence of Hazardous Materials or any other environmental concern at properties, assets or facilities currently or formerly owned, operated or leased by any Loan Party or any of their present or former Subsidiaries or predecessor in interest, or concerning compliance by any Loan Party or any such Subsidiary with, or liability under any Environmental Law.

Section 5.8 Ownership of Properties; Liens. Each Loan Party and its Subsidiaries (a) has good title to, or valid leasehold interests in, all its real and personal property material to its business, except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties for their intended purposes, (b) owns, or is entitled to use, all trademarks, service marks, trade names, domain names, copyrights, patents, patent rights, technology, software, know-how database rights, design rights and other intellectual property rights material to its business, and the use thereof by the Loan Parties and their respective Subsidiaries does not infringe upon the rights of any other Person, except for any such infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, (c) has complied in all material respects with all obligations under all material leases to which it is a party and all such leases are in full force and effect and (d) enjoys peaceful and undisturbed possession under all such material leases.

Section 5.9 Casualty, Etc. Neither the businesses nor the properties of any Loan Party or any of its Subsidiaries are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 5.10 Investment Company Status, Etc. No Loan Party or any of its Subsidiaries is (a) an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940 or (b) otherwise subject to any other regulatory scheme limiting its ability to incur debt.

Section 5.11 Taxes. Each Loan Party and its Subsidiaries has timely filed or caused to be filed all federal, provincial, state, municipal, foreign and other Tax returns and reports required to be filed, and have timely paid all federal, provincial, state, municipal, foreign and Taxes levied or imposed upon them or their properties, income or assets otherwise due and payable, except (a) those which are being Contested in Good Faith and (b) failures to file or pay as could not, either individually or in the aggregate, reasonably

be expected to result in a Material Adverse Effect. There are no Tax audits, deficiencies, assessments or other claims with respect to any Loan Party or any of its Subsidiaries that could, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

Section 5.12 ERISA.

(a) Each Loan Party and each of its ERISA Affiliates is in compliance in all material respects with the applicable provisions of ERISA and the Code and the regulations and published interpretations thereunder. No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Effect. No event described in Section 4062(e) of ERISA has occurred and is continuing with respect to any Pension Plan. The present value of all accumulated benefit obligations under each Pension Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of such Pension Plan and the present value of all accumulated benefit obligations of all underfunded Pension Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of all such underfunded Pension Plans.

(b) Each Pension Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto and, to the knowledge of the Loan Parties, nothing has occurred which would prevent, or cause the loss of, such qualification. Each Loan Party and ERISA Affiliate has made all required contributions to each Pension Plan subject to Section 412 of the Code, and no application for a funding waiver pursuant to Section 412 of the Code has been made with respect to any Pension Plan.

(c) There are no pending or, to the knowledge of the Loan Parties, threatened claims, actions, or lawsuits, or action by any Governmental Authority, with respect to any Pension Plan. There has been no violation of the fiduciary responsibility rules of ERISA with respect to any Pension Plan.

(d) No Loan Party or ERISA Affiliate (i) has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA), (ii) has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 of ERISA with respect to a Multiemployer Plan, and (iii) has engaged in a transaction that could be subject to Section 4069 or Section 4212(c) of ERISA.

(e) No such Pension Plan or trust created thereunder, or party in interest (as defined in Section 3(14) of ERISA), or any fiduciary (as defined in Section 3(21) of ERISA), has engaged in a "prohibited transaction" (as such term is defined in Section 406 of ERISA or Section 4975 of the Code) which would subject such Pension Plan or any other plan of any Loan Party or any of its ERISA Affiliates, any trust created thereunder, or any such party in interest or fiduciary, or any party dealing with any such Pension Plan or any such trust, to any material penalty or tax on "prohibited transactions" imposed by Section 502 of ERISA or Section 4975 of the Code.

(f) With respect to any Foreign Plan, (i) all employer and employee contributions required by law or by the terms of the Foreign Plan have been made, or, if applicable, accrued, in accordance with normal accounting practices; (ii) the fair market value of the assets of each funded Foreign Plan, the liability of each insurer for any Foreign Plan funded through insurance, or the book reserve established for any Foreign Plan, together with any accrued contributions, is sufficient to procure or provide for the accrued

benefit obligations with respect to all current and former participants in such Foreign Plan according to the actuarial assumptions and valuations most recently used to account for such obligations in accordance with applicable generally accepted accounting principles; and (iii) it has been registered as required and has been maintained in good standing with applicable regulatory authorities.

Section 5.13 Subsidiaries; Equity Interests. As of the Agreement Date, no Loan Party has any direct or indirect Subsidiaries or investments (other than Cash Equivalents) in, or joint ventures or partnerships with, any Person, except as disclosed in Schedule 5.13. Such Schedule sets forth (a) the name and jurisdiction of organization or incorporation of each Loan Party and identifies each Subsidiary of the Borrower that is an Excluded Subsidiary, (b) the ownership interest of each Loan Party and their respective Subsidiaries in each of their respective Subsidiaries, including the percentage of such ownership and (c) identifies each Person the Equity Interests of which are required to be pledged on the Closing Date pursuant to the Collateral and Guarantee Requirement. Within 120 days of the Closing Date, Debtor may deliver a revised schedule of relating to each Person required to pledge Equity Interests and shall cause such amendments to the Loan Documents as Lender may deem reasonably necessary in connection with such revised schedule. Neither any Loan Party nor any of its Subsidiaries has issued any Disqualified Equity Interests and there are no outstanding options or warrants to purchase Equity Interests of any Loan Party or any of its Subsidiaries of any class or kind, and there are no agreements, voting trusts or understandings with respect thereto or affecting in any manner the sale, pledge, assignment or other disposition thereof, including any right of first refusal, option, redemption, call or other rights with respect thereto, whether similar or dissimilar to any of the foregoing. All of the issued and outstanding Equity Interests owned by any Loan Party in its Subsidiaries have been duly authorized and issued and are fully paid and non-assessable and are free and clear of all Liens other than Liens in favor of the Administrative Agent under the Collateral Documents.

Section 5.14 Insurance. Schedule 5.14 sets forth a description of all insurance maintained by or on behalf of the Loan Parties and their Subsidiaries on the Agreement Date (including names of carriers, policy number, expiration dates, insurance types and coverage amounts). As of the Agreement Date, all premiums in respect of such insurance that are due and payable have been paid.

Section 5.15 Federal Reserve Regulations, Etc. Neither any Loan Party nor any of its Subsidiaries is engaged principally, or as one of their important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock. Immediately before and after giving effect to the making of each Loan, Margin Stock will constitute less than 25% of each Loan Party's assets as determined in accordance with Regulation U. No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, (a) to purchase, acquire or carry any Margin Stock or for any purpose that entails a violation of, or that is inconsistent with, the provisions of the regulations of the Board, including Regulation T, U or X or (b) for any purpose that would violate any Anti-Corruption Laws or applicable Sanctions.

Section 5.16 Collateral Documents.

(a) The Security Agreement, upon execution and delivery thereof by the parties thereto, will create in favor of the Administrative Agent, for the ratable benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral and the proceeds thereof and (i) when the Pledged Equity Interests (other than uncertificated Equity Interests) and the Pledged Debt Securities (as each such term is defined in the Security Agreement) are delivered to the Administrative Agent together with the proper endorsements, the Lien created under Security Agreement shall constitute a fully perfected first priority Lien on, and security interest in, all right, title and interest of the Loan Parties in such Pledged Equity Interests and Pledged Debt Securities to the extent that the laws of the United States or any state, commonwealth or other political subdivision thereof govern the creation and perfection of any such security

interest, in each case prior and superior in right to any other Lien or right of any other person and (ii) when financing statements in appropriate form are filed in the offices specified on Schedule 5.16(a) and, with respect to Collateral consisting of Intellectual Property, when the Security Agreement (or applicable Intellectual Property Security Agreements) are filed with the United States Patent and Trademark Office or the United States Copyright Office, as applicable, and in each case, all applicable filing fees have been paid, the Lien created under the Security Agreement will constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in the Collateral to the extent such security interest may be perfected by the filing of a UCC financing statement and, with respect to Intellectual Property, the filing of such Intellectual Property Security Agreements with the United States Patent and Trademark Office or the United States Copyright Office, as applicable, in each case prior and superior in right to any other Lien or right of any other person, other than Liens expressly permitted by Section 7.2 which by operation of law or contract have priority over the Liens securing the Secured Obligations.

(b) The Mortgages, upon the execution and delivery thereof by the parties thereto, will create in favor of the Administrative Agent, subject to the exceptions listed in each insurance policy covering such Mortgage, for the ratable benefit of the Secured Parties, a legal, valid and enforceable Lien on all of the Loan Parties' right, title and interest in and to the Mortgaged Property thereunder and the proceeds thereof, and when (i) the Mortgages to be delivered on the Closing Date or on a post-closing basis pursuant to Section 6.15 are recorded in the offices specified in Schedule 5.16(b) and (ii) other Mortgages to be delivered pursuant to Section 6.12 and Section 6.14, and, in each case, all applicable fees have been paid, the Mortgages will constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Mortgaged Property and the proceeds thereof, in each case prior and superior in right to any other person, other than with respect to the rights of persons pursuant to Liens expressly permitted by Section 7.2 which by operation of law or contract would have priority over the Liens securing the Secured Obligations.

Section 5.17 Solvency. Immediately before and after the consummation of each Transaction, each of the Borrower and its Subsidiaries, on a consolidated basis, are Solvent.

Section 5.18 Anti-Corruption Laws; Sanctions; Anti-Terrorism Laws.

(a) Each Loan Party, its Subsidiaries, and their respective officers and employees and their directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions. Neither any Loan Party, any of its Subsidiaries or any of their respective directors, officers or employees is a Sanctioned Person. Each Loan Party and each of its Subsidiaries has implemented and maintains in effect policies and procedures reasonably designed to ensure compliance by the Loan Party, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and all applicable Sanctions.

(b) No Loan, use of the proceeds of any Loan or other transactions contemplated hereby will violate Anti-Corruption Laws or applicable Sanctions. No part of the proceeds of the Loans or the Letters or Credit will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the Anti-Corruption Laws.

(c) Neither the making of the Loans hereunder nor the use of the proceeds thereof will violate the any regulations passed under the USA PATRIOT Act or will violate the Trading with the Enemy Act, the International Emergency Economic Powers Act, or any regulations passed thereunder, including the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V) or any enabling legislation or executive order relating thereto or successor statute thereto

(together with Sanctions, "Anti-Terrorism Laws"). Each Loan Party and each of its Subsidiaries are in compliance with applicable Anti-Terrorism Laws.

Section 5.19 Material Owned Real Property. Schedule 5.19 lists completely and correctly as of the Agreement Date all Material Owned Real Property and the addresses thereof. One or more of the Loan Parties own in fee all the real property set forth on Schedule 5.19.

Section 5.20 Accuracy of Information, Etc.

(a) Each Loan Party has disclosed to the Credit Parties all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. None of the reports, financial statements, certificates or other information furnished (whether in writing or orally) by or on behalf of any Loan Party to any Credit Party in connection with the transactions contemplated hereby and the negotiation of this Credit Agreement or delivered hereunder or under any other Loan Document (in each case as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, provided that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

(b) As of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

Section 5.21 Labor Matters. There are no strikes, lockouts or slowdowns against any Loan Party or any of its Subsidiaries pending or, to the knowledge of any Loan Party, threatened. The hours worked by and payments made to employees of the Loan Parties and their Subsidiaries have not been in violation in any material respect of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters. All material payments due from the Loan Parties or any of their Subsidiaries, or for which any claim may be made against any of the Loan Parties or any of their Subsidiaries, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such Loan Party or such Subsidiary. The consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any of the Loan Parties or any of their Subsidiaries is bound.

Section 5.22 Absence of Certain Restrictions. No indenture, certificate of designation for preferred stock, agreement or instrument to which any Loan Party or any of its Subsidiaries is a party (other than this Credit Agreement), prohibits or limits in any way, directly or indirectly the ability of any Subsidiary to make Restricted Payments or loans to, to make any advance on behalf of, or to repay any Indebtedness to, any Loan Party or to another Subsidiary.

Section 5.23 No Default. No Loan Party nor any of its Subsidiaries is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound in any respect that could reasonably be expected to have a Material Adverse Effect. No Default has occurred and is continuing.

Section 5.24 Brokers' Fees. None of the Loan Parties or their Subsidiaries has any obligation to any Person in respect of any finder's, broker's, investment banking or other similar fee in connection

with any of the transactions contemplated under the Loan Documents other than the closing and other fees payable pursuant to this Credit Agreement and as set forth in the Fee Letter.

Section 5.25 EEA Financial Institutions. No Loan Party is an EEA Financial Institution.

Section 5.26 Use of Proceeds. The proceeds of any Revolving Loans on the Closing Date are being used only as set forth in Section 6.8.

Section 5.27 Capitalization. As of the Closing Date, Schedule 5.27 sets forth a true, complete and accurate description of the equity capital structure of each Loan Party and its Subsidiaries, in each case showing accurate ownership percentages of the equity holders of record of such Person and accompanied by a statement of authorized and issued Equity Interests of such Person. Except as set forth on Schedule 5.28, as of the Closing Date (a) there are no preemptive rights, outstanding subscriptions, warrants or options to purchase any Equity Interests of any Loan Party or any of its Subsidiaries, (b) there are no obligations of any Loan Party to redeem or repurchase any of its Equity Interests and (c) there is no agreement, arrangement or plan to which any Loan Party is a party or of which any Loan Party has knowledge that could directly or indirectly affect the capital structure of any Loan Party, any of its Subsidiaries. The Equity Interests of each Loan Party described on Schedule 5.28 (i) are validly issued and fully paid and non-assessable (to the extent such concepts are applicable to the respective Equity Interests) and (ii) are owned of record and beneficially as set forth on Schedule 5.28, free and clear of all Liens (other than Liens permitted under Section 7.2).

Section 5.28 Affiliate Transactions. Except as set forth on Schedule 5.28, as of the Closing Date, there are no existing or proposed agreements, arrangements or transactions between any Loan Party and any of the officers, members, managers, directors, stockholders, parents, other interest holders, employees or Affiliates (other than the Subsidiaries) of any Loan Party or any members of their respective immediate families, and none of the foregoing Persons are directly or indirectly indebted to, or have any direct or indirect ownership, partnership, or voting interest in, any Affiliate of any Loan Party or any Person with which any Loan Party has a business relationship or which competes with any Loan Party.

Section 5.29 Material Contracts. No Loan Party is a party to any Material Contract other than the Material Contracts on Schedule 5.29. To Loan Parties' knowledge after due inquiry, no Loan Party is in violation of, or default under, any Material Agreement obligation to which it is a party beyond any applicable grace or cure period except where such violation or default, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

## ARTICLE 6

## AFFIRMATIVE COVENANTS

Until the Termination Date, the Borrower covenants and agrees with the Credit Parties that:

Section 6.1 Financial Statements and Other Information. The Borrower will furnish or caused to be furnished to the Administrative Agent and each Lender either in hard copy or by electronic communication (including by email, internet and intranet websites) pursuant to procedures approved by the Administrative Agent:

(a) within 120 days after the Fiscal Year ending December 31, 2021, and after each Fiscal Year thereafter (y) the audited consolidated balance sheet of each Loan Party and its Subsidiaries together with the related statements of income, comprehensive income, stockholders' equity and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous

Fiscal Year, all reported on by a registered independent public accounting firm of recognized national standing approved by Administrative Agent (without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit, other than a qualification resulting solely from the impending maturity of any Indebtedness within the four consecutive fiscal quarter period following the relevant audit date with respect to any Indebtedness incurred under this Credit Agreement) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of each Loan Party and its Subsidiaries on a consolidated basis in accordance with GAAP consistently applied;

(b) within 60 days after each Fiscal Year commencing with Fiscal Year ending December 31, 2021, the unaudited consolidating balance sheets of each Loan Party and its Subsidiaries and the related statements of income, comprehensive income, stockholders' equity and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous Fiscal Year and certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of each Loan Party and its Subsidiaries on a consolidating basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes, together with a schedule of other financial information consisting of consolidating or combining details in columnar form with its Subsidiaries separately identified, in accordance with GAAP consistently applied

(c) within 45 days after the end of each fiscal quarter of each Fiscal Year, commencing with the fiscal quarter ending September 30, 2021, (i) the unaudited consolidated balance sheet of each Loan Party and its Subsidiaries and the related unaudited statements of income, comprehensive income, stockholders' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the Fiscal Year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous Fiscal Year, all certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of each Loan Party and its Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes, and (ii) the unaudited consolidating balance sheet of each Loan Party and its Subsidiaries and the related unaudited statements of income, comprehensive income, stockholders' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the Fiscal Year, setting forth in each case in comparative form (A) the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous Fiscal Year and (B) the figures set forth in the financial projections required delivered under Section 6.1, in each case certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of each Loan Party and its Subsidiaries on a consolidating basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes, together with a schedule of other financial information consisting of consolidating or combining details in columnar form with its Subsidiaries separately identified, in accordance with GAAP consistently applied;

(d) concurrently with any delivery of financial statements under clause (a), (b), or (c) above, a Compliance Certificate signed by a Financial Officer of the Borrower (i) stating whether any change in GAAP or in the application thereof has occurred since the date of the Audited Financial Statements and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such Compliance Certificate, (ii) containing either a certification that no Default exists or, specifying the nature of each such Default, the nature and status thereof and any action taken or proposed to be taken with respect thereto, (iii) certifying that there have been no changes to the jurisdiction of organization or legal name of any Loan Party since the date of the last Compliance Certificate delivered pursuant to the Credit Agreement, (iv) attaching reasonably detailed calculations demonstrating compliance with Section 7.12, (v) certifying that no Loan Party has any Subsidiaries other than (A) those that existed

on the Closing Date and were reflected on Schedule 5.13 on the Closing Date, (B) those formed or acquired after the Closing Date with respect to which the Administrative Agent was previously notified either pursuant to Section 6.12 or in a previous Compliance Certificate, and (C) those other Subsidiaries set forth on the relevant Schedule to such Compliance Certificate, which Schedule sets forth for each such Subsidiary whether such Subsidiary is (1) a Domestic Subsidiary, (2) a Guarantor (including the basis for it not being a Guarantor, if applicable), (3) a first tier Foreign Subsidiary, or (4) an Excluded Subsidiary (including the basis for its constituting an Excluded Subsidiary);

(e) within 30 days after the end of each calendar month that is not March, June, September or December (i) the unaudited consolidated balance sheet of each Loan Party and its Subsidiaries and the related unaudited statements of income, comprehensive income, stockholders' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the Fiscal Year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous Fiscal Year, all certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of each Loan Party and its Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes, and (ii) the unaudited consolidating balance sheet of each Loan Party and its Subsidiaries and the related unaudited statements of income, comprehensive income, stockholders' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the Fiscal Year, setting forth in each case in comparative form (A) the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous Fiscal Year and (B) the figures set forth in the financial projections required delivered under Section 6.1, in each case certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of each Loan Party and its Subsidiaries on a consolidating basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes, together with a schedule of other financial information consisting of consolidating or combining details in columnar form with its Subsidiaries separately identified, in accordance with GAAP consistently applied;

(f) Within 60 days after September 30, 2021, a third-party review of the percentage of completion accounting of the Loan Parties;

(g) within 60 days after the beginning of each Fiscal Year (commencing with the Fiscal Year beginning January 1, 2021), (i) an annual consolidated and consolidating projections for each Loan Party and its Subsidiaries for such Fiscal Year, including projected consolidated and consolidating statements of income and comprehensive income of each Loan Party and its Subsidiaries, all in reasonable detail acceptable to the Administrative Agent, including all underlying assumptions; and (ii) utilization reports;

(h) concurrently with the delivery of any Compliance Certificate under clause (c) above, a discussion and analysis of the financial condition and results of operations of each Loan Party and its Subsidiaries for the portion of the Fiscal Year then-elapsed, including a discussion of the reasons for any significant variations from the figures for the corresponding period of the previous Fiscal Year or the figures show in the financial forecasts required to be delivered pursuant to Section 6.1(f); and

(i) within 30 days of the end of each calendar month (and within 5 Business Days after the Administrative Agent's reasonable request following and during the continuation of an Event of Default), as of the period then ended, a Borrowing Base Certificate and supporting information in connection therewith, together with any additional reports with respect to the Borrowing as the Administrative Agent may reasonably request, including without limitation, a certification that there are no bonded projects experiencing delays or any problems that could reasonably be expected to cause a bond to

be pulled. The Borrowing Base Certificate shall not be submitted to Administrative Agent more than twice per calendar month unless otherwise agreed to by Administrative Agent in its sole discretion.

(j) within 30 days of the end of each calendar month (and such other times as may be reasonably requested by the Administrative Agent following and during the continuation of an Event of Default), as of the last day of such calendar month, all delivered electronically in a form reasonably acceptable to the Administrative Agent (i) a detailed aging of the Borrower's Accounts Receivable, including all invoices aged by invoice date and due date, prepared in a manner reasonably acceptable to the Lender, together with a summary specifying the name and balance due for each Account Debtor (and, upon the reasonable request of the Administrative Agent, a list of the addresses of each Account Debtor), (ii) a detailed aging of Borrower's accounts payable, including all invoices aged by invoice date and due date, prepared in a manner reasonably acceptable to the Lender, together with a summary specifying the name and balance due to each trade creditor (and, upon the reasonable request of the Lender, a list of the addresses of each trade creditor), (iii) an inventory report, and (iv) a backlog report.

(k) Intentionally deleted.

(l) Within 60 days after the end of each Fiscal Year, a Field Audit and from time to time as required by Administrative Agent. Loan Parties shall, at reasonable times during normal business hours, and the observance of reasonable safety precautions, grant access to Administrative Agent and its representatives to the property, assets, books and records of the Loan Parties to enable the Administrative Agent to conduct Field Audits. The Borrower is responsible for the cost of no more than one Field Audit per Fiscal Year (except all Field Audits conducted during the existence of an Event of Default or Default shall be paid by the Borrower).

(m) promptly following any request therefor, (i) such other information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with applicable "know your customer" requirements under the USA Patriot Act, the Beneficial Ownership Regulation or other applicable Anti-Corruption and Anti-Terrorism Laws (including those passed pursuant to the USA PATRIOT Act) and (ii) such other information regarding the operations, business affairs and financial condition of each Loan Party or any Subsidiary, or compliance with the terms of the Loan Documents, as any Credit Party may reasonably request..

Section 6.2 <u>Notices of Material Events</u>. The Borrower will furnish or cause to be furnished to the Administrative Agent each Lender prompt written notice of the following:

(a) the occurrence of any Default, specifying the nature and extent thereof;

(b) the filing or commencement of, or any written threat or notice of intention of any Person to file or commence, any action, suit or proceeding, whether at law or in equity or by or before any Governmental Authority, against, or affecting, any Loan Party or any of its Subsidiaries that could reasonably be expected to result in a Material Adverse Effect;

(c) if requested by Administrative Agent from time to time, copies of any annual report required to be filed in connection with each Pension Plan or Foreign Plan, and as soon as possible after, and in any event within ten days after any Loan Party or any ERISA Affiliate knows or has reason to know that, any ERISA Event (or any similar event with respect to a Foreign Plan) has occurred that, alone or together with any other ERISA Event (or any similar event with respect to a Foreign Plan) could reasonably be expected to result in liability of any Loan Party or any ERISA Affiliate in an aggregate amount exceeding the Threshold Amount;

(d) as soon as possible and in no event later than five (5) Business Days after the receipt by any Loan Party or any of its Subsidiaries, of a written copy of any notice, summons, citation or other written communication concerning any actual, alleged, suspected or threatened violation of any Environmental Law by, Environmental Claim against or Environmental Liability of, any Loan Party or any of its Subsidiaries, in each case, which could reasonably be expected to have a Material Adverse Effect;

(e) promptly after the furnishing thereof, copies of any written statement or report furnished by a Loan Party to its shareholders generally or furnished to any holder of debt securities of any Loan Party or of any of its Subsidiaries pursuant to the terms of any indenture, loan or credit or similar agreement and not otherwise required to be furnished to the Lenders pursuant to any other clause of this Section 6.2;

(f) promptly after any Loan Party or any of its Subsidiaries (i) being required to file reports under Section 15(d) of the Securities Exchange Act of 1934, or (ii) registering securities under Section 12 of the Securities Exchange Act of 1934;

(g) in the event that any Person shall become, or cease to be, a Subsidiary or a Guarantor, the Borrower shall promptly furnish to the Administrative Agent an updated list of Subsidiaries or Guarantors, as the case may be;

(h) the occurrence of any other development that has resulted in, or could reasonably be expected to result in, a Material Adverse Effect; and

(i) any change in the information provided in the most recently delivered Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified therein.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer of the Borrower or other executive officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 6.3 Existence; Conduct of Business. The Borrower will, and will cause each Loan Party and its Subsidiaries to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges and franchises material to the conduct of its business, provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 7.3 or any sale, lease, transfer or other disposition permitted by Section 7.5.

Section 6.4 Payment and Performance of Obligations. The Borrower will, and will cause each Loan Party and its Subsidiaries to, pay or perform its obligations, including Tax liabilities, that, if not paid or performed, could reasonably be expected to result in a Material Adverse Effect before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being Contested in Good Faith and (b) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect; provided that nothing in this Section shall be deemed to require any Loan Party to pay any subordinated Indebtedness in violation of the subordination provisions applicable thereto.

Section 6.5 Maintenance of Properties. The Borrower will, and will cause each of its Subsidiaries to, keep and maintain all of its property material to the conduct of its business in good working order and condition, casualty, condemnation and ordinary wear and tear excepted.

