IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| COLE WAYNE JOHNSON | § | Case No. 26-43993-MXM-7 |
| CORD HENRY JOHNSON | § | Case No. 26-43995-ELM-7 |
| | § | |
| | § | Jointly Administered Under |
| Alleged Debtors. | § | Case No. 26-43993-MXM-7 |

**PETITIONING CREDITOR'S OMNIBUS OBJECTION TO**
**MOTIONS TO REQUIRE PETITION CREDITORS TO POST BOND**

Century Bank ("Century"), Huntington National Bank f/k/a Cadence Bank ("Huntington") Hunt Guillot & Associates, LLC ("HGA"), and Spin Capital, LLC ("Spin," and with Century, Huntington, and HGA, the "Petitioning Creditors") hereby file their Omnibus Objection to the Motion to Require Petitioning Creditors to Post Bond [ECF No. 22] (the "Bond Motion" or "Bond Mot.") filed by Cole Wayne Johnson and Cord Henry Johnson (together, the "Alleged Debtors") and in support thereof respectfully represent as follows:

## INTRODUCTION

1. Instead of putting forth a basis for the relief requested therein, the Motions serve as attempts by the Alleged Debtors to relitigate the final and unstayed judgments against them and cast aspersions against the Petitioning Creditors that are wholly irrelevant to establishing that cause exists to require the Petitioning Creditors to post a $20,000,000.00 bond. After hearing the evidence, the Petitioning Creditors are comfortable that the Court will have little trouble finding that the Involuntary Petitions are neither frivolous nor spiteful and that the Alleged Debtors have failed to prove that the Involuntary Petitions were filed in bad faith. As such there is no reason for this Court to exercise its discretion under Section 303(e) and order the Petitioning Creditors to post

a bond in any amount and the Motions should be denied. The Motions fail for three independent reasons.

2. First, a bond under Section 303(e) is permissive and is not routinely imposed; it may issue only upon a showing of "cause," and because a petitioning creditor's good faith is presumed, the Alleged Debtors must first establish a prima facie case of bad faith, which they have not done and cannot do where the Involuntary Petitions rest on final, unstayed judgments. Second, the Involuntary Petitions were neither frivolous nor spiteful, and the Petitioning Creditors filed them in good faith to secure an orderly, collective, and equitable administration of the Alleged Debtors' assets for the benefit of all creditors. Third, the $20,000,000.00 sought bears no relationship to any amount the Court could "later allow" under Section 303(i): damages are unavailable absent bad faith, only the debtor's own damages are ever recoverable, and the Alleged Debtors' claimed business losses are indirect, speculative, and attributed to non-debtor entities. In the alternative, and without waiver of the foregoing, any bond must be limited to a substantiated estimate of the reasonable fees and costs that could later be allowed under Section 303(i)(1).

## BACKGROUND

3. The Petitioning Creditors each hold a final and unstayed judgment against the Alleged Debtors. *See* Petitioning Creditors' Omnibus Response in Opposition to Alleged Debtors' Motions to Dismiss the Involuntary Petitions [Case No. 26-43993, ECF No. 29] (the "Omnibus Response") at 2 (¶ 2), 5–6 (¶¶ 12–14), 17–18 (¶ 33) & Ex. F (Bank Judgment).

4. Century and Huntington obtained a $39,825,693.39 judgment (the "Bank Judgment") against the Alleged Debtors in the United States District Court for the Northern District of Texas on June 17, 2024. The Bank Judgment was affirmed by the United States Court of Appeals for the Fifth Circuit on November 24, 2025. The Bank Judgment accrues interest at

5.17% until paid. Neither Century nor Huntington Bank has received a payment on the Bank Judgment since the Bank Judgment was entered. Omnibus Response at 2 (¶ 2), 5 (¶ 12), 14–16 (¶¶ 28–31), 28 (¶ 54) & Exs. F, G.

5. On November 14, 2024, the 3rd Judicial District Court for Lincoln Parish Louisiana entered a judgment in the amount of $938,678.53 (the "HGA Judgment") against the Alleged Debtors and in favor of HGA. The Alleged Debtors did not seek to appeal or supersede the HGA Judgment. Omnibus Response at 5–6 (¶ 13), 17–18 (¶ 33).

6. On February 9, 2024, the Supreme Court for the State of New York, Nassau County, entered a judgment in the amount of $8,234,160.50 (the "Spin Judgment") against the Alleged Debtors and in favor of Spin. The Alleged Debtors did not seek to appeal or supersede the Spin Judgment. Omnibus Response at 6 (¶ 14), 19 (¶ 38).

7. On June 13, 2023, the 134th District Court of Dallas County Texas entered a judgment in the amount of $37,484.39 (the "CWL Judgment") against the Cole Johnson and in favor of Crawford, Wishnew & Lang PLLC ("CWL"). The Alleged Debtors did not seek to appeal or supersede the CWL Judgment. Upon information and belief, the Alleged Debtors caused CWL to receive payment on the CWL Judgment following the filing of the Involuntary Petitions. *See* Cole MTD at 3, 13 (¶ 15) (asserting that Cole Johnson "has paid CWL the agreed amount" and that CWL elected to withdraw from the Involuntary Petition); CWL's October 1, 2026 Notice of Withdrawal, Case No. 26-43993, ECF No. 13.

8. In addition to the judgments held by the Petitioning Creditors and CWL, the Alleged Debtors have also sustained no fewer than eight (8) additional judgments entered against them in various courts across the United States. Doc. No. 11 at 3–4.

9. Following the affirmance of the Bank Judgment, Century and Huntington attempted to conduct post-judgment discovery. However, those attempts were largely stonewalled by the Alleged Debtors. The record of those efforts includes Cole Johnson's failure to appear at all for a properly noticed deposition on February 20, 2024. Certificate of Nonappearance for Cole Johnson at 4 (Feb. 20, 2024) ("The witness did not appear for his deposition.") [hereinafter Feb. 2024 Cert.] (attached as Exhibit A). When Cole Johnson was later ordered to appear before the District Court, the Court observed that, for over a year, the matter had been post-judgment, that the creditors had been trying to obtain documents, and that those efforts had been frustrated. Tr. of Dep. Proceedings at 86, *Cadence Bank v. Bridgelink Eng'g, LLC*, No. 4:23-CV-609 (N.D. Tex. Nov., 2025) [hereinafter Nov. 2025 Dep.] (referenced pages are attached hereto as Exhibit B). *See* Order Granting Pls.' Mot. to Compel Produc. of Docs. by Cord Henry Johnson & Cole Wayne Johnson in Aid of Execution of J. at 29–33, *Cadence Bank v. Bridgelink Eng'g, LLC*, No. 4:23-CV-609-BJ (N.D. Tex. Dec. 16, 2024), ECF No. 105 [hereinafter Dec. 2024 Discovery Order] (attached as Exhibit F); Order Partially Granting Pls.' Mot. to Compel at 4–5, *Cadence Bank v. Bridgelink Eng'g, LLC*, No. 4:23-CV-609-BJ (N.D. Tex. Sept. 8, 2025), ECF No. 208 [hereinafter Sept. 2025 Discovery Order] (attached as Exhibit G); Minute Order—Deposition at 1, *Cadence Bank v. Bridgelink Eng'g, LLC*, No. 4:23-CV-609-BJ (N.D. Tex. Nov. 7, 2025), ECF No. 246 [hereinafter Nov. 2025 Minute Order] (attached as Exhibit H).

