# EXHIBIT B

UNEDITED TRANSCRIPTION DISCLAIMER

IN THE MATTER OF

Cadence Bank f/k/a BANCORPSOUTH BANK and CENTURY BANK,

PLAINTIFF

V.

BRIDGELINK ENGINEERING LLC, et a

DEFENDANTS

The following transcript of proceedings, or any portion thereof, in the above-entitled matter, taken on any date, is being delivered UNEDITED and UNCERTIFIED by the certified court reporter at the request of Mr. Jeffrey Richter.

It is agreed not to disclose this unedited transcription in any form (written or electronic) to anyone who has no connection to this case. This is an unofficial transcription which should NOT be relied upon for purposes of verbatim citation of testimony.

This transcription has not been checked, proofread or corrected. It is a draft transcript, NOT a certified transcript. As such, it may contain computer-generated

mistranslations of stenotype code or electronic transmission errors, resulting in inaccurate or

nonsensical word combinations, or untranslated stenotype symbols which cannot be deciphered by non-stenotypists. Corrections will be made in the preparation of the certified transcription, resulting in differences in content, page and line numbers, punctuation, and formatting.

This unedited transcript contains no appearance page, certificate page, index, or certification.

Now, first time in 15 years I've ordered a deposition in the courtroom. I'm not going to sit in here the whole time. I do have my lawyer -- my law clerk will be sitting in, but I also do have it piped in to my office. As I'm working on other things, I will be listening. I don't anticipate we're going to run into the same problems we had before.

We need information to be given. Relevance is broad in post judgment discovery. That being said, let me ask, do you anticipate a certain amount of time if you're provided the information you need? Are you looking at a couple hours? Let me ask the Plaintiff.

MR. GRANT JONES: Your Honor, I'm anticipating being here a while.

THE COURT: Okay.

MR. GRANT JONES: There's a lot to go over, there's a lot to get through.

THE COURT: And there's two --

MR. GRANT JONES: There are two deponents set to go today, so I anticipate being here until the end of the day.

THE COURT: Okay. So what I need from Defendants is cooperation to answer the questions. There's no protective order, there's no nondisclosure agreement that was raised at the first time. I don't

want any of that nonsense. At this point, they are entitled -- Plaintiff is entitled to inquire into assets and -- and all of the information regarding potential sources of judgment red. So just answer the questions, and it will go fine.

Whether those assets are exempt or not is a whole different issue. They're entitled to the information, and y'all can figure out what is exempt or nonexempt. You have your appeal at the Fifth Circuit. While that's pending, it's appropriate for this information to continue to be gathered, and this is an appropriate vehicle for it.

So with those ground rules, I want to turn it over. I do have your own court reporter here. I don't see a videographer, so I'm assuming it's just going to be recorded that way.

I'm encouraging you not to involve me in your deposition. If I have to sit here and rule on objections, it's not going to be pretty. For either side, it's going to be an ugly deposition, and it's going to take all day, and that's not what this process

is about.

So I expect full cooperation from the Defense and I expect reasonable questions from the Plaintiff.

Judgment-Debtor."
Do you see that?
A. I do.
Q. It says, Each Judgment-Debtor is ordered to turn over to the receivers within five days of receipt of copy of this order, the documents listed in Exhibit A, attached hereto, together with all documents and financial records which may be requested by the Receivers, and, two, all checks, cash, securities, stocks and bonds, promissory notes, documents of title, contracts owned by or in the name of Judgment-Debtors, collectively or individually."
First of all, did I read that correctly?
A. I believe so. Can you reread it?
Q. You can read it.
A. You asked me to -- you asked me if you read it correctly, and I'm just answering.
Q. Were you following along?
A. Yes.
Q. Okay. So this order, this portion of the order is ordering yo but to turn over documents and all cash,

checks, security promissory notes, documents and title, contracts owned by or in the name of judgment-debtors collectively or individually.

