# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| CADENCE BANK f/k/a BANCORPSOUTH BANK and CENTURY BANK, Plaintiffs, v. BRIDGELINK ENGINEERING, LLC; COLE WAYNE JOHNSON, CORD HENRY JOHNSON, BIGHORN CONSTRUCTION AND RECLAMATION, L.L.C.; BIGHORN SAND & GRAVEL LLC, BIGHORN INVESTMENTS AND PROPERTIES, LLC, Defendants. | ) | Civil Action No 4:23-CV-00609-BJ |

*******************************************************

ORAL DEPOSITION OF

COLE W. JOHNSON

JUNE 9, 2026

*******************************************************

ORAL DEPOSITION OF COLE W. JOHNSON, produced as a witness at the instance of the Plaintiffs, was taken in the above-styled and -numbered cause on the 9th day of June, 2026, from 10:34 a.m. to 5:02 p.m., before Karen Gonzalez, Commissioned Notary, in and for the State of Texas, reported by machine shorthand, from Tarrant County, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

A P P E A R A N C E S

FOR PLAINTIFFS:

Mr. Andrew Korn
ATTORNEY AT LAW
RECEIVER
4221 Avondale Ave
Dallas, Texas 75219
Telephone: (214) 521-8800
E-mail: Akorn@receiverandrewkorn.com

Mr. M. Grant Jones
Mr. Blake Rasner
HALEY & OLSON, P.C.
100 North Ritchie Road
Suite 200
Waco, Texas 76712
Telephone: (254) 776-3336
E-mail: Grant.jones@haleyolson.com
Brasner@haleyolson.com

FOR THE DEFENDANTS:

Mr. David Skeels
WHITAKER CHALK SWINDLE & SCHWARTZ PLLC
301 Commerce Street
Suite 3500
Fort Worth, Texas 76102
Telephone: (817) 878-0500
E-mail: Dskeels@whitakerchalk.com

A. I don't -- none of them. No other accounts.

Q. If -- you're employed and you've been employed. Let's talk about the time period when the first receivership order was signed, which was October 22nd of 2025 -- from October 22nd of '25 through current, you've been employed by -- by Bimergen, correct?

A. Yes.

Q. All right. And in their public filings they -- they show that you receive a salary, correct?

A. That's correct.

Q. When Bimergen pays you your salary, what account does that money go in?

A. I have it sent to an account at Johnson River Ranch. I keep it separate.

Q. So earnings from Bimergen go into a Johnson River Ranch account?

A. That is correct.

Q. Are there any other sources of money that you direct other than from Bimergen to Johnson River Ranch -- to Johnson River Ranch accounts?

A. Can you repeat the question for me?

Q. Sure. I'm trying to understand the flow of money into the Johnson River Ranch accounts. And you've identified if Bimergen pays you, you have it put in a Johnson River Ranch account. What about any -- any

Q. (BY MR. KORN) Did you produce a copy of your Executive Employment Agreement with Bimergen Energy Corporation, the one that is marked as Exhibit 42? Did you produce a copy of that to me?

A. I have -- I don't know. We -- we produced a lot of documents, if I haven't then it's a pure oversight. It's online so it's not like anybody can hide it, so...

Q. True. But somebody might not get it as fast as the Receivership order calls for it, right?

A. Sure.

Q. So, as of -- effective April 1, your base salary with Bimergen went to $425,000 on an annual basis; is that correct?

A. I believe that's correct.

Q. I'm reading from the second page. Payable monthly, correct?

A. That is correct.

Q. And have you been paid any salary at the $425,000 basis?

A. I haven't.

Q. Page 17, which is just one page from the end. There's a section in your agreement. That says, "Governing law and waiver of jury trial." Did you negotiate this agreement with Bimergen?

A. I wouldn't have. When you say, "negotiate,"

then non-judgment debtors?

Q. Sure. Let's do this. I'll come back to that. But let's go to Exhibit 46. Have you seen 46 before?

(Exhibit 46 marked.)