Section 6.6 Books and Records; Inspection Rights. The Borrower will, and will cause each Loan Party and its Subsidiaries to, (a) keep proper books of record and account in which full, true and

correct entries are made of all dealings and transactions in relation to its business and activities and (b) permit any representatives designated by any Credit Party, upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accounting firm, all at the expense of the Borrower and at such reasonable times and as often as reasonably requested; provided, however, that during the existence of an Event of Default, the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and without advance notice; provided, further, that notwithstanding anything to the contrary herein, neither any of the Loan Parties nor any of its Subsidiaries shall be required to disclose, permit the inspection, examination or making of copies of or taking abstracts from, or discuss any document, information, or other matter (A) that constitutes non-financial trade secrets or non-financial proprietary information of any Loan Party or any of its Subsidiaries and/or any of its customers and/or suppliers, (B) in respect of which disclosure to the Administrative Agent or any Lender (or any of their respective representatives or contractors) is prohibited by applicable law, (C) that is subject to attorney-client or similar privilege or constitutes attorney work product or (D) in respect of which any Loan Party or any of its Subsidiaries owes confidentiality obligations to any third party (provided such confidentiality obligations were not entered into in contemplation of the requirements of this Section 6.6).

Section 6.7 Compliance with Laws. The Borrower will, and will cause each Loan Party and its Subsidiaries to, comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property and maintain all permits and licenses necessary to conduct its business, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. In addition, and without limiting the foregoing sentence, each Loan Party will, and will cause each of its Subsidiaries to, comply with all applicable Environmental Laws in all material respects, and with Anti-Corruption Laws, Anti-Terrorism Laws, applicable Sanctions and the USA PATRIOT Act and the regulations promulgated thereunder in all respects.

Section 6.8 Use of Proceeds.

(a) The proceeds of the Revolving Loans will be used only as follows: (a) on the Closing Date, proceeds of Revolving Borrowings shall be used to pay the Main Street Debt, Transaction Expenses, and to pay any upfront fees payable pursuant to the Fee Letter, and (b) after the Closing Date, the proceeds of the Revolving Loans will be used to finance working capital and general business purposes.

(b) No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, (a) to purchase, acquire or carry any Margin Stock or (b) for any purpose that entails a violation of any of the regulations of the Board, including Regulations T, U and X. The Borrower will not request any Credit Extension, and the Borrower shall not use, and shall ensure that each Loan Party, their respective Subsidiaries and their respective directors, officers, employees and agents shall not use, the proceeds of any Credit Extension (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws or (ii) in any manner that would result in the violation of any applicable Sanctions or any Anti-Terrorism Laws by any Person, including any Credit Party.

Section 6.9 Information Concerning Collateral. The Borrower will furnish to the Administrative Agent at least ten (10) days prior written notice of any change in (a) the legal name or jurisdiction of incorporation or formation of any Loan Party, (b) the location of the chief executive office of any Loan Party or its principal place of business or any office in which it maintains books or records relating to Collateral owned or held by it or on its behalf, (c) the identity or organizational structure of any Loan Party such that a filed financing statement becomes misleading or (d) the Federal Taxpayer Identification Number or company organizational number of any Loan Party. The Borrower agrees not to

effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC or otherwise that are required in order for the Administrative Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral. The Borrower will promptly notify the Administrative Agent if any material portion of the Collateral is damaged or destroyed.

Section 6.10 Insurance.

(a) The Borrower will, and will cause each Loan Party and its Subsidiaries to, maintain, with financially sound and reputable insurance companies, adequate insurance for its insurable properties, all to such extent and against such risks, including fire, casualty, business interruption and other risks insured against by extended coverage, as is customary with companies in the same or similar businesses operating in the same or similar locations and of same or similar size, including public liability insurance against claims for personal injury or death or property damage occurring upon, in, about or in connection with the use of any properties owned, occupied or controlled by it (including the insurance required pursuant to the Collateral Documents); and maintain such other insurance as may be required by law.

(b) With respect to any portion of any Mortgaged Property that is located in a Flood Zone within a community participating in the Flood Program, the Borrower will, and will cause any applicable Loan Party to, maintain through the Flood Program or through private insurance policies, with financially sound and reputable insurance companies (except to the extent that any insurance company insuring the Mortgaged Property of the Borrower and each other Loan Party ceases to be financially sound and reputable after the Closing Date, in which case, the Borrower shall promptly replace such insurance company with a financially sound and reputable insurance company), (A) such flood insurance coverage under policies issued pursuant to and in compliance with the Flood Insurance Laws ("Flood Insurance Policies") in an amount equal to the maximum limit of coverage available for such Mortgaged Property under Flood Insurance Laws, subject only to deductibles consistent in scope and amount with those permitted under the Flood Program and (B) such additional coverage as required by Administrative Agent, if any, under supplemental private insurance policies in an amount so required by the Administrative Agent;

(c) The Borrower will, and will cause each Loan Party and its Subsidiaries to, (i) cause all such policies of such Loan Party and its Subsidiaries to be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable endorsement, in form and substance reasonably satisfactory to the Administrative Agent, which endorsement or amendment shall provide that, from and after the Closing Date, if the insurance carrier shall have received written notice from the Administrative Agent of the occurrence of an Event of Default, the insurance carrier shall pay all proceeds otherwise payable to such Loan Party under such policies directly to the Administrative Agent, (ii) cause all such policies to provide that neither such Loan Party, any Subsidiary or the Administrative Agent nor any other party shall be a co-insurer thereunder and to contain a "Replacement Cost Endorsement", without any deduction for depreciation, and such other provisions as the Administrative Agent may reasonably require from time to time to protect its interests, (iii) deliver original or certified copies of all such policies to the Administrative Agent, (iv) cause each such policy to provide that it shall not be canceled, modified or not renewed for any other reason upon not less than 30 days' (or in the case of Flood Insurance Policies issued by private insurance companies, 45 days') prior written notice thereof by the insurer to the Administrative Agent, (v) deliver to the Administrative Agent, prior to the cancellation, modification or non-renewal of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Administrative Agent) together with evidence satisfactory to the Administrative Agent of payment of the premium therefor.

(d) The Borrower will promptly upon request of the Administrative Agent or any other Lender, deliver to the Administrative Agent (for distribution to all Lenders), evidence of compliance by all Loan Parties with the requirements contained Sections 6.10(a) through (c) in form and substance reasonably acceptable to the Administrative Agent and the Lenders, including, without limitation, evidence of annual renewals of such insurance.

(e) The Borrower will, and will cause each Loan Party and its Subsidiaries to, notify the Administrative Agent immediately whenever any separate insurance concurrent in form or contributing in the event of loss with that required to be maintained under this Section 6.10 is taken out by any Loan Party; and promptly deliver to the Administrative Agent a duplicate original copy of such policy or policies.

(f) In connection with the covenants set forth in this Section 6.10, it is understood and agreed that:

(i) no Credit Party or any of its Related Parties shall be liable for any loss or damage insured by the insurance policies required to be maintained under this Section 6.10, it being understood that (A) each Loan Party shall look solely to its insurance companies or any other parties other than the aforesaid parties for the recovery of such loss or damage and (B) such insurance companies shall have no rights of subrogation against any Credit Party or any of their Related Parties, provided, however, that if the insurance policies do not provide waiver of subrogation rights against such parties, as required above, then the Borrower (for itself and each Loan Party and its Subsidiaries) hereby agrees, to the extent permitted by law, to waive its right of recovery, if any, against the Credit Parties and their Related Parties; and

(ii) the designation of any form, type or amount of insurance coverage by the Administrative Agent or the Required Lenders under this Section 6.10 shall in no event be deemed a representation, warranty or advice by any Credit Party that such insurance is adequate for the purposes of the business of any Loan Party or its Subsidiaries or the protection of their properties and the Administrative Agent and the Required Lenders shall have the right from time to time to require the Loan Parties and their respective Subsidiaries to keep other insurance in such form and amount as the Administrative Agent or the Required Lenders may reasonably request; provided that such insurance shall be obtainable on commercially reasonable terms.

Section 6.11 Casualty Events. The Borrower will, and will cause each Loan Party and its Subsidiaries to, furnish to the Credit Parties prompt written notice of each Casualty Event or other insured damage to any portion of any property owned or held by or on behalf of any Loan Party or any of its Subsidiaries or the commencement of any action or proceeding for the condemnation or other taking of any such property or any part thereof or interest therein under power of eminent domain or by condemnation or similar proceeding.

(a) If any Casualty Event results in Net Cash Proceeds (whether in the form of insurance proceeds, condemnation award or otherwise), the Administrative Agent is authorized to collect such Net Cash Proceeds and, if received by any Loan Party or any of its Subsidiaries, such Net Cash Proceeds shall not be commingled with any of its other funds or property but shall be held separate and apart therefrom, shall be held in trust for the benefit of the Administrative Agent hereunder and shall be forthwith paid over to the Administrative Agent, provided that (i) to the extent that any Loan Party or any of its Subsidiaries intends to use any such Net Cash Proceeds to repair, restore, reinvest or replace assets of any Loan Party or any of its Subsidiaries as provided in the definition of Net Cash Proceeds, the Administrative Agent shall, subject to the terms and conditions of such proviso, deliver such Net Cash Proceeds to the Borrower on behalf of the applicable Loan Party, (ii) otherwise, subject to the reinvestment provisions set forth in the definition of Net Cash Proceeds, the Administrative Agent shall, and each Loan

Party hereby authorizes the Administrative Agent to, apply such Net Cash Proceeds to prepay the Loans in accordance with Section 2.7 and (iii) all proceeds of business interruption insurance shall be paid over to the Borrower unless an Event of Default has occurred and is continuing.

(b) All proceeds received by or paid to the Administrative Agent that do not constitute Net Cash Proceeds shall be paid over to the Borrower on behalf of the applicable Loan Party unless an Event of Default has occurred and is continuing.

Section 6.12 Covenant to Guarantee and Provide Security.

(a) Guarantors. If any Subsidiary of a Loan Party is formed or acquired after the Agreement Date or if an Excluded Subsidiary ceases to be an Excluded Subsidiary, the Borrower will notify the Credit Parties in writing thereof within 30 days following the date on which such Subsidiary is formed or acquired or such Excluded Subsidiary ceases to be an Excluded Subsidiary (or such later date as may be acceptable to the Administrative Agent in its sole discretion) and, by such date:

(i) the Borrower will cause each Loan Party and each of its Subsidiaries (other than an Excluded Subsidiary) to (A) execute and deliver a Subsidiary Joinder Agreement in form and substance satisfactory to the Administrative Agent and (B) promptly take such actions to create and perfect Liens on such Subsidiary's assets to secure the Secured Obligations as the Administrative Agent shall reasonably request (it being understood that a pledge of Voting Equity Interests in any Controlled Foreign Corporation or Foreign Subsidiary Holdco shall not include more than 65% of the Voting Equity Interests of such Foreign Subsidiary or Foreign Subsidiary Holdco if a pledge of a greater percentage would result in material adverse tax consequences to each Loan Party and its Subsidiaries (as reasonably determined by the Borrower in consultation with Administrative Agent));

(ii) if any Equity Interests issued by any such Subsidiary are owned or held by or on behalf of any Loan Party, the Borrower will cause such Equity Interests to be pledged pursuant to the Collateral Documents not later than the tenth Business Day after the date on which such Subsidiary is formed or acquired (it being understood that Voting Equity Interests in each such Subsidiary that is a Controlled Foreign Corporation or Foreign Subsidiary Holdco shall not include more than 65% of the Voting Equity Interests of such Subsidiary if a pledge of a greater percentage would result in material adverse tax consequences to the any Loan Party and its Subsidiaries (as reasonably determined by the Borrower in consultation with Administrative Agent));

(iii) [Reserved], and

(iv) the Borrower will deliver or cause to be delivered to the Administrative Agent such certificates and legal opinions as would have been required had such Subsidiary been a Guarantor on the Closing Date.

(b) Real Property.

(i) Upon the acquisition by any Loan Party after Closing Date of any Material Owned Real Property or if any Real Property becomes Material Owned Real Property, the Borrower shall promptly notify the Administrative Agent, setting forth with specificity a description of such Material Owned Real Property, including the location thereof, any structures or improvements thereon and, as determined by the Administrative Agent in its sole discretion, either an appraisal or Borrower's good faith estimate of the current value of such Material Owned Real

Property. Within 90 days of the delivery of such notice and unless the Administrative Agent in its sole discretion determines not to require a Mortgage on such Material Owned Real Property:

(A) the Loan Party that owns such Material Owned Real Property shall have satisfied the Mortgage Requirement, and

(B) the Borrower shall, or shall cause such Loan Party to, pay all fees and expenses, including Attorney Costs, and all title insurances charges and premiums, in connection with each Loan Party's obligations under this Section.

(ii) Notwithstanding the foregoing, the Administrative Agent shall not enter into any Mortgage in respect of any improved real property acquired by any Loan Party after the Closing Date or to be mortgaged in connection with a MIRE Event unless the Administrative Agent has provided to the Lenders:

(A) if such Mortgage relates to an improved real property not located in a Flood Zone, a completed Flood Certificate from a third party vendor at least ten (10) days prior to entering into such Mortgage; or

(B) if such Mortgage relates to an improved real property located in a Flood Zone, the following documents with respect to such improved real property at least thirty (30) days prior to entering into such Mortgage: (i) a Flood Certificate a third party vendor; (ii) a notification to the applicable Loan Parties of that fact and (if applicable) notification to the applicable Loan Parties that flood insurance coverage is not available, (iii) evidence of the receipt by the applicable Loan Parties of such notice; and (iv) if required by the Flood Program, evidence of required flood insurance;

provided that the Administrative Agent may enter into any such Mortgage prior to the end of any notice period set forth above if the Administrative Agent shall have received confirmation from each applicable Lender that such Lender has completed any necessary flood insurance due diligence to its reasonable satisfaction.

(c) Further Assurances.

(i) The Borrower will, and will cause each of the Loan Parties to, grant to the Administrative Agent, for the benefit of the Secured Parties, security interests in such of its assets and properties as are not covered by the Collateral Documents in order that the Borrower be in compliance with the Collateral and Guarantee Requirement. Such security interests shall (i) be granted pursuant to documentation reasonably satisfactory in form and substance to the Administrative Agent and (ii) constitute valid and enforceable perfected security interests superior to and prior to the rights of all third Persons, and subject to no other Liens, except Liens permitted by Section 7.2. Such additional collateral documents and the other instruments related thereto shall have been duly recorded or filed in such manner and in such places as are required by law to establish, perfect, preserve and protect the Liens in favor of the Administrative Agent required to be granted pursuant to such additional collateral documents and all taxes, fees and other charges payable in connection therewith shall have been paid in full.

(ii) The Borrower will, and will cause each of the Loan Parties to, at its own expense, make, execute, endorse, acknowledge, file or deliver to the Administrative Agent from time to time such vouchers, invoices, schedules, confirmatory assignments, conveyances, financing statements, transfer endorsements, powers of attorney, certificates, surveys, reports and other

assurances or instruments, and take such further steps relating to the Collateral covered by any of the Collateral Documents as the Administrative Agent may reasonably require. The Borrower shall cause to be delivered to the Administrative Agent such opinions of counsel and other related documents as may be reasonably requested by the Administrative Agent.

(iii) Each action required by this Section 6.12(c) shall be completed as soon as possible, but in no event later than 30 days (or such longer period in the case of actions involving third parties as determined by the Administrative Agent in its reasonable discretion) after any such assets or properties are acquired or such action is requested to be taken by the Administrative Agent, as the case may be.

Section 6.13 Environmental Matters. The Borrower will, and will cause each Loan Party and its Subsidiaries to, (a) conduct its operations in material compliance with all applicable Environmental Laws, (b) implement any and all investigation, remediation, removal and response actions that either are necessary to materially comply with Environmental Laws pertaining to the presence, generation, treatment, storage, use, disposal, transportation or Release of any Hazardous Material on, at, under, or from any of their owned or leased property or are requested by Government Authorities pursuant to Environmental Law, (c) notify the Administrative Agent promptly upon becoming aware of any violation of Environmental Laws or any Release of Hazardous Materials on, at, under, or from, any property that is reasonably likely to result in an Environmental Claim against any Loan Party or any of its Subsidiaries in excess of the Threshold Amount in the aggregate and promptly forward to the Administrative Agent a copy of any written communication received in connection therewith. If the Administrative Agent at any time has a reasonable basis to believe that there may be a violation of any Environmental Laws or a Release of Hazardous Materials on, at, under, or from any property owned or leased by any Loan Party or any of its Subsidiaries that could reasonably be expected to have a Material Adverse Effect, then, subject to Section 9.3(d) and to the extent permitted by applicable law and not expressly prohibited by any applicable lease agreement, upon request by the Administrative Agent, the Borrower shall cause such Loan Party to permit the Administrative Agent to appoint a nationally-recognized independent environmental testing firm or such other consultant as the Administrative Agent shall determine, at the Loan Parties' expense, to have access to all property owned or leased by each Loan Party and each of its Subsidiaries for the purpose of conducting such environmental testing, including subsurface sampling of soil and groundwater, as the Administrative Agent deems appropriate to investigate the subject of the potential violation or Release.

Section 6.14 Reserved.

Section 6.15 Depository. Within 60 days after the Closing Date, each Loan Party shall maintain BancorpSouth Bank as the principal depository and disbursement bank for each Loan Party and its Subsidiaries, including for the maintenance of all primary business, cash management (including any corporate credit card programs), operating and administrative deposit accounts. For the avoidance of doubt, this Section 6.15 shall not prohibit any Loan Party and its Subsidiaries from maintaining certain non-primary accounts with other Lenders, provided that BancorpSouth Bank acts at all times as the principal depository and disbursement bank for each Loan Party and its Subsidiaries as set forth in this Section 6.15.

Section 6.16 Material Contracts. The Borrower shall, and shall cause each other Loan Party to, (i) perform and observe in all material respects its obligations under the Material Contracts to which such Person is a party, (ii) take all reasonable and necessary action to prevent the termination or cancellation of any Material Contracts to which such Person is a party in accordance with the terms of such Material Contracts or otherwise (except for the expiration of any Material Contract in accordance with its terms and not as a result of a breach or default thereunder), (iii) enforce each material covenant or obligation of such Material Contract to which such Person is a party in accordance with its terms, and (iv) preserve, protect and defend any material rights and remedies under each and every Material Contract, including as

reasonably necessary prosecution of suits to enforce any of their respective rights thereunder and enforcement of any claims with respect thereto.

Section 6.17 Post-Closing. Within 90 days after the Closing Date (or such longer period approved by Administrative Agent), Borrower shall deliver to Administrative Agent a Control Agreement acceptable to Administrative Agent executed by the applicable Loan Parties and Converse County Bank.

## ARTICLE 7

## NEGATIVE COVENANTS

Until the Termination Date, the Borrower covenants and agrees with the Credit Parties that:

Section 7.1 Indebtedness; Equity Interests.

(a) The Borrower will not, and will not permit any Loan Party to, create, incur, assume or permit to exist any Indebtedness, except:

(i) Indebtedness created under the Loan Documents;

(ii) Indebtedness existing on the Agreement Date and set forth in Schedule 7.1;

(iii) Indebtedness of a Loan Party incurred to finance the acquisition of Inventory; provided, (i) Administrative Agent has provide prior written consent to such Indebtedness, (ii) such Indebtedness is repaid in full within 180 days after the incurrence thereof, and (iii) the Loan Party has provided Administrative Agent documentation showing that before and after giving effect to the incurrence of such Indebtedness the Borrower is in compliance with Section 7.12(b).

(iv) intercompany Indebtedness of any Loan Party or any Subsidiary owing to and held by any Loan Party or any Subsidiary; provided, however, that such Indebtedness must be unsecured and expressly subordinated to the prior payment in full in cash of all Secured Obligations;

(v) Guarantees by any Loan Party of Indebtedness of any other Loan Party;

(vi) obligations under any Swap Agreements permitted by Section 7.7;

(vii) Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or other similar instrument drawn against insufficient funds in the ordinary course of business;

(viii) unsecured guarantees arising as a result of customary indemnification obligations to purchasers that are not Affiliates of a Loan Party in connection with any Disposition permitted by Section 7.5;

(ix) Indebtedness incurred in the ordinary course of business under (A) appeal bonds or similar instruments and (B) surety bonds, payment bonds, performance bonds, bid bonds, completion guarantees and similar obligations, workers' compensation claims, health, disability or

other employee benefits, and bankers acceptances issued for the account of any Loan Party or its Subsidiaries and unsecured guarantees thereof;

(b) The Borrower will not, and will not permit any of its Subsidiaries to, (i) issue any Disqualified Equity Interests, or (ii) be or become liable in respect of any obligation (contingent or otherwise) to purchase, redeem, retire, acquire or make any other payment in respect of any Equity Interests of any Loan Party or any of its Subsidiaries, except as permitted under Section 7.8.

Section 7.2 Liens. The Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except:

(a) Liens created under the Loan Documents;

(b) Permitted Encumbrances;

(c) any Lien that secures Indebtedness permitted by Section 7.1(a)(iv), provided (i) such Lien and the Indebtedness secured thereby are incurred prior to or within 90 days after such acquisition of the applicable property, (iii) the Indebtedness secured thereby does not exceed the cost of acquiring, constructing or improving such fixed or capital assets and (iv) such Lien shall not apply to any other property or assets of the Borrower or any Subsidiary;

(d) any Lien on any property or asset of the Borrower or any Subsidiary existing on the Agreement Date and set forth in Schedule 7.2, provided that (i) such Lien shall not apply to any other property or asset of the Borrower or any Subsidiary and (ii) such Lien shall secure only those obligations which it secures on the Agreement Date and any extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof;

(e) any Lien on fixed or capital assets acquired, constructed or improved by the Borrower or any Subsidiary, provided that (i) such Lien secures Indebtedness permitted by Section 7.1(a)(iii), (ii) such Lien and the Indebtedness secured thereby are incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement, (iii) the Indebtedness secured thereby does not exceed the cost of acquiring, constructing or improving such fixed or capital assets and (iv) such Lien shall not apply to any other property or assets of the Borrower or any Subsidiary;

(f) any Lien existing on any property or asset prior to the acquisition thereof by the Borrower or any Subsidiary or existing on any property or asset of any Person that becomes a Subsidiary after the Agreement Date prior to the time such Person becomes a Subsidiary, provided that (i) such Lien secures Indebtedness permitted by Section 7.1(a)(iv), (ii) such Lien is not created in contemplation of or in connection with such acquisition or such Person becoming a Subsidiary, as applicable, (iii) such Lien shall not apply to any other property or assets of the Borrower or any Subsidiary and (iv) such Lien shall secure only the Indebtedness and other obligations that it secures on the date of such acquisition or the date such Person becomes a Subsidiary, as applicable, and any extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof; and

(g) Liens of a depository bank or securities intermediary permitted by any Control Agreement.

Section 7.3 Fundamental Changes; Business; Fiscal Year; Accounting Policies.

(a) The Borrower will not, and will not permit any of its Subsidiaries to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise Dispose of (in one transaction or in a series of transactions) all or substantially all of its assets, or all or substantially all of the Equity Interests issued by any of its Subsidiaries (in each case, whether now owned or hereafter acquired), or liquidate or dissolve, provided that, if at the time thereof and immediately after giving effect thereto, no Default or Event of Default shall or would have occurred and be continuing:

(i) any Wholly-Owned Subsidiary of the Borrower may merge into or consolidate with (A) the Borrower in a transaction in which the Borrower is the surviving entity, and (B) any Guarantor in a transaction in which such Guarantor is the surviving entity;

(ii) the Borrower or any Subsidiary may merge into or consolidate with any Person in a transaction that is not permitted by Section 7.3(a)(i), provided that (x) in the case of a merger involving the Borrower, the Borrower shall be the surviving entity of such merger, (y) such merger is permitted by Section 7.4 and either (A) the Guarantor shall be the surviving entity or (B) such other Person shall become a Guarantor pursuant to Section 6.12, and (z) such merger shall not be prohibited by Section 7.5;

(iii) any Loan Party may sell, transfer, lease or otherwise Dispose of all or substantially all of its assets to the Borrower or to any Guarantor; and

(iv) the Borrower or any of its Subsidiaries may sell, transfer, lease or otherwise Dispose of its assets in a transaction that is not permitted by Section 7.3(a)(iii), provided that such sale, transfer, lease or other Disposition is permitted by Section 7.5; and

(b) The Borrower will not, and will not permit any of its Subsidiaries to, engage to any material extent in any business other than an Approved Line of Business.

(c) The Borrower will not, and will not permit any of its Subsidiaries to, change (i) its Fiscal Year or (ii) except to the extent in accordance with GAAP, its accounting policies from those in effect on the Closing Date.

Section 7.4 Investments, Loans, Advances, Guarantees and Acquisitions. The Borrower will not, and will not permit any of its Subsidiaries to, purchase, hold or acquire (including pursuant to any merger) any Investment, make or permit to exist any Guarantees of any obligations of, or make or permit to exist any investment or any other interest in, any other Person, make any Acquisition or purchase or otherwise enter into or become party to any derivative transaction, except:

(a) Investments in cash and Cash Equivalents;

(b) Investments existing on the Agreement Date and set forth in Schedule 5.13;

(c) equity Investments made by the Borrower in the Equity Interests of any Guarantor;

(d) Investments constituting Indebtedness made by (i) any Loan Party to any Subsidiary thereof or to any other Loan Party or (ii) any Subsidiary to any Loan Party or another Subsidiary, in each case subject to the limitations set forth in Section 7.1(a)(iv) and (v);

(e) acquisitions made by any Loan Party from any other Loan Party, or an acquisition of a Loan Party pursuant to a Permitted Restructuring;

(f) Guarantees permitted by Section 7.1(a);

(g) Swap Agreements permitted by Section 7.7;

(h) payroll, commission, travel and other similar cash advances made to directors (or comparable Persons), officers or employees in the ordinary course of business;

(i) (i) promissory notes and other non-cash consideration received in connection with Dispositions permitted by Section 7.5, (ii) Investments received in settlement of amounts due to any Loan Party or any of its Subsidiaries effected in the ordinary course of business as a result of insolvency, bankruptcy, reorganization, or other similar proceeding involving an account debtor or upon the foreclosure or enforcement of any Lien in favor of a Loan Party or its Subsidiaries and (iii) receivables acquired and held and similar items owing to a Loan Party in the ordinary course of business and payable or dischargeable in accordance with customary trade terms;

(j) Investments of any Person existing at the time such Person becomes a Subsidiary or consolidates or merges with the Borrower or any Subsidiary thereof so long as such Investments were not made in contemplation of such Person becoming a Subsidiary or of such consolidation or merger;

(k) deposits of cash made in the ordinary course of business to secure performance of (i) operating leases and (ii) other contractual obligations that do not constitute Indebtedness,; and

(l) Investments in negotiable instruments deposited or to be deposited for collection in the ordinary course of business.