10. First, Century and Huntington were required to file a Motion to Compel the Alleged Debtors to respond to written post-judgment discovery. In ruling on this motion, the District Court found:

> The Court is deeply concerned by [Alleged Debtors'] behavior, including that of their attorneys, and astounded that, despite clear and repeated warnings from this Court, [Alleged Debtors'] indifference towards the Federal Rules remains. The [Alleged Debtors'] behavior in asserting these objections and in their conduct

> throughout post judgment discovery is not consistent with the Federal Rules, this District's *Dondi* opinion, and certainly has no place in this Court.

*See* Dec. 2024 Discovery Order at 32–33.

11. Accordingly, the District Court, with the exception of certain spousal privilege objections raised by Cord Johnson, overruled all of the Alleged Debtors' objections to the written post judgment discovery served by Century and Cadence Bank and ordered the Alleged Debtors to respond to the requests. The Alleged Debtors failed to fully respond to the written discovery propounded on them. *See* Dec. 2024 Discovery Order at 31–33 (overruling Cord Johnson's remaining spousal-privacy objections and all other objections and requiring production by December 31, 2024); Nov. 2025 Minute Order at 1 (directing production of outstanding post-judgment discovery).

12. The deficiencies persisted through the receivership. The receivership order required each judgment debtor to turn over, within five days, bank statements, financial records, deeds, deeds of trust, certificates of title, ledgers, and a list of all entities in which they hold an interest. Nov. 2025 Dep. at 14–15. At the November 2025 court-supervised deposition, creditors' counsel advised the Court that no real property deeds and no bank statements had been produced, and Cole Johnson agreed to comply "as ordered." *Id.* at 24–25. Cole Johnson himself stated, "I don't keep bank statements," and conceded that there was a slew of documents that he had to turn over. *Id.* at 26. Crediting counsel's representation that the bank statements and deed records had not been received, the Court directed that receivership counsel be brought in. *Id.* at 30–31. Even in June 2026, Cole Johnson acknowledged that he may not have produced his Bimergen Executive Employment Agreement to the Receiver: "if I haven't then it's a pure oversight." Oral Dep. of Cole W. Johnson at 32 (June 9, 2026) [hereinafter Cole 6/9/2026 Dep.] (referenced pages attached hereto as Exhibit C). *See also* Nov. 2025 Minute Order at 1 (finding that the deposition would not

be productive without documents required by the prior discovery and amended receivership orders and directing production of all outstanding post-judgment discovery by November 13, 2025, at 5:00 p.m.).

13. In addition to failing to adequately respond to written discovery, Cole Johnson appeared for a post-judgment deposition and only repeated vague, evasive, non-responsive, and non-sensical non-answers to straight forward, routine post judgment discovery questions. After many breaks and little time on the record, Cole Johnson became agitated by the questions posed to him, decided to terminate the deposition, walked out of the room, and left the building. Cole Johnson acknowledged at the outset that the examination was "a postjudgment deposition . . . in aid of execution of the judgment." Oral Dep. of Cole Wayne Johnson at 19 (Oct. 30, 2024) [hereinafter Oct. 2024 Dep.] (referenced pages are attached hereto as Exhibit D). Yet he invoked a purported "nondisclosure" to avoid even listing the entities he owns ("They're under nondisclosure. I can't list them."), *id.* at 20, testified that even the names of the companies were covered, *id.* at 22–23, and, when shown the confidentiality provision of Deposition Exhibit 3, answered, "I don't know what this is." *Id.* at 26–28. Counsel for Century closed its examination by stating, "We're getting the judge on the phone for the nonresponsive answers and the evasive answers." *Id.* at 84. Cole Johnson then declared the questioning "harassment at this point in time . . . you're pretty much harassing me now," *id.* at 131, while answering basic questions about when he moved into his residence and its acreage with "I don't recall" and "I'm not here to ballpark it." *Id.* at 132. His counsel then announced, "we feel like it's harassment. It's unreasonably oppressive . . . . We're going to terminate the deposition here," and Cole Johnson directed, "terminate it now." *Id.* at 134. The deposition was terminated after approximately two hours and ten minutes on the record, measured against the seven-hour limit of Federal Rule of Civil Procedure 30(d)(1). *Id.* at

135. The final exchange closed with the witness's instruction: "Shut it down." *Id.* at 136. Again Cadence and Huntington filed a motion to compel the District Court. *See* Sept. 2025 Discovery Order at 1–3 (identifying the November 13, 2024 motion to compel, ECF No. 96, and recounting the October 2024 deposition and its termination); Dec. 2024 Discovery Order at 29–30 n.27 (discussing Cole Johnson's deposition responses).

14. At a hearing on February 18, 2025, the District Court reprimanded Cole for his behavior during his October 2024 deposition. The Court also informed the parties that, if such behavior continued, sanctions would be warranted. Additionally, the Court issued a ruling that "there is no valid 'NDA' and that any attempts to invoke an 'NDA' as a means to avoid disclosure is improper." Sept. 2025 Discovery Order at 4 (recounting the February 18, 2025 hearing and quoting the minute order, ECF No. 134, at 2) (alteration in original).