A. In Exhibit A?

Q. Let's turn to Exhibit A. Turn to Page 17, it's the last page.
A. I think you have some of it put together here.
Okay.
Q. So Exhibit A says all records as hereafter described concerning the affairs of judgment debtors and their business, unless otherwise noted for the proceeding 36 months.
A. Okay.
Q. So you were ordered to turn over the documents that are listed in Exhibit A?
A. Okay.
Q. Will you read A through H in Exhibit A, onto the record, please.
A. Bank statements, past books, other bank and financial institution records, federal income, state, franchise tax records, all motor vehicle certificates, real property, deeds, deeds of trust, business journals, ledgers, payable, receivable files, state tax reports, credit applications, and other documents dating debtor, financial condition, list of all NDA's judgment debtors

have interest in, whether direct or indirect, have any interest in pleading the six months preceding interest and in the six months.

Q. Have you complied with this order?

Q. (BY MR. GRANT JONES) What documents have you provided to your attorneys since October 22nd, that is compliant with Exhibit A?
A. I keep giving you 1,900 documents.
Q. Of though documents, what was in there?
A. Let me see the evidence and I'll read through it. I don't know every document, 1,900 documents, neither does anybody in this room.
Q. I can tell you for certain there are no real property deeds in those 1,900 pages.
A. Okay.
Q. So this order requires that you turn over the documents described concerning the affairs of judgment debtors and their businesses.
A. Okay.
Q. So of your businesses, what real property does your business own?
A. I think you need to be -- what business are you talking about?
Q. Any of them?
A. You can't just say "any of them."

Q. Yes, I can. That's what this order says?

A. Yeah. I mean, I believe we have, and if we haven't, then I'm happy to do so.

Q. You believe that you've turned over all the

documents responsive to Exhibit A for all of your businesses?

A. The way I understand, Exhibit A, yes.

Can I have some water?

Q. Where are those documents physically held?

A. I mean, what -- what -- what documents? I mean, you're really broad on what --

Q. Responsive to Exhibit A.

A. I've turned what I believe Exhibit A means to me, to you guys, and if there's any --

Q. Did you discuss --

A. Sorry. Go ahead.

-- that I'm missing, I will turn it over.

Q. I'm telling you, on the record, that you're missing real property deeds.

A. Okay.

Q. And you're missing bank statements.

So will you agree to comply with Exhibit A?

A. Yeah.

Q. As ordered?

A. Yeah.

Q. When? Do you have any with you?
A. No, I don't carry my records.
Q. Okay. Where are they?
A. What do you mean where are they at?

Q. Where do you keep your bank statements?
A. Where do I keep my bank statements?
Q. Yeah.
A. Bank? I don't keep bank statements.
Q. This order required that you produce documents within five days.
A. You're just not happy with what you've got --
Q. No, I'm not. Correct:
A. -- and you're just picking on a deal.
I've turned in what I have. I don't know -- to what I understand this means, I've turned it in, and if I haven't, then I will comply.
Q. Okay. Will you comply by -- today is Friday.
Will you comply by Monday?
A. Yeah.
Q. Okay.
A. I mean, I think I'm -- I need to talk to my legal counsel, but I believe there's a slew of documents that we gotta turn over, so, yeah.
Q. There's a slew of documents that you have to turn over --

A. Correct.

Q. -- that you have not yet turned other?

A. No, we have turned a slew of documents.
They're probably going to be the same ones, or really

encourage you look at how to spell your address, and then you can say it on the record once you look at it, okay?

A. Okay.

Q. Where is that address?

A. Weatherford, Texas.

Q. When did you acquire 180 Bielss lane?

A. I don't know the exact date.

Q. How long have you live there?

A. I don't know the exact date.

Q. I'm sorry?

A. I don't know the exact date.

Q. Was it six months?

A. I don't know the exact date. I don't know.

Q. What about a year? Have you lived there a year?

A. Probably close to a year, yeah.

Q. Probably close to a year?

A. Uh-huh.

Q. But not more than two?

A. I don't -- what's -- what's the reason for

that?

Q. I want to know when you acquired this property.

A. I'm happy to send it over to you. I mean, I don't know the exact date to be honest with you, it's

over a year.

Q. Okay. We're going to take a quick break, and I'd like for you to find how to spell your address. So let's take five minutes.

MR. GRANT JONES: Let's go off the record.

THE REPORTER: Off the record.

(Break taken from 9:31 a.m. to 9:39 a.m.)

THE COURT: All right. Please be seated.

All right. So I've listened to the first 30 minutes. It's a total waste of time, and I don't miss the deposition game. So we're going to have -- I'm going to be here, let's just go.