A. Yes.

Q. (BY MR. KORN) Is that a letter from your attorneys to the original Receivers in this case?

A. Yes.

Q. On Page 2, it says, "Pursuant to Exhibit A, Subsection G of the order, we have attached hereto as Exhibit 1 a list of non-judgment debtor entities" --

A. Okay.

Q. -- "each sometimes referred to as a NJDE."

A. Yeah.

Q. "In which Cole or Cord have a direct or indirect ownership interest." So I -- at that time there were 50 entities identified, so I'm -- I'm referring to those. So you wanting -- as you go through this list in 2026, are you aware of any of them having any type of accounting issue where somebody would be contacting the IRS on behalf of one of these 50 entities?

A. I have no idea where -- where that's going. We have Rahim as an accountant, I mean that's what I can tell you. He would've done all this. I can't -- I can't tell you someone else would be contacting these

A. Okay.
Q. So we're -- any musical instruments that you own?
A. No.
Q. Any electronics that you own?
A. An Apple Watch and a cell phone.
Q. No iPad, no laptop?
A. No. Laptops are always by the company that I work for.
Q. Do you have some software that it's expensive?
MR. SKEELS: Objection, form.
Q. (BY MR. KORN) That's his first good objection today. Expensive is a relative term, isn't it?
MR. SKEELS: And I will just be trying to clarify if you're asking him in his individual --
MR. KORN: Right.
MR. SKEELS: -- capacity or corporate representative capacity of some sort.
MR. KORN: No. You get an -- get an objection and you move on. I'll ask it a different way.
Q. (BY MR. KORN) Here's 49. Is that a true and correct copy of the declaration you filed yesterday in the case?
(Exhibit 49 marked.)
A. Yes.
Q. (BY MR. KORN) So on Page 5 there's a -- under

did you think the Receiver had recovered a material amount of money?

A. According to your e-mail, no.

Q. Were -- were you in danger --

A. What --

Q. -- of paying the whole judgment and just needed to know what credits remain before you can pay it off?

A. I think that's one of the biggest things to paying off a judgment is knowing what makes up the judgment.

Q. Well, you had an accounting filed just three days before you made your comment, three weeks -- May 22nd. It was an itemized inventory of what was recovered in the case. Why did you still need an accountant?

A. Because this doesn't -- this one shows -- this one shows what you have -- have done, and what you have got. I would like to know exactly what makes up the judgment. And I feel that I'm entitled to that.

Q. So what -- what more do you need to know, other than the numbers that are in the actual final judgment?

MR. SKEELS: Objection, asked and answered. With respect to the amounts collected by Cadence.

THE WITNESS: Correct.

MR. SKEELS: You can answer the question.

THE WITNESS: What makes up the $43 million

A. No.
Q. All right. So once Johnson River Ranch hires these new employees, why would they be upkeeping property that Johnson River Ranch doesn't own?
MR. SKEELS: Objection, form. Mischaracterizes prior testimony.
Q. (BY MR. JONES) Okay. Does Johnson River Ranch own any real property?
A. No.
Q. So when Johnson River Ranch hires new employees, what would they be taking care of?
A. They'll be taking care of the cows, property, feed, stuff like that.
Q. Who owns the real property that the Johnson River Ranch employees will be taking care of?
A. It will be, I think, it's New Standard Living.
Q. So that's the property that you live on currently?
A. That is correct.
Q. Johnson River Ranch, is that just a name, or does that reference a place?
A. Reference a place -- or referenced -- explain the question you're -- you're --
Q. So when I hear the name Johnson River Ranch --
A. Okay.