In determining the amount of Investments, acquisitions, loans, and advances permitted under this Section 7.4, Investments and acquisitions shall always be taken at the original cost thereof (regardless of any subsequent appreciation or depreciation therein) minus all returns of principal, capital, dividends, distributions and other cash returns thereof and minus all liabilities expressly assumed by another Person in connection with the sale or other Disposition of any Investment, and loans and advances shall be taken at the principal amount thereof then remaining unpaid.

Section 7.5 Dispositions. The Borrower will not, and will not permit any Loan Party or any Subsidiaries to, Dispose of any of its assets except:

(a) issuances of Qualified Equity Interests by any Wholly-Owned Subsidiary of a Loan Party to a Loan Party subject to the Collateral and Guarantee Requirement;

(b) the sale or lease of inventory in the ordinary course of business;

(c) the use or transfer of money, cash or Cash Equivalents in a manner that is not prohibited by the terms of this Credit Agreement or the other Loan Documents;

(d) the licensing and sublicensing on a non-exclusive basis of patents, trademarks, copyrights, and other intellectual property rights in the ordinary course of business, and the leasing and subleasing of any other property;

(e) the granting of Liens permitted hereunder and the other transactions permitted by Section 7.2;

(f) any Casualty Event and the Disposition of any property subject thereto;

(g) the abandonment, cancellation or lapse of issued patents, registered trademarks and other registered intellectual property of a Loan Party or Subsidiary thereof to the extent, in such Loan Party's reasonable business judgment, not economically desirable in the conduct of such Loan Party's business or so long as such lapse is not materially adverse to the interests of the Lenders and (ii) the expiration of patents in accordance with their statutory terms;

(h) the sale of assets (other than Equity Interests of any Wholly-Owned Subsidiary, unless all of the Equity Interests of such Wholly-Owned Subsidiary (other than the Borrower) are sold in accordance with this clause (i)) for at least fair market value, so long as (A) no Default or Event of Default then exists or would immediately result therefrom, (B) at least 75% of the consideration received by the applicable Loan Party consists of cash or Cash Equivalents and is paid at the time of the closing of such sale, and (C) the Net Cash Proceeds therefrom are applied and/or reinvested as (and to the extent) required by Section 2.7(b)(i)(A);

(i) any trade in of equipment in exchange for other equipment in the ordinary course of business or any disposition of worn out, damaged, uneconomical, surplus or obsolete equipment; and

(j) the unwinding or terminating of hedging arrangements or transactions contemplated by any Swap Agreement which are not prohibited hereunder.

To the extent the Required Lenders or all the Lenders, as applicable, waive the provisions of this Section 7.5 with respect to the sale of any Collateral, or any Collateral is sold as permitted by this Section 7.5, such Collateral (unless sold to a Loan Party) shall be sold automatically free and clear of the Liens created by the Collateral Documents and, at the expense of the Loan Parties, the Administrative Agent shall take all reasonable actions any Loan Party reasonably requests in writing in order to effect the foregoing.

Section 7.6 Sale and Lease Back Transactions. The Borrower will not, and will not permit any of its Subsidiaries to, enter into any Sale and Leaseback arrangement, directly or indirectly, with any Person.

Section 7.7 Swap Agreements. The Borrower will not, and will not permit any of its Subsidiaries to, enter into any Swap Agreement, except (a) Swap Agreements entered into in the ordinary course of business to hedge or mitigate risks to which the Borrower or any Subsidiary has actual exposure (other than those in respect of Equity Interests of the Borrower or any Subsidiary) and that are not for speculative purposes, and (b) Swap Agreements entered into in order to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of such Loan Party or Subsidiary.

Section 7.8 Restricted Payments. The Borrower will not, and will not permit any of its Subsidiaries to, declare or make, or agree to pay for or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except:

(a) subject to the Collateral and Guarantee Requirement, any Subsidiary of the Borrower may declare and pay, and agree to pay, dividends and other distributions with respect to its Equity Interests payable solely in Equity Interests (other than Disqualified Equity Interests);

(b) the Borrower may declare and pay Permitted Tax Distributions; and

(c) So long as (i) no Event of Default is continuing or would result therefrom, is continuing and, (ii) before and after giving effect to such Distribution, the Senior Leverage Ratio is no more than 1.00 to 1.00, the Borrower may declare and pay Distributions once per year.

Section 7.9 Transactions with Affiliates. The Borrower will not, and will not permit any of its Subsidiaries to, Dispose (including pursuant to a merger) of any property or assets to, or purchase, lease or otherwise acquire (including pursuant to a merger) any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (i) any Permitted Restructuring transaction, (ii) transactions disclosed on Schedule 5.28 (including any amendments, extensions, or modifications thereof in each case on the same or better material terms from the Borrower's perspective), and (iii) in the ordinary course of business and at prices and on terms and conditions not less favorable to such Loan Party or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties. For the avoidance of doubt, this Section shall not apply to any transaction that is expressly permitted under Sections 7.1, 7.3, 7.4, 7.5 or 7.8 of this Credit Agreement between or among the Loan Parties and not involving any other Affiliate.

Section 7.10 Restrictive Agreements. The Borrower will not, and will not permit any Loan Parties or any of its Subsidiaries to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of any Loan Party or any of its Subsidiaries to create, incur or permit to exist any Lien upon any of its property or assets (unless such agreement or arrangement does not prohibit, restrict or impose any condition upon the ability of any Loan Party to create, incur or permit to exist, or the ability of the Administrative Agent to exercise any right or remedy with respect to, any Lien in favor of the Administrative Agent on behalf of the Secured Parties created under the Loan Documents) or (b) the ability of any Subsidiary to pay dividends or make other distributions with respect to any of its Equity Interests or to make or repay loans or advances to any Loan Party or any other Subsidiary or to Guarantee Indebtedness of any Loan Party or any other Subsidiary, provided that (i) the foregoing shall not apply to (A) restrictions and conditions imposed by law or by the Loan Documents, (B) restrictions and conditions existing on the Agreement Date identified on Schedule 7.10 (but shall apply to any extension or renewal of, or any amendment or modification expanding the scope of, any such restriction or condition), and (C) customary restrictions and conditions contained in agreements relating to the sale of a subsidiary pending such sale, provided that such restrictions and conditions apply only to its Subsidiary that is to be sold and such sale is permitted hereunder, (ii) clause (a) of this Section shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Credit Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, and (iii) clause (a) of this Section shall not apply to customary provisions in agreements restricting the assignment thereof.

Section 7.11 Amendment of Material Documents. The Borrower will not, and will not permit any Loan Parties or any of its Subsidiaries to, amend, supplement modify or waive any of its rights under any Material Contract, Subordinated Debt Document, any document governing Junior Debt or any of its Organizational Documents, in each case other than immaterial amendments, modifications or waivers that could not reasonably be expected to adversely affect the Credit Parties; provided that the Borrower shall deliver or cause to be delivered to the Administrative Agent and each Lender a copy of all amendments, modifications or waivers thereto promptly after the execution and delivery thereof.

Section 7.12 Financial Covenants.

(a) Fixed Charge Coverage Ratio. The Borrower will not permit the Fixed Charge Coverage Ratio as of the end of any Measurement Period to be less than 1.25 to 1.00.

(b) Senior Leverage Ratio. The Borrower will not permit the Senior Leverage Ratio as of the end of any Measurement Period to be greater than the ratio set forth opposite such Measurement Period below:

| Measurement Period | Maximum Ratio |
|---|---|
| As of the end of the Measurement Period ending September 30, 2021 | 3.50 to 1.0 |
| As of the end of the Measurement Period ending December 31, 2021 | 3.25 to 1.0 |
| As of the end of any Measurement Period thereafter | 3.0 to 1.0 |

(c) Liquidity. The Borrower will not permit the sum of (i) Availability plus (ii) cash or Cash Equivalents, that are neither encumbered nor restricted, to be less than $4,000,000 as of the Closing Date or as of the end of any fiscal quarter of Borrower.

Section 7.13 Payments on Subordinated and Junior Debt. The Borrower will not, and will not permit any Loan Parties or any of its Subsidiaries to, declare or make, or agree to pay for or make, directly or indirectly, any repayment or prepayment of principal or interest or any purchase, redemption, retirement, acquisition or defeasance with respect to any Junior Debt; provided that so long as no Default or Event of Default shall have occurred and shall be continuing or would immediately result therefrom, (a) any Loan Party or any of its Subsidiaries may make regularly scheduled payments of interest, fees, expenses and indemnification obligations of Junior Debt and other Subordinated Debt to the extent permitted by the subordination provisions applicable thereto, and (c) Loan Parties may make payments of Subordinated Debt and Junior Debt as a result of the conversion of all or any portion of any such Subordinated Debt or Junior Debt into Qualified Equity Interests of any Loan Party or any of its Subsidiaries.

Section 7.14 Government Regulation. The Borrower will not, and will not permit any Loan Parties or Subsidiaries to, (a) at any time be or become the subject of any law, regulation, or list of any government agency (including the United States Office of Foreign Asset Control list) that prohibits or limits any Lender from making any loans or extension of credit (including the Loans and the Letters of Credit) to any Loan Party or from otherwise conducting business with any Loan Party, or (b) fail to provide documentary and other evidence of any Loan Party's identity as may be requested by any Credit Party at any time to enable such Credit Party to verify any Loan Party's identity or to comply with any applicable law or regulation, including Section 326 of the USA PATRIOT Act.

Section 7.15 Hazardous Materials. The Borrower will not, and will not permit any Loan Parties or Subsidiaries to, cause or permit a Release or threat of Release of Hazardous Materials on, at, in, above, to, from or about any of the property where such Release or threat of Release would (a) violate, or form the basis for any Environmental Claims under, any Environmental Law or any Environmental Permit or (b) otherwise adversely impact the value or marketability of any property of any Loan Party or any of its Subsidiaries or any of the Collateral; other than, in each case, any such Release, violation or Environmental Claim as could not reasonably be expected to result in a material Environmental Liability.

Section 7.16 Use of Proceeds. The Borrower shall not, and shall not permit any Loan Parties or Subsidiaries to, use the proceeds of any Credit Extension in a manner that would violate Section 5.26 or Section 6.8.

## ARTICLE 8

## EVENTS OF DEFAULT

Section 8.1 Events of Default. Any of the following shall constitute an Event of Default:

(a) Non-Payment of Principal. Any Loan Party shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise.

(b) Other Non-Payment. Any Loan Party shall fail to pay any interest on any Loan or any fee, commission or any other amount (other than an amount referred to in clause (a) of this Section) payable under any Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three Business Days.

(c) Representations and Warranties. Any representation or warranty made or deemed made by or on behalf of any Loan Party or any of its Subsidiaries in or in connection with any Loan Document or any amendment or modification hereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made.

(d) Specific Covenants. Any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in Sections 6.1, 6.2(a), 6.3, 6.7, 6.8, 6.10, 6.12, 6.14, or 6.15, or in Article 7, or any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in the Guarantee Agreement or any Collateral Document to which it is a party and such failure continues beyond any applicable notice and cure period set forth therein.

(e) Other Covenants. Any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in any Loan Document to which it is a party (other than those specified in clause (a), (b) or (d) of this Article), and such failure shall continue unremedied for a period of 20 days after the occurrence thereof.

(f) Cross Default - Payment Default on Material Indebtedness. Any Loan Party shall fail to make any payment (whether of principal, interest or otherwise and regardless of amount) in respect of any Material Indebtedness when and as the same shall become due and payable (after giving effect to any applicable grace period).

(g) Other Cross-Defaults. (i) Any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or payment date, or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due prior to their scheduled maturity or payment date or to require the prepayment, repurchase, redemption or defeasance thereof prior to their scheduled maturity or payment date (in each case after giving effect to any applicable notice and any applicable cure period), provided that this clause (g) shall not apply to secured Indebtedness that becomes due solely as a result of the voluntary sale, transfer or other disposition of the property or assets securing such Indebtedness; or (ii) any Loan Party or any of its Subsidiaries shall breach or default on any payment obligation constituting a Swap Agreement Obligation.

(h) Involuntary Proceedings. An involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of any

Loan Party or any of its Subsidiaries or its debts, or of a substantial part of its assets, under any Debtor Relief Law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Loan Party or any of its Subsidiaries or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 45 days or an order or decree approving or ordering any of the foregoing shall be entered.

(i) Voluntary Proceedings. Any Loan Party or any of its Subsidiaries shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Debtor Relief Law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Article, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Loan Party or any of its Subsidiaries or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing.

(j) Inability to Pay Debts. Any Loan Party or any of its Subsidiaries shall become unable, admit in writing its inability or fail generally to pay its debts as they become due.

(k) Judgments. (i) One or more judgments for the payment of money in an aggregate amount in excess of the Threshold Amount shall be rendered against any Loan Party or any of its Subsidiaries or any combination thereof (which shall not be fully covered (without taking into account any applicable deductibles) by insurance from an unaffiliated insurance company with an A.M. Best financial strength rating of at least A-, it being understood that even if such amounts are covered by insurance from such an insurance company, such amounts shall count against such basket if responsibility for such amounts has been denied by such insurance company) or (ii) any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and, in either case, the same shall remain undischarged or unbonded for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of any Loan Party or any of its Subsidiaries to enforce any such judgment.

(l) ERISA Events. (i) An ERISA Event shall have occurred that, in the opinion of the Required Lenders, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in liability of any Loan Party or any of its Subsidiaries (or in the case of an ERISA Event described in subsection (b) of the definition of that term in Section 1.1, could reasonably be expected to subject any Loan Party, any of its Subsidiaries, any Pension Plan, any trust created thereunder, any trustee or administrator thereof, or any party dealing with any Pension Plan or trust to a tax or penalty on "prohibited transactions" under Section 502 of ERISA or Section 4975 of the Code) in an aggregate amount exceeding the Threshold Amount for all periods, (ii) an ERISA Event shall occur with respect to a Pension Plan or Multiemployer Plan that constitutes grounds for appointment of a trustee for or termination by the PBGC of any Pension Plan or Multiemployer Plan; (iii) a Loan Party or ERISA Affiliate shall fail to pay when due any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan; (iv) any event similar to the foregoing shall occur or exist with respect to a Foreign Plan; or (v) there shall be at any time a Lien imposed against the assets of any Loan Party or ERISA Affiliate under Section 412 or Section 430 of the Code or Sections 302, Section 303, or Section 4068 of ERISA, which, in each case, could reasonably be expected to have a Material Adverse Effect.

(m) Invalidity of Loan Documents; Subordination.

(i) Any Loan Document shall cease, for any reason, to be in full force and effect, or any Loan Party shall so assert in writing or shall disavow any of its obligations thereunder; or

(ii) (A) The subordination provisions of the documents evidencing or governing any Junior Debt or other Subordinated Debt (the "Subordination Provisions") shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Junior Debt; or (B) either Borrower or any other Loan Party shall, directly or indirectly, disavow or contest in any manner (1) the effectiveness, validity or enforceability of any of the Subordination Provisions, (2) that the Subordination Provisions exist for the benefit of the Administrative Agent and the Lenders or (3) that all payments of principal of or premium and interest on the applicable Junior Debt, or realized from the liquidation of any property of any Loan Party, shall be subject to any of the Subordination Provisions.

(n) Liens and Collateral. (i) Any Lien purported to be created under any Collateral Document shall cease to be, or shall be asserted by any Loan Party not to be, a valid and perfected Lien on portion of the Collateral, with the priority required by the applicable Collateral Document, or (ii) any material portion of the Collateral shall have been lost, stolen or destroyed, in each case except (A) as a result of the sale or other disposition of the applicable Collateral in a transaction permitted under the Loan Documents or (B) as a result of the Administrative Agent's failure to maintain possession of any stock certificates, promissory notes or other instruments delivered to it under the Security Agreement.

(o) Licenses. There shall occur the loss, suspension or revocation of, or failure to renew any license or permit now held or hereafter acquired if such loss, suspension, revocation or failure to renew could reasonably be expected to have a Material Adverse Effect.

(p) Change of Control. A Change of Control shall occur.

Section 8.2 Remedies Upon Event of Default. If any Event of Default occurs and is continuing, then, and in every such event (other than an event described in Section 8.1(h) or (i)), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, take any or all of the following actions (whether before or after the Closing Date), at the same or different times: (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately and (ii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of each Loan Party accrued under the Loan Documents, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower, and in case of any event described in Section 8.1(h) or (i), the Commitments shall automatically terminate (whether before or after the Closing Date), the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of each Loan Party accrued under the Loan Documents, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.

Section 8.3 Application of Funds. After the exercise of remedies provided for in Section 8.2 (or after the Loans have automatically become immediately due and payable), any amounts received on account of the Secured Obligations shall be applied by the Administrative Agent in the following order:

First, to the payment of that portion of the Secured Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Administrative Agent and amounts payable under Article 3), in each case payable to the Administrative Agent in its capacity as such;

Second, to the extent of any excess of such proceeds, to the payment of that portion of the Secured Obligations constituting fees, indemnities, expenses and other amounts;

Third, to the extent of any excess of such proceeds, to the payment of that portion of the Secured Obligations constituting fees, indemnities and other amounts, payable to the Credit Parties (including fees, charges and disbursements of counsel to the respective Credit Parties and amounts payable under Article 3 but excluding fees described in Section 3.2(b)), ratably among them in proportion to the respective amounts described in this clause Third payable to them;

Fourth, to the extent of any excess of such proceeds, to the payment of that portion of the Secured Obligations constituting accrued and unpaid fees under Section 3.2(b) and interest on the Loans and other Secured Obligations, ratably among the Credit Parties in proportion to the respective amounts described in this clause Fourth payable to them;

Fifth, to the extent of any excess of such proceeds, to the payment of that portion of the Secured Obligations constituting unpaid principal of the Loans, the Cash Management Obligations and the Swap Agreement Obligations, ratably among the Secured Parties in proportion to the respective amounts described in this clause Fifth held by them;

Sixth, to the extent of any excess of such proceeds, to the payment of all other Secured Obligations of the Loan Parties owing under or in respect of the Loan Documents that are due and payable to the Credit Parties, or any of them, on such date, ratably based on the respective aggregate amounts of all such Secured Obligations owing to the Administrative Agent and the Lenders on such date; and

Last, to the extent of any excess of such proceeds, the balance, if any, after all of the Secured Obligations (other than unasserted contingent indemnification and unasserted expense reimbursement obligations in each case not yet due and payable) have been paid in full, to the Borrower or as otherwise required by law.

Notwithstanding anything to the contrary set forth above, Excluded CEA Swap Obligations with respect to any Guarantor shall not be paid with amounts received from such Guarantor or its assets, but appropriate adjustments shall be made with respect to payments from other Loan Parties to preserve the allocation to Secured Obligations otherwise set forth above in this Section.

Section 8.4 Equity Cure. In the event that the Borrower fails to comply with the requirements of any financial covenant set forth in Section 7.12, until the tenth (10th) day after the applicable testing date, Borrower shall have the right, upon written notice to the Administrative Agent, to cause Borrower's parent or owners to contribute funds to Borrower (including by means of issuing additional equity interests for cash or otherwise receive cash contributions to the equity capital so long as no Change of Control shall occur), and apply the amount of the proceeds thereof to satisfy the applicable financial covenant with respect to the applicable testing period (the "Cure Right"); provided that (a) such proceeds are actually received by the Borrower no later than ten (10) days after the applicable testing date for the relevant financial covenant(s), (b) such proceeds do not exceed the aggregate amount necessary to cure (the "Cure Amount") such Default under Section 7.12 for such period, (c) the Cure Right shall not be (y) exercised in

consecutive quarters, and (z) exercised more than (i) one time in any four fiscal quarter period and (ii) during the term of this Agreement, two times in total, and (d) within one Business Day of the receipt of the Cure Amount Borrower shall prepay the Loan by an amount equal or take such other necessary action up to such Cure Amount. If, after giving effect to the foregoing, the Borrower is in compliance with the financial covenants set forth in Section 7.12, the Borrower shall be deemed to have satisfied the requirements of such Section as of the relevant date of determination with the same effect as though there had been no failure to comply on such date, and the applicable breach or default of such Section 7.12 that had occurred shall be deemed cured for purposes of this Agreement.

# ARTICLE 9

## THE ADMINISTRATIVE AGENT

Section 9.1 Appointment and Authority. Each of the Lenders hereby irrevocably appoints BancorpSouth Bank to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Administrative Agent and the Lenders and neither the Borrower nor any other Loan Party shall have rights as a third-party beneficiary of any of such provisions. It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

Section 9.2 Rights as a Lender. The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for, and generally engage in any kind of business with, each Loan Party or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

Section 9.3 Exculpatory Provisions.

(a) The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, the Administrative Agent:

(i) shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(ii) shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may

expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(iii) shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

(b) The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 8.2 and Section 10.2), or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent in writing by the Borrower or a Lender.

(c) The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Credit Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Credit Agreement, any other Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article 5 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

(d) The Administrative Agent shall not be responsible or have any liability for, or have any duty to investigate a violation or potential violation of an Environmental Law or a Release or threat of Release of a Hazardous Material pursuant to Section 6.13, nor shall it have any liability for any action it takes or does not take in connection with any such investigation.

Section 9.4 Reliance by Administrative Agent. The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 9.5 Delegation of Duties. The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such

sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the Credit Facility as well as activities as Administrative Agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

Section 9.6 Resignation of Administrative Agent.

(a) The Administrative Agent may at any time give notice of its resignation to the Lenders and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "Resignation Effective Date"), then the retiring Administrative Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above, provided that in no event shall any such successor Administrative Agent be a Defaulting Lender. Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date. Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b) If the Person serving as Administrative Agent is a Defaulting Lender pursuant to clause (d) of the definition thereof, the Required Lenders may, to the extent permitted by applicable law, by notice in writing to the Borrower and such Person remove such Person as Administrative Agent and, in consultation with the Borrower, appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days (or such earlier day as shall be agreed by the Required Lenders) (the "Removal Effective Date"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

(c) With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (i) the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (ii) except for any indemnity payments owed to the retiring or removed Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring or removed Administrative Agent (other than any rights to indemnity payments owed to the retiring or removed Administrative Agent), and the retiring or removed Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents. The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring or removed Administrative Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Article and Section 10.3 shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or

omitted to be taken by any of them while the retiring or removed Administrative Agent was acting as Administrative Agent.

Section 9.7 Non-Reliance on Administrative Agent and Other Lenders. Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Credit Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Credit Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Section 9.8 No Other Duties, Etc. Anything herein to the contrary notwithstanding, none of the Lead Arranger or any agent listed on the cover page hereof shall have any powers, duties or responsibilities under this Credit Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent or a Lender hereunder.

Section 9.9 Administrative Agent May File Proofs of Claim. In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Loan Document Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Section 10.3) allowed in such judicial proceeding; and

(b) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Section 10.3.

Section 9.10 Collateral and Guarantee Matters.

(a) The Secured Parties irrevocably authorize the Administrative Agent, at its option and in its discretion,

(i) to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (A) at the Termination Date, (B) that is sold or otherwise Disposed of or to be sold or otherwise Disposed of as part of or in connection with any

sale or other Disposition permitted under the Loan Documents (including all of the Collateral of a Guarantor which is released from its obligations under the Loan Documents pursuant to clause (iii) below); provided, however, any sale or Disposition of all or substantially all of the Collateral or all or substantially all of the value of the Guarantees under the Guarantee Agreement shall be subject to Section 10.2(b), or (C) subject to Section 10.2, if approved, authorized or ratified in writing by the Required Lenders;

(ii) to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 7.2(d); and

(iii) to release any Guarantor from its obligations under the Loan Documents if such Person ceases to be a Subsidiary as a result of a transaction permitted under the Loan Documents, provided, however, that the release of all or substantially all of the Collateral or all or substantially all of the value of the Guarantees under the Guarantee Agreement shall be subject to Section 10.2(b).

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Loan Documents pursuant to this Section 9.10.

(b) The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

Section 9.11 Compliance with Flood Insurance Laws. The Administrative Agent has adopted internal policies and procedures that address requirements placed on federally regulated lenders under the Flood Insurance Laws and will post on the applicable electronic platform (or otherwise distribute to each Lender documents that it receives in connection with the Flood Insurance Laws (collectively, the "Flood Documents"); provided, however that the Administrative Agent makes no representation or warranty with respect to the adequacy of the Flood Documents or their compliance with the Flood Insurance Laws. Each Lender acknowledges and agrees that it is individually responsible for its own compliance with the Flood Insurance Laws and that it shall, independently and without reliance upon Administrative Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, including the Flood Documents posted or distributed by the Administrative Agent, continue to do its own due diligence to ensure its compliance with the Flood Insurance Laws.

Section 9.12 Cash Management Obligations and Swap Agreement Obligations. Except as otherwise expressly set forth herein or in the Security Agreement, any other Collateral Document or any other Loan Document, no Person holding Cash Management Obligations or Swap Agreement Obligations that obtains the benefits of any Guarantee under the Guarantee Agreement or any Collateral by virtue of the provisions hereof or of any Loan Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral or amendment to any Loan Document (including any Collateral Document) other than in its capacity as a Lender or Administrative Agent and, in such case, only to the extent expressly provided in the Loan Documents. Notwithstanding any other provision of this Article 9 to the contrary, the Administrative Agent shall not be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Cash Management

Obligations or Swap Agreement Obligations except to the extent expressly required hereunder, provided that the Administrative Agent has received a Secured Obligation Designation Notice, together with such supporting documentation as the Administrative Agent may request, from the applicable Person holding such Secured Obligations. The Administrative Agent shall not be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Cash Management Obligations and Swap Agreement Obligations in the case of the Termination Date.

# ARTICLE 10

# MISCELLANEOUS

Section 10.1 Notices.

(a) Notices Generally. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile or electronic communications as follows:

(i) if to any Loan Party, to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 10.1;

(ii) if to the Administrative Agent, to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 10.1; and

(iii) if to any other Credit Party, the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices delivered through electronic communications (other than facsimile) to the extent provided in paragraph (b) below, shall be effective as provided in said paragraph (b).

(b) Electronic Communications. Notices and other communications to the Credit Parties hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Credit Party pursuant to Article 2 if such Credit Party has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient

at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c) Change of Address, Etc. Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other parties hereto.

(d) Platform.