15. Cole Johnson next appeared for his deposition in Judge Cureton's courtroom with Judge Cureton presiding from the bench and ruling on objections. After approximately 90 minutes, Judge Cureton called an end to the deposition determining that further questioning would not be helpful because the Alleged Debtors had failed to produce responsive documents pursuant to the Court's previous order. The Court's own statements on the record confirm each step. At the outset, the Court stated that there was no protective order and no nondisclosure agreement, that it did not want any of that nonsense, and that the creditor was "entitled to inquire into assets." Nov. 2025 Dep. at 4–5. The Court also read into the record its prior order directing Cole Johnson to reappear and to answer all questions fully without reliance on an NDA or other nondisclosure agreement. After the first thirty minutes of testimony, the Court called the examination "**a total waste of time**" and found the witness to be elusive. Nov. 2025 Dep. at 29–30. The Court said that it did not know anyone who did not know how to spell their own address and, when Cole Johnson refused to define

"home," told him not to play that game and that he was going to answer questions that day. *Id.* at 32–33. The Court noted that it had read the prior failed deposition and did not like it, which was why the parties were there doing it again. *Id.* at 56. The Court then suspended the deposition, ordered that the documents all be produced in full by 5:00 p.m. that Thursday, and observed that, a year after judgment, it was still fighting this battle and that the deposition was not productive. *Id.* at 83–84. It also stated that it would not put up with nonexistent nondisclosure agreements anymore. *Id.* at 84. The Court observed that the deadlines under the receivership orders had technically already passed and that production should already have been done, and it ruled that the deposition would not continue for the rest of the day, that production would begin immediately, and that whatever was physically present and could be turned over to the receiver should be turned over. *Id.* at 86–88. *See* Sept. 2025 Discovery Order at 4–5 (requiring Cole Johnson to reappear and answer fully without reliance on an NDA and directing courthouse depositions); Nov. 2025 Minute Order at 1 (memorializing suspension of the deposition and the November 13, 2025 production deadline).

16. Century and Huntington conducted the foregoing discovery in connection with a court appointed receiver (the "First Receiver"). Subsequently, the First Receiver resigned and a replacement receiver (the "Second Receiver") was appointed. The Second Receiver was making progress in obtaining information, but his receivership was terminated by Judge Cureton in favor of at least two other state court receiverships over the Alleged Debtors.

17. In the limited discovery obtained, Century and Huntington learned that the Alleged Debtors were involved in a web of over fifty (50) limited liability companies and were involved in structuring transactions to avoid creditor claims. *See* Decl. of Cole W. Johnson Regarding Monthly Accounting at 2–3, 5–8, *Cadence Bank v. Bridgelink Eng'g, LLC,* No. 4:23-CV-609-BJ

(N.D. Tex. June 8, 2026), ECF No. 353 (listing 47 entities in which the Judgment Debtors hold an interest) [hereinafter Cole May 2026 Decl.] (attached as Exhibit I); *id.* at 6 ("The Judgment-Debtors only directly own six entities . . . ."). In October 2024, Cole Johnson explained that "our companies are set up in a way to where they flow down. So I don't recall who owns what." Oct. 2024 Dep. at 34–35. Shown an organizational chart, he refused to confirm his ownership of Enhanced Midstream, Bighorn Investments & Properties, C&C Johnson Holdings, Johnson River Ranch, and other entities, stating, "I have a nondisclosure with every company that I've ever been associated with," *id.* at 45–47, and he gave the "[s]ame answer" as to Bridgelink Operating, Bridgelink Engineering, Bighorn Construction & Reclamation, and Bighorn Sand & Gravel, *id.* at 59–60, and as to still more Bridgelink and Intermountain entities. *Id.* at 63–68. In November 2025, he described LLCs that own LLCs that own LLCs, and when the Court asked whether he was telling it that he does not know what he owns, he answered, "Yeah, kind of." Nov. 2025 Dep. at 57–58. He added that the structure was set up by outside counsel and that he does not fully understand it. *Id.* at 53–54.

18. Cord Johnson's June 2026 testimony is to the same effect. He described the real estate assets as held in special-purpose-vehicle LLCs and volunteered that "there's probably 30 or 40 of them that need to be wound down. There are old SPVs that are just completely nothing." Oral Dep. of Cord H. Johnson at 29, 49 (June 2, 2026) [hereinafter Cord 6/2/2026 Dep.] (referenced pages are attached hereto as Exhibit E). The record developed in June 2026 identified 50 entities in which Cole or Cord Johnson holds a direct or indirect ownership interest, Cole 6/9/2026 Dep. at 63, and Cole Johnson confirmed that C&C Johnson Holdings, which the brothers own, holds Johnson River Ranch, Bridgelink Europe, and Bridgelink Development, and that C&C's only assets "is other entities." *Id.* at 150–51, 163. He also testified that the Orion Trust

"was setup to move stuff, and it has not been moved today," and that Bridgelink Investments is "mainly not shut down because of liability reasons" because it "does have some lawsuits in it." *Id.* at 125, 129, 137.

19. Following termination of the receivership, Century and Huntington became concerned that left to their own devices, the Alleged Debtors would dissipate assets and/or engage in transfers structured to put the Alleged Debtors' assets beyond the reach of creditor's claims. That concern was grounded in the testimony. Cole Johnson testified that 1301 Alltontop Road was sold for "8.5 million" with "a lot of debt on it," that net proceeds of "under a million" went to Johnson River Ranch, and that "I didn't pay myself anything from the sale." Nov. 2025 Dep. at 62–64. He could not reconcile a release reciting a lien of approximately $13 million with the sale price, *id.* at 69–70, and he claimed not to know the buyers: "I don't know anything about them." *Id.* at 78. The testimony shows the same pattern elsewhere. A 2021 Ford F-150 King Ranch titled to Bighorn Investments and Properties was re-registered in January 2025 to a third party in Bossier County, Louisiana, and Cord Johnson disclaimed any knowledge of the vehicle or the transferee: "No, sir, I do not . . . we at one point had over 200 vehicles." Cord 6/2/2026 Dep. at 47–48. And Cole Johnson testified that the Johnson River Ranch home and land were sold to a buyer he claimed not to know ("I don't know the guy"), who now "own[s] both the house and the land." Cole 6/9/2026 Dep. at 118. Century and Huntington thought it would be in the best interest of all the Alleged Debtors' creditors to pursue involuntary bankruptcy petitions against the Alleged Debtors to prevent additional asset transfers and to ensure an orderly collection and equitable distribution of any assets to the Alleged Debtors' entire creditor body.

20. On or about August 25, 2026, before the Involuntary Petitions were filed, arrest warrants were issued in Parker County, Texas, alleging that each of the Alleged Debtors committed

the offense of false statement for property or credit over $300,000.00, a first-degree felony. Upon information and belief, the Alleged Debtors were subsequently arrested in Hood County, Texas on October 1, 2026. The Petitioning Creditors do not offer these allegations to prove any element of the Involuntary Petitions, and the Court need not resolve them. They are relevant for two limited reasons. First, allegations of false statements made to obtain property or credit reinforce the need for an independent fiduciary to examine the Alleged Debtors' assets and transactions. Second, they bear on causation. The Alleged Debtors seek a $20,000,000.00 bond to secure reputational, credit, and business harm that they attribute to the Involuntary Petitions, but felony charges alleging false statements to obtain credit, which were first issued before the Involuntary Petitions were filed, are an independent source of that same harm. That source arises from the Alleged Debtors' own alleged conduct, predates the Involuntary Petitions, and does not depend on them.