You are correct, Mr. Barnes. Form; objection is a state or court procedure. You may state short or nonargumentative basis for your objection. I did not feel any of that was out of line.

I'm going to ask Plaintiff to try to be specific with your questioning because I find the witness is being a little bit elusive, and I think the more you are direct and specific, I -- I will make sure those answers -- those answers are given to you.

I do have a question before we begin. The witness has stated several times he's turned over 1,900 documents to what sounds like his counsel.

Have those documents, Mr. Barnes, been

produced to the other side?

MR. STACEY BARNES: He turned them over to Whitaker Chalk, his counsel that had been handling the protective order -- the receivership issues, Your Honor.

And I don't know for certain, but my understanding is the documents have been turned over. They've been -- they actually set up a data room for the access. I don't know the details of that because the Whitaker Chalk law firm has been handling this that.

THE COURT: Well, then they should be here then. They should be here.

If this is -- if this is a discovery hearing that deals with that receivership as well, those lawyers need to be here so I can ask them that question. So I guess we need to --

MR. GRANT JONES: Your Honor, once we connect to WiFi, we can show you the documents that have been produced because we have access to the Whittaker Chalk database.

THE COURT: Okay. Well, you are an officer of the Court herein before me right now, and I'm taking

you at your representation that you have not received bank statements or these deed records.

And so, I guess, maybe Mr. Barnes, you can contact David Skeels and Robert Simon and -- and see if

one of them is available to be here to answer that question for me, and we'll continue the deposition, and I'll take that up when they get here.

MR. STACEY BARNES: Should I do that right now, Your Honor?

THE COURT: You can, or Mr. Patel can. I know you're defending the deposition, it seems, so you can have your colleague do that for now.

MR. STACEY BARNES: Will do.

THE COURT: As to the witness, I'll refer that I think you're being elusive. I don't know --

THE WITNESS: And I --

THE COURT: I don't know -- hold on.

I don't know anyone who doesn't know how to spell their own address, that seemed a little offensive.

THE WITNESS: Yeah.

THE COURT: I mean, even if it's a strange word, we all know where we live. We all generally when we moved there.

THE WITNESS: Uh-huh.

THE COURT: Don't play games with the

question. If he says, how long have you lived there, he's not looking for a specific date. Tell him the number of years, all right?

We don't need to be here all day because

you don't know what the word "home" means. That was offensive to me when I heard it. When he said, where's your home, you said, what do you mean by home?

We know what "home" means, all right? Do not play that game. We are going to answer questions today.

THE WITNESS: Yeah.

THE COURT: And I know you don't want to be here. I don't want to be here.

THE WITNESS: Yeah, yeah.

THE COURT: But you just need to give them the information. The law will play out the way the law plays out. This is just --

THE WITNESS: No, I agree.

THE COURT: -- fact gathering, okay?

THE WITNESS: I --

THE COURT: Okay. If you -- if you have that agreement, let's go.

THE WITNESS: I -- I said -- I said, if I'm missing something, I'm happy --

THE COURT: I understand.

THE WITNESS: You got my full -- you got my full corporation.

THE COURT: Okay.

THE WITNESS: I did what I could. That is

Q. Okay. Item A on Exhibit A says a list of all entities, judgment debtors have an interest in, whether direct or indirect, or have had an interest in, in the preceding 60 months.

A. Okay.

Q. Why haven't you turned that over?

A. We did the best -- the best I could there. If you feel like something was out, then I have -- I defniitely turn it in.

Q. I'm not asking you what you did. I'm asking you why that specific thing was not turned over.

A. I -- I just answered.

THE COURT: Did you compile a list of entities that meet that definition? Did you personally do that?

THE WITNESS: I think where the problem is, they're trying to make the definition go into other stuff, and I understand this, as me, personally, and the debtors that are on there, so the --

THE COURT: Bridgelink.

THE WITNESS: Bridgelink. So that's how I

understand this.

THE COURT: Okay.

THE WITNESS: So I don't, personally, own those LLC's. They have different structures, right, so

I -- I did the best I could and turn over 1,900 documents that had to do with that.

THE COURT: I understand him to be asking about a specific list of entities, just naming them.

THE WITNESS: Yeah.

THE COURT: Is that the question?

MR. GRANT JONES: Yes.