A. It was sold.
Q. Do you know who owns it now?
A. Same as Ashley's deposition, I don't know the guy. I hear his name, starts with N --
Q. Is it Neiberger?
A. Neiberger, yeah.
Q. And so it's your testimony that the Neiberger's own both the house and the land?
A. They do.
Q. Okay. When Mr. Korn was asking you earlier about who was in charge of HR and paperwork for Johnson River Ranch, I believe the comment you made was, we were in the middle of a restructuring, so you didn't know exactly who that was; is that right?
A. I don't believe so. Can we pull that back up? I don't believe anybody ever said HR at all.
Q. Oh, I -- I meant he asked who was in charge of paperwork at Johnson River Ranch?
A. I think he was on the W-2. I don't know if we ever talked about paperwork of Johnson River Ranch. If I'm mistaken we can --
Q. And really the -- the comment that I'm more focused on is you -- you said that, "We were in the middle of a restructuring." What were you talking about when you were referencing a restructuring?

know, everything kind of situated and refinanced. It's -- it's a refinancing arm and cleaning the teeth for that. So that's -- that's the goal of the Evergreen Royalty.

Now if everything -- I'm not sure if everything's been moved yet, but that's what the -- that's what the reasoning for it is.

Q. You -- you kind of lost me there, Cole, refinance what?

A. Refinance just our -- our, you know, just everything, right? These right here some -- some that you're like seeing, C&C Holdings and stuff like that, that's the main one that should be -- refinancing and restructuring -- or refinancing.

MR. SKEELS: For the record, he's referring to the back page, last page of Exhibit 46. If you think that might be helpful, Grant.

THE WITNESS: Those right there. Those are mainly the assets.

Q. (BY MR. JONES) So your testimony here today is that Evergreen Royalty Group, LLC -- what's its purposes?

A. It's a clean entity, for money to come in for a new lender at a later date to refinance and recap some of these and other C&C Holdings. That's what it's meant

A. Okay.
Q. Starting on Page 2. We discussed briefly both Orion Trust and Evergreen --
A. Okay.
Q. -- Royalty Group. Could you clarify --
A. Yes.
Q. -- Orion Trust?
A. I -- I went out and confirmed, I didn't want to lie under the record. I went out and confirmed that nothing has been moved under Orion Trust, as of today. It was setup to move stuff, and it has not been moved today.
Q. So as you sit here today, your knowledge is it has nothing?
A. It has nothing.
Q. What about Evergreen Royalty Group, LLC?
A. Evergreen Royalty is similar. It's setup to get stuff moved into it, at a later date, upon, you know, the big graces of some of the parties that are here today. But there's nothing in it today.
Q. So currently it has nothing?
A. That is correct.
Q. And it currently has no activity?
A. It -- it's setup to have activity in the future, but not as of today. That's correct.

Q. So as you sit here today, it owns nothing, it has no operation?
A. That's correct.
Q. Number 5, Bridgelink Investments LLC. What's the status of Bridgelink Investments?
A. Bridgelink Investments has some legacy. Some legacy stuff there. Meaning, you know, maybe small payments coming in very, very small. And it's mainly not shut down because of liability reasons.
Q. Can you explain that a little bit more? What do you mean by, "not shut down because of liability reasons"?
A. Liability reasons, an LLC is setup to run a business and Bridgelink Investments does have some lawsuits in it. So if not I shut them down in there. And I believe they're still active.
Q. So part of the reason that you haven't shutdown Bridgelink Investments is because there's active litigation?
A. That is part of it, yeah.
Q. Where is that litigation?
A. I -- I can give you a list of it at a later date. But I don't know those right offhand.
Q. Is it here in Texas?
A. It could be, yeah. I --

A. This Exhibit 16?

MR. SKEELS: 46.

THE WITNESS: 46. On the back of 46, explains the work chart for that one.

Q. (BY MR. JONES) Again, Cole, I'm not asking you to reference anything else. As you sit here today, what is your knowledge of C&C Johnson Holdings?

MR. SKEELS: Objection, form. Whether you asked him to consult something else or not, he decided to consult something else, because he's trying to give an accurate helpful answer to you. So I'll object to the form of the question. Crying out loud. We're trying to give you guys free discovery and you won't take it. We give you a gift, and you won't take it. It's assuming.

But go ahead. Do your best to answer the question, Cole.