(i) The Borrower agrees that the Administrative Agent may, but shall not be obligated to, make the Communications available to the other Lenders by posting the Communications on the Platform and that certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive material non-public information with respect to the Loan Parties or their Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities.

(ii) The Borrower hereby acknowledges and agrees that so long as any Loan Party is the issuer of any outstanding debt or equity securities that are registered or issued pursuant to a private offering or is actively contemplating issuing any such securities it will use commercially reasonable efforts to identify that portion of the Communications that may be distributed to the Public Lenders and that: (A) all such Communications shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, means that the word "PUBLIC" shall appear prominently on the first page thereof; (B) by marking such Communications "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent, Lead Arranger and the Lenders to treat such Communications as not containing any material non-public information (although it may be sensitive and proprietary) with respect to any Loan Party or its securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Communications constitute Information, they shall be treated as set forth in Section 10.15); (C) all Communications marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (D) the Administrative Agent and the Lead Arranger shall be entitled to treat any Communications that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information".

(iii) The Platform is provided "as is" and "as available." The Agent Parties (as defined below) do not warrant the adequacy of the Platform and expressly disclaim liability for errors or omissions in the Communications. No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Communications or the Platform. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to the Borrower or the other Loan Parties, any Lender or any other Person or entity for damages of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Loan Party's or the Administrative Agent's transmission of communications through the Platform.

Section 10.2 Waivers; Amendments.

(a) No failure or delay by any Credit Party in exercising any right or power under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Credit Parties under the Loan Documents are cumulative and are not exclusive of any rights or remedies

that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section 10.2, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether any Credit Party may have had notice or knowledge of such Default at the time.

(b) Except as expressly provided by Section 3.3(b), or in any of the other paragraphs of this Section 10.2, neither this Credit Agreement, any other Loan Document (other than the Fee Letter) nor any provision thereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Loan Parties and the Required Lenders (or, in the case of waivers of any condition precedent to any Revolving Borrowing set forth in Section 4.2, the Required Lenders in respect of the Revolving Facility), or by the Borrower and the Administrative Agent with the consent of the Required Lenders; provided that no such agreement shall:

(i) extend or increase any Commitment of any Lender without the written consent of such Lender (it being understood that a waiver of (A) any condition precedent set forth in Article 4, (B) any Default or Event of Default or (C) any mandatory prepayment, shall not constitute an extension or increase of any Commitment of any Lender;

(ii) reduce the principal amount of any Loan, or reduce the rate of any interest, or reduce any fees or other amounts, payable under the Loan Documents, without the written consent of each Credit Party directly and adversely affected thereby; provided that only the consent of the Required Lenders shall be necessary to (A) amend or modify any Financial Covenant, any defined terms used therein or the definition of "Default Rate", (B) waive any obligation of the Borrower to pay interest at the Default Rate, (C) waive any condition precedent set forth in Article 4, (D) waive any Default or Event of Default or (E) waive any mandatory prepayment, in each case, notwithstanding the fact that any such amendment, modification, or waiver actually results in reduction in the rate of interest or fees;

(iii) postpone any date scheduled for any payment of principal of, or interest on, any Loan, or any fees or other amounts payable hereunder or under any other Loan Document, or reduce the amount of, waive or excuse any such payment, or postpone the stated termination or expiration of the Revolving Commitments or reduce the amount of or postpone the date of any prepayment required by Section 2.7(b) without the written consent of each Credit Party directly and adversely affected thereby (it being understood that a waiver of (A) any condition precedent set forth in Article 4, (B) any Default or Event of Default or (C) any mandatory prepayment shall not constitute such a postponement or reduction);

(iv) except as provided in subsection (c) below, change any provision hereof in a manner that would alter the pro rata sharing of payments required by Section 2.8(b) or the pro rata reduction of Revolving Commitments required by Section 2.5(d), without the written consent of each Lender;

(v) change any of the provisions of this Section or the definition of the term "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender;

(vi) change the currency in which any Commitment or Loan is, or is to be, denominated, Letters of Credit are to be issued or payment under the Loan Documents is to be made without the written consent of each Lender directly affected thereby;

(vii) release any Guarantor from its Guarantee under the Guarantee Agreement (except as expressly provided therein or in Section 9.10), or limit its liability in respect of such Guarantee, without the written consent of each Lender;

(viii) release all or substantially all of the Collateral from the Liens of the Loan Documents (except as expressly provided in the applicable Collateral Document or in connection with a transaction permitted by Section 7.3), without the consent of each Lender;

(ix) alter the order of priority of payments set forth in Section 8.3 without the written consent of each Lender; or

(x) permit the Borrower or any Guarantor to assign its rights or obligations under the Loan Documents without the written consent of each Lender; and

provided, further, that no such amendment, waiver or consent shall amend, modify or otherwise affect the rights or duties hereunder or under any other Loan Document of the Administrative Agent, unless in writing executed by the Administrative Agent, in addition to the Borrower and the Lenders required above.

(c) Notwithstanding anything herein to the contrary, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent that by its terms requires the consent of all the Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders, except that (x) the Commitment of any Defaulting Lender may not be increased or extended, or the maturity of any of its Loan may not be extended, the rate of interest on any of its Loans may not be reduced and the principal amount of any of its Loans may not be forgiven, in each case without the consent of such Defaulting Lender and (y) any amendment, waiver or consent requiring the consent of all the Lenders or each affected Lender that by its terms affects any Defaulting Lender more adversely than the other affected Lenders shall require the consent of such Defaulting Lender.

(d) [Reserved].

(e) In addition, notwithstanding anything in this Section 10.2, any other provision of this Agreement or any other Loan Document to the contrary, if the Administrative Agent and the Borrower shall have jointly identified an obvious error or any error or omission of a technical nature, in each case, in any provision of the Loan Documents, then the Administrative Agent and the Borrower shall be permitted to amend such provision, and, in each case, such amendment shall become effective without any further action or consent of any other party to any Loan Document if the same is not objected to in writing by the Required Lenders to the Administrative Agent within ten Business Days following receipt of notice thereof.

Section 10.3 Expenses; Indemnity; Damage Waiver.

(a) Costs and Expenses. The Loan Parties, jointly and severally, shall pay (i) all reasonable out-of-pocket expenses incurred by the Administrative Agent, Lead Arranger and their respective Affiliates (including Attorney Costs of counsel for the Administrative Agent), in connection with the syndication of the Credit Facility provided for herein, the preparation, negotiation, execution, delivery and administration of this Credit Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated

hereby or thereby shall be consummated) and (ii) all reasonable out-of-pocket expenses incurred by the Administrative Agent, Lead Arranger or any Credit Party (including Attorney Costs of the Administrative Agent or any Credit Party), in connection with the enforcement or protection of its rights (whether through negotiations, legal proceedings or otherwise) (A) in connection with this Credit Agreement and the other Loan Documents, including its rights under this Section, or (B) in connection with the Loans made or Letters of Credit issued hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit.

(b) INDEMNIFICATION BY LOAN PARTIES. THE LOAN PARTIES, JOINTLY AND SEVERALLY, SHALL INDEMNIFY THE ADMINISTRATIVE AGENT (AND ANY SUB-AGENT THEREOF), EACH CREDIT PARTY, AND EACH RELATED PARTY OF ANY OF THE FOREGOING PERSONS (EACH SUCH PERSON BEING CALLED AN "INDEMNITEE") AGAINST, AND HOLD EACH INDEMNITEE HARMLESS FROM, ANY AND ALL LOSSES, CLAIMS, DAMAGES, LIABILITIES AND RELATED EXPENSES (INCLUDING ATTORNEY COSTS), INCURRED BY ANY INDEMNITEE OR ASSERTED AGAINST ANY INDEMNITEE BY ANY THIRD PARTY OR BY ANY LOAN PARTY ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF (I) THE EXECUTION OR DELIVERY OF THIS CREDIT AGREEMENT, ANY OTHER LOAN DOCUMENT OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR THEREBY, THE PERFORMANCE BY THE PARTIES HERETO OF THEIR RESPECTIVE OBLIGATIONS HEREUNDER OR THEREUNDER OR THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, (II) ANY LOAN OR THE USE OR PROPOSED USE OF THE PROCEEDS THEREFROM, (III) ANY ACTUAL OR ALLEGED PRESENCE OR RELEASE OF HAZARDOUS MATERIALS AT, ON, UNDER OR FROM ANY PROPERTY OWNED OR OPERATED BY ANY LOAN PARTY OR ANY OF ITS SUBSIDIARIES, OR ANY ENVIRONMENTAL CLAIM OR ENVIRONMENTAL LIABILITY RELATED IN ANY WAY TO ANY LOAN PARTY OR ANY OF ITS SUBSIDIARIES, (IV) ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY, WHETHER BROUGHT BY A THIRD PARTY OR BY ANY LOAN PARTY, AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO OR (V) ANY GOVERNMENT INVESTIGATION, AUDIT, HEARING OR ENFORCEMENT ACTION RESULTING FROM ANY LOAN PARTY'S OR ANY OF ITS AFFILIATE'S NONCOMPLIANCE (OR PURPORTED NONCOMPLIANCE) WITH ANY APPLICABLE SANCTIONS, OTHER ANTI-TERRORISM LAWS OR ANTI-CORRUPTION LAWS (IT BEING UNDERSTOOD AND AGREED THAT THE INDEMNITEES SHALL BE ENTITLED TO INDEMNIFICATION PURSUANT TO THIS CLAUSE (INCLUDING INDEMNIFICATION FOR FINES, PENALTIES AND OTHER EXPENSES) REGARDLESS OF WHETHER ANY ADVERSE FINDING IS MADE AGAINST ANY LOAN PARTY OR ANY OF ITS AFFILIATES). WITHOUT LIMITING ANY PROVISION OF THIS CREDIT AGREEMENT OR ANY OTHER LOAN DOCUMENT, **IT IS THE EXPRESS INTENTION OF THE PARTIES HERETO THAT EACH INDEMNITEE SHALL BE INDEMNIFIED AGAINST, AND HELD HARMLESS FROM, ANY AND ALL LOSSES, CLAIMS, DAMAGES, LIABILITIES AND RELATED EXPENSES (INCLUDING ATTORNEY COSTS), INCURRED BY ANY INDEMNITEE OR ASSERTED AGAINST ANY INDEMNITEE BY ANY THIRD PARTY OR BY ANY LOAN PARTY ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF, THE SOLE, CONTRIBUTORY, COMPARATIVE, CONCURRENT OR ORDINARY NEGLIGENCE OF SUCH INDEMNITEE;** PROVIDED THAT SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LOSSES, CLAIMS, DAMAGES, LIABILITIES OR RELATED EXPENSES (A)(X) ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NON-APPEALABLE JUDGMENT TO HAVE RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE OR (Y) RESULT FROM A CLAIM BROUGHT BY ANY LOAN PARTY AGAINST AN

INDEMNITEE FOR A MATERIAL BREACH OF SUCH INDEMNITEE'S OBLIGATIONS HEREUNDER OR UNDER ANY OTHER LOAN DOCUMENT, IF SUCH LOAN PARTY HAS OBTAINED A FINAL AND NON-APPEALABLE JUDGMENT IN ITS FAVOR ON SUCH CLAIM AS DETERMINED BY A COURT OF COMPETENT JURISDICTION OR (B) ARISE OUT OF ANY CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING BROUGHT BY SUCH INDEMNITEE AGAINST ANOTHER INDEMNITEE (OTHER THAN ANY CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING THAT IS BROUGHT BY OR AGAINST THE ADMINISTRATIVE AGENT OR THE LEAD ARRANGER, ACTING IN ITS CAPACITY AS SUCH) THAT DOES NOT INVOLVE ANY ACT OR OMISSION OF THE BORROWER OR ANY OF ITS SUBSIDIARIES OR AFFILIATES. TO THE EXTENT THAT THE INDEMNITY SET FORTH ABOVE IN THIS PARAGRAPH SHALL BE HELD TO BE UNENFORCEABLE IN WHOLE OR IN PART BECAUSE IT IS VIOLATIVE OF ANY LAW OR PUBLIC POLICY, THE BORROWER SHALL CONTRIBUTE THE MAXIMUM PORTION THAT IT IS PERMITTED TO PAY AND SATISFY UNDER APPLICABLE LAW TO THE PAYMENT AND SATISFACTION OF ALL INDEMNIFIED AMOUNTS INCURRED BY INDEMNITEES OR ANY OF THEM.

(c) Reimbursement by Lenders. To the extent that the Borrower for any reason fails to indefeasibly pay any amount required under paragraph (a) or (b) of this Section to be paid by it to the Administrative Agent (or any sub-agent thereof), or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), or such Related Party, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought based on each Lender's share of the Total Credit Exposure at such time) of such unpaid amount (including any such unpaid amount in respect of a claim asserted by such Lender); provided, that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent), or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) in connection with such capacity. The obligations of the Lenders under this paragraph (c) are subject to the provisions of Section 2.8(d).

(d) Waiver of Consequential Damages, Etc. To the fullest extent permitted by applicable law, no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Credit Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof. No Indemnitee referred to in paragraph (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Credit Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(e) Payments. All amounts due under this Section 10.3 shall be payable promptly and in no event later than ten days after demand therefor.

Section 10.4 Successors and Assigns.

(a) Successors and Assigns Generally. The provisions of this Credit Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of paragraph (b) of this Section, (ii) by way of participation in accordance

with the provisions of paragraph (d) of this Section or (iii) by way of pledge or assignment of a security interest subject to the restrictions of paragraph (e) of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Credit Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in paragraph (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of Credit Party) any legal or equitable right, remedy or claim under or by reason of this Credit Agreement.

(b) Assignments by Lenders. Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Credit Agreement (including all or a portion of its Commitments and the Loans at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i) Minimum Amounts.

(A) in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and/or the Loans at the time owing to it (in each case with respect to any Credit Facility) or contemporaneous assignments to related Approved Funds (determined after giving effect to such assignments) that equal at least the amount specified in paragraph (b)(i)(B) of this Section in the aggregate or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B) in any case not described in paragraph (b)(i)(A) of this Section, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than $1,000,000 unless each of the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed).

(ii) [Reserved].

(iii) Required Consents. No consent shall be required for any assignment except to the extent required by paragraph (b)(i)(B) of this Section and, in addition:

(A) the consent of the Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (x) an Event of Default has occurred and is continuing at the time of such assignment or (y) such assignment is to a Lender (other than a Defaulting Lender), an Affiliate of a Lender (other than a Defaulting Lender) or an Approved Fund, provided that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five Business Days after written notice of such assignment shall have been delivered to the Borrower; and provided, further, that the Borrower's consent shall not be required during the primary syndication of the Credit Facilities; and

(B) the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of the

Revolving Facility if such assignment is to a Person that is not a Lender with a Commitment in respect of such facility, an Affiliate of such Lender or an Approved Fund with respect to such Lender.

(iv) Assignment and Assumption. The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent), and the assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire. In addition, each assignee shall, on or before the effective date of such assignment, deliver to the Borrower and the Administrative Agent certification as to exemption from deduction or withholding of any United States Taxes in accordance with Section 3.6(g).

(v) No Assignment to Certain Persons. No such assignment shall be made to (A) the Borrower or any of the Borrower's Affiliates (including any equity investor in the Borrower and such equity investor's Affiliates) or Subsidiaries, (B) to any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute a Defaulting Lender or a Subsidiary thereof or (C) a Person who, at the time of such assignment, is a Sanctioned Person if such assignment would violate applicable law.

(vi) No Assignment to Natural Persons. No such assignment shall be made to a natural person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural person).

(vii) Certain Additional Payments. In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the prior written consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans and participations in Letters of Credit in accordance with its Applicable Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Credit Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to paragraph (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Credit Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Credit Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Credit Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Credit Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Section 3.5 and Section 10.3 with respect to facts and circumstances occurring prior to the effective date of

such assignment. Any assignment or transfer by a Lender of rights or obligations under this Credit Agreement that does not comply with this paragraph shall be treated for purposes of this Credit Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (d) of this Section.

(c) Register. The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of (and stated interest on) the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Credit Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d) Participations. Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than (w) a natural person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural person), (x) the Borrower or any of the Borrower's Affiliates (including any equity investor in the Borrower and such equity investor's Affiliates) or Subsidiaries, (y) any Defaulting Lender or any of its subsidiaries or (z) a Person who, at the time of such participation, is a Sanctioned Person if the sale of such participation would violate applicable law) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Credit Agreement (including all or a portion of its Revolving Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Credit Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent and each Credit Party shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Credit Agreement.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Credit Agreement and to approve any amendment, modification or waiver of any provision of this Credit Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in Section 10.2(b) that affects such Participant. The Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.4, 3.5 and 3.6 (subject to the requirements and limitations therein, including the requirements under Section 3.6 (it being understood that the documentation required under Section 3.6(g) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant (A) agrees to be subject to the provisions of Section 3.7 as if it were an assignee under paragraph (b) of this Section; and (B) shall not be entitled to receive any greater payment under Sections 3.5 or 3.6, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation or the sale of the participation to such participant is made with the consent of the Borrower. Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 3.7(b) with respect to any Participant. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.8 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.8(h) as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts of (and stated interest on) of each Participant's interest in the Loans

or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Credit Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(e) Certain Pledges. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Credit Agreement and the Loan Documents to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(f) Cashless Settlement. Notwithstanding anything to the contrary contained in this Credit Agreement, any Lender may exchange, continue or rollover all or a portion of its Loans in connection with any refinancing, extension, loan modification or similar transaction permitted by the terms of this Credit Agreement, pursuant to a cashless settlement mechanism approved by the Borrower, the Administrative Agent and such Lender notwithstanding any provision herein requiring such payment to be made in cash, in same day funds, or the like.

Section 10.5 Survival. All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Credit Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of any Loan Document and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that any Credit Party may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under the Loan Documents is outstanding and unpaid and so long as the Commitments have not expired or terminated. The provisions of Sections 3.4, 3.5, 3.6, 10.3, 10.9, and 10.10 and Article 9 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby or the Termination Date.

Section 10.6 Counterparts; Effectiveness; Electronic Execution.

(a) Counterparts; Effectiveness. This Credit Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Except as provided in Section 4.1, this Credit Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Credit Agreement by facsimile or in electronic (e.g., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Credit Agreement.

(b) Electronic Execution of Assignments. The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal

effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the Texas Uniform Electronic Transactions Act.

Section 10.7 Severability. In the event any one or more of the provisions contained in this Credit Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction). The parties shall endeavor in good faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 10.8 Right of Setoff. If an Event of Default shall have occurred and be continuing, each Credit Party and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by Credit Party or any such Affiliate to or for the credit or the account of any Loan Party or any of its Subsidiaries against any and all of the obligations of such Loan Party or such Subsidiary now or hereafter existing under this Credit Agreement or any other Loan Document to such Credit Party or Affiliate, irrespective of whether or not such Credit Party shall have made any demand under this Credit Agreement or any other Loan Document and although such obligations of such Loan Party or Subsidiary may be contingent or unmatured or are owed to a branch or office of such Credit Party different from the branch or office holding such deposit or obligated on such indebtedness, provided, that in the event that any Defaulting Lender shall exercise any right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.9 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Secured Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Credit Party and its Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Credit Party and its Affiliates may have. Each Credit Party agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

Section 10.9 Governing Law; Jurisdiction; Consent to Service of Process.

(a) Governing Law. This Credit Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas (without regard to principles of conflicts of laws).

(b) Submission to Jurisdiction. Each of the parties hereto irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the courts of the State of Texas sitting in Harris County and of the United States District Court for the Southern District of Texas and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Credit Agreement or any other Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such Texas State court or, to the fullest extent permitted by applicable law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment

or in any other manner provided by law. Nothing in this Credit Agreement or in any other Loan Document shall affect any right that any Credit Party may otherwise have to bring any action or proceeding relating to this Credit Agreement or any other Loan Document against the Borrower or any other Loan Party or its properties in the courts of any jurisdiction.

(c) Waiver of Objection to Venue. Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Credit Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d) Service of Process. Each of the parties hereto irrevocably consents to service of process in the manner provided for notices in Section 10.1. Nothing in this Credit Agreement will affect the right of any party to this Credit Agreement to serve process in any other manner permitted by law.

Section 10.10 WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS CREDIT AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO HEREBY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS CREDIT AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 10.11 Payments Set Aside. To the extent that any payment by or on behalf of the Borrower is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or Fraudulent Transfer Law, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Effective Rate.

Section 10.12 Headings. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Credit Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Credit Agreement.

Section 10.13 Interest Rate Limitation. It is expressly stipulated and agreed to be the intent of Borrower and Lenders at all times to comply strictly with the applicable law governing the maximum rate or amount of interest payable on the indebtedness evidenced by any Note, any Loan Document, and the Related Indebtedness (defined below) (or applicable United States federal law to the extent that it permits

Lenders to contract for, charge, take, reserve or receive a greater amount of interest than under applicable law). If the applicable law is ever judicially interpreted so as to render usurious any amount (a) contracted for, charged, taken, reserved or received pursuant to any Note, any of the other Loan Documents or any other communication or writing by or between Borrower and Lenders related to the transaction or transactions that are the subject matter of the Loan Documents, (b) contracted for, charged, taken, reserved or received by reason of Lender's exercise of the option to accelerate the maturity of any Note and/or any and all indebtedness paid or payable by Borrower to Lenders pursuant to any Loan Document other than any Note (such other indebtedness being referred to in this Section as the "Related Indebtedness"), or (c) Borrower will have paid or Lenders will have received by reason of any voluntary prepayment by Borrower of any Note and/or the Related Indebtedness, then it is Borrower's and Lenders' express intent that all amounts charged in excess of the Maximum Rate shall be automatically canceled, ab initio, and all amounts in excess of the Maximum Rate theretofore collected by Lenders shall be credited on the principal balance of any Note and/or the Related Indebtedness (or, if any Note and all Related Indebtedness have been or would thereby be paid in full, refunded to Borrower), and the provisions of any Note and the other Loan Documents shall immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder and thereunder; provided, however, if any Note or Related Indebtedness has been paid in full before the end of the stated term thereof, then Borrower and Lenders agree that Lenders shall, with reasonable promptness after Lenders discover or is advised by Borrower that interest was received in an amount in excess of the Maximum Rate, either refund such excess interest to Borrower and/or credit such excess interest against such Note and/or any Related Indebtedness then owing by Borrower to Lenders. Borrower hereby agrees that as a condition precedent to any claim seeking usury penalties against Lenders, Borrower will provide written notice to Lenders, advising Lenders in reasonable detail of the nature and amount of the violation, and Lenders shall have sixty (60) days after receipt of such notice in which to correct such usury violation, if any, by either refunding such excess interest to Borrower or crediting such excess interest against the Note to which the alleged violation relates and/or the Related Indebtedness then owing by Borrower to Lenders. All sums contracted for, charged, taken, reserved or received by Lenders for the use, forbearance or detention of any debt evidenced by any Note and/or the Related Indebtedness shall, to the extent permitted by applicable law, be amortized or spread, using the actuarial method, throughout the stated term of such Note and/or the Related Indebtedness (including any and all renewal and extension periods) until payment in full so that the rate or amount of interest on account of any Note and/or the Related Indebtedness does not exceed the Maximum Rate from time to time in effect and applicable to such Note and/or the Related Indebtedness for so long as debt is outstanding. In no event shall the provisions of Chapter 346 of the Texas Finance Code (which regulates certain revolving credit loan accounts and revolving triparty accounts) apply to this Note and/or any of the Related Indebtedness. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Lenders to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

Section 10.14 Ceiling Election. To the extent that Lenders are relying on Chapter 303 of the Texas Finance Code to determine the Maximum Rate payable on any such Note and/or any other portion of the Obligations, Lenders will utilize the weekly ceiling from time to time in effect as provided in such Chapter 303. To the extent United States federal law permits Lenders to contract for, charge, take, receive or reserve a greater amount of interest than under Texas law, Lenders will rely on United States federal law instead of such Chapter 303 for the purpose of determining the Maximum Rate. Additionally, to the extent permitted by applicable law now or hereafter in effect, Lenders may, at their option and from time to time, utilize any other method of establishing the Maximum Rate under such Chapter 303 or under other applicable law by giving notice, if required, to Borrower as provided by applicable law now or hereafter in effect. For purposes of this Agreement, "Maximum Rate" means, at all times, the maximum rate of interest which may be charged, contracted for, taken, received or reserved by Lenders in accordance with applicable

Texas law (or applicable United States federal law to the extent that such law permits Lenders to charge, contract for, receive or reserve a greater amount of interest than under Texas law). The Maximum Rate shall be calculated in a manner that takes into account any and all fees, payments, and other charges in respect of the Loan Documents that constitute interest under applicable law. Each change in any interest rate provided for herein based upon the Maximum Rate resulting from a change in the Maximum Rate shall take effect without notice to Borrower at the time of such change in the Maximum Rate.

Section 10.15 Treatment of Certain Information; Confidentiality.

(a) Each Credit Party agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, advisors and other representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (ii) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (iii) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (iv) to any other party hereto, (v) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Credit Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (vi) subject to an agreement containing provisions substantially the same as those of this Section, to (A) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Credit Agreement or (B) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which payments are to be made by reference to the Borrower and its obligations, this Credit Agreement or payments hereunder, (vii) with the consent of the Borrower, (viii) to any Person to whom a Lender pledges its rights under the Loan Documents in accordance with Section 10.4(e), (ix) to any rating agency or (x) to the extent such Information (A) becomes publicly available other than as a result of a breach of this Section or (B) becomes available to the Administrative Agent, any Credit Party or any of their respective Affiliates on a non-confidential basis from a source other than the Borrower or (C) is independently generated by the Administrative Agent, any Credit Party or any of their respective Affiliates. In addition, the Administrative Agent and the Lenders may disclose the existence of this Credit Agreement and information about this Credit Agreement to market data collectors, similar service providers to the lending industry and service providers to the Administrative Agent and the Lenders in connection with the administration of this Credit Agreement, the other Loan Documents, and the Commitments. Notwithstanding the foregoing, any Credit Party may disclose such information pertaining to this Credit Agreement and the Credit Facility as is routinely provided by arrangers to data service providers, including league table providers, that serve the lending industry.