21. The record also shows that the Alleged Debtors are generally not paying their debts. Nearly $49,000,000.00 in judgments held by the Petitioning Creditors remain unpaid, and the Alleged Debtors are subject to no fewer than eight (8) additional judgments exceeding $24,000,000.00, while paying only small household bills. Omnibus Response at 2 (¶ 2), 22–23 (¶¶ 44–46). That entities the Alleged Debtors own are paying their own debts and perhaps those of the Alleged Debtors is not the same as the Alleged Debtors paying their own debts. The Alleged Debtors' testimony confirms the point. Cord Johnson acknowledged that, "if you ask me to write a check for it today, I could not . . . I can't pay that bill," yet entity funds paid his attorneys, Red Leaf Investments paid $538,473.08 in expenses for the month of December, and New Standard Living paid "$50,000 in expenses." Cord 6/2/2026 Dep. at 60, 138. Cole Johnson described the Bank Judgment as accruing interest at "5.17 percent" but demanded an accounting of "what makes up the judgment" rather than paying it. Cole 6/9/2026 Dep. at 89. Neither Alleged Debtor claims

to hold assets personally. Cole Johnson agreed in October 2024 that he has no personal bank accounts, Oct. 2024 Dep. at 85, and testified in November 2025, "I don't personally own anything," that his home is being paid by a company, and that his truck is leased. Nov. 2025 Dep. at 58–60. Cord Johnson testified, "I do not have a personal bank account" because "[a]ny account that I have is garnished," and that he pays his bills through a company, which he called "a very weird way to have to do it." Cord 6/2/2026 Dep. at 83. And in June 2026, Cole Johnson claimed to own almost nothing personally: "[a]n Apple Watch and a cell phone." Cole 6/9/2026 Dep. at 7, 74, 116.

22. The Alleged Debtors' Motion seeks an aggregate bond of $20,000,000.00, or $10,000,000.00 per Alleged Debtor. Bond Mot. at 32. By the Alleged Debtors' own accounting, that figure is built almost entirely on approximately $9,750,000.00 in claimed business-interruption and lost-value "damages," together with only approximately $250,000.00 in anticipated attorney's fees and costs. *Id.* at 28. Cord Johnson concedes that his claimed damages are "indirect" and are attributable to business entities, such as Red Leaf Investments, LLC and Bridgelink Development, rather than to him personally. *Id.*

23. At the same time, the Alleged Debtors maintain that their businesses are thriving and that their asset values are increasing. Bond Mot. at 4 (¶ 7); *see also* Cord MTD at 6–7 (¶¶ 4–5); Cole MTD at 6–7 (¶¶ 4–5). That position cannot be reconciled with the assertion that the filing of the Involuntary Petitions has caused the Alleged Debtors nearly $10,000,000.00 each in quantifiable losses.

**ARGUMENT**

24. The Motion seeks an order requiring the Petitioning Creditors to post a bond in the amount of $20,000,000 for the Alleged Debtors' anticipated costs in defending the Involuntary

Petitions and for damages the Court may later award to the Alleged Debtors pursuant to 11 U.S.C. § 303(i). *See* Bond Mot. at 1, 32.

25. Pursuant to Section 303(e) of the Bankruptcy Code, a bankruptcy court *may* require petitioning creditors to post a bond for amounts the court may later allow under Section 303(i) if the alleged debtor establishes "cause." *See* 11 U.S.C. § 303(e)(*emphasis added*). Pursuant to Section 303(i), upon dismissal of an involuntary petition, a bankruptcy court may grant judgment against petitioners for costs or reasonable attorney's fees and if the court finds the involuntary petition was filed in bad faith, for damages proximately caused by the filing or punitive damages. The bond authorized by Section 303(e) is therefore not a free-standing remedy; it exists solely "to indemnify the debtor for such amounts as the court may later allow under subsection (i)." 11 U.S.C. § 303(e). Because damages and punitive damages under Section 303(i)(2) are available only against a petitioner that "filed the petition in bad faith," and because only costs or a reasonable attorney's fee under Section 303(i)(1) may be awarded absent bad faith, the scope of any bond is necessarily constrained by whether the Alleged Debtors can establish bad faith.

26. Cause does not exist in this case to require the Petitioning Creditors to post a bond. First, each of the Petitioning Creditors holds a claim against the Alleged Debtors that is neither contingent as to liability nor subject to a bona fide dispute as to liability or amount. Second, the Petitioning Creditors filed the Involuntary Petitions in good faith. As such, the Court should refuse to exercise its discretion in this case and deny the Alleged Debtors' request for a bond. Third, and in all events, the $20,000,000.00 bond demanded bears no relationship to any amount the Court could later allow under Section 303(i), and the Alleged Debtors' own estimate of their anticipated fees and costs is a small fraction of that sum.

27. As an initial matter, petitioning creditors in involuntary cases "should not be routinely required to post a bond upon the alleged debtor's request," because the Bankruptcy Code does not impose a mandatory bond requirement. *In re Ransome Grp. Invs. I, LP*, 423 B.R. 556, 558 (Bankr. M.D. Fla. 2009). Section 303(e) is intended to "discourage frivolous petitions as well as the more dangerous spiteful petitions, based on the desire to embarrass the debtor…or put the debtor out of business without good cause. *In re Reed*, 11 B.R. 755, 757 (Bankr. S.D. W.Va. 1981) (*quoting* H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 323 (1977), U.S. Cod Cong. & Admin. News 1978, p. 5787).

28. Section 303(e) is permissive, and the burden of establishing "cause" rests squarely on the Alleged Debtors. Because a petitioning creditor's good faith is presumed, "the putative debtor must establish a prima facie case of bad faith before petitioning creditors may be required to post a bond." *Ransome*, 423 B.R. at 558. Nor is a bond motion a vehicle for a preview of the merits: "the determination of whether to require a bond should not be turned into a *de facto* hearing on the merits; instead the involuntary petition's lack of merit must be relatively clear." *Id.* Applying that standard, the *Ransome* court denied the requested bond even though the debtor's motion to dismiss remained pending, because the petition was presumed to have been filed in good faith and the debtor had not established "cause." *Id.* at 559. The Eastern District of Texas has likewise upheld the denial of a bond where no bad faith was shown, reasoning that actual and punitive damages were therefore unrecoverable and that the $100,000.00 bond requested was "grossly in excess of any amount needed to secure the attorneys' fees." *In re Funnel Sci. Internet Mktg., LLC*, 551 B.R. 262, 274 (E.D. Tex. 2016).