THE COURT: Did you butt together a list, naming entities that those judgment debtors, yourself and Bridgelink and those listed, all have ownership in, that they have ownership in? Originally owns, you know --

THE WITNESS: That's what I'm saying.

THE COURT: Yeah.

THE WITNESS: It's -- it's complicated, and I did the best I could.

THE COURT: I hear you.

THE WITNESS: The structure is set up by an outside counsel, not even here today, that I don't fully understand, so I did the best I could. I turned in my personal stuff.

THE COURT: Okay.

THE WITNESS: And what has to do with the -- what has to do with --

THE COURT: But you're saying you produced

MR. STACEY BARNES: I'm not aware of it. The question being asked was about, I believe, what is it, by mergent.

MR. GRANT JONES: H.

MR. STACEY BARNES: And judgment River Ranch, which are not judgment debtors.

MR. GRANT JONES: And that's fine. The question is, they listed entities that they had any interest in, and so just an order chart is not compliant.

THE COURT: All right.

THE WITNESS: I -- I mean D just to be -- just to be honest, the --

MR. GRANT JONES: I hope you're being honest. Yeah.

THE COURT: Let's not side bar.

Go ahead. Mr. Johnson, go ahead.

THE WITNESS: I mean, this is what happened the last time, and -- and --

THE COURT: Well, I know. I read it and I didn't like it, and that's why we're here. We're doing

it again.

(Overlapped speaking.)

THE WITNESS: They -- they -- they taunted and that was not put on the record, and I'm just going

to keep going, but there's entities that own entities in a structured corporate structure that I don't fully understand. I've turned in exactly what I thought was suffici.

THE COURT: Okay.

THE WITNESS: I've turned in exactly what I thought was sufficient, so that's where I stand, okay.

THE COURT: Okay. All right. Move on.

Q. (BY MR. GRANT JONES) Can you start listing out entities that you have an interest in. Name the first one.

A. I just -- I just explained that I don't -- I did exactly what I thought.

THE COURT: So no, he's -- you're not listening to the question. The question is for you to now just answer some entities that you own interest in.

THE WITNESS: Sir?

THE COURT: Yes, sir.

THE WITNESS: We have LLCs that own LLCs that own LLCs.

THE COURT: Okay.

THE WITNESS: They go up to a corporate structure --

THE COURT: Okay. Start listing them. Just list as many as you can remember.

THE WITNESS: There's -- I mean, it's a corporate structure. I don't even know how it works.

THE COURT: Can you name one?

THE WITNESS: Yeah. I can -- Bridgelink. You get -- you got all the work chart over there. Johnson River Ranch. You know, we have all the Bridgelink companies. I mean, we have a lot of special vehicles where properties are under. I mean, there's a lot a.

I mean, if you give me a list, then I can definitely do them, but there's a -- there's lot of LLCs. And it -- and it's not just an LLC. It's a corporate structure that I don't fully understand, meaning, like --

THE COURT: You don't even know what you own?

THE WITNESS: Yeah.

THE COURT: You're telling this -- you're telling the Court you don't know what own?

THE WITNESS: Yeah, kind of. I mean --

THE COURT: You just trust lawyers and tax

accounts to do all of that for you and you just -- you
just collect money and --

(Overlapped speaking.)

THE WITNESS: I don't collect money. I

haven't -- I haven't collected money. No. No.

THE COURT: Well, what are you living on?

THE WITNESS: Very little. I mean.

THE COURT: Uh-huh.

THE WITNESS: We -- we -- we had some -- you know, I pay myself from the ranch a, W2, but, I mean, I pay myself very little.

THE COURT: But you buy meals?

THE WITNESS: Yeah.

THE COURT: Have you gone on vacation at all?

THE WITNESS: No. I haven't been on vacation in probably six years.

THE COURT: You're truck's paid for?

THE WITNESS: No. No, I lease.

THE COURT: It's a lease?

THE WITNESS: It's a lease, yeah.

THE COURT: Yeah. And so your house is being paid for by a company?

THE WITNESS: Yeah. It's -- it's being paid by a company.

THE COURT: So you've chosen a structure where you don't have to pay anything personally, is that what I understand?

THE WITNESS: No.

THE COURT: Everything's paid for by other entities that you have an interest in?

THE WITNESS: There -- there is some -- there is some entities that pay for them. But, personally, yeah. I mean, I don't personally own anything.