Q. (BY MR. JONES) What assets does C&C Holdings have?

A. It has Johnson River Ranch, Bridgelink Europe, Bridgelink Development.

Q. Okay. Who are the members of C&C Johnson Holdings, LLC?

A. I would -- I need to look at the -- probably the -- I need to look at the formations docs in there.

Q. So you're -- as you sit here today, you're not sure?
A. I -- you want me to --
MR. SKEELS: If you're not sure, tell him you're not sure.
THE WITNESS: I'm not sure.
Q. (BY MR. JONES) You said, the assets that it holds --
A. Uh-huh.
Q. -- or has are three other entities. You said Johnson River Ranch, Bridgelink Development, and what was the third one?
A. Bridgelink Europe, it's in the back of -- actually of Exhibit 46.
Q. So it's your testimony today, that the only assets that C&C Johnson Holdings has is other entities?
A. Okay. I believe so. Yeah.
Q. Well, we've talked about Bridgelink Development. Does C&C Johnson Holdings have any Bimergen stock?
A. No.
Q. The only Bimergen stock that C&C Johnson may have, would be through Bridgelink Development, true or false?
MR. SKEELS: Objection, form. Confusing and mischaracterizes prior testimony.

Q. Does that include stock options?
A. No.
Q. No. What is the value of your stock options?
A. Negative value.
Q. Okay.
A. They're out of the money. They're exercised at 450.
Q. And I believe you -- you stated that to Mr. Korn earlier. That's why you haven't exercised those?
A. Exactly.
Q. The stock held by Bridgelink Development, that you testified to being worth approximately $8 million -- 7.6, as we sit here today, potentially. Is any of that stock pledged or liened by someone else?
A. It is.
Q. How much?
A. I don't know the exact number, but somewhere around 1.5 million.
Q. Who has a lien on that stock?
A. KeyBank helped us through the -- through the deal. They're the investment bank, and we give them stock for the transaction.
Q. Helped through the deal, you mean Bridgelink Development?
A. That is correct.

A. This chart is accurate.
Q. I understand that. I'm just trying to clarify.
A. I know we got off subject a little there, but this is accurate. Okay.
Q. Okay. I appreciate that. Thank you for telling me that. As far as Bridgelink Development is concerned, can we use that org chart real quick?
A. Yeah.
Q. Who owns Bridgelink Development?
A. It's -- it's in the same one Exhibit 46.
Q. Okay.
A. And it sits off to the side, under C&C Holdings, Johnson River Ranch, Bridgelink Europe, Bridgelink Development.
Q. So you testified earlier that Bridgelink Development owns the Bimergen stock?
A. That is correct.
Q. According to your org chart, C&C Johnson is above Bridgelink Development?
A. That is correct.
Q. So what relationship does C&C have to Bimergen?
A. It --
MR. SKEELS: Objection, form. Assumes facts not in evidence.
THE WITNESS: This one -- this one is purely

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| CADENCE BANK f/k/a BANCORPSOUTH BANK and CENTURY BANK, | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| BRIDGELINK ENGINEERING, LLC; COLE WAYNE JOHNSON, CORD HENRY JOHNSON, BIGHORN CONSTRUCTION AND RECLAMATION, L.L.C.; BIGHORN SAND & GRAVEL LLC, BIGHORN INVESTMENTS AND PROPERTIES, LLC, | ) | Civil Action No 4:23-CV-00609-BJ |
| Defendants. | ) | |

REPORTER'S CERTIFICATION
ORAL DEPOSITION OF
COLE W. JOHNSON
JUNE 9, 2026

I, Karen Gonzalez, a Notary in and for the State of Texas, hereby certify to the following:

That the witness, COLE W. JOHNSON, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That a copy of the certificate was served on all parties and/or the witness shown herein on ___________________.

I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent:

X was requested by the deponent or a party before the completion of the deposition and that signature is to be before any notary public and returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;

Was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 16th day of July, 2026.

/s/ Karen Gonzalez

__________________________
KAREN GONZALEZ, CSR
Notary in and for the
State of Texas
Notary: 132644762
My Commission Expires:
October 9, 2028
Associated Court Reporters
Firm Registration No. 29
425 Austin Avenue, Suite 1206
Waco, TX 76701
254-753-3330
800-340-5881