(b) For purposes of this Section, "Information" means all information received from any Loan Party or any of its Subsidiaries relating to any Loan Party or any of its Subsidiaries or any of their respective businesses, other than any such information that is available to the Administrative Agent or any other Credit Party on a non-confidential basis prior to disclosure by any Loan Party or any Subsidiary or that is independently prepared by the Administrative Agent or any other Credit Party, provided that, in the case of information received from any Loan Party or any of its Subsidiaries after the Agreement Date, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information. Notwithstanding anything herein to the contrary, "Information" shall not include, and each Credit Party (and their Affiliates and respective partners, directors, officers, employees, agents, advisors and representatives) may disclose to any and all persons, without limitation of any kind, any information with respect to the U.S. federal income tax treatment and U.S. federal income tax structure of the transactions contemplated hereby and all

materials of any kind (including opinions or other tax analyses) that are provided to such Credit Party relating to such tax treatment and tax structure.

(c) The Loan Parties agree, on behalf of themselves and their Affiliates, that they will not in the future issue any press releases or other public disclosure using the name of the Administrative Agent or any Lender or their respective Affiliates or referring to this Credit Agreement or any of the other Loan Documents without the prior written consent of such Person, unless (and only to the extent that) the Loan Parties or such Affiliate is required to do so under law and then, in any event, the Loan Parties or such Affiliate will consult with such Person before issuing such press release or other public disclosure.

(d) The Loan Parties consent to the publication by the Administrative Agent or any Lender of customary advertising material relating to the Transactions using the name, product photographs, logo or trademark of the Loan Parties.

Section 10.16 USA PATRIOT Act Notice. Each Lender that is subject to the USA PATRIOT Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the USA PATRIOT Act. The Borrower shall, and shall cause each Loan Party and its Subsidiaries to, provide such information and take such actions as are reasonably requested by the Administrative Agent or any Lender in order to assist the Administrative Agent and the Lenders in maintaining compliance with the USA PATRIOT Act.

Section 10.17 No Fiduciary Duty. Each Loan Party agrees that in connection with all aspects of the transactions contemplated hereby and any communications in connection therewith, such Loan Party and its Affiliates, on the one hand, and the Administrative Agent, the Lead Arranger, the Documentation Agent, the Syndication Agent, the other Credit Parties and their respective Affiliates, on the other hand, will have a business relationship that does not create, by implication or otherwise, any fiduciary duty on the part of the Administrative Agent, the Lead Arranger, the Documentation Agent, the Syndication Agent, the other Credit Parties or their respective Affiliates and no such duty will be deemed to have arisen in connection with any such transactions or communications.

Section 10.18 Acknowledgement and Consent to Bail-In of EEA Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a) the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b) the effects of any Bail-in Action on any such liability, including, if applicable:

(i) a reduction in full or in part or cancellation of any such liability;

(ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other

instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Credit Agreement or any other Loan Document; or

(iii) the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

Section 10.19 Certain ERISA Matters.

(a) Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, the Arranger and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i) such Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans, the Letters of Credit or the Commitments,

(ii) the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Credit Agreement,

(iii) (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Letters of Credit, the Commitments and this Credit Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Credit Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Credit Agreement, or

(iv) such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b) In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, the Arranger and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that:

(i) none of the Administrative Agent or the Arranger or any of their respective Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Credit Agreement, any Loan Document or any documents related to hereto or thereto),

(ii) the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Credit Agreement is independent (within the meaning of 29 CFR § 2510.3-21) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least $50 million, in each case as described in 29 CFR § 2510.3-21(c)(1)(i)(A)-(E),

(iii) the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Credit Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the Loan Document Obligations),

(iv) the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Credit Agreement is a fiduciary under ERISA or the Code, or both, with respect to the Loans, the Letters of Credit, the Commitments and this Credit Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder, and

(v) no fee or other compensation is being paid directly to the Administrative Agent or the Arranger or any their respective Affiliates for investment advice (as opposed to other services) in connection with the Loans, the Letters of Credit, the Commitments or this Credit Agreement.

(c) The Administrative Agent and the Arranger hereby inform the Lenders that each such Person is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans, the Letters of Credit, the Commitments and this Credit Agreement, (ii) may recognize a gain if it extended the Loans, the Letters of Credit or the Commitments for an amount less than the amount being paid for an interest in the Loans, the Letters of Credit or the Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

Section 10.20 Acknowledgment Regarding Any Supported QFCs. To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Swap Contracts or any other agreement or instrument that is a QFC (such support, "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions

below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of Texas and/or of the United States or any other state of the United States), in the event that a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

Section 10.21 ENTIRE AGREEMENT. THIS CREDIT AGREEMENT AND THE OTHER LOAN DOCUMENTS REFERRED TO HEREIN EMBODY THE FINAL, ENTIRE AGREEMENT AMONG THE PARTIES HERETO WITH RESPECT TO THE SUBJECT MATTER HEREOF AND THEREOF AND SUPERSEDE ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO. THERE ARE NO ORAL AGREEMENTS AMONG THE PARTIES HERETO.

[Signature pages follow]

IN WITNESS WHEREOF, the parties hereto have caused this Credit Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**BRIDGELINK ENGINEERING, LLC**, as the Borrower

By: ______________________________
Name: Cole W. Johnson
Title: Manager

**BANCORPSOUTH BANK**, as the Administrative Agent and a Lender

By: ______________________________
Name: Grant Sifers
Title: Vice President

**CENTURY BANK**, as a Lender

By: ______________________
Name: Keith Miller
Title: Senior Vice President

**SCHEDULE 1.1(a)**
**APPROVED PROJECTS**

| Project Name |
|---|
| Anadarko |
| Concord Energy |
| Depcom – Richfield |
| Devon Energy – Gillette |
| Ecoplexus – Jamison Solar |
| Endurance Lift Solutions, LLC |
| Enhanced – Agua Verde, Big Bend, Orla, Overton, Santorini, Tonto |
| EOG Resources Inc. |
| Freestone Midstream |
| HDDS |
| JSI – Axial |
| J-W Power Company |
| MYR – Augusta, Baldwin, Harmony, Monmouth |
| Narenco – Stanly Solar |
| NNG – Gilmore City, Omaha |
| PCL – Rayos Del Sol |
| Rosendin Electric – Aktina, Todd |
| Signal Energy – Aragorn, Noble, Titan |
| United Renewable Energy – Pinson |

**SCHEDULE 1.1(b)**
**SPECIFIC EXCLUSIONS FROM MATERIAL OWNED PROPERTY**

| Material Owned Real Property | Address |
|---|---|
| **Office/Shop** | 915 N. 4th Street, Douglas, WY 82633 |
| | |
| | |
| | |

**SCHEDULE 1.1(c)**
**MORTGAGE REQUIREMENT**

"Mortgage Requirement" means, at any time, the requirement that, with respect to each Material Owned Real Property, the Administrative Agent shall have received the following, each in form and substance satisfactory to the Administrative Agent:

(a) a Mortgage with respect to such Material Owned Real Property duly executed and delivered by the record owner of such Material Owned Real Property;

(b) an appraisal with respect to such Material Owned Real Property;

(c) a survey with respect to such Material Owned Real Property;

(d) a title insurance policy (including any endorsements thereto) and appropriate lien searches with respect to such Material Owned Real Property;

(e) with respect to such Material Owned Real Property: environmental reports, audits and analyses (whether produced by any Loan Party or its Subsidiaries or any third party or Governmental Authority) and Phase I or Phase II reports;

(f) with respect to such Material Owned Real Property not located in a Flood Zone, a completed Flood Certificate from a third party vendor in compliance with the Flood Program;

(g) with respect to any portion such Material Owned Real Property that is located in a Flood Zone:

(i) a completed Flood Certificate from a third party vendor in compliance with the Flood Program,

(ii) written acknowledgement from the Borrower that it received notification from the Administrative Agent that such Material Owned Real Property is located within a Flood Zone and indicating whether the community in which such Material Owned Real Property is located is participating in the Flood Program;

(iii) if such Material Owned Real Property is located in a community participating in the Flood Program, evidence that the Borrower has complied with the insurance requirements set forth in Section 6.10 of the Credit Agreement;

(iv) such additional coverage as required by Administrative Agent, if any, under supplemental private insurance policies in an amount so required by the Administrative Agent;

(h) evidence of earthquake insurance with respect to such Material Owned Real Property; and

(i) legal opinions with respect to such Mortgage and related matters.

**SCHEDULE 2.1**

**COMMITMENTS**

| Lender | Revolving Commitment | Total Commitments |
|---|---|---|
| BancorpSouth Bank | $20,000,000.00 | $20,000,000.00 |
| Century Bank | $14,000,000.00 | $14,000,000.00 |
| | | |
| | | |
| | | |
| | | |

**SCHEDULE 5.13**

**SUBSIDIARIES; EQUITY INTERESTS**

| (a) Name & Jurisdiction of Organization or Incorporation; Identify each Subsidiary of the Borrower that is an Excluded Subsidiary | (b) Ownership Interest of each Loan Party & Respective Subsidiaries in each Respective Subsidiary, Including Percentage (%) of Ownership | (c) Identify each Person the Equity Interests of Which are Required to be Pledged on the Closing Date |
|---|---|---|
| Bighorn Sand & Gravel, LLC (Delaware) | 100% owned by Bighorn Construction and Reclamation, LLC | N/A |
| | | |
| | | |
| | | |
| | | |
| | | |

**SCHEDULE 5.14**

**INSURANCE**

| Name of Carrier | Policy Number | Expiration Dates | Insurance Type | Coverage Amount |
|---|---|---|---|---|
| Everest National Insurance Company | EN6GL00066211 | 4/19/2022 | CGL | $1,000,000 each occurrence / $2,000,000 aggregate |
| Everest National Insurance Company | EN6CA00099211 | 4/19/2022 | Auto Liability | $1,000,000 each accident |
| Everest National Insurance Company | EN6EX00055211 | 4/19/2022 | Excess Liability | $10,000,000 |
| Everest Premier Insurance Company | EN6WC00108211 | 4/19/2022 | Workers Comp. & Employers' Liability | Statutory / $1,000,000 |
| Everest Indemnity Insurance Company | IM8ML00126211 | 4/19/2022 | Cargo | $250,000 each conveyance |
| Everest Indemnity Insurance Company | IM8ML00126211 | 4/19/2022 | Blanket Building / Business Personal Property | $2,387,500 / $700,000 |
| Everest Indemnity Insurance Company | IM8ML00126211 | 4/19/2022 | Equipment Floater | $16,231,746 |

**SCHEDULE 5.16(a)**

**UCC FILING OFFICES**

| Debtor | Filing Jurisdiction |
|---|---|
| Bridgelink Engineering LLC | Secretary of State of the State of Delaware |
| Bighorn Construction and Reclamation L.L.C. | Secretary of State of the State of Wyoming |
| Bighorn Sand & Gravel LLC | Secretary of State of the State of Delaware |
| Bighorn Investments and Properties, LLC | Secretary of State of the State of Wyoming |

## SCHEDULE 5.16(b)

## MORTGAGE FILING OFFICES

| Mortgagor/Grantor | Filing Jurisdiction |
|---|---|
| Bighorn Investments and Properties, LLC | Wyoming |
| | |
| | |

**SCHEDULE 5.19**

**MATERIAL OWNED REAL PROPERTY**

| Material Owned Real Property | Address |
|---|---|
| **Office/Shop** | 915 N. 4th Street, Douglas, WY 82633 |
| | |
| | |
| | |

**SCHEDULE 5.27**

**CAPITALIZATION**

| **Party** | **Equity Holder** | **Ownership Percentage (%) of Equity Holder** | **Statement of Authorized and Issued Equity Interests** |
|---|---|---|---|
| Bridgelink Engineering LLC (Borrower) | Cole W. Johnson<br>Cord H. Johnson | 80%<br>20% | 100% of membership interests have been authorized and issued |
| Bighorn Construction and Reclamation, LLC (Guarantor) | Cole W. Johnson<br>Cord H. Johnson | 80%<br>20% | 100% of membership interests have been authorized and issued |
| Bighorn Investments and Properties, LLC (Guarantor) | Cole W. Johnson<br>Cord H. Johnson | 80%<br>20% | 100% of membership interests have been authorized and issued |
| Bighorn Sand & Gravel LLC (Guarantor) | Bighorn Construction and Reclamation, LLC | 100% | 100% of membership interests have been authorized and issued |

**SCHEDULE 5.28**

**AFFILIATE TRANSACTIONS**

1. None, other than as permitted under clause (iii) of Section 7.9.

**SCHEDULE 5.29**

**MATERIAL CONTRACTS**

| Project Name | Status |
|---|---|
| Anadarko | Active |
| Bridgelink Cave Springs, LLC – Christoval | Active |
| Concord Energy | Active |
| Depcom – Richfield | Active |
| Devon Energy – Gillette | Active |
| Ecoplexus – Jamison Solar | Active |
| Endurance Lift Solutions, LLC | Active |
| Enhanced – Agua Verde, Big Bend, Orla, Overton, Santorini, Tonto | Active |
| EOG Resources Inc. | Active |
| Freestone Midstream | Active |
| HDDS | Active |
| JSI – Axial | Active |
| J-W Power Company | Active |
| Narenco – Stanly | Active |
| NNG – Gilmore City, Omaha | Active |
| PCL – Rayos Del Sol | Active |
| Rosendin Electric – Aktina | Active |
| Signal Energy – Aragorn, Noble, Titan | Active |
| United Renewable Energy – Pinson | Active |
| RES – Aurora | Active |
| Signal – Aragorn (Mechanical) | Awarded Contracts |
| Narenco – Stanly (Electrical) | Awarded Contracts |
| Orbital – Blackbear | Awarded Contracts |
| AEP – Prairie Hills, Flatridge | Bidding Process |
| Borea – Ball Hill Wind Farm Access Roads | Bidding Process |
| Ecoplexus – Olin Creek, Westminster | Bidding Process |
| JSI – Dolores Canyon, Spanish Peaks | Bidding Process |
| Mortenson – San Juan Solar | Bidding Process |
| MYR – Days Corner, Vassalboro | Bidding Process |
| Orbital – Happy Solar | Bidding Process |
| Rosendin – Roseland Civil | Bidding Process |
| Signal – Gerdau, Mulligan | Bidding Process |
| Shell – Brazos Wind | Bidding Process |
| Sunpin – Vega, Staley | Bidding Process |
| Wood – NV Gold TS Solar, Pecan Prairie North and South Solar | Bidding Process |

**SCHEDULE 7.1**

**EXISTING INDEBTEDNESS**

1. Main Street Loan: Bighorn Construction and Reclamation, LLC entered in to a Loan Agreement with Vista Bank dated on or about August 21, 2020.

2. Equipment Financing: The follow equipment is subject to Indebtedness:

| Asset | No. | Year | Make | Model | Identifier | Lender |
|---|---|---|---|---|---|---|
| A102 | S-74 | 2014 | Mack | GU713 w/Headrack & FETC 25 Ton Bed & Winches | 1M2AX04C4EM019098 | 777 Equipment Finance (Prev Advantage) |
| A106 | BCR0265 | | John Deere | 772D Motor Grader | 1DW772DX620265 | Ag Direct |
| A110 | U-75 | 2017 | Dodge | Ram 3500 Flatbed | 3C7WRTCL5HG500835 | Ally Financial |
| A112 | U-84 | 2018 | Chevrolet | Suburban | 1GNSKJKC7JR295733 | Ally Financial |
| A113 | U-67 | 2018 | Chevrolet | Silverado 2500 | 1GC1KWEY8JF263092 | Ally Financial |
| A114 | U-58 | 2018 | Ford | F150 Pickup Truck | 1FTFW1E56JFE79123 | Ally Financial |
| A115 | U-57 | 2018 | Ford | F150 Pickup Truck | 1FTFW1E51JFE79126 | Ally Financial |
| A116 | U-59 | 2018 | Ford | F150 Pickup Truck | 1FTFW1E58JFE79124 | Ally Financial |
| A117 | U-66 | 2018 | GMC | Sierra Pickup Truck | 1GT12TEY6JF257404 | Ally Financial |
| A118 | U-08 | 2018 | Dodge | Ram 3500 Pickup Truck | 3C7WRTCL4JG188805 | Ally Financial |
| A390 | S-90 | 2012 | International | 7400 Bucket Truck | 1HTWJAAT3CJ535119 | Altec Capital |
| A391 | S-91 | 2013 | International | 7400 Bucket Truck | 1HTWJAAT0DJ152658 | Altec Capital |
| A105 | BCR487 | 1998 | Caterpillar | 627F Motor Scraper | 1DL00487 | Ascentium Capital |
| A121 | U-09 | 2019 | Ford | F350 Pickup Truck | 1FT8W3BT7KEC12071 | Bank of the West |
| A122.1 | S-67 | 2018 | International | Durastar-Series 4300 SBA 4x2 | 3HAMMMML5JL695318 | BMO Transport Financial |
| A122.2 | S-68 | 2018 | International | Durastar-Series 4300 SBA 4x2 | 3HAMMMML3JL695317 | BMO Transport Financial |
| A126 | S-71 | 2018 | International | Durastar-Series 4300 SBA 4x2 | 3HAMMMML8JL498160 | BMO Transport Financial |
| A200 | S-69 | 2013 | International | Durastar-Series 4300 SBA 4x2 | 3HAMMAAL1DL175995 | BMO Transport Financial |
| A127 | BCR120 | 2018 | Caterpillar | 279D Compact Track Loader | CAT0279DJGTL06120 | Caterpillar Financial Services |
| A130 | BCR045 | 2014 | Caterpillar | 420FIT Backhoe Loader | CAT0420FKJWJ02045 | Caterpillar Financial Services |
| A197.1 | 6001 | 2012 | Caterpillar | Motor Grader 140M2 | M9D00895 | Caterpillar Financial Services |
| A197.2 | BCR017 | 2015 | Caterpillar | Vibratory Compactor CS56B | CATCS56BVL8H01017 | Caterpillar Financial Services |
| A209 | BCR610 | 2014 | Caterpillar | 420F2IT BACKHOE LOADER | CAT0420FVJWJ00610 | Caterpillar Financial Services |
| A210 | BCR2041 | | Caterpillar | TL1255D Telehandler | OML702041 | Caterpillar Financial Services |
| A211 | BCR5665 | | Genie | S65XCV1 Manlift | S65XCH-45665 | Caterpillar Financial Services |
| A139 | U-78 | 2018 | Jeep | Grand Cherokee | 1C4RJFCT9JC499622 | Chrysler Capital |
| A140.1 | S-72 | 2012 | International | TerraStar with Altec AT37G | 1HTJSSKK8CJ655002 | Commercial Fleet Financing/CIT |
| A140.2 | S-73 | 2012 | International | TerraStar with Altec AT37G | 1HTJSSKK3CJ654985 | Commercial Fleet Financing/CIT |

| | | | | | | |
|---|---|---|---|---|---|---|
| A141.1 | BCR400 | 2018 | Haybuster | 2100 Bale Processor | 2117112400 | Commercial Fleet Financing/CIT |
| A142.1 | BCR000 | 2018 | Haybuster | 2100 Bale Processor | 2117113000 | Commercial Fleet Financing/CIT |
| A142.2 | BCR900 | 2018 | Haybuster | 2100 Bale Processor | 2117112900 | Commercial Fleet Financing/CIT |
| A142.3 | BCRX46 | 2018 | Wishek | Straw Press | LGCW005POJX46 | Commercial Fleet Financing/CIT |
| A142.4 | BCR172 | 2018 | K-Line | 10' Speedtiller | 2935D182172 | Commercial Fleet Financing/CIT |
| A142.5 | BCR173B | 2018 | K-Line | 16' Speedtiller | 2935D182173 | Commercial Fleet Financing/CIT |
| A194.10 | | | Various | Trucks and Equipment (Various) | CCB1 | Converse County Bank |
| A194.8 | BCR778 | 1991 | Caterpillar | D8N Crawler Tractor Dozer | 9TC03778 | Converse County Bank |
| A101.1 | BCR783 | 2018 | Genie | GTH-1056 Telehandler | GTH10E-12783 | De Lage Landen Financial Services |
| A101.2 | BCR2769 | 2018 | Genie | GTH-1056 Telehandler | GTH10E-12769 | De Lage Landen Financial Services |
| A415 | U-500 | 2020 | Ford | F-250 Pickup | 1FT7W2B62LED07459 | Enterprise |
| A416 | U-501 | 2020 | Ford | F-250 Pickup | 1FT7W2B6XLED07452 | Enterprise |
| A417 | U-502 | 2020 | Ford | F-250 Pickup | 1FT7W2B64LED07463 | Enterprise |
| A418 | U-503 | 2020 | Ford | F-250 Pickup | 1FT7W2B66LED07464 | Enterprise |
| A419 | U-504 | 2020 | Ford | F-250 Pickup | 1FT7W2B67LED07456 | Enterprise |
| A420 | U-505 | 2020 | Ford | F-250 Pickup | 1FT7W2B69LED07474 | Enterprise |
| A421 | U-506 | 2020 | Ford | F-250 Pickup | 1FT7W2B68LED07451 | Enterprise |
| A422 | U-507 | 2020 | Ford | F-250 Pickup | 1FT7W2B63LED07471 | Enterprise |
| A423 | U-508 | 2020 | Ford | F-250 Pickup | 1FT7W2B63LED07454 | Enterprise |
| A424 | U-509 | 2020 | Ford | F-250 Pickup | 1FT7W2B65LED07472 | Enterprise |
| A425 | U-510 | 2020 | Ford | F-250 Pickup | 1FT7W2B61LED07467 | Enterprise |
| A426 | U-511 | 2020 | Ford | F-250 Pickup | 1FT7W2B65LED07469 | Enterprise |
| A427 | U-512 | 2020 | Ford | F-250 Pickup | 1FT7W2B69LED07460 | Enterprise |
| A428 | U-513 | 2020 | Ford | F-250 Pickup | 1FT7W2B69LED07457 | Enterprise |
| A429 | U-514 | 2020 | Ford | F-250 XLT Pickup | 1FT7W2B6XLED36689 | Enterprise |
| A430 | U-515 | 2020 | Ford | F-250 XLT Pickup | 1FT7W2B64LED36686 | Enterprise |
| A431 | U-516 | 2020 | Ford | F-250 XLT Pickup | 1FT7W2B62LED36685 | Enterprise |
| A432 | U-517 | 2020 | Ford | F-150 Pickup | 1FTEW1EP0LKF04590 | Enterprise |
| A433 | U-518 | 2020 | Ford | F-150 Pickup | 1FTEW1EP4LKF04592 | Enterprise |
| A434 | U-519 | 2020 | Ford | F-150 Pickup | 1FTEW1EP4LKF04589 | Enterprise |
| A435 | U-520 | 2020 | Ford | F-150 Pickup | IFTEW1EP2LKF04591 | Enterprise |
| A436 | U-521 | 2020 | Ford | F-150 Pickup | 1FTEW1EP6LKF04593 | Enterprise |
| A437 | U-522 | 2020 | Ford | F-150 Pickup | 1FTEW1EP0LKF18957 | Enterprise |
| A438 | U-523 | 2020 | Ford | F-150 Pickup | 1FTEW1EP4LKF04608 | Enterprise |
| A439 | U-524 | 2020 | Ford | F-150 Pickup | 1FTEW1EP9LKF18956 | Enterprise |
| A440 | U-525 | 2020 | Ford | F-250 Pickup | 1FT7W2B65LED06662 | Enterprise |
| A441 | U-526 | 2020 | Ford | F-250 Pickup | 1FT7W2B67LED06663 | Enterprise |
| A442 | U-527 | 2020 | Ford | F-250 Pickup | 1FT7W2B69LED06664 | Enterprise |
| A443 | U-528 | 2020 | Ford | F-250 Pickup | 1FT7W2B60LED06665 | Enterprise |