29. The Fifth Circuit authority is consistent. In *Funnel Science*, the Eastern District of Texas recognized that imposing a bond under Section 303(e) requires (i) notice, (ii) a hearing, and

(iii) a showing of cause, and that the decision whether to require a bond is committed to the bankruptcy court's discretion and reviewed for abuse of discretion. *In re Funnel Sci. Internet Mktg., LLC*, 551 B.R. 262, 272–73 (E.D. Tex. 2016). Consistent with the statutory text, a bond serves only to indemnify the debtor for amounts the court may later allow under Section 303(i), and it is reserved for petitions whose bona fides are genuinely in doubt. *See In re Kidwell*, 158 B.R. 203, 217–18 (Bankr. E.D. Cal. 1993). The burden is therefore the organizing principle of this Objection: the Motions fail at the threshold because the Alleged Debtors cannot carry their burden of a prima facie showing of bad faith against petitions grounded in final, unstayed judgments, including a judgment affirmed by the Fifth Circuit. *Ransome*, 423 B.R. at 558.

30. The Alleged Debtors cannot satisfy that threshold. The Involuntary Petitions are not merely colorable; each rests on a final, unstayed judgment, including a $39,825,693.39 judgment that was affirmed by the Fifth Circuit. Petitions grounded in judgments of that kind are not ones whose "lack of merit" is "relatively clear." Instead of making a prima facie showing of bad faith, the Motions attempt to relitigate the underlying judgments and to cast aspersions on the Petitioning Creditors, none of which establishes bad faith, much less cause for a $20,000,000.00 bond. To the extent the Motions recycle the bad-faith contentions the Alleged Debtors advance in their motions to dismiss, *see* Cord MTD at 13–14, 23–33 (¶¶ 15, 30–47); Cole MTD at 13–14, 23–33 (¶¶ 16, 31–48), the Petitioning Creditors incorporate herein by reference the Omnibus Response.

**A. The Involuntary Petitions Were Not Frivolous or Spiteful**

31. The Involuntary Petitions filed in this case are not frivolous. Each of the Petitioning Creditors held a final unstayed judgment at the time the Involuntary Petitions were filed. For purposes of Sections 303(b)(1) and (h)(1), an unstayed final judgment against an alleged debtor is not subject to a bona fide dispute. *Norris v. Johnson*, 1997 U.S. App. Lexis 41449 at * 14 (5th Cir.

April 11, 1997), *see also In re Smith*, 437 B.R. 817, 823 (Bankr. N.D. Tex. 2010)(final judgments against an alleged debtor are not subject to a bona fide dispute); *In re Edwards*, 501 B.R. 666, 681(Bankr. N.D. Tex. 2013)("The majority of decisions analyzing this issue have found that final judgments from state courts that have not been stayed on appeal are not subject to bona fide dispute.")

32. Additionally, the Involuntary Petitions were filed in this case after several fruitless efforts at post-judgment discovery, including instances in which the Alleged Debtors were admonished and or sanctioned by the District Court for their failures to cooperate. An involuntary bankruptcy was the only way to obtain an accurate picture of the Alleged Debtors' ability to satisfy all of the judgments against them and to ensure a fair distribution among the competing judgment creditors once assets were located. Accordingly, the Petitioning Creditors sought the appointment of an independent third party to investigate the Alleged Debtors' assets and ability to pay their debts, collect such assets, and distribute such recoveries to all creditors pursuant to their relative priorities. The deposition record bears this out: Cole Johnson failed to appear for a noticed deposition, Feb. 2024 Cert. at 4; he terminated his October 2024 deposition after approximately two hours and ten minutes on the record, Oct. 2024 Dep. at 134–36; and in November 2025 the Court itself found his testimony elusive and suspended the deposition for nonproduction. Nov. 2025 Dep. at 29–30, 83–84. *See supra* ¶¶ 7, 10, 12. Cord Johnson, for his part, conceded that entity funds pay his counsel because "my attorneys are paid to protect the entities that are valuable," which underscores the need for an independent fiduciary to investigate those entities. Cord 6/2/2026 Dep. at 121. *See also* Dec. 2024 Discovery Order at 29–33; Sept. 2025 Discovery Order at 4–5 (recounting the reprimand and warning of possible sanctions, compelling further testimony, and denying sanctions without prejudice); Nov. 2025 Minute Order at 1.

33. The record likewise refutes any suggestion that the Involuntary Petitions are spiteful. The Petitioning Creditors did not rush to this Court. They obtained judgments, and Century and Huntington pursued post-judgment discovery, including in connection with a court-appointed receiver. The Alleged Debtors' response was to stonewall written discovery, to frustrate their depositions, and to disregard the District Court's repeated warnings. *See supra* ¶¶ 7–12. The limited discovery that was obtained revealed a web of more than fifty (50) limited liability companies and transactions structured to avoid creditor claims. *See supra* ¶ 14. And when the receivership that had begun to yield information was terminated, Century and Huntington were left with a legitimate and well-founded concern that the Alleged Debtors would dissipate or transfer assets beyond the reach of creditors. *See supra* ¶ 15. Nor was the disclosure sought by the creditors alone: the Court itself supervised the November 2025 deposition, demanding "full cooperation" and ordering production of "the full universe of documents and assets." Nov. 2025 Dep. at 85. Those are the circumstances in which the collective process of the Bankruptcy Code serves its intended purpose; they are not the hallmarks of a petition filed to embarrass the debtors or to put them out of business without good cause. *See Reed*, 11 B.R. at 757. *See also* Dec. 2024 Discovery Order at 29–33; Sept. 2025 Discovery Order at 4–5; Nov. 2025 Minute Order at 1.

34. The merits of the Involuntary Petitions are further reinforced by the Alleged Debtors' broader pattern of nonpayment. The Alleged Debtors have left unpaid nearly $49,000,000.00 in judgments held by the Petitioning Creditors, and have sustained no fewer than eight (8) additional judgments exceeding $24,000,000.00, while making only modest household payments. Payments by entities owned by the Alleged Debtors toward those entities' obligations—and possibly the Alleged Debtors' obligations—are distinct from payments by the Alleged Debtors themselves. Omnibus Response at 2 (¶ 2), 22–23 (¶¶ 44–46). Petitions brought by creditors holding

tens of millions of dollars in final, unpaid judgments against alleged debtors who are not paying their debts are not petitions whose lack of merit is "relatively clear"; they are the paradigm of a legitimate use of the involuntary process. *See Acis Cap. Mgmt.*, 604 B.R. at 532.