THE COURT: Do you have a personal bank account.

THE WITNESS: I don't.

THE COURT: So all your money comes through entities?

THE WITNESS: Um --

THE COURT: It has to if you don't have a bank account, right?

THE WITNESS: We have -- yeah.

THE COURT: All right.

Q. (BY MR. GRANT JONES) So the debit card that you mentioned earlier, who is it issued to?

A. What do you mean by issued? Is it the -- the -- the account --

Q. So a debit cared is tied to a bank account.

A. Yeah.
Q. Who owns that bank account.
A. Johnson River Ranch.
Q. Okay. How does Johnson River Ranch get paid,

A. Yeah. I think the first one is Citizen National Bank or something like that. Yeah.
Q. Is that the property that you used to live on?
A. Part of it, yeah.
Q. Is that 101 alltontop road?
A. I don't believe that's the address.
Q. That's not the address?
A. It's probably -- it's probably right next to it, though.
Q. Okay. So this is a separate piece of property unrelated to 1301?
A. That's right.
Q. That Johnson River Ranch also owns?
A. Yeah, that's right.
Q. 1301, who owns 1301?
A. It was sold.
Q. To who?
A. Oh, I don't know the -- I don't know the person it was sold to. I -- I -- actually, I think it was the Nineberger's, to be honest with you. That's their last name. I don't -- I don't know anything about them, who

sold them or --

Q. So if we look for the Parker County records for 1301, Johnson River Ranch is not going to be listed as the owner?

A. I mean, I don't know about that. You'd have to go -- you'd have to go look at it. I don't know.
Q. When was 1301 sold?
A. A couple years -- about a year -- year, year and a half ago. Somewhere in there.
Q. Did Johnson River Ranch own it when it was sold?
A. I believe so, yeah.
Q. How much did you sell it for?
A. I believe it was 8.5 million. I had a lot of debt on it, though.
Q. It had a lot of debt on it, is that what you said?
A. I did, yeah.
Q. Who provided -- well, who provided financing for that?
A. Who provided financing for what?
Q. Who is the debt owed to?
A. Vista Bank.
Q. Vista Bank.
Q. So you're saying 8.5 million was the net

proceeds?

A. No, I didn't say that.

Q. So what was the net proceeds?

A. I think it -- I don't remember exactly. It

was -- I believe it was under a million, though.
Q. Where did that money go?
A. To Johnson River Ranch, state doesn't leave anything.
Q. How did Johnson River Ranch initially acquire 1301 Alltontop Road?
A. Through the bank, just like I said.
Q. When?
A. When?
Q. Yeah.
A. Oh, I think it was 2020, or something like that, 2021. I don't know, somewhere in there.
Q. How much money did you get from that sale?
A. I didn't pay myself anything from the sale.
Q. Can you say that again?
A. I didn't want pay myself anything from the sale.
Q. Where did that money go, Cole?
A. It went to operations.
Q. No, no, no.
A. Okay.

Q. Into what account did that money go into?

A. I don't recall the account number, nothing like that.

Q. What bank did it go to?

want me to tell you?

Q. It says the original amount of $5,000,085, and $8,000,095.

A. Okay.

Q. Holder of the note, Vista Bank.

A. Okay.

Q. And if you'll go a little bit further down in that paragraph, it says court ordered Document Number 202108125, official public record, Parker County Texas, executed by Bridgelink Investments, LLC, securing the payment of the note and the principle sums of $5,000,085 and $8,000,090 and other endebtness and performance for the benefit of Vista Bank.

A. I'm not sure if this is the right one. This is an unofficial copy. I'm not sure if it is this is right.

Q. So you're questioning the validity of the document?

A. Yeah, I am.

Q. Okay.

A. It says right on there, copy unofficial.

Q. I'm going to hand you Exhibit 6.

(Exhibit 8 marked.)

Q. (BY MR. GRANT JONES) This is a petition filed by Vista Bank.

A. Okay.
Q. In Parker County, naming you, personally, as the Defendant.
A. Okay.
Q. And the claim is for -- if you'll look to the back page of the petition -- well, Page 9 -- over $1 million. If you'll good on Page 3.
A. Page 9 or Page 3?
Q. Page 9 just had over a million dollars. Page 3 is that 8,000,095 number.
A. Okay.
Q. And then Page 4 is that 5,008,500.
A. Okay. What are we trying to -- yeah. What are you trying to get? Yeah.
Q. So Vista Bank sued you, personally, for this property?
A. Yeah. They didn't -- I'm not sure what you're trying to say, but yeah, they did sue me.
Q. And then -- there, Exhibit 7.
(Exhibit 7 marked.)
Q. (BY MR. GRANT JONES) This is the bank

nonsuited with prejudice its lawsuit against you.