| | | | | | | |
|---|---|---|---|---|---|---|
| A444 | U-529 | 2020 | Ford | F-250 Pickup | 1FT7W2B62LED06666 | Enterprise |
| A445 | U-530 | 2020 | Ford | F-250 Pickup | 1FT7W2B64LED06667 | Enterprise |
| A446 | U-531 | 2020 | Ford | F-250 Pickup | 1FT7W2B66LED06668 | Enterprise |
| A447 | U-532 | 2020 | Ford | F-150 Pickup | 1FTEW1EP7LKF18955 | Enterprise |
| A448 | U-533 | 2020 | Ford | F-150 Pickup | 1FTEW1EP5LKF18954 | Enterprise |
| A144 | U-70 | 2019 | Ford | Explorer | 1FM5K8GT7KGA41102 | Ford Motor Credit |
| A145.1 | U-44 | 2019 | Ford | F250 XL 4WD SuperCab 8' Box | 1FT7X2B66KEC45737 | Ford Motor Credit |
| A145.2 | U-62 | 2019 | Ford | F250 XL 4WD SuperCab 8' Box | 1FT7X2B61KEC42597 | Ford Motor Credit |
| A145.3 | U-61 | 2019 | Ford | F250 XL 4WD SuperCab 8' Box | 1FT7X2B64KEC45736 | Ford Motor Credit |
| A146 | U-07 | 2019 | Ford | F350 Pickup Truck | 1FT8W3BT4KEC50373 | Ford Motor Credit |
| A207 | U-82 | 2019 | Ford | F350 Pickup Truck | 1FT8W3DTXKEG42030 | Ford Motor Credit |
| A208 | U-83 | 2019 | Ford | F350 Pickup Truck | 1FD8W3HT3KEG42036 | Ford Motor Credit |
| A104 | U-69 | 2018 | Chevrolet | Tahoe | 1GNSCCKC4JR298484 | GM Financial |
| A383 | S-82 | 2009 | International | 8600 Water Truck | 1HSHWAHN99J115220 | JB&B Capital |
| A384 | S-83 | 2009 | International | 8600 Water Truck | 1HSHWAHN9H130830 | JB&B Capital |
| A386 | S-85 | 2006 | International | 8600 Water Truck | 1HSHWAHN76J257528 | JB&B Capital |
| A388 | S-87 | 2009 | Peterbilt | 384 Water Truck | 1NPVLU9X99D786822 | JB&B Capital |
| A150.1 | BCR062 | | John Deere | 210GLC Excavator | 1FF210GXEGF524062 | John Deere Financial |
| A150.2 | BCR046 | | Hitachi | ZX2140CS6 Excavator | 1FFDC571KGF340046 | John Deere Financial |
| A150.3 | BCR3043 | | John Deere | 410L Backhoe Loader | 1T0410LXCGF293043 | John Deere Financial |
| A150.4 | BCR907 | | John Deere | 310SL Backhoe Loader | 1T0310SLJJF328907 | John Deere Financial |
| A151.1 | BCR559b | 2018 | John Deere | 323E Compact Track Loader | 1T0323EKAJJ326559 | John Deere Financial |
| A151.2 | BCR770 | 2018 | John Deere | 332G Skid Steer Loader | 1T0332GKAHF314770 | John Deere Financial |
| A151.3 | BCR580 | 2018 | John Deere | 324E Skid Steer Loader | 1T0324EKTJJ327580 | John Deere Financial |
| A151.4 | BCR256 | 2018 | John Deere | 324E Skid Steer Loader | 1T0324EKKHJ306256 | John Deere Financial |
| A151.5 | BCR937 | 2018 | John Deere | 324E Skid Steer Loader | 1T0324EKKHJ321937 | John Deere Financial |
| A152.1 | BCR393 | 2018 | John Deere | 6150 Row Crop Tractor | 1RW6150RKDA007393 | John Deere Financial |
| A152.2 | BCR785 | 2018 | John Deere | 6150 Row Crop Tractor | 1RW6150RPCA005785 | John Deere Financial |
| A152.3 | BCR604 | 2018 | John Deere | H360 Farm Loader | 1P0H360XLDC005604 | John Deere Financial |
| A153.1 | BCR511 | | John Deere | 772GP Motor Grader | 1DW772GPTFF667511 | John Deere Financial |
| A153.2 | BCR530 | | John Deere | 410K Loader Backhoe | 1T0410KXAEE273530 | John Deere Financial |
| A153.3 | BCR121 | | John Deere | 410K Loader Backhoe | 1T0410KXAEE261121 | John Deere Financial |
| A153.4 | BCR6173 | 2014 | JLG | G1255 Telehandler | 160056173 | John Deere Financial |
| A153.5 | BCR377 | | John Deere | 324E Skid Steer | 1T0324EKCHJ320377 | John Deere Financial |
| A153.6 | BCR796 | | John Deere | 320E Skid Steer Loader | 1T0320EKKFJ284796 | John Deere Financial |
| A154.1 | BCR205 | 2015 | John Deere | 6155 Row Crop Tractor | 1L06155MTKK929205 | John Deere Financial |
| A154.2 | BCR652 | 2015 | John Deere | 6145 Row Crop Tractor | 1L06145MCJG907652 | John Deere Financial |
| A154.3 | BCR559 | | John Deere | 6155 Row Crop Tractor | 1L06155MCKK928559 | John Deere Financial |
| A154.4 | BCR714 | | John Deere | 640R Loader | 1P0640RXCJC007714 | John Deere Financial |
| A154.5 | BCR083 | | John Deere | 640R Loader | 1P0640RXHJC008083 | John Deere Financial |
| A154.6 | BCR806 | | John Deere | 640R Loader | 1P0640RXLJC007806 | John Deere Financial |
| A155.1 | 4001 | 2016 | John Deere | 300GLC Excavator | 1FF300GXCFF730142 | John Deere Financial |

| | | | | | | |
|---|---|---|---|---|---|---|
| A155.2 | BCR093 | | John Deere | 772G Motor Grader | 1DW772GXCGF674093 | John Deere Financial |
| A155.3 | 3001 | 2015 | John Deere | 310S Wheel Loader Backhoe | 1T0310SLCHF317376 | John Deere Financial |
| A156.1 | BCR208 | 2019 | John Deere | 410L Backhoe Loader | 1T0410LXKKF348208 | John Deere Financial |
| A156.2 | BCR391 | 2018 | John Deere | 310SL Backhoe Loader | 1T0310SLLJF327391 | John Deere Financial |
| A156.3 | BCR748 | 2018 | John Deere | 310SL Backhoe Loader | 1T0310SLTKF348748 | John Deere Financial |
| A156.4 | BCR257 | 2018 | John Deere | 310SL Backhoe Loader | 1T0310SLVJF327257 | John Deere Financial |
| A156.5 | BCR149 | 2019 | John Deere | 310SL Backhoe Loader | 1T0310SLVJF343149 | John Deere Financial |
| A156.6 | BCR786 | 2019 | John Deere | 410L Backhoe Loader | 1T0410LXAJF339786 | John Deere Financial |
| A157.1 | BCR213 | 2019 | John Deere | 210G Excavator | 1FF210GXHKF527213 | John Deere Financial |
| A157.2 | BCR522 | 2015 | John Deere | 310SL Backhoe Loader | 1T0310SLCFF280522 | John Deere Financial |
| A157.3 | BCR615 | 2019 | John Deere | 310SL Backhoe Loader | 1T0310SLPKF350615 | John Deere Financial |
| A158 | BCR439 | 2015 | John Deere | 210G Excavator | 1FF210GXLFF523439 | John Deere Financial |
| A159 | BCR043 | 2016 | John Deere | 210GLC Excavator | 1FF210GXJHF525043 | John Deere Financial |
| A160 | BCR890 | 2015 | John Deere | 310SL Backhoe Loader | 1T0310SLLFF284890 | John Deere Financial |
| A161 | BCR085 | | John Deere | 410L Backhoe Loader | 1T0410LXKFF282085 | John Deere Financial |
| A163 | BCR519 | | John Deere | 410L Backhoe Loader | 1T0410LXAFF280519 | John Deere Financial |
| A166 | BCR450 | 2017 | John Deere | 772G Motor Grader | 1DW772GPKGF678450 | John Deere Financial |
| A201 | 8032 | 2013 | Great Plains | 1006NT No Till Drill | W124669A | John Deere Financial |
| A212.1 | BCR9786.1 & .2 | | John Deere | 850L Crawler Dozer | 1T0850LXLKF359786 | John Deere Financial |
| A212.2 | 5002 | | John Deere | 700K Crawler Dozer | 1T0700KXEEE275380 | John Deere Financial |
| A212.3 | BCR7252 | | John Deere | 850L Crawler Dozer | 1T0850LXTKF357252 | John Deere Financial |
| A213 | BCR2327 | | John Deere | 333G Compact Track Loader | 1T0333GMVLF372327 | John Deere Financial |
| A167 | BCR337 | 2013 | Sakai | Sakai Rollers SV510TB-III | VSV2110337 | Komatsu Financial |
| A168 | 5001 | | Komatsu | Crawler Dozer D61PXi-24 | KMT0D129CGBB60159 | Komatsu Financial |
| A169 | BCR199 | 2016 | Komatsu | Crawler Dozer D61PXi-24 | B60199 | Komatsu Financial |
| A202 | 8126 | 2019 | Topcon | Twin Antenna Kit w/MCR3 Dual | 1446-00793 | Komatsu Financial |
| A214 | 63758 | | Komatsu | PC210LC-11 | KMTPC257CJTC80725 | Komatsu Financial |
| A215 | 63845 | | Komatsu | PC210LC-11 | KMTPC257HKTC80831 | Komatsu Financial |
| A216 | 64026 | | Komatsu | PC290LC-11 | KMTPC255CKK73141 | Komatsu Financial |
| A217 | 63913 | | Komatsu | PC210LC-11 | KMTPC257HKTC80974 | Komatsu Financial |
| A218 | 63672 | | Komatsu | PC290LC-11 | KMTPC255KJKK73059 | Komatsu Financial |
| A223 | BCR5131 | 2019 | Komatsu | PC290 Excavator | 35131 | Komatsu Financial |
| A224 | BCR0242 | 2014 | Sakai | SV540T Pad Foot Roller | 3SV53-10242 | Komatsu Financial |
| A225 | 7002 | | Sakai | SV540T Pad Foot Roller | 3SV53-10484 | Komatsu Financial |
| A226 | BCR7212 | 2019 | Komatsu | PC360 Excavator | A37212 | Komatsu Financial |
| A227 | BCR3199 | 2019 | Komatsu | PC290 Excavator | K73199 | Komatsu Financial |
| A228 | BCR5127 | 2019 | Komatsu | PC290 Excavator | KMTPC255JKCO35127 | Komatsu Financial |
| A229 | BCR0251 | | Sakai | SV510 Pad Foot Roller | VSV21-10251 | Komatsu Financial |
| A230 | BCR3498 | 2017 | Xtreme | XR1045 Telehandler | XR104511170393498 | Komatsu Financial |
| A172.1 | BCR793 | 2019 | K-Line | Speedtiller | 2930D171793 | Northland Capital |
| A302 | 8031 | 2012 | Frontier | DH1612 Disk Harrow | Unk - DUPE???? | NOT - Utica Leaseco |
| A198 | BCR466 | 1997 | Caterpillar | 627F Motor Scraper | 1DL00466 | Tandem Finance |

| | | | | | | |
|---|---|---|---|---|---|---|
| A173 | U-02 | 2017 | Dodge | Ram 4500 | 3C7WRLELXHG617131 | TD Auto Finance |
| A174 | S-78 | 2012 | Western Star | 4900 SA OTR HH Tractor | 5KKHALBG0CPBJ4069 | TransLease |
| A175 | T-43 | 2013 | Scona | Low Boy Trailer | 53UL06053DHB20910 | TransLease |
| A181 | T-63 | 2019 | Big Tex | Gooseneck Utility Trailer 35' | 16VGX3522K6010510 | TransLease |
| A182.1 | T-32 | 2019 | Big Tex | Gooseneck Trailer | 16VGX3523K6096538 | TransLease |
| A182.2 | T-33 | 2019 | Big Tex | Gooseneck Trailer | 16VGX3521K6096540 | TransLease |
| A182.3 | T-31 | 2019 | Big Tex | Gooseneck Trailer | 16VGX3520K6096545 | TransLease |
| A183.1 | T-85 | 2019 | Cargo Mate | Enclosed Trailer | 49TCB1427K1027965 | TransLease |
| A183.2 | T-86 | 2019 | Big Tex | Gooseneck Trailer | 16VGX3526K6092502 | TransLease |
| A184 | T-62 | 2019 | Dorsey | 48' Flatbed Trailer | 5JYFB4825KED13122 | TransLease |
| A185 | T-44 | 2019 | Eager Beaver | Detachable Low Boy Trailer | 112SD5536KL083399 | TransLease |
| A186.1 | U-63 | 2019 | Ford | Ford F250 XL 4x4 SD Crew Cab | 1FT7X2B68KED37223 | TransLease |
| A186.2 | U-64 | 2019 | Ford | Ford F250 XL 4x4 SD Crew Cab | 1FT7X2B63KEC42598 | TransLease |
| A187.2 | T-01 | 2019 | PJ Trailer Mfg. Co. | 35' Tandem Dual Deck Gooseneck | 4P5FD3627K1302087 | TransLease |
| A188.1 | T-76 | 2019 | Haulmark | Haulmark Trailer TS8524T3 | 7KD1E2421KU001130 | TransLease |
| A188.2 | T-75 | 2019 | Haulmark | Haulmark Trailer TS8524T3 | 7KD1E2420KU001135 | TransLease |
| A189 | T-70 | 2019 | Jet | 53' Trailer | 5JNDS5320KH000511 | TransLease |
| A190 | T-79 | 2019 | Poly Real | Gooseneck Poly Pipe Trailer | 4T93R1250KP083760 | TransLease |
| A191 | T-78 | 2019 | Poly Real | Gooseneck Poly Pipe Trailer | 4T93R1522KP083761 | TransLease |
| A192.2 | T-04 | 2019 | Big Tex | 14' Utility Dump Trailer | 16VDX1423K5063375 | TransLease |
| A381 | S-79 | 2015 | Peterbilt | 389 HH Tractor | 1XPXP4EX2FD269088 | TransLease |
| A394 | T-103 | 2020 | Thunder Creek | FST990 Fuel Trailer | 56ZL1UG20LP000709 | Translease |
| A395 | T-104 | 2020 | Thunder Creek | FST990 Fuel Trailer | 56ZL1UG28LP000182 | Translease |
| A413 | T-99 | 2020 | Liddell | C-55F Lowboy Trailer | 1L94L5331LB564068 | Translease |
| A449 | T-107 | 2020 | Liddell | C-55 Tag Axle Dolly Trailer | 1L94L0516LB564040 | Translease |
| A450 (A178) | S-77 | 2015 | Kenworth | T800 Tractor | 1XKDDP9X3FJ423631 | Translease |
| A1007 | 8033 | 2013 | Great Plains | 1006NT Seeder | GP-3009XX | Utica Leaseco |
| A1008 | 8112 | 2017 | Great Plains | 3PNG15-2475 Drill Seeder | GPA1214D | Utica Leaseco |
| A231 | 8017 | | Danuser | SM40 Hammer w/Grapple | 3026 | Utica Leaseco |
| A232 | BCR1328 | 2015 | Kubota | M126GX | 51328 | Utica Leaseco |
| A233 | 8037 | 2018 | Legend | 33088-C12 Skidsteer Mower | 101525 | Utica Leaseco |
| A234 | 8038 | | Legend | 786 Skidsteer Mower | 105292 | Utica Leaseco |
| A235 | 8092 | 2018 | Alkota | 3500 PSI Portable Hot Water Pressure Washer | 294697 | Utica Leaseco |
| A236 | 8121 | 2018 | Warne | Skid Mounted Sprayer | 403346 | Utica Leaseco |
| A237 | 8008 | 2018 | Paladin | 82" Skidsteer Skeleton Bucket | 526600 | Utica Leaseco |
| A238 | T-24 | 2011 | Menard | 500 BBL Frac Trailer | 10111663 | Utica Leaseco |
| A239 | T-23 | 2011 | Menard | 500 BBL Frac Frac Trailer | 10111667 | Utica Leaseco |
| A240 | T-29 | 2011 | Menard | 500 BBL Frac Trailer | 11111675 | Utica Leaseco |
| A241 | 8099 | 2014 | Hot & Mighty | HDS35061HG 3500 PSI Pressure Washer | 15085039 | Utica Leaseco |

| | | | | | | |
|---|---|---|---|---|---|---|
| A242 | 8101 | | Haybuster | 2100 Haybuster | 2117112600 | Utica Leaseco |
| A243 | 8119 | 2006 | Allmand Bros | Night Light Pro Portable Light Tower | 0117PRO06 | Utica Leaseco |
| A244 | 8106 | | Hotsy | 1425 SS 3000 Psi Pressure Washer | 11095900-161028 | Utica Leaseco |
| A245 | 8115 | 2019 | Hotsy | 1260SSF 3000 PSI Pressure Washer | 11105350-163173 | Utica Leaseco |
| A246 | T-28 | 2011 | Menard | 500 BBL Frac Trailer | 11111687 | Utica Leaseco |
| A247 | 637 | 2010 | Park | GN116 Gooseneck Trailer | 13ZGN1626A1000637 | Utica Leaseco |
| A248 | T-89 | 2019 | Big Tex | 14TL-20BK Gooseneck Trailer | 16VEX2023L4035910 | Utica Leaseco |
| A249 | T-50 | 2019 | Big Tex | 20' EQ Trailer | 16VEX202XK2015602 | Utica Leaseco |
| A250 | T-92 | 2019 | Big Tex | 14-20BK Gooseneck Trailer | 16VFX2025L4045942 | Utica Leaseco |
| A251 | T-66 | 2018 | Texas | Bragg Trailer | 17XFP2025J1081834 | Utica Leaseco |
| A252 | BCR688 | | Case | 3909 Discbine | 181688 | Utica Leaseco |
| A253 | S-89 | 2002 | Freightliner | FL80 | 1FVABXAK62HJ26654 | Utica Leaseco |
| A254 | T-38 | 2013 | Tank | SEQTR Trailer | 1G9VT4026DH018618 | Utica Leaseco |
| A255 | T-36 | 2011 | Galye | 130 BBL Vac Trailer | 1G9VT4029BH017802 | Utica Leaseco |
| A256 | S-55 | 2001 | Mack | RD688S OTR Truck | 1M2P267CX1M060515 | Utica Leaseco |
| A257 | BCR3783 | 2014 | John Deere | 320E Skid Steer Loader | 1T0320EKPEJ263783 | Utica Leaseco |
| A258 | S-59 | 2005 | Kenworth | T600 OTR Truck | 1XKADU9X65R091542 | Utica Leaseco |
| A259 | S-800 | 2000 | Peterbilt | 379 | 1XP5DB9X4YN534458 | Utica Leaseco |
| A260 | S-53 | 1999 | Peterbilt | 378 OTR Truck | 1XPFPBEX2YN508135 | Utica Leaseco |
| A261 | BCR550 | | Drua Tech | 2650 Haybuster | 2615799850 | Utica Leaseco |
| A262 | BCR650 | | Haybuster | 2650 Bale Processor | 26DJ078650 | Utica Leaseco |
| A263 | 8051 | | Traux | 12' Drill Seeder | 2976 | Utica Leaseco |
| A264 | S-80 | 2009 | Peterbilt | 335 | 2NPLHN7X09M787403 | Utica Leaseco |
| A265 | U-60 | 2012 | Dodge | 5500 4X4 M | 3C7WDNBL6CG112310 | Utica Leaseco |
| A266 | S-65 | 2012 | International | ProStar OTR Truck | 3HSDJSJR9CN652027 | Utica Leaseco |
| A267 | BCR218 | 2018 | SCHMEISE R | VR327P Deep Ripper | 3PVR 212-18 | Utica Leaseco |
| A268 | T-100 | 2019 | Cargo Mate | CMC5240 Cargo Trailer | 49TCB1627K1029227 | Utica Leaseco |
| A269 | T-05 | 2008 | H&H | Trailer | 4J6HD35258B096999 | Utica Leaseco |
| A270 | T-14 | 2006 | Delta | Flatbed Trailer | 4MWFS36236N017717 | Utica Leaseco |
| A271 | T-17 | 2015 | Delta | Flatbed Trailer | 4MWGF4029FN036635 | Utica Leaseco |
| A272 | T-07 | 2009 | PJ Trailer Mfg. Co. | Flatbed Trailer | 4P5FD402191126369 | Utica Leaseco |
| A273 | T-09 | 2015 | H&H | Dump Trailer | 533DG142XFC241406 | Utica Leaseco |
| A274 | T-88 | 2019 | RC Trailer | 20' Enclosed Trailer | 56VBE2026KM651777 | Utica Leaseco |
| A275 | T-49 | 2018 | E Tex Longhorn | 18' Flatbed Trailer | 5J2CS1821JE020101 | Utica Leaseco |
| A276 | T-11 | 2015 | Dorsey | Steel Giant Flatbed Trailer | 5JYDF5324FE087067 | Utica Leaseco |
| A277 | T-53 | 2018 | Maxey | Pipe Hauler Trailer | 5R89T3220JM052592 | Utica Leaseco |
| A278 | T-69 | 2018 | Maxey | Pipe hauler Trailer | 5R8BS4020JM57622 | Utica Leaseco |
| A279 | T-47 | 2015 | Maxey | Dump Trailer | 5R8G81425FM035796 | Utica Leaseco |
| A280 | T-52 | 2018 | Maxey | Pipe Top 7K Trailer | 5VNBV1825JT189909 | Utica Leaseco |
| A281 | BCR582 | 2015 | Yamaha | SxS SxS | 5Y4AM62Y2FA101582 | Utica Leaseco |

| | | | | | | |
|---|---|---|---|---|---|---|
| A282 | 8050 | | MQ | DCA-25SSIU4F Generator | 7155303 | Utica Leaseco |
| A283 | T-64 | 2019 | Salv | 7 x 14 Enclosed Trailer | 7GG1E1428KW004364 | Utica Leaseco |
| A284 | T-67 | 2019 | Salv | TA 10K Enclosed Trailer | 7GG1E2027KW004626 | Utica Leaseco |
| A285 | T-101 | 2019 | Wells Cargo | 16' Enclosed Trailer | 7KC1E1621KT001260 | Utica Leaseco |
| A286 | 8024 | | Bobcat | 15C Augar Attachment | 944261288 | Utica Leaseco |
| A287 | 8052 | | Unverferth | Mod 122 Subsoiler | A59950100 | Utica Leaseco |
| A288 | BCR7956 | 2019 | McElroy | AT1830101 Fusion Machine | C97956 | Utica Leaseco |
| A289 | T-77 | 1998 | Container Trailer | 1AA-1P40G Trailer | CIMC 43045711 | Utica Leaseco |
| A290 | T-106 | 1998 | CIMC | 8 x 40' Storage Trailer | DCMCA035853 | Utica Leaseco |
| A291 | 8107 | 2012 | Great Plains | 1005NG Grain Drill | GP5547U | Utica Leaseco |
| A292 | 8111 | | Great Plains | 3P1006NT-1575 Grain Drill | GP-A1134W | Utica Leaseco |
| A293 | 8002 | | ANBO | 76" Grapple Rake | GRS531368472 | Utica Leaseco |
| A294 | 8080 | | Misc | 142 4' x 16' Wood Crane Mats | n/a | Utica Leaseco |
| A295 | A295 | | Custom | 3 20' Steel Water Road Crossing Plate | n/a | Utica Leaseco |
| A296 | A296 | | Custom | 3 24' Steel Water Road Crossing Plate | n/a | Utica Leaseco |
| A297 | BCR105 | | John Deere | 640 Tractor Loader attachment | N00640X000105 | Utica Leaseco |
| A298 | BCR996 | | Pioneer Pump | PP44S8L71-C2.2NA Pump | NSTR/PKG2996 | Utica Leaseco |
| A299 | 8029 | 2017 | Degelman | R1500 Rock Rake | RR3962 | Utica Leaseco |
| A300 | T-94 | 2004 | B&B | Dump Trailer | S68874W | Utica Leaseco |
| A303 | 8120 | 2018 | Warne | Skid Mounted Sprayer | | Utica Leaseco |
| A108 | U-21 | 2015 | Dodge | Ram 3500 | 3C7WRTCJ3FG586285 | Utica Leaseco (Prev Ally) |
| A119 | U-71 | 2018 | Dodge | Ram 3500 | 3C7WRTCJXJG331724 | Utica Leaseco (Prev Ally) |
| A120 | U-48 | 2018 | Dodge | Ram 3500 Flatbed | 3C7WRTCL1JG231433 | Utica Leaseco (Prev Ally) |
| A123 | S-75 | 2019 | International | Durastar-Series 4300 SBA 4x2 | 3HAMMMML4KL136974 | Utica Leaseco (Prev BMO) |
| A124 | S-70 | 2018 | International | Durastar-Series 4300 SBA 4x2 | 3HAMMMML1JL331025 | Utica Leaseco (Prev BMO) |
| A1001 | 8064 | 2019 | Oasis | 47520' 6" TPU Lay Flat Water Hose w/VIC End | n/a | Utica Leaseco (Prev Cash) |
| A1003 | T-87a | 2018 | Carry-On Trailer | Carry On Trailer 5X8CGRECP | 4YMBC0815JT001686 | Utica Leaseco (Prev Cash) |
| A1004.2 | S-50 | 1994 | International | 9400 OTR Truck | 2HSFHGMR2RC087871 | Utica Leaseco (Prev Cash) |
| A1009 | BCR750 | 2012 | Haybuster | 2650 Bale Processor | 2612651750 | Utica Leaseco (Prev Cash) |
| A1010 | BCR116c | 2012 | Wishek | 16-SP Strawpress | 13111116 | Utica Leaseco (Prev Cash) |
| A1011 | BCR153 | 2012 | John Deere | 1612 Strawpress Disk Harrow | 1XFDH16XJB0000153 | Utica Leaseco (Prev Cash) |
| A1013 | 8054 | 2010 | Wishek | 16-SP Strawpress | 3021116 | Utica Leaseco (Prev Cash) |
| A1015 | BCR312 | 2013 | Sunflower | 1212-12 Tiller Disc | AGCS12110DZ100013-12 | Utica Leaseco (Prev Cash) |
| A1016 | T-87 | | Cargo Express | Trailer | 53BCTEA22KT022618 | Utica Leaseco (Prev Cash) |
| A1017 | T-84 | 2020 | Big Tex | 14TL-22BL Gooseneck Trailer | 16VEX2225L4034299 | Utica Leaseco (Prev Cash) |
| A301 | T-105 | 2016 | Shanghai | 8 x 20' Office Trailer | TRDU1041821 | Utica Leaseco (Prev Cash) |
| A304 | T-71 | 2019 | Big Tex | Trash Trailer | 16VNX1626J2079460 | Utica Leaseco (Prev Cash) |
| A305 | T-58 | 2019 | Big Tex | Trash Trailer | 16VNX162XJ2079459 | Utica Leaseco (Prev Cash) |