**B. The Involuntary Petitions Were Filed in Good Faith**

35. "There is a presumption of good faith in favor of a petitioning creditor." *Lubow Mach. Co. v. Bayshore Wire Prods.*, 209 F.3d 100, 105 (2nd Cir. 2000); *In re Texas Legacy Exploration, LLC*, 2026 Bankr. LEXIS 1775, at *19 (Bankr. N.D. Tex. July 16, 2026). "[T]hus the alleged debtor has the burden of proving bad faith." *Legacy Exploration* at *19. There is no consistent case law in the 5th Circuit when it comes to determining a petitioning creditor's bad faith. *See In re Acis Cap. Mgmt., L.P.*, 604 B.R. 484, 530-31 (N.D. Tex. 2019)(recognizing five (5) tests). Approaches various courts have considered include: (i) the improper use test; (ii) the improper purpose test; (iii) the objective test; (iv) the subjective test; and (v) the combined or two-part test. *Acis Cap. Mgmt.*, 604 B.R. at 530-31; *In re Sims*, 994 F.2d 210, 222 (5th Cir. 1993). (noting that it is appropriate to consider both objecting and subjective factors in determining whether an involuntary petition was filed in bad faith). Regardless of which test the Court follows, the Involuntary Petitions were not filed in bad faith.

36. The Petitioning Creditors did not attempt to use the Involuntary Petitions as a means to obtain a disproportionate share of the Alleged Debtors' non-exempt assets for themselves. To the contrary, the Petitioning Creditors filed the Involuntary Petitions as a means to bring an independent review of the Alleged Debtors' assets and transactions and to provide an organized and centralized collection of the Alleged Debtors' non-exempt assets and an equal distribution of such assets to the Alleged Debtors' unsecured creditors. The Petitioning Creditors did not file the Involuntary Petitions out of ill will, malice or for the purpose of harassing the Alleged Debtors.

Instead, the Petitioning Creditors believe that a bankruptcy is the best avenue for the universe of the Alleged Debtors' creditors to receive an equal distribution of any non-exempt assets the Alleged Debtors own. The Petitioning Creditors submit that they are reasonable actors and that a reasonable person in their position would have filed the Involuntary Petitions under the circumstances of these cases. The Petitioning Creditors further believe that, given the number of judgments, receiverships, and ongoing litigation involving the Alleged Debtors, a bankruptcy avoids the race among competing creditors to collect the Alleged Debtors' non-exempt assets.

37. Additionally, the Petitioning Creditors hold significant debts against the Alleged Debtors and none of them were receiving payment. Other creditors also hold significant judgments against the Alleged Debtors and are not being paid either. Using an involuntary bankruptcy filing to protect creditors' rights against an alleged debtor that is not paying his debts by forcing them to submit to the jurisdiction of the bankruptcy court is a legitimate use of the involuntary bankruptcy process. *Acis Cap. Mgmt.*, 604 B.R. at 532; *citing In re All Media Props., Inc.*, 5 B.R. 126, 137 (Bankr. S.D. Tex. 1980), *aff'd*, 646 F.2d 193 (5th Cir. Unit A May 1981).

38. The Involuntary Petitions do not arise out of a two-party dispute. The record amply demonstrates that there are significantly more than two parties interested in the outcome of this case. Cole Johnson acknowledged that Vista Bank separately sued him personally ("yeah, they did sue me"), Nov. 2025 Dep. at 66–67, and Cord Johnson could not say how many judgments are outstanding: "three or four for sure, could be more," and later, "I don't know how many there are." Cord 6/2/2026 Dep. at 7-8. In addition to the three judgments held by the Petitioning Creditors, the Alleged Debtors have sustained the CWL Judgment and no fewer than eight (8) additional judgments in courts across the United States, and are subject to multiple state-court receiverships.

39. A receivership obtained at the instance of a single judgment creditor is no substitute for the collective, court-supervised process the Bankruptcy Code provides. As discussed in the Omnibus Response, a turnover receiver collects assets only to pay the judgment he was appointed to collect. He does not act for all creditors the way that a bankruptcy trustee does. Omnibus Response at 26–28 (¶¶ 52–53).

40. A bankruptcy case ends the race among competing creditors, centralizes the Alleged Debtors' assets under the control of an independent fiduciary armed with the avoidance powers of Chapter 5, and assures an equitable, pro rata distribution to the entire creditor body. The Alleged Debtors' post-filing payment to CWL, made at their direction, illustrates precisely why that process is necessary: the Alleged Debtors selectively paid a $37,484.39 judgment while ignoring tens of millions of dollars in other judgments. *See* Cole MTD at 3, 13 (¶ 15); Exhibit 2 to Motion to Dismiss, Order Appointing Receiver; Notice of Withdrawal at ECF No. 13.

41. The Petitioning Creditors' conduct satisfies each of the tests recognized in *Acis*. Under the improper-use and improper-purpose tests, the Petitioning Creditors sought no advantage unavailable to the Alleged Debtors' other creditors; they sought neither a disproportionate recovery nor leverage in an unrelated dispute, but an independent fiduciary's review of the Alleged Debtors' assets and transactions. Under the objective test, a reasonable creditor holding a large, unpaid, final judgment against a debtor who has stonewalled post-judgment discovery and is the subject of numerous competing collection proceedings would have filed. Under the subjective test, there is no evidence of ill will, malice, or an intent to harass. Finally, to the extent the Alleged Debtors contend that disputed factual questions about good faith remain, those questions are to be resolved at trial on the Involuntary Petitions and do not supply cause for a bond. *See Ransome*, 423 B.R. at 558–59.

42. Bad faith is not a freestanding basis for relief. Where the requirements of Section 303 are satisfied, the Court "lacks the authority to arbitrarily impose non-statutory requirements" on petitioning creditors. Omnibus Response at 8–9 (¶ 18); *see also id.* at 23–24 (¶ 48). That principle applies with even greater force to a bond motion, which is a lesser-included, discretionary request: if the Alleged Debtors' bad-faith contentions do not establish a basis to disturb the Involuntary Petitions themselves, they cannot, without a prima facie showing, supply the "cause" that Section 303(e) requires.

43. The Alleged Debtors' Motion does not engage the Petitioning Creditors' legitimate purpose. Instead, it rests on the same bad-faith contentions advanced in their motions to dismiss: improper purpose, a theory that the Bank Judgment is "one indivisible judgment," purported deficiencies in the Petitioning Creditors' corporate-ownership statements under Federal Rule of Bankruptcy Procedure 1010(b), alleged defects in Spin's signature and claim amount, an affiliate's allegedly undisclosed bankruptcy case, and HGA's alleged alter-ego and automatic-stay problems. Each has a ready, record-based answer, which the Petitioning Creditors summarize below and which is developed more fully in the Omnibus Response. The purpose is not to relitigate the motions to dismiss, but to show that no "bad faith" flag raised by the Alleged Debtors establishes that the lack of merit of the Involuntary Petitions is "relatively clear."