A. Okay.

Q. Is that correct?

A. I mean, I don't know. You have to get an

Q. The second page?
A. The unofficial -- this one?
Q. Yeah, Exhibit 5?
A. Unofficial, okay. .
Q. At the top of Exhibit 5, Page 2.
A. Okay.
Q. Will you read that paragraph for me into the record.
A. It's blurry. I mean, it's about as blurry as you can get.
THE WITNESS: You can look at it --
THE COURT: That's okay.
A. It's about as blurry -- you can read it to me..
Q. Sure.
A. Yeah.
Q. For and in consideration of the full and final payment of all endebtedness secured by the aforesaid lien, granted in the lien documents, the receipt of which is hereby acknowledged, Vista Bank releases and discharges the property from any and all liens and security interests held by Vista Bank, against the

property, including those granted in the afore liening documents. Did I read that correctly?

A. I believe so. Like I said, it's blurry.

Q. Where did you get the money to pay this lien?

A. It sold. I just said that. I started with it.
Q. You said it sold for 8.5?
A. Yeah.
Q. This is a lien for 13.
A. That -- that -- I mean, I'm not sure that -- that's the correct thing, because, I mean, we truly sold it and that paid off the lien. I mean, that's what happened, so --
Q. I'm reading the release that says it was full and final -- final payment of all endebtedness.
A. I mean, I didn't give you any more cash to pay it off. We had to sell the place, yeah.
Q. (BY MR. GRANT JONES) So let's go back to that Exhibit A, where we ask for bank statements.
A. Where -- okay.
Q. Can you provide us with the bank statements for that First National with the proceeds of this sale?
A. I need to go back to my work chart if -- and see it legally, because I'm pretty hour that it's owned by another LLC, but --
Q. The order requires that you turn over bank

statements for all of your businesses. So in the chart --

(Overlapped speaking.)

A. Oh, okay. Yeah, but it's pretty big on -- on

Q. Who are the Nebergers?
A. They are -- I mean, I don't know them actually. I mean, sold through a Realtor. I don't -- I don't know them actually.
Q. Who is --
A. I don't know.
Q. You don't know?
A. I don't know. No.
Q. Who is your Realtor?
A. I believe he used Don Bell on that one.
Q. Who at Vista bank did you work for?
A. There's a couple of them.
Marcus, I don't know his last name.
Q. Anyone else?
A. I mean, I think there's a few of them, yeah, but I don't -- I don't remember their names.
Q. You're saying that 8 and a half million loan and you don't remember the name of the banker?
A. I did just say Marcus was the name of the banker at Vista. Go on the website and you look at marcus. I don't know the names of the rest of the guys,

so I don't know what you want me to tell you.

THE COURT: Counsel, is there not more global questions you can ask and then -- and then drill down? Because I just feel like we're swimming in weeds

your debit card?

THE WITNESS: That is correct.

THE COURT: Okay. I see Mr. Skeels has joined us,.

MR. SKEELS: Yes, Your Honor.

THE COURT: So we're going to take a short break from the deposition. The witness may step down a minute, and let's have a discussion with the attorneys up at the bench. It doesn't need to be on the record. Thank you, Ms. Court Reporter. You can take a break as well.

THE REPORTER: Thank you, Judge.

(At the Bench, off the record.)

(Break taken from ^ .)

THE COURT: Let's go back on the record.

After discussion with counsel in chamber and reviewing the status of where we are with production of documents, both pursuant to the Court's previous orders compelling production of documents and the amended receiver, receivership order, which required production of documents, it's the Court's decision to

suspend this deposition and order that by Thursday, 5:00 p.m., those documents all be produced through counsel, to Plaintiff's counsel, in full. Nothing without, unless there's a privilege law of some type of

attorney-client privilege only. Well, I shouldn't say only.

You have a valid privilege. You better make sure it's valid because I'm not putting with nonexistent nondisclosure agreements anymore either.