| | | | | | | |
|---|---|---|---|---|---|---|
| A306 | T-57 | 2019 | Big Tex | Pipe Trailer 14LX | 16VPX2021K2094344 | Utica Leaseco (Prev Cash) |
| A307 | T-73 | 2019 | Lark | Vnose Enclosed Trailer | 571BE2023KM032543 | Utica Leaseco (Prev Cash) |
| A308 | T-74 | 2019 | Lark | Vnose Enclosed Trailer | 571BE2028KM032540 | Utica Leaseco (Prev Cash) |
| A309 | T-40 | 2018 | MaxxD | Pipe Hauler Trailer 32x84 | 5R8LH4021JM053095 | Utica Leaseco (Prev Cash) |
| A310 | BCR554 | 2019 | Yamaha | Viking EPS | 5Y4AMB2Y9KA102554 | Utica Leaseco (Prev Cash) |
| A311 | T-93 | 2020 | Criterion | 20' Enclosed Trailer | 7HVCBEF25LA001339 | Utica Leaseco (Prev Cash) |
| A312 | A312 | | Misc | 600 20' Wood Crane Mats | n/a | Utica Leaseco (Prev Cash) |
| A313 | 8053 | | Wishek | Straw Processor | Unk | Utica Leaseco (Prev Cash) |
| A128 | BCR0559 | 2017 | Caterpillar | 259D Compact Track Loader | CAT0259DVFTL10559 | Utica Leaseco (Prev Cat FS) |
| A129 | BCR083a | 2019 | Caterpillar | 299D2 Compact Track Loader | FD205083 | Utica Leaseco (Prev Cat FS) |
| A131 | BCR294 | 2006 | Caterpillar | D6RXL Track Type Tractor | GJB00673 | Utica Leaseco (Prev Cat FS) |
| A194 | BCR752 | 1989 | Caterpillar | 627E Motor Scraper | 6GB00752 | Utica Leaseco (Prev CCB) |
| A194.1 | BCR754 | 1989 | Caterpillar | 627E Motor Scraper | 6GB00754 | Utica Leaseco (Prev CCB) |
| A194.2 | S-52 | 2007 | Kenworth | W900 | 1XKWD49X77R193232 | Utica Leaseco (Prev CCB) |
| A194.3 | BCR769 | 2015 | JLG | G1255A Turbo Telehandler | 160066769 | Utica Leaseco (Prev CCB) |
| A194.5 | BCR570 | 1986 | Caterpillar | 627E Motor Scraper | 6EB00570 | Utica Leaseco (Prev CCB) |
| A194.6 | BCR738 | 1989 | Caterpillar | 627E Motor Scraper | 6GB00738 | Utica Leaseco (Prev CCB) |
| A194.7 | BCR0500 | 1998 | Caterpillar | 627F Motor Scraper | 1DL00500 | Utica Leaseco (Prev CCB) |
| A203 | U-79 | 2017 | Dodge | Ram 3500 Flatbed | 3C7WRTCL9HG651645 | Utica Leaseco (Prev CCB) |
| A314 | T-25 | 2006 | Dragon | 500 BBL Frac Trailer | 43691 | Utica Leaseco (Prev CCB) |
| A315 | T-22 | 2006 | Dragon | 500 BBL Frac Trailer | 43696 | Utica Leaseco (Prev CCB) |
| A316 | T-19 | 2006 | Dragon | 500 BBL Frac Trailer | 43972 | Utica Leaseco (Prev CCB) |
| A317 | T-81 | | Dragon | 500 BBL Frac Trailer | 64949 | Utica Leaseco (Prev CCB) |
| A318 | T-82 | | Dragon | 500 BBL Frac Trailer | 66251 | Utica Leaseco (Prev CCB) |
| A319 | T-80 | | Dragon | 500 BBL Frac Trailer | 72605 | Utica Leaseco (Prev CCB) |
| A320 | T-26 | 2010 | Dragon | 500 BBL Frac Trailer | 82362 | Utica Leaseco (Prev CCB) |
| A321 | T-27 | 2010 | Dragon | 500 BBL Frac Trailer | 84065 | Utica Leaseco (Prev CCB) |
| A136 | U-04 | 2016 | Dodge | Ram 3500 | 3C63RRGL8GG246847 | Utica Leaseco (Prev Chase) |
| A137 | U-12 | 2017 | Dodge | Ram 3500 | 3C7WRTCL6HG567685 | Utica Leaseco (Prev Chrysler) |
| A138 | U-11 | 2017 | Dodge | Ram 3500 | 3C7WRTCL8HG508900 | Utica Leaseco (Prev Chrysler) |
| A141.2 | BCR447 | 2018 | Wishek | Straw Press | AGCW00SP0JX464447 | Utica Leaseco (Prev CIT) |
| A147.2 | 8036 | 2018 | Great Plains | 16' 3PT Native Grass Drill | GPA1207D | Utica Leaseco (Prev Great Plains) |
| A148.1 | BCR526 | 2015 | John Deere | 310SL Backhoe Loader | 1T0310SLJFF280526 | Utica Leaseco (Prev JDF) |
| A148.2 | BCR514 | 2015 | John Deere | 310SL Backhoe Loader | 1T0310SLVFF280514 | Utica Leaseco (Prev JDF) |
| A149 | BCR1796 | 2018 | John Deere | 331G Compact Track Loader | 1T0331GKAHF311796 | Utica Leaseco (Prev JDF) |
| A162 | BCR986 | 2015 | John Deere | 844k-III 4WD Loader | 1DW844kCPHF680986 | Utica Leaseco (Prev JDF) |
| A164.1 | BCR818 | 2013 | John Deere | 6140 Row Crop Tractor and H360 Loader | 1RW6140RAD008818 | Utica Leaseco (Prev JDF) |
| A164.2 | BCR167 | 2012 | John Deere | 7330 Row Crop Tractor and H380 Loader | RW7330K030167 | Utica Leaseco (Prev JDF) |
| A165.1 | BCR173 | | John Deere | 323D Compact Track Loader | 1T0323DKACG230173 | Utica Leaseco (Prev JDF) |

| | | | | | | |
|---|---|---|---|---|---|---|
| A165.2 | BCR147 | 2014 | John Deere | 326D Skid Steer | 1T0326EKKEJ261147 | Utica Leaseco (Prev JDF) |
| A165.3 | BCR628 | 2016 | Rhino | Rotary Mower 4150 | 30628 | Utica Leaseco (Prev JDF) |
| A165.4 | 8034 | 2014 | Great Plains | NT1006 No Till Drill | GP-3264 | Utica Leaseco (Prev JDF) |
| A219.3 | 8048 | | John Deere | K-line 2935 Disk | 2935DA192488 | Utica Leaseco (Prev JDF) |
| A219.4 | 8049 | | John Deere | K-line 2935 Disk | 2935DA192489 | Utica Leaseco (Prev JDF) |
| A219.5 | 8104 | | Rhino | 3150 Rotary Mower | 40574 | Utica Leaseco (Prev JDF) |
| A322 | BCR637 | 2012 | John Deere | 7230 Tractor | RW7230P011637 | Utica Leaseco (Prev JDF) |
| A170 | 3002 | 2015 | Kubota | 4WD Tractor M126GXDTC-F | 51275 | Utica Leaseco (Prev Kubota) |
| A199 | 6002 | 2014 | John Deere | 770GP Motor Grader | 1DW770GPKEF661102 | Utica Leaseco (Prev M2 Lease Funds LLC) |
| A172.2 | 8047 | 2019 | K-Line | 12' Speedtiller | 2935D192288 | Utica Leaseco (Prev Northland Cap) |
| A206 | BCR259 | 2015 | Kuhn Knight | PS150T Spreader | D0259 | Utica Leaseco (Prev Northland Cap) |
| A172.3 | BCR292 | 2019 | K-Line | 12' Speedtiller | 2935D192292 | Utica Leaseco (Prev Northland) |
| A176 | S-58 | 2014 | Kenworth | T800 Tractor | 1XKDP4EXXEJ413995 | Utica Leaseco (Prev TransLease) |
| A177 | S-76 | 2014 | Peterbilt | 567 | 1XPCD40X5ED251164 | Utica Leaseco (Prev TransLease) |
| A179 | T-60 | 2015 | Landoll | 855D Trailer | 1LH855WJ3F1C21467 | Utica Leaseco (Prev TransLease) |
| A180 | T-15 | 2016 | Trail King | Low Boy Trailer | 1TKJ05333GW078193 | Utica LeaseCo (Prev TransLease) |
| A187.1 | T-03 | 2019 | PJ Trailer Mfg. Co. | 35' Tandem Dual Deck Gooseneck | 4P5FD3527K1302804 | Utica Leaseco (Prev TransLease) |
| A192.1 | T-02 | 2019 | Big Tex | 30' Gooseneck Utility Trailer | 16VGX3020K6053203 | Utica Leaseco (Prev TransLease) |
| A193 | U-05 | 2017 | Dodge | Ram 3500 | 3C7WRTCL5HG692306 | Utica Leaseco (Prev Wells Fargo) |
| A147.1 | 8035 | 2018 | Great Plains | 16' 3PT Native Grass Drill | GPA1195D | Utica Leaseco (PrevGreat Plains) |
| A385 | S-84 | 2010 | Peterbilt | 384 Water Truck | 1NPVLU9X8AD796679 | Western Equipment Finance |
| A387 | S-86 | 2010 | Peterbilt | 384 Water Truck | 1NPVLU9X0AD796658 | Western Equipment Finance |
| A389 | S-88 | 2012 | Kenworth | T270 Service Truck | 2NKHHM6X4CM309242 | Western Equipment Finance |

**SCHEDULE 7.2**

**EXISTING LIENS**

Liens on the assets set forth on Schedule 7.1

## SCHEDULE 7.10

## EXISTING RESTRICTIONS

None.

**SCHEDULE 10.1**

**NOTICE INFORMATION**

| Name | Address | Facsimile Number | E-Mail Address | Telephone Number |
|---|---|---|---|---|
| BancorpSouth Bank | 2800 North Loop West<br>Suite 1000<br>Houston, TX 77092<br>Attn: Mina Valverde | n/a | mina.valverde@bxs.com | 281-492-3298 |
| Bridgelink Engineering LLC | 777 Main Street<br>Suite 2800<br>Fort Worth, TX 76102<br>Attn: Cody Bissett | 817-549-2713 | cbissett@bridgelinkengineering.com | 682-816-5006 |
| Bighorn Construction and Reclamation L.L.C. | 777 Main Street<br>Suite 2800<br>Fort Worth, TX 76102<br>Attn: Cody Bissett | 817-549-2713 | cbissett@bcrcompanies.com | 682-816-5006 |
| Bighorn Sand & Gravel LLC | 777 Main Street<br>Suite 2800<br>Fort Worth, TX 76102<br>Attn: Cody Bissett | 817-549-2713 | cbissett@bcrcompanies.com | 682-816-5006 |
| Bighorn Investments and Properties, LLC | 777 Main Street<br>Suite 2800<br>Fort Worth, TX 76102<br>Attn: Cody Bissett | 817-549-2713 | cbissett@bcrcompanies.com | 682-816-5006 |

## EXHIBIT A

## FORM OF ASSIGNMENT AND ASSUMPTION

This Assignment and Assumption (the "Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into by and between the Assignor identified in item 1 below (the "Assignor") and **[the][each]**[1] Assignee identified in item 2 below (**[the][each, an]** "Assignee"). **[It is understood and agreed that the rights and obligations of [the Assignors][the Assignees]**[2] **hereunder are several and not joint.]**[3] Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by **[the][each]** Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to **[the Assignee][the respective Assignees]**, and **[the][each]** Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below (including, without limitation, any Letters of Credit and Swingline Loans included in such facilities) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by the Assignor to **[the][any]** Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as **[the][an]** "Assigned Interest"). Each such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1. Assignor: ___________________________________

2. Assignee**[s]**: ___________________________________

   **[Assignee is an [Affiliate][Approved Fund]** of **[identify Lender]]**

3. Borrower: BRIDGELINK ENGINEERING, LLC, a Delaware limited liability company.

4. Administrative Agent: BANCORPSOUTH BANK, as the administrative agent under the Credit Agreement.

---

[1] NTD: For bracketed language here and elsewhere in this form relating to the Assignee(s), if the assignment is to a single Assignee, choose the first bracketed language. If the assignment is to multiple Assignees, choose the second bracketed language.

[2] NTD: Select as appropriate.

[3] NTD: Include bracketed language, if appropriate, if there are either multiple Assignors or multiple Assignees.

5. Credit Agreement: The Credit Agreement, dated as of August 6, 2021, among the Borrower, the Lenders party thereto and the Administrative Agent, as from time to time amended, restated, supplemented or otherwise modified.

6. Assigned Interest**[s]**:

| Assignor | Assignee**[s]**[4] | Facility Assigned[5] | Aggregate Amount of Commitment/ Loans for all Lenders[6] | Amount of Commitment/ Loans Assigned | Percentage Assigned of Commitment/ Loans[7] |
|---|---|---|---|---|---|
| | | | $____________ | $____________ | ____% |
| | | | $____________ | $____________ | ____% |
| | | | $____________ | $____________ | ____% |

7. Trade Date: **[_____ __]**, 20**[__]**[8]

8. Effective Date: **[_____ __]**, 20**[__]**[9]

[Signature pages follow]

---

4 NTD: List each Assignee, as appropriate.

5 NTD: Fill in the commitment(s) that are being assigned under this Assignment (e.g. "Revolving Commitment," "Term Loan Commitment," etc.).

6 NTD: Amount to be adjusted by the counterparties to take into account any payments or prepayments made between the Trade Date and the Effective Date.

7 NTD: Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

8 NTD: To be completed if the Assignor(s) and the Assignee(s) intend that the minimum assignment amount is to be determined as of the Trade Date.

9 NTD: To be inserted by Administrative Agent and which shall be the Effective Date of recordation of transfer in the register therefor.

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR

**[NAME OF ASSIGNOR]**

By: ______________________________
Title: ____________________________

ASSIGNEE**[S]**[10]

**[NAME OF ASSIGNEE]**

By: ______________________________
Title: ____________________________

**[NAME OF ASSIGNEE]**

By: ______________________________
Title: ____________________________

[10] NTD: Add additional signature blocks as needed.

**[Consented to and]**[11] Accepted:

**BANCORPSOUTH BANK**, as Administrative Agent

By: ____________________________________
Title: ___________________________________

**[Consented to:]**[12]

**BRIDGELINK ENGINEERING, LLC**, as Borrower

By: ____________________________________
Title: ___________________________________

[11] NTD: To be added only if the consent of the Administrative Agent is required by the terms of the Credit Agreement.

[12] NTD: To be added only if the consent of the Borrower and/or other parties (e.g. Swingline Lender, L/C Issuer) is required by the terms of the Credit Agreement.

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1. Representations and Warranties

1.1 Assignor. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of **[the][the relevant]** Assigned Interest, (ii) **[the][such]** Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and (iv) it is not a Defaulting Lender; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document, or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2 Assignee**[s]**. **[The][Each]** Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all the requirements to be an assignee under Section 10.4(b)(iii), (v) and (vi) of the Credit Agreement (subject to such consents, if any, as may be required thereunder), (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of **[the][the relevant]** Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to Section 6.1 thereof, as applicable, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase **[the][such]** Assigned Interest, (vi) it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase **[the][such]** Assigned Interest, and (vii) if it is a Foreign Lender, attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by **[the][such]** Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2. Payments. From and after the Effective Date, the Administrative Agent shall make all payments in respect of **[the][each]** Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to **[the][the relevant]** Assignee for amounts which have accrued from and after the Effective Date. Notwithstanding the foregoing, the Administrative Agent shall make all payments of interest, fees or other amounts paid or payable in kind from and after the Effective Date to **[the][the relevant]** Assignee.

3. General Provisions. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Assumption by facsimile shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption. This Assignment and Assumption shall be governed by, and construed in accordance with, the laws of the State of Texas without regard to conflicts of laws principles.

**EXHIBIT B**

**FORM OF COMMITTED LOAN NOTICE**

**[Date]**

BANCORPSOUTH BANK, as Administrative Agent
2800 North Loop West, Suite 1000
Houston, TX 77092
Attention: Mina Valverde
Phone: 281-492-3298
Email: mina.valverde@bxs.com

Ladies and Gentlemen:

Reference is made to the Credit Agreement, dated as of August 6, 2021, among **BRIDGELINK ENGINEERING, LLC**, a Delaware limited liability company (the "Borrower"), the Lenders party thereto and **BANCORPSOUTH BANK**, as Administrative Agent (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"). Capitalized terms used herein and not defined herein shall have the meanings assigned to such terms in the Credit Agreement.

1. Borrowings.[13] Pursuant to Section 2.2 of the Credit Agreement, the Borrower hereby irrevocably requests the following Borrowing**[s]** under the Credit Agreement and sets forth below the information relating to such Borrowing**[s]** (the "Proposed Borrowing") as required by Section 2.2 of the Credit Agreement:

(a) The Business Day of the Proposed Borrowing**[s]** is [____________], 202[_].

(b) The Class, Type and amount of the Loans comprising the Proposed Borrowing**[s]**, and, in the case of LIBOR Borrowings, the initial Interest Period applicable thereto, are as follows:

| Class of Borrowings (Revolving Loans or Term Loans) | Type of Borrowing (ABR or LIBOR) | Amount[14] | Initial Interest Period |
|---|---|---|---|
| | | | __ months |
| | | | __ months |

(c) The location and number of the Borrower's account to which funds are to be disbursed is:

Bank: ____________________________
ABA #: __________________________
Account #: ________________________
Account Name: ____________________

[13] NTD: Include this Section if Borrowings are being requested. Delete inapplicable bracketed terms.

[14] NTD: Must be a minimum of the Borrowing Minimum or a whole multiple of the Borrowing Multiple in excess thereof.

2. Certifications with respect to all Borrowings.[15] The Borrower hereby certifies that on the date hereof as well as on the date of the Proposed Borrowing (a) each of the representations and warranties of the Loan Parties set forth in the Loan Documents are true and correct in all material respects, in each case on and as of the date hereof as if made on and as of such date, provided that to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided further that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates and (b) no Default exists or would result from such Proposed Borrowing or from the application of the proceeds therefrom.

3. Conversions and Continuations.[16] Pursuant to Section 2.2 of the Credit Agreement, the Borrower hereby irrevocably requests a **[conversion] [continuation]** under the Credit Agreement and sets forth below the information relating to such **[conversion] [continuation]** (the "Proposed **[Conversion] [Continuation]**"):

(a) The Business Day of the Proposed **[Conversion] [Continuation]** is [____________], 202[_].

(b) The Type and amount of the Proposed **[Conversion] [Continuation]**, in the case of LIBOR Borrowings, the initial Interest Period are as follows:

| Type of Borrowing (ABR or LIBOR) being [Converted] [Continued] | Amount[17] | Interest Period |
|---|---|---|
| | | __ months |
| | | __ months |

Delivery of an executed counterpart of this Committed Loan Notice by an electronic method of transmission shall be effective as delivery of an original executed counterpart of this Committed Loan Notice.

[Signature page follows]

---

[15] NTD: Include this Section if Borrowings are being requested.

[16] NTD: Include this Section if conversions or continuations are being requested. Delete inapplicable bracketed terms.

[17] NTD: Must be a minimum of the Borrowing Minimum or a whole multiple of the Borrowing Multiple in excess thereof.

IN WITNESS WHEREOF, the Borrower has caused this Committed Loan Notice to be executed as of the date and year first written above.

**BRIDGELINK ENGINEERING, LLC**, as the Borrower

By: ________________________________
Name: ______________________________
Title: ________________________

**EXHIBIT C**

**FORM OF REVOLVING LOAN NOTE**

**[________ __]**, 20**[__]**

FOR VALUE RECEIVED, **BRIDGELINK ENGINEERING, LLC**, a Delaware limited liability company (the "Borrower"), hereby promises to pay to **[___________]** (the "Lender") or its registered assigns the unpaid principal amount of the Revolving Loans made by the Lender to the Borrower, in the amounts and at the times set forth in the Credit Agreement, dated as of August 6, 2021, among the Borrower, the Lenders party thereto and **BANCORPSOUTH BANK**, as Administrative Agent (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement") and to pay interest from the date hereof on the principal balance of such Revolving Loans from time to time outstanding at the rate or rates and at the times set forth in the Credit Agreement, in each case at the Administrative Agent's Payment Office, in the currency in which such Loan is denominated in immediately available funds. Capitalized terms used herein and not defined herein shall have the meanings assigned to such terms in the Credit Agreement.

The Revolving Loans evidenced by this Revolving Loan Note (this "Note") are prepayable in the amounts, and under the circumstances, and their respective maturities are subject to acceleration upon the terms, set forth in the Credit Agreement. This Note is subject to, and shall be construed in accordance with, the provisions of the Credit Agreement and is entitled to the benefits and security set forth in the Loan Documents.

The Lender is hereby authorized to record on the Schedule annexed hereto, and any continuation sheets which the Lender may attach hereto, (a) the date of each Revolving Loan made by the Lender, (b) the Type and amount thereof, (c) the interest rate (without regard to the Applicable Margin) and Interest Period applicable to each such Revolving Loan that is a LIBOR Loan, and (d) the date and amount of each conversion of, and each payment or prepayment of the principal of, each such Revolving Loan. The entries made on such Schedule shall be prima facie evidence absent manifest error of the existence and amounts of the obligations recorded thereon, provided that the failure to so record or any error therein shall not in any manner affect the obligation of the Borrower to repay such Revolving Loans in accordance with the terms of the Credit Agreement.

Except as specifically otherwise provided in the Credit Agreement, the Borrower hereby waives presentment, demand, notice of dishonor, protest, notice of protest and all other demands, protests and notices in connection with the execution, delivery, performance, collection and enforcement of this Note.

Whenever in this Note a Person is referred to, such reference shall be deemed to include the successors and assigns of such Person. The Borrower shall not have the right to assign its rights or obligations hereunder or any interest herein (and any such attempted assignment shall be void), except as expressly permitted by the Loan Documents. No failure or delay of the Lender in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. Neither this Note nor any provision hereof may be waived, amended or modified, nor shall any departure therefrom be consented to, except pursuant to a written agreement entered into between the Borrower and the Lender with respect to which such waiver, amendment, modification or consent is to apply, subject to any consent required in accordance with Section 10.2 of the Credit Agreement.

All communications and notices hereunder shall be in writing and given as provided in Section 10.1 of the Credit Agreement.

THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS).

The Borrower, and by accepting this Note, the Lender, each hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the courts of the State of Texas sitting in Harris County and of the United States District Court for the Southern District of Texas and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Note or the other Loan Documents, or for recognition or enforcement of any judgment, and the Borrower, and by accepting this Note, the Lender, each hereby irrevocably and unconditionally agrees that, to the extent permitted by applicable law, all claims in respect of any such action or proceeding may be heard and determined in such Texas State court or, to the extent permitted by applicable law, in such Federal court. The Borrower, and by accepting this Note, the Lender, each agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Note shall affect any right that the Lender may otherwise have to bring any action or proceeding relating to this Note or the other Loan Documents against the Borrower, or any of its property, in the courts of any jurisdiction.

The Borrower, and by accepting this Note, the Lender, hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Note or the other Loan Documents in any court referred to in the preceding paragraph hereof. The Borrower, and by accepting this Note, the Lender, hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

The Borrower, and by accepting this Note, the Lender, irrevocably consents to service of process in the manner provided for notices herein. Nothing herein will affect the right of the Lender to serve process in any other manner permitted by law.

**THE BORROWER, AND BY ACCEPTING THIS NOTE, THE LENDER, EACH HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS NOTE. THE BORROWER, AND BY ACCEPTING THIS NOTE, THE LENDER, EACH (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT SUCH OTHER PERSON HAS BEEN INDUCED TO ACCEPT THIS NOTE AND ENTER INTO THE LOAN DOCUMENTS TO WHICH IT IS A PARTY BY, AMONG OTHER THINGS, THE WAIVERS AND CERTIFICATIONS IN THIS PARAGRAPH.**

IN WITNESS WHEREOF, the Borrower has executed this Revolving Loan Note as of the date and year first written above.

**BRIDGELINK ENGINEERING, LLC**, as the Borrower

By: ___________________________________
Name: _________________________________
Title: __________________________________

SCHEDULE TO REVOLVING LOAN NOTE

| Date | Type of Revolving Loan | Amount of Revolving Loan | Amount of principal converted, repaid or prepaid | Interest Rate if LIBOR Loan[18] | Interest Period if LIBOR Loan | Notation Made By |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

[18] NTD: Without regard to the Applicable Margin.

**EXHIBIT D**

**FORM OF COMPLIANCE CERTIFICATE**

**[________ __]**, 20**[__]**

I, ______________, do hereby certify that I am the **[Chief Financial Officer]** of [________________] a [__________________] (the "Borrower"), and that, as such, I am duly authorized to execute and deliver this Compliance Certificate on the Borrower's behalf pursuant to Section 6.1(d) of the Credit Agreement, dated as of [_____________], 2021, among the Borrower, the Lenders party thereto and **BANCORPSOUTH BANK**, as Administrative Agent (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"). Capitalized terms used herein and not defined herein shall have the meanings assigned to such terms in the Credit Agreement. Section references herein relate to the Credit Agreement unless stated otherwise. In the event of any conflict between the calculations set forth in this Compliance Certificate and the manner of calculation required by the Credit Agreement, the terms of the Credit Agreement shall govern and control.

1. Test Date. This Compliance Certificate is delivered for the fiscal **[quarter/year]** ended **[________ __]**, 20**[__]** (the "Test Date"). Unless otherwise indicated, references to the "Period" refer to the four fiscal quarters ending on the Test Date.

2. No Default. No Default exists **[, except as follows: [describe]]**.[19]

3. Financial Statements. All financial statements delivered herewith have been prepared in accordance with GAAP. There has been no change in GAAP or in the application thereof that has resulted in a change to the financial statements accompanying this Compliance Certificate since the date of the Audited Financial Statements which has an effect on the financial statements accompanying this Compliance Certificate **[, except as follows: [describe]]**.

4. Subsidiaries. The Borrower has no Subsidiaries other than (a) those that set forth on Schedule 4 to this Compliance Certificate, which Schedule sets forth for each such Subsidiary whether such Subsidiary is (i) a Domestic Subsidiary, (ii) a Subsidiary Guarantor (including the basis for it not being a Subsidiary Guarantor), (iii) a first tier Foreign Subsidiary or (iv) an Excluded Subsidiary (including the basis for its constituting an Excluded Subsidiary).

5. Security Interests.[20] There have been no changes to the jurisdiction of organization or legal name of any Loan Party since the latest of the (i) the Closing Date, (ii) any later written notice of such change provided to the Administrative Agent and (iii) the date of the last Compliance Certificate delivered pursuant to Section 6.1(d) of the Credit Agreement **[in each case, except as follows: [describe]]**.

6. Financial Covenant Compliance.

(a) Fixed Charge Coverage Ratio. As of the Test Date, the Consolidated Fixed Charge Coverage Ratio was **[_.__]** to 1.00, calculated as set forth on Schedule 6(a) to this Compliance Certificate. The minimum required Fixed Charge Coverage Ratio pursuant to Section 7.12(a) of the Credit Agreement was 1.25 to 1.00.

---

[19] Specify the nature and status thereof and any action taken or proposed to be taken with respect thereto.

[20] NTD: Include this paragraph if the transaction is secured.

(b) Senior Leverage Ratio. As of the Test Date, the Senior Leverage Ratio was **[_.__]** to 1.00, calculated as set forth on Schedule 6(b) to this Compliance Certificate. The maximum permitted Senior Leverage Ratio as of the Test Date pursuant to Section 7.12(b) of the Credit Agreement was [___] to 1:00.

(c) Liquidity. As of the Test Date, the liquidity was [$_____________], calculated as set forth on Schedule 6(c) to this Compliance Certificate. The minimum liquidity as of the Test Date pursuant to Section 7.12(c) of the Credit Agreement was $4,000,000.