44. First, the Alleged Debtors contend that the existing state-court receivership makes bankruptcy a redundant collection device and shows an improper purpose. That contention fails. The Noack receivership is a turnover receivership under Texas Civil Practice and Remedies Code § 31.002, the proceeds of which go only to Amarillo National Bank. A turnover receiver cannot bind nonconsenting creditors or adjudicate the rights of non-parties, and the receivership has produced no payment to any of the Petitioning Creditors. Omnibus Response at 6–7 (¶ 15), 26–28

(¶¶ 52–54). A single-creditor turnover receivership is the antithesis of the collective, pro rata process the Bankruptcy Code provides, and resort to that process for the benefit of all creditors reflects a legitimate purpose, not an improper one. *See Acis Cap. Mgmt.*, 604 B.R. at 532.

45. Second, the Alleged Debtors' "one indivisible judgment" theory) misapprehends the Bank Judgment. Century and Huntington are separate creditors with separate commitments ($20,000,000.00 and $14,000,000.00, respectively), separate notes, and separate guarantees. Cord MTD at 2, 7–9, 15–16; Cole MTD at 2, 7–9, 15–16. The Bank Judgment is easily divisible between them, and any inter-creditor litigation is irrelevant to each bank's claim against the Alleged Debtors. Omnibus Response at 4–5 (¶ 11), 9–11 (¶¶ 19–23). Spin's qualification rests on its final, unstayed New York judgment.

46. Third, the Alleged Debtors' complaint of uncredited collections does not support a finding of bad faith. *See* Cord MTD at 2–3, 9, 16–17 (¶¶ 8, 18); Cole MTD at 2–3, 9, 16–17 (¶¶ 8, 19). The approximately $329,393.30 on which they rely was a pre-judgment registry disbursement that is already embedded in the Bank Judgment, not an uncredited post-judgment offset. Even if that amount were deducted, each bank's undisputed claim would still dwarf the statutory threshold. Omnibus Response at 14 (¶ 28), 16 (¶ 31).

47. Fourth, the challenge to HGA's eligibility fails. HGA holds a final, unstayed Louisiana judgment, which is a qualifying claim regardless of the alter-ego ownership theory the Alleged Debtors advance. *See* Cord MTD at 9–11, 17–19; Cole MTD at 9–11, 18–19. And to the extent the Alleged Debtors invoke the automatic stay arising from the bankruptcy case of an affiliate, they are non-debtors in that case and lack standing to assert the estate's stay rights, which belong to the trustee, Garner. Omnibus Response at 17–19 (¶¶ 33, 36–37).

48. Lastly, the attacks on Spin do not negate its claim. *See* Cord MTD at 11–13, 19–20, 28; Cole MTD at 3, 11–13, 19–20, 28. The $5,336.19 variance does not negate the New York judgment; there is no evidence that garnishment proceeds were actually collected; a non-attorney signature is curable and not fatal; and the New Jersey and Lubin developments are post-petition and do not bear on petition-date eligibility. Omnibus Response at 19–20 (¶¶ 38–40). Spin's qualification rests on its final, unstayed New York judgment, and the Petitioning Creditors do not vouch for Spin's pre-petition conduct.

49. In short, each "bad faith" flag raised by the Alleged Debtors has a ready, record-based answer, and this Objection and the Omnibus Response speak with one voice. Because none of those contentions establishes a prima facie case of bad faith, the Alleged Debtors have not shown that the lack of merit of the Involuntary Petitions is "relatively clear," and the Court need not, and should not, resolve those disputed matters on a bond motion. *See Ransome*, 423 B.R. at 558–59.

**C. The Requested $20,000,000.00 Bond Is Untethered to Any Amount Recoverable Under Section 303(i)**

50. Even if the Court were inclined to consider a bond, the amount demanded cannot be sustained. Section 303(e) permits a bond only "to indemnify the debtor for such amounts as the court may later allow under subsection (i)." 11 U.S.C. § 303(e). Of the $10,000,000.00 sought for each Alleged Debtor, approximately $9,750,000.00 is attributed to business-interruption and lost-value "damages." Such damages are recoverable, if at all, only under Section 303(i)(2), and only against a petitioner that "filed the petition in bad faith." 11 U.S.C. § 303(i)(2). Absent a finding of bad faith, the Alleged Debtors could recover, at most, costs or a reasonable attorney's fee under Section 303(i)(1). The Eastern District of Texas tied these provisions together directly in *Funnel Science*: the court's finding of no bad faith "precluded [the debtor] from obtaining actual or punitive damages," 551 B.R. at 268–69, so that a bond could secure only Section 303(i)(1) fees,

and a $100,000.00 bond was "grossly in excess of any amount needed to secure the attorneys' fees." *Id.* at 274. The same reasoning applies with greater force here. Because the Alleged Debtors cannot make the prima facie showing of bad faith required for cause, the approximately $9,750,000.00 damages component has no bearing on the amount of any bond.

51. The damages component fails for a second, independent reason: by the Alleged Debtors' own account, it consists of indirect losses of non-debtor business entities. Section 303(i) "limits standing to recover statutory damages resulting from an involuntary bankruptcy proceeding to the debtor." *Matter of 8Speed8, Inc.*, 921 F.3d 1193, 1195 (9th Cir. 2019). In *8Speed8*, the Ninth Circuit held that a fifty-percent shareholder of the involuntary debtor lacked standing to recover under Section 303(i) because it was not the debtor, emphasizing that the statute is intended to alleviate the consequences that an involuntary proceeding imposes on the debtor, which a third party does not face. *Id.* at 1195–96. A court in this District has applied the same rule, recognizing that Section 303(i) provides damage awards only to the debtor, supporting the exclusion of losses belonging to separate non-debtor entities form the requested bond. *In re McMillan*, 543 B.R. 808, 816 (Bankr. N.D. Tex. 2016). The losses attributed to Red Leaf Investments, LLC, Bridgelink Development, and similar entities are those entities' losses. They are not Cord Johnson's damages and cannot support a bond in his favor. Cord Johnson's own testimony confirms the point. Asked about the value of the entity holdings, he testified, "I don't own them directly," and conceded, "Can I write a check for them, no." Cord 6/2/2026 Dep. at 62–63.