So, counsel, make wise decisions about anything that you're withholding to give a privilege law, but all documents to be produced by Thursday at 5 o'clock p.m., and that also means giving the receivers or counsel for Cadence bank access to whatever documents you're trying to produce to make sure that they have the universer of documents.

We're a year post judgment, I'm still fighting this battle. This was not a productive deposition, and those documents must be produced for us to do that. I'm suspending this deposition. I will resume this deposition upon request of Cadence bank once those documents have been produced, reviewed, and we're ready to go forward with a productive deposition.

THE WITNESS: Judge, one thing, and my attorney and anything they can seal will be good for me

know that.

THE COURT: Look, we got reasonable lawyers in the room know no one's here to to put you personally.

A. John John yeah.

THE COURT: But that needs to be discussed and I'll step in as needed, but at the same time I've got to have your full corporation. This is a serious case, as you know, so you've got to, you know, produce the information, and then your lawyers are good lawyers. They'll -- they'll understand what's exempt and what's not, but we get to -- or we must produce to the other side the full universe of documents and assets, and then it goes forward from there. So any questions about the order from the court from the plaintiff?

44: Your Honor, first, the protective order, when you want us to respond to that.

THE COURT: I think by Thursday as well. As y'all are going through this, you'll recognize if there's some -- I saw trade secret was thrown out there, I don't know if there was any of that, but certainly Social Security numbers or anything like that, personal

information that, you know, doesn't really need to be out there. That can be agreed upon, sure. But let not -- the Fifth circuit has told us to be narrow in our scope when we seal or protect, and so this court follows

because I do run a public company and I've already got some scrutiny.

THE COURT: Well, do do what you can.

THE WITNESS: But I just wanted to let you

that, which means y'all can agree to it, but if it's public information, I'm not going to order it because the Circuit will slap me down for that. If it's private information that both sides agree, I am perfectly fine with that, so I'm sure good lawyers like you can figure that part out.

But for over a year, this thing has has been post judgment and this side of the left of the room has been trying to get documents and that has been frustrated and bored and that's ending now. By Thursday, 5 o'clock p.m., no exceptions, all those documents must be produced. So drop whatever else you're doing, set that fundraiser you're going back to, todayu, but get on this and let's make this happen. All right?

44 Your Honor, I also have a question that I raised back in chambers about the debit card.

THE COURT: Yeah, those are supposed to be turned over to the receiver, so get with your client and what can be turned over today, be turned over today, right. It can be a rolling production, but if there's

certain things like debit card, was a physical direct card, you're requesting for the physical card.

44 yes, Your Honor.

THE COURT: To be turned over to the

receiver, that's where we are. Yes, sir?

MR. SKEELS: I don't have a copy under or I think you called it an amend receivership order, I think those things were due to be turned over in 3 to five days.

THE COURT: The original order was in place past the 3 to five-day time period so it should have already been done.

MR. GRANT JONES: That portion of it didn't change.

THE COURT: The amended portion dealt with some things that were worked out with between the parties an questioned by the parties back into live, and as I said to the defense, a response would have been helpful at the beginning, didn't get one, so I entered the order that was proposed, and now I've amended it at the request of the Defense.

But those deadlines are really technically already passed, but I amended it. Thursday is the deadline, but I think they're entitled to that document today.

So, counsel, y'all talk about what's technically due right now.

44: I'm talking about the physical card.

THE COURT: That's turned over.

Tick skin skin and our receiver is here, Judge.

THE COURT: Okay. I didn't realize that. Okay. Sir.

So get with counsel, and look, you're not doing the deposition the rest of the day. Document production starts right now. And so whatever is physically here that can be turned over to the receiver should be turned over to the receiver. Can't be more clear than that.

Skin skin judge, one more. I'm sorry. Time /PWHREBG raids cage, Your Honor. I just want to make sure when the deposition resumed we would like them back in the courtroom as well.

THE COURT: Unfortunately, I think we might have to.

Yes, sir.

Fortune listen.

MR. SKEELS: The debit card in question that mr. Lininberger is asking, my Understanding is that that's a debit card on an account of a nonjudgment

debtor, not one of the Defendant's or Defendant entities in the case.

THE COURT: Hold on, his testimony before you got here was he gets paid by Johnson ranch to a