[Signature page follows]

IN WITNESS WHEREOF, I have executed this Compliance Certificate on behalf of the Borrower as of the date first above-written.

**BRIDGELINK ENGINEERING, LLC**

By: ___________________________________
Name:_________________________________
Title: ___________________________________

**SCHEDULE 4 TO COMPLIANCE CERTIFICATE**

**SUBSIDIARIES**

[to be completed by Borrower]

**SCHEDULE 6(a) TO COMPLIANCE CERTIFICATE**

**CALCULATION OF THE FIXED CHARGE COVERAGE RATIO**

| | | | |
|---|---|---|---|
| 1. | **Consolidated EBITDA (Line 2 from Schedule 6(b) of this Compliance Certificate)** | | $____________ |
| | a. | lease payments made during such period: | $____________ |
| | b. | unfinanced Capital Expenditures made during such period: | |
| | c. | Taxes paid or payable in cash (including Permitted Tax Distributions) for such period: | $____________ |
| | d. | dividends and distributions made during such period: | $____________ |
| | e. | **Sum of Lines 1.b through 1.d:** | $____________ |
| 2. | **Fixed Charges (Sum of Lines 2.a through Line 2.c):** | | $____________ |
| | a. | scheduled principal payments made in cash on Funded Indebtedness during such period: | $____________ |
| | b. | Consolidated Cash Interest Expense for such period: | $____________ |
| | c. | lease payments made during such period: | $____________ |
| **Fixed Charge Coverage Ratio (Ratio of (Line 1 plus Line 1.a minus Line 1.e) to Line 2):** | | | __________:1.00 |
| **Required Minimum Fixed Charge Coverage Ratio:** | | | [___]:1.00 |
| **In Compliance?:** | | | Yes / No |

**SCHEDULE 6(b) TO COMPLIANCE CERTIFICATE**

**CALCULATION OF THE SENIOR LEVERAGE RATIO**

| | | | |
|---|---|---|---|
| 1. | **Funded Indebtedness (the sum of Lines 1.a through 1.g)** | | $___________ |
| | a. | the outstanding principal amount of all Indebtedness which is classified as "long-term debt" on the consolidated balance sheet of each Loan Party and its Subsidiaries prepared as of such date in accordance with GAAP (subject to year-end audit adjustments with respect to non-year-end periods) and any current maturities and other principal amount in respect of such Indebtedness due within one year: | $___________ |
| | b. | the outstanding principal amount of Indebtedness for borrowed money of each Loan Party and its Subsidiaries outstanding under a revolving credit, term or similar agreement including, without limitation, any Subordinated Debt (and renewals and extensions of any thereof): | $___________ |
| | c. | the borrowing of money or the obtaining of credit by each Loan Party and its Subsidiary (other than trade payables incurred in the ordinary course of business), including the issuance of notes or bonds (but excluding surety, performance or bid bonds): | $___________ |
| | d. | the deferred purchase price of assets acquired (other than trade payables incurred in the ordinary course of business): | $___________ |
| | e. | inventory financing: | $___________ |
| | f. | Indebtedness of the type referred to in clauses (a) through (e) above of another Person guaranteed by, or secured by a Lien on assets of, the Borrower, any Guarantor or any of their respective Subsidiaries | $___________ |
| | g. | Excluding, without duplication, Subordinated and Junior Debt | $___________ |
| 2. | **Consolidated EBITDA (Line 2.d <u>minus</u> Line 2.e.i):** | | $___________ |
| | a. | Consolidated Net Income of such Person and its Subsidiaries during such period: | $___________ |
| | b. | Add backs (without duplication and to the extent deducted in calculating Consolidated Net Income): | |
| | | i. all income taxes of such Person and its subsidiaries paid or accrued in accordance with GAAP for such period: | $___________ |
| | | ii. Consolidated Interest Expense of such Person and its Subsidiaries for such period: | $___________ |

| | | |
|---|---|---|
| | iii. the amount of non-cash charges, including depletion, and Consolidated Depreciation and Amortization Expense of such Person and its Subsidiaries for such period, in each case unless non-cash during such period but the subject of a cash payment in a future period: | $____________ |
| | iv. reasonable Transaction Expenses and other costs, fees and charges incurred by the Loan Parties on or prior to the Closing Date in connection with this Agreement and the other Loan Documents in an amount not to exceed $250,000 in the aggregate: | $____________ |
| | v. all expenses and charges indemnified by third parties and for which notice of a claim has been given and with respect to which liability is not being contested or reimbursed in cash by third parties or satisfied with the proceeds of business interruption insurance: | $____________ |
| | vi. adjustments to Consolidated Net Income arising from the Borrower's establishment of percentage of completion accounting in accordance with GAAP to the extent such adjustments are verified by a third party accountant acceptable to Lender: | $____________ |
| c. | **Sum of Lines 2.b.i through 2.b.vi:** | $____________ |
| d. | **Sum of Lines 2.a and 2.c:** | $____________ |
| e. | Deductions (to the extent included in calculating Consolidated Net Income): | |
| | i. all non-recurring or extraordinary income or gains during such period (including, without limitation, as a result of the acquisition of Indebtedness at a discount): | $____________ |

| | |
|---|---|
| **<u>Senior Leverage Ratio</u> (Ratio of Line 1 to Line 2):** | __________:1.00 |
| **Required Maximum Senior Leverage Ratio:** | [___]:1.00 |
| **In Compliance?:** | Yes / No |

**SCHEDULE 6(c) TO COMPLIANCE CERTIFICATE**

**CALCULATION OF LIQUIDITY**

| | | |
|---|---|---|
| 1. | Availability: | $___________ |
| 2. | Cash or Cash Equivalents that are neither encumbered nor restricted | $___________ |
| **Liquidity (Sum of Line 1 and Line 2):** | | $___________ |
| **Required Minimum Liquidity:** | | $4,000,000 |
| **In Compliance?:** | | Yes / No |

**EXHIBIT E**

**FORM OF BORROWING BASE CERTIFICATE**

**[Attached]**

# BORROWING BASE CERTIFICATE

Presented by: ____________ Presented to: ____________

Collateral Reporting as of date: ____________

| | | | |
|---|---|---|---|
| 1 | TOTAL ACCOUNTS RECEIVABLE ASSIGNED TO BANK | | $ |
| | ASSIGNED ACCOUNTS RECEIVABLE ADJUSTMENTS: | | |
| a. | Delinquents ( > 60 Days from Due Date or > 120 Days from Invoice Date ) | $ | |
| c. | 25% Cross-Aging Rule | $ | |
| d. | Retainage Receivables | $ | |
| e. | Related Party | $ | |
| f. | Bonded Receivables (not in good standing) | $ | |
| g. | 25% Concentration Rule | $ | |
| h. | Other (International, COD, etc.) | $ | |
| 2 | TOTAL INELIGIBLE A/R | | $ |
| 3 | TOTAL ELIGIBLE ACCOUNTS RECEIVABLE BALANCE | | $ |
| 4 | ELIGIBLE ACCOUNTS RECEIVABLE TIMES ADVANCE RATE (Line 3 times 85.00% ) | | $ |

| | INVENTORY | Cost | FMV | BBC Value |
|---|---|---|---|---|
| a. | Inv - Finished | $ | $ | $ |
| b. | Inv - Raw | $ | $ | $ |
| c. | Inv - In Process/transit (Ineligible) | $ | $ | $ |
| d. | Inv - Other (Ineligible) | $ | $ | $ |

| | | | |
|---|---|---|---|
| 5 | TOTAL INVENTORY ASSIGNED TO BANK (Lesser of Cost or FMV): | | $ |
| 6 | TOTAL INVENTORY LOAN VALUE: | | |
| | ( The lesser of: {a} Line 4 | $ | |
| | INVENTORY TIMES ADV RATE {b} Line 5 @ 50.00% | $ | |
| | INVENTORY CAP {c} CAP - 50% | $ | $ |
| 7 | LINE AVAILABLITY PER ASSIGNED A/R AND INV. | | $ |
| 8 | MINIMUM LIQUIDITY REQUIREMENT ($4MM) | | $ 4,000,000.00 |
| 9 | CURRENT CASH ON HAND BALANCE | | $ |
| 10 | CURRENT LIQUIDITY (Line Availability + Cash on Hand) | | $ |
| 11 | TOTAL BORROWING BASE AVAILABILITY INCLUDING MINIMUM LIQUIDITY REQUIREMENT | | $ |
| 12 | MAXIMUM LINE OF CREDIT AMOUNT | | $ 34,000,000.00 |
| 13 | MAXIMUM AVAILABLE FOR LOAN ADVANCE | | $ |
| 14 | CURRENT LOAN BALANCE | | $ |
| 15 | AVAILABLE TO BE ADVANCED | | $ |

For the purposes of inducing BancorpSouth Bank to grant loans to us pursuant to the terms of our Note, Loan Agreement and other security documents, we hereby certify that the foreoing statement of accounts and inventory described above is true and correct and according to our books and records and is available as acceptable collateral for loans in accordance with the representations and warranties set forth in the Note, Loan Agreement and other security documents.

The following reports are attached to this Certificate and are incorporated by reference:

- [ ] Accounts Receivable Aging
- [ ] Accounts Payable Aging
- [ ] Detailed Inventory Report

By: ____________

Name: ____________

Title:

**EXHIBIT F**

**FORM OF CLOSING CERTIFICATE**

**[_______________________]**
**SECRETARY'S CERTIFICATE**

**August __, 2021**

This Secretary's Certificate of [______________], a [______________] limited liability company (the "Company"), is provided to BancorpSouth Bank (the "Bank") in connection with that certain Credit Agreement dated as of the date hereof (the "Credit Agreement"), by and among the Company, as borrower, the lenders party thereto, and the Bank, as administrative agent. The undersigned, being the duly appointed Secretary of the Company, hereby certifies, in his capacity as the Secretary of the Company, that:

1. The Company is a limited liability company duly formed, validly existing and in good standing under the laws of the State of [______________];

2. Attached hereto as Exhibit A is a true, correct and complete certified copy of the Certificate of Formation of the Company (the "Certificate of Formation"), together with all amendments to the foregoing, which has not otherwise been modified or rescinded and is in full force and effect as of the date hereof;

3. Attached hereto as Exhibit B is a true, correct and complete copy of the Limited Liability Company Agreement of the Company (the "Operating Agreement"), together with all amendments to the foregoing, which has not otherwise been modified or rescinded and is in full force and effect as of the date hereof;

4. Attached hereto as Exhibit C is a full, true and correct copy of the resolutions that were adopted by written consent of the Managers of the Company, which have not in any way been modified or rescinded and are in full force and effect on and as of the date hereof;

5. Attached hereto as Exhibit D are certificates from the Secretary of State of the State of Texas and the Secretary of State of the State of Delaware evidencing the Company's existence and good standing in the states of Texas and Delaware (the "Good Standings");

6. Set forth below is the name and genuine signature of the duly elected and qualified officer of the Company, holding on the date hereof the title set forth opposite his name, and is duly authorized to sign the Credit Agreement and all other related documents on behalf of the Company:

| Name | Title | Signature |
| --- | --- | --- |
| [_______________] | [_______________] | _________________________ |

**IN WITNESS WHEREOF**, the undersigned has executed this certificate as of the date first set forth above.

____________________________________________________________________________________________________________________________________
[________________], [________________]

**EXHIBIT G**

**FORM OF SUBSIDIARY JOINDER AGREEMENT**

SUBSIDIARY JOINDER AGREEMENT (this "Agreement"), dated as of **[________ __]**, 20**[__]**, by and between **[NAME OF NEW SUBSIDIARY]** a **[___________] [corporation] [limited liability company]** (the "New Subsidiary"), and **BANCORPSOUTH BANK**, as Administrative Agent under the Credit Agreement referred to in the next paragraph acting on behalf of the Secured Parties.

RECITALS

A. Reference is made to (i) the Credit Agreement, dated as of [____________], 2021, among [________________], a [________________] (the "Borrower"), the Lenders party thereto and the Administrative Agent (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), (ii) the Guarantee Agreement, dated as of [____________], 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "Guarantee Agreement"), by and among the Borrower, the Subsidiary Guarantors party thereto (together with the Borrower, the "Loan Parties"; each, a "Loan Party") and the Administrative Agent, and (iii) the Pledge and Security Agreement, dated as of [____________], 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "Security Agreement"), by and among the Loan Parties and the Administrative Agent

B. Capitalized terms used herein and not defined herein shall have the meanings assigned to such terms in the Credit Agreement, the Guarantee Agreement and the Security Agreement.

C. The New Subsidiary is a **[direct] [indirect]** Subsidiary of the Borrower. Pursuant to Section 6.12 of the Credit Agreement, the New Subsidiary is required to execute and deliver this Agreement for the purposes described herein.

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the New Subsidiary hereby agrees as follows:

Section 1. Assumption and Joinder.

(a) Guarantee. The New Subsidiary hereby expressly (i) joins in and agrees to be bound by all of the provisions of the Guarantee Agreement, (ii) hereby assumes the obligations and liabilities of a Guarantor (as defined in the Guarantee Agreement) under the Guarantee Agreement and (iii) agrees to all the terms and provisions of the Guarantee Agreement applicable to it as a Guarantor thereunder, in each case with the same force and effect as if originally named therein as a Subsidiary Guarantor. The New Subsidiary acknowledges and agrees that its liability under the Guarantee Agreement shall be joint and several with the other Guarantors party thereto. From and after the date hereof, each reference to a "Guarantor" in the Loan Documents shall be deemed to include the New Subsidiary.

(b) Security Agreement. The New Subsidiary hereby expressly joins in and agrees to be bound by all of the provisions of the Security Agreement and hereby assumes the obligations and liabilities of a Grantor (as defined in the Security Agreement) under the Security Agreement with the same force and effect as if originally named therein as a Grantor, and the New Subsidiary hereby agrees to all the terms and provisions of the Security Agreement applicable to it as a Grantor thereunder. In furtherance of the foregoing, the New Subsidiary, as security for the payment and performance in full of

the Secured Obligations, does hereby grant, subject to the terms and conditions of the Security Agreement, to the Administrative Agent for the benefit of the Secured Parties, a security interest in and lien on all of the New Subsidiary's right, title and interest in and to the Collateral (as defined in the Security Agreement) now or hereafter owned or held by or on behalf of the New Subsidiary. From and after the date hereof, each reference to a "Grantor" in the Security Agreement shall be deemed to include the New Subsidiary.

Section 2. Representations and Warranties.

(a) The execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party are within the New Subsidiary's corporate, partnership, limited liability company or other analogous powers and have been duly authorized by all necessary corporate, partnership, limited liability company or other analogous and, if required, equity holder action of the New Subsidiary. This Agreement has been duly executed and delivered by the New Subsidiary and this Agreement and each of the other Loan Documents to which the New Subsidiary is a party constitutes a legal, valid and binding obligation of the New Subsidiary, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(b) The New Subsidiary hereby expressly represents and warrants that each of the representations and warranties made by or with respect to it set forth in the Loan Documents are true and correct in all material respects, provided that to the extent that such representations and warranties specifically refer to an earlier date, they are true and correct in all material respects as of such earlier date; provided further that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(c) The New Subsidiary represents and warrants that it has received and reviewed copies of the Credit Agreement and each of the other Loan Documents.

Section 3. Miscellaneous.

(a) This Agreement, the Guarantee Agreement and the Security Agreement constitute the entire contract among the New Subsidiary and the Secured Parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, among such parties relating to the subject matter hereof.

(b) This Agreement shall be binding upon the New Subsidiary and its permitted successors and assigns, and shall inure to the benefit of the Administrative Agent and the other Secured Parties, and their successors and assigns.

(c) In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction). The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which shall be as close as possible to that of the invalid, illegal or unenforceable provisions.

(d) The New Subsidiary shall pay, or shall cause to be paid, all costs and expenses of the Administrative Agent, including, without limitation, reasonable and documented attorneys' fees in connection with the preparation, negotiation, execution and delivery of this Agreement.

(e) The New Subsidiary represents and warrants that it has consulted with independent legal counsel of its selection in connection with this Agreement and is not relying on any representations or warranties of the Administrative Agent or the other Secured Parties or their counsel in entering into this Agreement.

(f) The New Subsidiary hereby agrees that all notices and other communications required or permitted to be sent to it under this Agreement and the Loan Documents are to be sent to it at the same address as provided in Section 10.1 of the Credit Agreement for notices to the Loan Parties.

(g) This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas (without regard to principles of conflicts of laws).

(h) Each of the parties hereto irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any of the courts of the State of Texas sitting in Harris County and of the United States District Court for the Southern District of Texas and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that, to the extent permitted by applicable law, all claims in respect of any such action or proceeding may be heard and determined in such Texas State court or, to the extent permitted by applicable law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that any Credit Party may otherwise have to bring any action or proceeding relating to this Agreement or the other Loan Documents against the New Subsidiary, or any of its property, in the courts of any jurisdiction.

(i) Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in clause (h) above. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(j) Each of the parties hereto irrevocably consents to service of process in the manner provided for notices in Section 10.1 of the Credit Agreement. Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by law.

(k) EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO HEREBY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED

TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

(l) This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic (e.g., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.

[Signature pages follow]

IN WITNESS WHEREOF, the undersigned have caused this Subsidiary Joinder Agreement to be duly executed as of the date first above written.

**[NAME OF NEW SUBSIDIARY]**

By: ___________________________________
Name: _________________________________
Title: __________________________________

Acknowledged and accepted as of the date first written above:

**BANCORPSOUTH BANK**,
as Administrative Agent

By: __________________________
Name: __________________________
Title: __________________________

**EXHIBIT H-1**

**FORM OF U.S. TAX COMPLIANCE CERTIFICATE**

**(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)**

Reference is made to the Credit Agreement, dated as of August 6, 2021, among [________________] a [__________________], the Lenders party thereto and **BANCORPSOUTH BANK**, as the Administrative Agent (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"). Capitalized terms used herein and not defined herein shall have the meanings assigned to such terms in the Credit Agreement.

Pursuant to the provisions of Section 3.6 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "ten percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E (as applicable). By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

**[NAME OF LENDER]**

By: ________________________________

Name ______________________________

Title: _______________________________

Date: **[________ __]**, 20**[__]**

**EXHIBIT H-2**

**FORM OF U.S. TAX COMPLIANCE CERTIFICATE**

**(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)**

Reference is made to the Credit Agreement, dated as of August 6, 2021, among [________________] a [__________________], the Lenders party thereto and **BANCORPSOUTH BANK**, as the Administrative Agent (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"). Capitalized terms used herein and not defined herein shall have the meanings assigned to such terms in the Credit Agreement.

Pursuant to the provisions of Section 3.6 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "ten percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, and (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E (as applicable). By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

**[NAME OF PARTICIPANT]**

By: ___________________________________

Name ________________________________

Title: _________________________________

Date: **[________ __]**, 20**[__]**

**EXHIBIT H-3**

**FORM OF U.S. TAX COMPLIANCE CERTIFICATE**

**(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)**

Reference is made to the Credit Agreement, dated as of August 6, 2021, among [________________] a [__________________], the Lenders party thereto and **BANCORPSOUTH BANK**, as the Administrative Agent (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"). Capitalized terms used herein and not defined herein shall have the meanings assigned to such terms in the Credit Agreement.

Pursuant to the provisions of Section 3.6 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect to such participation, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "ten percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS FORM W-8BEN-E (as applicable) or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E (as applicable) from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

**[NAME OF PARTICIPANT]**

By: ______________________________

Name ______________________________

Title: ______________________________

Date: **[________ __]**, 20**[__]**

**EXHIBIT H-4**

**FORM OF U.S. TAX COMPLIANCE CERTIFICATE**

**(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)**

Reference is made to the Credit Agreement, dated as of August 6, 2021, among [________________] a [__________________], the Lenders party thereto and **BANCORPSOUTH BANK**, as the Administrative Agent (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"). Capitalized terms used herein and not defined herein shall have the meanings assigned to such terms in the Credit Agreement.

Pursuant to the provisions of Section 3.6 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to the Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "ten percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E (as applicable) or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E (as applicable) from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

**[NAME OF LENDER]**

By: ___________________________________

Name ________________________________

Title: _________________________________

Date: **[________ __]**, 20**[__]**

# EXHIBIT I

## FORM OF SOLVENCY CERTIFICATE

August 6, 2021

The undersigned, the Chief Financial Officer of **BRIDGELINK ENGINEERING, LLC**, a Delaware limited liability company (the "Borrower"), hereby certifies on behalf of the Borrower, pursuant to Section 4.1(h) of the Credit Agreement, dated as of August 6, 2021, among the Borrower, the Lenders party thereto and **BANCORPSOUTH BANK**, as Administrative Agent (the "Credit Agreement"), that:

1. Capitalized terms used herein and not defined herein shall have the meanings assigned to such terms in the Credit Agreement.

2. I have reviewed the Credit Agreement and have made, or have caused to be made, such examinations or investigations as is necessary to enable me to express an informed opinion as to the matters referred to herein. The financial information, projections and assumptions that underlie and form the basis for the certifications made in this Solvency Certificate were made in good faith and were based on assumptions reasonably believed by the Borrower to be fair in light of the circumstances existing at the time made and continue to be fair as of the date hereof. For purposes of providing this Solvency Certificate, the amount of contingent liabilities has been computed as the amount that, in the light of all the facts and circumstances existing as of the time of such computation, represents the amount that can reasonably be expected to become an actual or matured liability.

3. I acknowledge that the Administrative Agent and the Lenders are relying on the truth and accuracy of this Solvency Certificate in connection with the making of Loans and the issuance of Letters of Credit under the Credit Agreement.

4. Based upon the review and examination described in paragraph 2 above, I hereby certify, on behalf of the Borrower and not individually, that as of the date hereof, immediately before and immediately after giving effect to the Transactions on the Closing Date:

(a) the fair value of the present assets of the Borrower and its Subsidiaries, taken as a whole, is not less than the sum of the debt (including contingent liabilities) of the Borrower and its Subsidiaries, taken as a whole;

(b) the present fair salable value of the assets of the Borrower and its Subsidiaries, taken as a whole, is not less than the amount that will be required to pay the probable liabilities (including contingent liabilities) of the Borrower and its Subsidiaries, taken as a whole, on their debts as they become absolute and matured;

(c) the capital of the Borrower and its Subsidiaries, taken as a whole, is not unreasonably small in relation to the business of the Borrower or its Subsidiaries, taken as a whole, contemplated as of such date; and

(d) the Borrower and its Subsidiaries, taken as a whole, do not intend to incur, or believe that they will incur, debts (including current obligations and contingent liabilities) beyond their ability to pay such debts as they mature in the ordinary course of business.

IN WITNESS WHEREOF, the undersigned has executed this Solvency Certificate on behalf of the Borrower as of the date first above-written.

**BRIDGELINK ENGINEERING LLC**

By: ______________________________
Name: ____________________________
Title: Chief Financial Officer

**EXHIBIT J**

**FORM OF SECURED OBLIGATION DESIGNATION NOTICE**

Date: August 6, 2021

To: BANCORPSOUTH BANK,
as Administrative Agent

Ladies and Gentlemen:

Reference is made to the Credit Agreement, dated as of August 6, 2021, among **BRIDGELINK ENGINEERING, LLC** a Delaware limited liability company, the Lenders party thereto and **BANCORPSOUTH BANK**, as Administrative Agent (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"). Capitalized terms used herein and not defined herein shall have the meanings assigned to such terms in the Credit Agreement.

The undersigned, **[Name of Provider]**, a **[___________] [corporation] [limited liability company]** (the "Counterparty"), is a counterparty to the **[Swap Agreement] [agreement to provide Cash Management Services]** described on Schedule 1 hereto (the "Agreement") with the Loan Party referred to on such Schedule. The Counterparty is delivering this Secured Obligation Designation Notice as required under the Credit Agreement in order that the obligations of such Loan Party to the Counterparty under the Agreement constitute **[Swap Agreement Obligations] [Cash Management Obligations]** and that the Counterparty be a Secured Party in respect thereof.[21]

1. Designation. The Counterparty hereby represents and warrants to the Administrative Agent that the Agreement **[was in effect on the Closing Date and the Counterparty was a Lender or an Affiliate of a Lender on the Closing Date] [was entered into after the Closing Date and on the date on which the Agreement was entered into or thereafter, the Counterparty was or became a Lender or Affiliate of a Lender]**.[22]

2. Loan Documents. By executing and delivering this Secured Obligation Designation Notice, the Counterparty hereby agrees to be bound by all of the provisions of the Loan Documents which are applicable to it as a provider of the services described in the Agreement, including, without limitation, the provisions of Articles 9 and 10 of the Credit Agreement. In addition, the Counterparty hereby (a) acknowledges and agrees that it has received a copy of the Loan Documents and such other documents and information as it has deemed appropriate to make its own decision to enter into the Agreement and execute and deliver this Secured Obligation Designation Notice, (b) appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers and discretion under the Credit Agreement, the other Loan Documents or any other instrument or document furnished pursuant thereto as are delegated to the Administrative Agent by the terms thereof, together with such powers as are incidental thereto (including, without limitation, the provisions of Articles 9 and 10 of the Credit Agreement), (c) agrees that it will be bound by the provisions of the Loan Documents and will perform in accordance with its terms all the obligations which by the terms of the Loan Documents are required to be performed by it as a provider of the services described in the Agreement. Without limiting the foregoing, the Counterparty agrees to indemnify the Administrative Agent as contemplated by Section 10.3(b) of the Credit Agreement and agrees to the provisions of Section 10.3(d) of the Credit Agreement

---

[21] Delete inapplicable items.

[22] Delete inapplicable items.

*mutatis mutandis* and (d) acknowledges and agrees to the terms and conditions set forth in Section 9.12 of the Credit Agreement.

3. Governing Law. This Secured Obligation Designation Notice shall be governed by and construed in accordance with the laws of the State of Texas (without regard to principles of conflicts of law).

IN WITNESS WHEREOF, the undersigned has caused this Secured Obligation Designation Notice to be duly executed as of the date first above written.

**[NAME OF COUNTERPARTY]**

By: ___________________________________
Name: _________________________________
Title: __________________________________

Acknowledged and accepted as of the
date first written above:

**BANCORPSOUTH BANK**,
as Administrative Agent

By: ________________________
Name: ________________________
Title: ________________________

Schedule 1 to Secured Obligation Designation Notice