52. Third, even a debtor's own business-loss damages must be proximately caused by the filing and proven with competent, non-speculative evidence. Courts routinely deny such damages where they cannot be isolated from other causes or quantified. A documented post-filing decline in revenue is insufficient where "other factors may also have contributed" to the loss. *In re*

*Laclede Cab Co.*, 76 B.R. 687, 693–94 (Bankr. E.D. Mo. 1987). "[A]rgument by counsel about the stigma of bankruptcy is not evidence of any damage proximately caused to Atlas's ongoing business reputation," and speculative post-filing losses are "not compensable." *In re Atlas Mach. & Iron Works, Inc.*, 190 B.R. 796, 804 (Bankr. E.D. Va. 1995). Reputational harm "must be proven through more than general testimony." *In re Cadillac by DeLorean & DeLorean Cadillac, Inc.*, 265 B.R. 574, 584 (Bankr. N.D. Ohio 2001). And as a recent decision restates the measure, damages must "be proximate" and "quantifiable if an award is to be made," and the "stigma of bankruptcy" is "not, in and of itself, sufficient evidence." *In re Amrusi*, 674 B.R. 591, 625 (Bankr. E.D.N.Y. 2025).

53. The Alleged Debtors' figure is precisely the speculative, multi-cause, entity-level estimate of business value that these decisions reject. It is also contradicted by the Alleged Debtors' own position that their businesses are thriving and their asset values are increasing. And any impairment of the Alleged Debtors' credit standing or business prospects is readily attributable to causes other than the Involuntary Petitions, including the approximately $49,000,000.00 in principal judgment amounts held by the Petitioning Creditors alone that the Alleged Debtors have left unpaid, the multiple additional judgments totaling $24,000,000 against them, the state-court receiverships and their recent arrests for fraud. The deposition testimony confirms that the claimed value is speculative. Cord Johnson testified that the entity assets "could potentially be . . . value over 100 million, easily," while comparing the valuation to "Bitcoin." Cord 6/2/2026 Dep. at 62–63. Cole Johnson testified that his Bimergen stock options are "out of the money" with "Negative value," and remain unexercised. Cole 6/9/2026 Dep. at 155.

54. Fourth, the Alleged Debtors' assertion that the Petitioning Creditors cannot or will not pay a Section 303(i) award does not justify a bond of this size. The Alleged Debtors contend

that Spin and its affiliate Lubin are insolvent (Lubin is in Chapter 11 with a trustee, and Spin has not operated for approximately two years) and that Cadence refused to pay court-ordered receiver fees.[1] Bond Mot. at 29; *see also* Cord MTD at 4, 40 (¶ 62) (receiver fees); Cole MTD at 4–5, 39–40 (¶ 63) (receiver fees). Those contentions do not carry the Alleged Debtors' burden. *Funnel Science* treated the absence of any "evidence or allegation . . . that the [petitioners] will not pay" as a reason to deny a bond. 551 B.R. at 274.

55. Huntington and Century are banks that can plainly satisfy any award the Court might allow. The Alleged Debtors' solvency attack is aimed mainly at Spin, whose potential exposure is a fraction of the amount demanded, and the long-resolved dispute between Huntington and the receiver over receiver fees is a collateral matter, not evidence of an inability or unwillingness to pay a federal judgment.

56. Fifth, the only component of the demand that could conceivably be secured by a bond is the reasonable attorney's fees and costs recoverable under Section 303(i)(1). Those amounts are limited to professional services that are "both necessary and reasonable," and "[c]osts must be proven litigation costs actually incurred." *Cadillac by DeLorean*, 265 B.R. at 583. By the Alleged Debtors' own estimate, anticipated fees and costs are approximately $250,000.00, a small fraction of the $20,000,000.00 demanded. Accordingly, if the Court were to conclude that any bond is warranted, which the Petitioning Creditors dispute and as to which they reserve all rights, the amount must be limited to a substantiated and reasonable estimate of the fees and costs that could later be allowed under Section 303(i)(1), and must not include speculative damages or losses belonging to non-debtor entities.

---

[1] Cadence did, in fact, pay the receiver in its case. *See* Exhibit J, Joint Notice of Resolution of Fee Dispute

## CONCLUSION

57. The standard under Section 303(e) is permissive, i.e., the Court may require petitioning creditors to post a bond. Based on the foregoing, the facts of these cases do not justify the Court exercising its discretion against the Petitioning Creditors. The Alleged Debtors have not established cause under Section 303(e). They have not made the prima facie showing of bad faith that the presumption of good faith requires, the lack of merit of the Involuntary Petitions is far from "relatively clear," and the $20,000,000.00 demanded is untethered to any amount the Court could later allow under Section 303(i). The Court should therefore deny the Motions. In the alternative, and without waiver of the foregoing, any bond should be limited to a substantiated estimate of the reasonable fees and costs potentially recoverable under Section 303(i)(1), should exclude speculative damages and losses belonging to non-debtor entities, and should leave all disputed eligibility and bad-faith issues for trial on the Involuntary Petitions. To the extent the Court is inclined to consider any bond, it should do so only after an evidentiary hearing at which the Alleged Debtors bear their burden of establishing cause.

WHEREFORE, the Petitioning Creditors respectfully request the Court enter an order denying the Motions in their entirety; and granting such other and further relief as the Court deems just or appropriate.

Dated: November 6, 2026

Respectfully submitted,

**AKERMAN LLP**

*/s/ Michael D. Napoli*
Michael D. Napoli
Texas Bar No. 14803400
Laura M. Taveras
Texas Bar No. 24127243
2001 Ross Avenue, Suite 3600
Dallas, Texas 75201
Telephone: (214) 720-4300
Facsimile: (214) 981-9339
michael.napoli@akerman.com
laura.taveras@akerman.com

*Attorneys for Petitioning Creditor Huntington Bank f/k/a Cadence Bank*

*/s/ John C. Leininger*
John C. Leininger
Texas Bar No. 24007544
Otteson Shapiro LLP
4851 LBJ Freeway, Suite 650
Dallas, Texas 75244
(214) 619-8325 (Telephone)
Email: jcl@os.law

*Counsel for Century Bank and Spin Capital, LLC*

*/s/ Russell A. Woodward*
Russell A. Woodward
Louisiana Bar No. 34163
Law Offices of Russell A. Woodward Jr., LLC
119 Pelican Blvd.
Ruston, LA 71270
(318) 255-4898 (Telephone)
Email: raw@therawlaw.com

*Attorneys for Hunt, Gulliot & Associates, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 6, 2026, the foregoing document was electronically filed and served upon all counsel of record via the Court's CM/ECF system.

*/s/ Michael D. Napoli*
Michael D. Napoli